## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE STATE OF OREGON; THE STATE OF ARIZONA; THE STATE OF CALIFORNIA; THE STATE OF NEW YORK; THE STATE OF COLORADO; THE STATE OF CONNECTICUT; THE STATE OF DELAWARE; THE STATE OF ILLINOIS; THE OFFICE OF THE GOVERNOR *ex rel.* Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky; THE STATE OF MAINE; THE STATE OF MARYLAND; THE COMMONWEALTH OF MASSACHUSETTS; THE STATE OF MICHIGAN; THE STATE OF MINNESOTA; THE STATE OF NEVADA; THE STATE OF NEW JERSEY; THE STATE OF NEW MEXICO; THE STATE OF NORTH CAROLINA; JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania; THE STATE OF RHODE ISLAND; THE STATE OF VERMONT; THE COMMONWEALTH OF VIRGINIA; THE STATE OF WASHINGTON; THE STATE OF WISCONSIN, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; THE UNITED STATES; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES CUSTOMS AND BORDER PROTECTION; and RODNEY S. SCOTT, in his official capacity as Commissioner for U.S. Customs and Border Protection, <br><br> Defendants. | Court No. 26-01472 <br><br> THREE-JUDGE COURT REQUESTED |

## COMPLAINT

1.    The Constitution assigns to Congress, not the President, the "Power To lay and collect Taxes, Duties, Imposts and Excises." U.S. Const. art. I, § 8. "The power to impose tariffs is very clearly a branch of the taxing power." *Learning Res., Inc. v. Trump*, 607 U.S. ---- , 2026

1

WL 477534, at *7 (U.S. Feb. 20, 2026) (citation modified). Congress has delegated limited authority to the President to impose tariffs only in carefully defined circumstances.

2.      For more than a year, the President has imposed, modified, escalated, and suspended tariffs by executive order, memoranda, social media post, and agency decree, without legal authority to do so. These tariffs have been remarkably broad with global scope. To implement his tariffs, the President first relied on a 1977 statute that the Supreme Court has now ruled does not authorize the imposition of tariffs at all—the International Emergency Economic Powers Act ("IEEPA"). That statute had, unsurprisingly, never been used to attempt anything of the sort.

3.      Having lost the battle on IEEPA, the President now dusts off a separate statute: Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132, which is another statute that has never been used to impose tariffs. Indeed, it has never been used at all.

4.      The same day the Supreme Court invalidated his recent IEEPA tariffs, the President began to sidestep its ruling by imposing a 10 percent tariff on most products worldwide pursuant to Section 122. Proclamation No. 11012 (Feb. 20, 2026), 91 Fed. Reg. 9339 (Feb. 25, 2026) ("Section 122 Proclamation") (Compl. Ex. 1). The next day, he announced via a Truth Social post that he would raise the worldwide tariff rate to 15 percent. Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 21, 2026, at 07:56 ET), https://truthsocial.com/@realDonaldTrump/posts/116109447886304328 [https://perma.cc/AA4X-QJZB]. The 10 percent tariffs went into effect on February 24, 2026. On March 4, 2026, the Secretary of the Treasury stated that the United States will increase tariffs on most global imports to 15 percent this week. Alan Rappeport, *Bessent Says Global Tariffs Will Rise to 15 Percent This Week*, N.Y. Times (Mar. 4, 2026, at 11:11 ET), https://www.nytimes.com/2026/03/04/business/economy/bessent-trump-tariffs-15-percent.html.

5.     Contrary to the purpose and limited delegation of Section 122, President Trump has invoked this statute to impose immense and ever-changing tariffs on whatever goods entering the United States he chooses and for whatever reasons he finds convenient. As with his unlawful use of IEEPA, the President has once again exercised tariff authority that he does not have—involving a statute that does not authorize the tariffs he has imposed—to upend the constitutional order and bring chaos to the global economy.

6.     Section 122 exists to permit a limited tariff authority to address "fundamental international payments problems" that require "special import measures to restrict imports" to deal with "large and serious balance-of-payments deficits," among other things. 19 U.S.C. § 2132(a). Here, the President has invoked as justification a purported "balance-of-payments" deficit.

7.     The President's purported justification is fatally flawed. First, the President is contorting the term "balance of payments," redefining it contrary to its meaning and cherry-picking only the *negative* components that make up the balance of payments, while ignoring entirely the huge net *positive* financial inflow components that also make up the balance of payments. Second, a balance of payments crisis is a *currency* crisis that was of great concern when Congress enacted Section 122, but which can no longer exist following the formal end of the fixed-rate currency exchange system in 1976. For these reasons, the President cannot meet the statutory requirements of Section 122, and his effort to impose tariffs under this statute is unlawful.

8.     The balance of payments consists of three components: the current account, the capital account, and the financial account. *See* U.S. Bureau of Econ. Analysis ("BEA"), *Balance of Payments* (Apr. 11, 2018), https://www.bea.gov/help/glossary/balance-payments [https://perma.cc/P4Y3-DFS9].

9.	The current account is a record of net receipts or payments on goods, services, income, and unilateral credit transfers. BEA, *Balance on Current Account*, https://www.bea.gov/ help/glossary/balance-current-account [https://perma.cc/6JCY-7E7W]. The *current account* is what the Section 122 Proclamation addresses and misconstrues as the "balance of payments" as a whole. Section 122 Proclamation ¶¶ 6–9. In particular, the Section 122 Proclamation focuses on *trade* deficits. But the balance of trade is just *one component* of the current account, which itself is just *one component* of the balance of payments.

10.	Contrary to the Section 122 Proclamation, a trade deficit is not a balance of payments deficit. Indeed, Section 122 expressly differentiates between "balance of payments" and "balance of trade." *Compare* 19 U.S.C. § 2132(a) *with* 19 U.S.C. § 2132(c).

11.	The President's Proclamation completely ignores the balance, so to speak, of the balance of payments: foreign capital and financial investment inflows into the United States, which are essential components of the definition of the "balance of payments," and are what balances a trade deficit in the balance of payments today.

12.	The Section 122 Proclamation cites a $1.2 trillion goods trade deficit in 2024, and states that it "remained at approximately $1.2 trillion" in 2025. *Id.* ¶ 8. But when foreign capital and financial investment inflows into the United States are included, as they must be, the United States' actual balance of payments is approximately $53 billion, or 0.2 percent of the United States' GDP—essentially a rounding error.

13.	Section 122 does not grant the President authority to impose tariffs based on a trade deficit. Nor does it allow the President to redefine the statutory term "balance of payments" to extend only to the negative subcomponents (and not the positive subcomponents) of the balance of payments that the Proclamation has cherry-picked.

14.     Rather, Congress drafted Section 122's "balance-of-payment deficits" language to account for a particular scenario that is possible in a fixed-rate exchange system where dollars are convertible to gold or other foreign currencies at fixed rates, but not in today's floating rate exchange system. In a fixed-rate world, it was possible for large imbalances to occur in currency settlements, requiring the United States to intervene to buy or sell currency in order to preserve a fixed exchange rate. It is this type of significant imbalance that Section 122 addresses.

15.     Congress enacted Section 122 in the aftermath of two things: (1) a dizzying array of monetary problems manifesting around the early 1970s, including large deficits in the balance of payments tied to the increasingly-antiquated fixed-rate exchange system that had been in effect since 1944; and (2) the "Nixon Shock"—President Nixon's attempt to address a shortage of U.S. gold reserves by unilaterally suspending the convertibility of dollars into gold and imposing duties and other policies via the controversial Proclamation 4074. Proclamation No. 4074, 85 Stat. 926 (1971).

16.     Congress had ample reason to enact a new statute to provide definition for, and constraints on, the tariff authority of the executive in such a system. Currency controls had come and gone before, and President Nixon himself intended to return to the earlier fixed-rate system, although at rates more advantageous to the United States. The end of the fixed-rate exchange was not officially formalized until 1976.

17.     Today, the United States operates in a floating rate exchange system, not a fixed-rate one. Unlike in a fixed-rate exchange system, in the floating rate currency system, there is never a "large and serious balance of payments deficit," because the exchange rate automatically adjusts.

18.     As Milton Friedman predicted in the 1960s:

> [A] system of floating exchange rates completely eliminates the balance-of-payments problem—just as in a free market there cannot

> be a surplus or a shortage in the sense of eager sellers unable to find buyers or eager buyers unable to find sellers. The price may fluctuate but there cannot be a deficit or a surplus threatening an exchange crisis.

Milton Friedman & Robert V. Roosa, *The Balance of Payments: Free Versus Fixed Exchange Rates* 15 (1967).

19.     Section 122 also requires that tariffs "be applied consistently with the principle of nondiscriminatory treatment" and "of broad and uniform application with respect to product coverage," subject to narrow exceptions. 19 U.S.C. § 2132(d), (e). Nevertheless, the Proclamation exempts many goods from Canada, Mexico, Costa Rica, the Dominican Republic, El Salvador, Guatemala, Honduras, and Nicaragua. Section 122 Proclamation ¶ 14(*l*)–(m). It also includes more than 80 pages of product exceptions. *Id.* Annexes I, II (91 Fed. Reg. 9345–9432).

20.     The President's attempt to use Section 122 to impose his desired tariffs is as lawless as his prior use of IEEPA. The President has made clear that he is going to impose worldwide tariffs by any means necessary. Until last month it was IEEPA, now it is Section 122, but the policy is the same—an exercise of completely unrestrained executive power in an attempt to usurp the taxing power that the Constitution vests in Congress, not the President.

21.     But "[i]n light of the breadth, history, and constitutional context of" the authority to tariff, the President "must identify clear congressional authorization to exercise it." *Learning Res., Inc.*, 2026 WL 477534, at *13 (Roberts, C.J., plurality). Such authorization cannot be found in Section 122 and its application to balance of payments deficits.

22.     Were the President to find the endless tariff authority he seeks based only on his decision to conflate trade deficits alone with balance of payments deficits, he would be seizing power from Congress unconstitutionally. "The Constitution lodges the Nation's lawmaking

powers in Congress alone, and the major questions doctrine safeguards that assignment against" such "executive encroachment." *Id.* at *14 (Gorsuch, J., concurring).

23. The President has no authority to impose tariffs under Section 122 as he has done here. The text and history of Section 122 confirm that the President has not met the statutory prerequisites for its use. Section 122 cannot be invoked merely to address trade deficits on their own, and the President does not have the discretion to use clearly erroneous propositions about terms of art to support his tariffs.

24. Because these tariffs are unlawful, this Court should declare that they are not in force, enjoin the Defendant agencies and officers from enforcing them, and vacate the agency actions implementing them.

## PARTIES

### A. Plaintiff States

25. The State of Oregon is a sovereign state of the United States. Oregon is represented by Attorney General Dan Rayfield. The Attorney General is the chief legal officer of Oregon and is authorized to institute this action.

26. The State of Arizona is a sovereign state of the United States. Arizona is represented by Attorney General Kris Mayes. The Attorney General is Arizona's chief law enforcement officer and is authorized to institute this action.

27. The State of California is a sovereign state in the United States of America. California is represented by Rob Bonta, the Attorney General of California, who is the chief law officer of the State of California and head of the California Department of Justice. He has the authority to file civil actions to protect California's rights and interests and the resources of the State. Cal. Const. art. V, § 13; Cal. Gov't Code §§ 12510-12511.

28.     The State of New York is a sovereign state in the United States. New York is represented by Attorney General Letitia James, who is the chief law enforcement officer of New York.

29.     The State of Colorado is a sovereign state of the United States of America. Colorado is represented by Philip J. Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the state and is authorized by Colorado Revised Statute § 24-31-101 to pursue this action.

30.     The State of Connecticut is a sovereign state of the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statute § 3-125 to pursue this action on behalf of the State of Connecticut.

31.     The State of Delaware is a sovereign state of the United States of America. Delaware is represented by and through its Attorney General, Kathleen Jennings. The Attorney General is Delaware's chief law enforcement officer and is authorized to pursue this action pursuant to 29 Del. C. § 2504.

32.     The State of Illinois, acting by and through its Attorney General Kwame Raoul, is a sovereign state of the United States of America. As the state's chief legal officer, the Attorney General is authorized to act on behalf of the State in this matter. Ill. Const. art. V, § 15; 15 Ill. Comp. Stat. 205/4.

33.     Plaintiff Office of the Governor, *ex rel.* Andy Beshear, brings this suit his official capacity as Governor of the Commonwealth of Kentucky. The Kentucky Constitution makes the Governor the Chief Magistrate with the "supreme executive power of the Commonwealth," Ky. Const. § 69, and gives the Governor, and only the Governor, the duty to "take care that the laws

be faithfully executed," Ky. Const. § 81. In taking office, Governor Beshear swears an oath that he will support the Constitution of the United States and the Kentucky Constitution. Ky. Const. § 228. Under Kentucky statute, the Governor is the head of his General Cabinet and his Executive Cabinet. Ky. Rev. Stat. § 11.060; Ky. Rev. Stat. § 11.065.

34.    The State of Maine is a sovereign state of the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. Ann. § 191.

35.    The State of Maryland is a sovereign state of the United States of America. Maryland is represented by Attorney General Anthony G. Brown, who is the chief legal officer of Maryland.

36.    The Commonwealth of Massachusetts, represented by and through its Attorney General Andrea Joy Campbell, is a sovereign state of the United States of America. Attorney General Campbell is authorized to pursue this action under Mass. Gen. Laws ch. 12, §§ 3, 10.

37.    The State of Michigan is a sovereign state of the United States of America. Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

38.    The State of Minnesota is a sovereign state of the United States of America. Minnesota's Attorney General, Keith Ellison, is the chief law enforcement officer of Minnesota and is authorized under Minnesota Statutes Chapter 8 and has common law authority to bring this action on behalf of the State and its residents, to vindicate the State's sovereign and quasi-sovereign interests, and to remediate all harm arising out of—and provide full relief for—violations of the law.

39.     The State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America. The Attorney General is the chief law enforcement officer of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. § 228.110 and Nev. Rev. Stat. § 228.170.

40.     The State of New Jersey is a sovereign state of the United States of America. New Jersey is represented by and through its chief legal officer, Attorney General Jennifer Davenport, who has authority to represent the State in this matter.

41.     The State of New Mexico is a sovereign state in the United States of America. New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer of New Mexico and is authorized to pursue this action under N.M. Stat. § 8-5-2(B).

42.     The State of North Carolina is a sovereign state of the United States of America. North Carolina is represented by Attorney General Jeff Jackson, who is the chief law enforcement officer of North Carolina.

43.     Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed." Pa. Const. art. IV, § 2. The Governor oversees all executive agencies in Pennsylvania and is authorized to bring suit on their behalf. 71 P.S. §§ 732-204(c), 732-301(6), 732-303.

44.     The State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

45.     The State of Vermont is a sovereign state of the United States. Vermont is represented by its Attorney General, Charity Clark, who is the chief legal officer of Vermont and has authority to represent the State in this matter.

46.     The Commonwealth of Virginia is a sovereign state of the United States of America. Virginia is represented by Attorney General Jay Jones, the chief executive officer of the Department of Law. Va. Code § 2.2-500. Attorney General Jones is authorized to represent the Commonwealth and its interests in controversies with the federal government. Va. Code § 2.2-513.

47.     The State of Washington is a sovereign state of the United States of America. Washington is represented by Attorney General Nicholas W. Brown, who is the chief legal advisor to the State and is authorized to act in federal court on behalf of Washington on matters of public concern.

48.     The State of Wisconsin is a sovereign state in the United States. Wisconsin is represented by Joshua L. Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized to pursue this action.

**B.     Federal Defendants**

49.     Donald Trump is President of the United States. He is sued in his official capacity for declaratory relief only.

50.     The United States is a statutory defendant under 28 U.S.C. § 1581. That statute also waives the United States' sovereign immunity. See *Humane Soc'y of U.S. v. Clinton*, 236 F.3d 1320, 1328 (Fed. Cir. 2001).

51.     The Department of Homeland Security is an agency of the federal government.

52. Kristi Noem is Secretary of the Department of Homeland Security. She is sued in her official capacity.

53. U.S. Customs and Border Protection is an agency of the federal government and a component of the Department of Homeland Security.

54. Rodney S. Scott is the Commissioner for U.S. Customs and Border Protection. He is sued in his official capacity.

## JURISDICTION

55. This Court has subject-matter jurisdiction under 28 U.S.C. § 1581(i)(1).

56. Plaintiff States request the Chief Judge of this Court designate three judges "to hear and determine" this action because it "(1) raises an issue of the constitutionality of an Act of Congress, a proclamation of the President or an Executive order" and "(2) has broad or significant implications in the administration or interpretation of the customs laws." 28 U.S.C. § 255.

## FACTUAL AND LEGAL BACKGROUND

### A. The Balance of Payments and the Balance of Trade

57. A fixed-rate exchange system has not existed in the United States since a gold standard was formally abandoned in 1976, after being in flux starting in 1971. The United States experimented with different fixed-exchange rate systems in its history, but the U.S. has had a floating rate exchange system without interruption from that point until today.

58. In 1944, the United States set in place a system, known as the Bretton Woods system (a moniker deriving from the meeting of 44 nations during the end of the war in Bretton Woods, New Hampshire), with the goal of stabilizing the international economic order following the anticipated end of World War II. The Bretton Woods system set up an array of policies and

entities to govern a new fixed-rate exchange system. Among other things, the system required dollars to be convertible into gold for the signatory nations.

59. As any economist can attest, fixed-rate exchange systems like the gold standard can have some benefits, but they can also create longer term economic problems, including currency volatility, devaluation, and inflation. The United States experienced these issues both times a fixed-exchange rate system was in place.

60. In 1971, the United States had experienced a series of large deficits in its *balance of payments* related to the fixed-rate exchange system, which obliged foreign central banks to buy dollars to prevent their currencies from appreciating. This balance of payments deficit led to foreign central banks holding a large stock of dollars. This surplus of dollars resulted in the United States having insufficient gold to cover the volume of dollars in worldwide circulation.

61. The balance of payments, which Congress incorporated into Section 122 of the Trade Act of 1974, is fundamentally an accounting concept that Congress incorporated as a legal term to define the nation's aggregate transactions involving goods, services, and investment between it and all other countries over a given time.

62. The balance of payments is made up of (1) a nation's "current account," which is a record of net receipts or payments on goods, services, income, and unilateral current transfers (U.S. government grants to foreign countries, private remittances, and other current transfers), (2) its "capital account," which is a record of capital transfers between U.S. residents and foreign residents, and (3) its "financial account," which is a record of transactions between U.S. residents and foreign residents resulting in changes in the level of international claims or liabilities, such as in deposits, ownership of portfolio investment securities, and direct investment. BEA, *Balance of Payments* (Apr. 11, 2018), https://www.bea.gov/help/glossary/balance-payments

[https://perma.cc/P4Y3-DFS9]; BEA, *Balance on Current Account* (Apr. 13, 2018), https://www.bea.gov/help/glossary/balance-current-account [https://perma.cc/6JCY-7E7W]; BEA, *Capital Account (International)* (Apr. 13, 2018), https://www.bea.gov/help/glossary/capital-account-international [https://perma.cc/JF2H-ZQTD]; BEA, *Financial Account (International)* (Apr. 13, 2018), https://www. bea.gov/help/glossary/financial-account-international [https://perma.cc/88HS-HK7J]. As discussed above, the balance of trade is just one component of the current account, which itself is just one component of the balance of payments, but there are other transactions (the capital and financial accounts) included.

63.     On its own, a trade deficit is *not* a balance of payments deficit. The balance of payments could be considered as a grand balance sheet, with subsidiary profit and loss statements within it. One of those subsidiary statements (e.g., trade) might not be balanced (i.e., there may be a trade deficit), but can be—and as discussed below, is in fact—balanced by, for example, the capital and financial accounts.

64.     In other words, a trade deficit is distinct from, and does not on its own generate, a balance of payments deficit.

**B.      Section 122 of the Trade Act of 1974**

65.     The U.S. Constitution provides: "The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States … ." U.S. Const. art. I, § 8. Congress has exercised this authority by providing an extensive statutory structure for "Duties, Imposts and Excises" on imports to the United States, which are codified in Title 19 of the U.S. Code. Section 122 is a delegation from Congress of a small part of its control over tariffs.

66. Congress enacted Section 122 of the Trade Act of 1974 to serve a narrow purpose—to govern the President's authority to use tariffs in response to currency crises that could arise in a *fixed-rate* exchange system. As with IEEPA, no President has ever invoked Section 122 to impose tariffs. And although Congress enacted this provision at a moment when the global currency exchange system remained in flux, we have not returned to such a system since the fixed-rate exchange system was formally abandoned in 1976.

67. In 1971, President Nixon pursued a set of measures that became known as the "Nixon Shock." President Nixon issued Proclamation 4074. Alongside unilaterally abandoning the United States' commitment to convert dollars into gold that had underpinned the Bretton Woods system, the Proclamation imposed a 10 percent ad valorem duty on all dutiable imports to the United States along with certain price and wage controls. President Nixon articulated that the duties would force trading partners to revalue their currencies against the dollar.

68. President Nixon at least initially desired to return to a fixed-rate exchange system (with more favorable rates). Ted O'Callahan, *How the 'Nixon Shock' Remade the World Economy, Interview with Jeffrey Garten*, Yale Insights (July 13, 2021), https://insights.som.yale.edu/insights/how-the-nixon-shock-remade-the-world-economy. The Nixon Shock forced a massive change in the global economy, which had already been facing significant upheaval. Though the duties were in effect for only around four months, they resulted in the devaluing of the dollar and caused significant chaos for other nations.

69. It was in this context that Congress enacted a number of reforms, which provided additional definition to tariff authority it grants to the President.

70.     Congress enacted IEEPA, 50 U.S.C. § 1701, which the Supreme Court recently ruled makes clear that the executive has some trade powers in response to economic emergencies, but the power to tariff is not one of them. *Learning Res., Inc.*, 2026 WL 477534, at \*13.

71.     Congress also enacted Section 122 as part of the Trade Act of 1974. It provides narrow tariff authority when "fundamental international payments problems require special import measures to restrict imports" along with at least one of three scenarios "(1) to deal with large and serious United States balance-of-payments deficits, or (2) to prevent an imminent and significant depreciation of the dollar in foreign exchange markets, or (3) to cooperate with other countries in correcting an international balance-of-payments disequilibrium." 19 U.S.C. § 2132(a).

72.     The authority to impose tariffs under this statute is limited even further: the tariffs may only be imposed for "150 days," and they cannot "exceed 15 percent ad valorem." *Id.* § 2132(a)(3).

73.     Further, subsection (d) of Section 122 requires that any tariffs imposed "be applied consistently with the principle of nondiscriminatory treatment." And subsection (e) of Section 122 requires that any tariffs imposed "be of broad and uniform application with respect to product coverage except where the President determines, consistently with the purposes of this section, that certain articles should not be subject to import restricting actions because of the needs of the United States economy." However, "[s]uch exceptions shall be limited to the unavailability of domestic supply at reasonable prices, the necessary importation of raw materials, avoiding serious dislocations in the supply of imported goods, and other similar factors." *Id.* § 2132(e).

74.     Section 122 has never been invoked to impose tariffs. Nor has any President informed Congress that, despite "fundamental international payments problems," he was refraining from imposing tariffs because to do so would be "contrary to the national interest," as

16

subsection (b) of the statute requires. *Id.* § 2132(a), (b). Indeed, Section 122 has never been used in any way at all.

75.     Furthermore, the statute is clear that balance of payments is not synonymous with balance of trade: Section 122(c)(1) specifically provides the President with the authority to handle certain "balance-of-trade surpluses" through other means.

**C.     President Trump's Section 122 Proclamation**

76.     Shortly after coming into office, President Trump enacted sweeping tariffs on most goods coming into the United States from abroad under IEEPA. A wide range of plaintiffs challenged the legality of those tariffs.

77.     On February 20, 2026, the U.S. Supreme Court struck down these tariffs, ruling that the President lacked authority under IEEPA to impose tariffs. That same day, President Trump made unprecedented statements regarding the Court and his plans to impose the same tariffs regardless. He stated that he was "ashamed" of the Justices in the majority. He stated that somehow the Court's decision "made a president's ability to both regulate trade and impose tariffs more powerful and more crystal clear, rather than less." He stated that his new tariffs had "already been approved." He rebuffed the idea that Congressional action might be necessary. Aaron Pellish & Gregory Svirnovskiy, *Trump Attacks Supreme Court Justices After He is Handed a Major Tariff Loss*, Politico (Feb. 20, 2026, at 13:32 ET), https://www.politico.com/news/2026/02/20/donald-trump-tariff-supreme-court-reaction-00791245.

78.     Altogether, the President's goal is clear—he wishes to exercise carte blanche authority when tariffing the world based on any statutory reed he can find.

79.     Later that same day, President Trump issued his Section 122 proclamation, entitled, Proclamation 11012 of February 20, 2026, Imposing a Temporary Import Surcharge to Address Fundamental International Payments Problems.

80.     In the Section 122 Proclamation, President Trump described four purported grounds for invoking Section 122, which are riddled with omissions and mischaracterizations:

   a.   First, he identified the United States' "substantial trade deficit." Section 122 Proclamation ¶ 8.

   b.   Second, he stated that, in 2024, "the annual balance on the United States primary income turned negative for the first time since at least 1960." *Id.* ¶ 9. President Trump failed to note that primary income is a *subcomponent* of the "current account" that includes the trade deficit for purposes of balance of payment accounting, which is set off by the United States' financial account surplus.

   c.   Third, President Trump stated that "the net international-investment position of the United States is in an ongoing decline." *Id.* ¶ 10. The key fact that Trump omitted here is that the United States' financial account position, which offsets its trade deficit for purpose of balance of payment accounting, has the largest surplus of any country in the world, at approximately $1.13 trillion in 2024. *Net Financial Account (BoP, current US$) - United States*, World Bank Group: Data, https://data.worldbank.org/indicator/BN.FIN.TOTL.CD?locations=US&most_recent_value_desc=false [https://perma.cc/V4VM-KUES] (last visited Mar. 3, 2026). And that surplus has been steadily increasing since 2018 with the trade deficit. For comparison, in 2024 the

country with the next highest financial account surplus was the United Kingdom at approximately $82 billion. *Id.*

    d. Finally, Trump stated that "the balance on secondary income of the United States has been persistently in a deficit since the 1960s." Section 122 Proclamation ¶ 11. Again, the United States' secondary income is a subcomponent of its "current account" that includes the trade deficit, which is offset by the United States' historically high financial account surplus.

81. Based on the preceding representations, Trump determined in the Section 122 Proclamation that he would impose "ad valorem duties," i.e., tariffs, of 10 percent on all imports into the United States not specifically exempted for 150 days, effective February 24, 2026. *See id.* ¶¶ 13–14, (1).

82. Absent from President Trump's proclamation was the fact that, in 2024—the most recent year for which complete data is available—the balance of payments position (approximately negative $53 billion) was a mere 0.2 percent of the United States' 2024 GDP. This is consistent with the United States' balance of payments position for the last five decades: between 1970 and 2024, the United States' balance of payments position has swung on a pendulum from year to year in a small range between approximately negative $148 billion in 1998 and positive $138 billion in 2023. The BEA and World Bank both treat any differences between the total figure (whether positive or negative) and $0 as a rounding error or statistical anomaly.

83. President Trump dismissed or outright ignored the United States' extraordinary $1.13 trillion in financial account gains that must be considered for proper balance of payment accounting.

84.    But these numbers aside, ultimately, the balance of payments is a statutory term incorporating an accounting term that, by definition, must account for *all* these components. The government itself has recognized this recently. During briefing in *Learning Resources*, the Government itself attested: "trade deficits … are conceptually distinct from balance-of-payments deficits." Reply Brief for Appellants at 13, *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025) (No. 25-1812).

85.    Given the principles outlined above, the President has not identified *any* actual justification permitted by Section 122 for his tariffs, much less the balance of payments deficit he purports to address.

86.    Contrary to President Trump's rhetoric in the Section 122 Proclamation, the only thing extraordinary about the United States' recent balance of payments position is how utterly ordinary it has been.

87.    President Trump has also not met the other requirements of Section 122. Subsection (d) of Section 122 requires that any tariffs imposed "be applied consistently with the principle of nondiscriminatory treatment." 19 U.S.C. § 2132(d). The Section 122 Proclamation exempts numerous goods from Canada, Mexico, Costa Rica, the Dominican Republic, El Salvador, Guatemala, Honduras, and Nicaragua in violation of that requirement. Section 122 Proclamation ¶ 14(*l*)–(m). The principle of nondiscriminatory treatment requires treatment based on normal trade relations. *See generally* 19 U.S.C. § 2481(9). But there is no basis under the system of normal trade relations to provide preferential treatment to a select handful of countries with which the United States has free trade agreements, but not others, including many with which the United States also has free trade agreements (such as Australia and South Korea). Moreover, Section 122(d) provides that tariffs may be targeted "against one or more countries having large or

persistent balance-of-payments surpluses," 19 U.S.C. § 2132(d)(2), but the Proclamation makes no country-specific findings at all, let alone findings of country-specific balance-of-payments surpluses.

88.     And subsection (e) of Section 122 requires that any tariffs imposed "be of broad and uniform application with respect to product coverage except where the President determines, consistently with the purposes of this section, that certain articles should not be subject to import restricting actions because of the needs of the United States economy. Such exceptions shall be limited to the unavailability of domestic supply at reasonable prices, the necessary importation of raw materials, avoiding serious dislocations in the supply of imported goods, and other similar factors." 19 U.S.C. § 2132(e). Despite these restrictions, the Section 122 Proclamation includes more than 80 pages of product exceptions, with no facts to establish that any of the limited circumstances warranting an exception is present. Section 122 Proclamation Annexes I, II. Nor is the breadth of these exemptions "consistent[] with the purposes of" Section 122: to authorize broadly applicable tariffs to restore the balance of payments.

89.     In order to meet the requirements of subsection (d) and (e) of Section 122, the President would have needed to provide, at a minimum, some determinations to support discriminatory treatment under Section 122(d)(2), and some factual findings to support such discriminatory treatment or to support the exceptions under Section 122(e). The Proclamation does not contain such determinations or findings and is plainly insufficient to comply with either provision.

**D.     Collection and Enforcement under the Section 122 Proclamation**

90.     U.S. Customs and Border Protection is responsible for the collection of tariffs. 6 U.S.C. §§ 211(c)(4), 215(1); 19 U.S.C. § 4301(2)(A). The Section 122 Proclamation directs the

Commissioner of Customs and Border Protection to "take any necessary or appropriate measures to administer the surcharge imposed by this proclamation." Section 122 Proclamation ¶ (11).

91.     To facilitate the collection of tariffs, Customs and Border Protection uses its Cargo Systems Messaging Service ("CSMS") to inform importers of changes to the amount and administration of import duties. The guidance incorporates and imposes the current duties imposed under the Section 122 Proclamation.

92.     U.S. Customs and Border Protection enforces the Section 122 Proclamation under CSMS # 67844987, which provides that, imports, with certain exceptions, "will be subject to an additional ad valorem rate of 10%" from February 24 to July 24. Imposing Temporary Section 122 Duties, CSMS No. 67844987 (U.S. Customs & Border Prot. Feb. 23, 2026) ("CSMS # 67844987") (Compl. Ex. 2).

## PLAINTIFF STATES' INTERESTS

93.     Plaintiff States provide a wide range of public services to their residents and visitors. Essential to the provision of those services is the purchase of equipment, supplies, and parts, many of which are imported from other countries. Other products are manufactured in the United States but contain components that are imported from other countries. Because tariffs directly impact the costs of these products, they cause direct financial harm to Plaintiff States.

94.     Plaintiff States include states that have standing based on the Section 122 tariffs they have paid or will pay as direct importers. *See generally V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1369 (Ct. Int'l Trade), *aff'd in part, vacated in part, remanded sub nom. V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025), *cert. granted*, 146 S. Ct. 73 (2025), *aff'd sub nom. Learning Res., Inc.*, 2026 WL 477534 (recognizing that the United States conceded that plaintiff states had standing because they had paid IEEPA Tariffs).

95.     Plaintiff States also have standing based on the higher costs they have paid for imported products and by increasing the price of goods and services that they purchase from domestic producers and suppliers that rely on imports. "To suffer an economic injury from a tariff it is not necessary to incur direct liability to Customs, or even to directly import an article of dutiable merchandise. Fair traceability is more flexible than that." *V.O.S. Selections, Inc.*, 772 F. Supp. 3d at 1368.

96.     As direct or indirect purchasers, Plaintiff States—like other domestic purchasers— shoulder nearly all the cost of tariffs levied on the products they purchase. In fact, the Federal Reserve Bank of New York reports that 90% of the costs of tariffs are paid by American consumers and companies. *See* Mary Amiti, et al., *Who is Paying for the 2025 U.S. Tariffs?*, Fed. Rsrv. Bank of N.Y.: Liberty Street Econ. (Feb. 12, 2026), https://libertystreeteconomics.newyorkfed.org/2026/02/who-is-paying-for-the-2025-u-s-tariffs/.

97.     The President's invocation of Section 122 to impose, modify, and reinstate tariffs by executive order, memoranda, social media post, and other means has resulted in national trade policy that reflects the President's whims on a particular day rather than reasoned decision. The President's abrupt policy changes have disrupted Plaintiff States' economies. President Trump's Section 122 Proclamation was published on February 20, proposed to be changed via social media post on February 21, and took effect on February 24. Plaintiff States and other purchasers are left to sort out what products are included and what tariff rate, if any, will apply.

98.     These erratic swings in trade policy not only affect the markets, but they also harm Plaintiff States' ability to procure goods and services and to budget for and audit price adjustments. Unpredictable tariffs also are already burdening or almost certainly will burden Plaintiff States by increasing administrative costs.

99. When tariff rates increased in the past, many Plaintiff States saw vendors and contractors claim the rate increases as the basis for price adjustments. When a vendor or contractor seeks to impose a price-adjustment based on tariff rates, many Plaintiff States' agencies audit the adjustment to ensure that it is reasonably based on actual costs incurred. That is particularly difficult with regard to domestically produced goods made in part with foreign-sourced components, or contracted services that use some foreign-sourced materials. Due to the President's erratic tariff-rate directives, many of Plaintiff States' agencies must piece together the applicable tariff for a particular day by reviewing multiple executive orders, memoranda, social media posts, and so on, and also investigate how much of those costs were actually incurred by the vendor or contractor. That imposes a substantial and additional administrative cost to many Plaintiff States.

## CAUSES OF ACTION

### Count I
### The Section 122 Proclamation is Ultra Vires
### (Against All Defendants)

100. Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

101. The President has no inherent authority to impose tariffs. The Constitution grants only Congress, not the President, the "Power To lay and collect Taxes, Duties, Imposts and Excises …." U.S. Const. art. I, § 8, cl. 1.

102. The only statute cited in the Proclamation claiming substantive authority to impose tariffs is Section 122. But the Proclamation violates and is plainly beyond the bounds of Section 122.

103. The President's tariff authority under Section 122 is limited to narrow circumstances. This authority may be exercised only when "fundamental international payments

problems require special import measures …." The scenarios set forth in the statute as potential bases for such an exercise of power are not present—these include only (1) "large and serious United States balance-of-payments deficits," (2) "imminent and significant depreciation of the dollar," or (3) "[cooperation] with other countries in correcting an international balance-of-payments disequilibrium." 19 U.S.C. § 2132(a).

104.    The President has identified effectively one ground named in Section 122, despite many separate characterizations of it—a balance of payments deficit. A balance of payments deficit is a term of art incorporating into law a settled meaning from international financial accounting—it includes the balance of trade as only one element, but it also includes the balance of capital and financial transactions. A trade deficit does not qualify, either as a matter of economics or of law, as a balance of payments deficit. The Proclamation thus violates Section 122.

105.    The Proclamation is also unlawful because it exempts many goods from Canada, Mexico, Costa Rica, the Dominican Republic, El Salvador, Guatemala, Honduras, and Nicaragua. Section 122 Proclamation ¶ 14(*l*)–(m). This violates subsection (d) of Section 122, which requires that any tariffs imposed "be applied consistently with the principle of nondiscriminatory treatment." 19 U.S.C. § 2132(d)(1).

106.    The Proclamation is also unlawful because it does not impose tariffs that are "of broad and uniform application with respect to product coverage except where the President determines, consistently with the purposes of this section, that certain articles should not be subject to import restricting actions because of the needs of the United States economy." 19 U.S.C. § 2132(e). Despite these restrictions, the Section 122 Proclamation includes more than 80 pages of product exceptions, with no determinations establishing that any of the limited circumstances

warranting an exception is present. Section 122 Proclamation Annexes I, II. The Proclamation also violates Section 122 for this reason.

107.    Plaintiff States have a non-statutory right of action to enjoin and declare unlawful official action that is ultra vires.

108.    The Section 122 Proclamation is not authorized by Section 122 or any other statute. The Proclamation is beyond the bounds of the authority to tariff in Section 122 and clearly violates the statute. As such, it is ultra vires and unlawful.

**Count II**
**The Section 122 Proclamation Violates the Separation of Powers**
**(Against All Defendants)**

109.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

110.    The President has no inherent authority to impose tariffs. The Constitution grants only Congress, not the President, the "Power To lay and collect Taxes, Duties, Imposts and Excises …." U.S. Const. art. I, § 8, cl. 1.

111.    No statute authorizes the President to issue the Section 122 Proclamation. For the reasons stated above, Section 122 does not authorize the imposition of these tariffs.

112.    Plaintiff States have a non-statutory right of action to enjoin and declare unlawful official action that is unconstitutional.

113.    Because the power to tariff rests with Congress, the President lacks inherent authority to impose tariffs, and the President has usurped Congress's authority by imposing tariffs that violate Section 122. The Section 122 Proclamation is an exercise of Congressional authority in violation of separation of powers.

## Count III
## No statutory authority — 5 U.S.C. § 706(2)(C)
## (Against U.S. Customs and Border Protection)

114.    Plaintiff States incorporate by reference the allegations contained in the preceding paragraphs.

115.    U.S. Customs and Border Protection is an "agency" under the Administrative Procedure Act, 5 U.S.C. § 551(1) ("APA").

116.    The Customs and Border Protection's CSMS # 67844987 is a final agency action subject to review under the APA. CSMS # 67844987 marks the consummation of the agency's decision-making process because it announces the agency's implementation of the Section 122 Proclamation.

117.    CSMS # 67844987 is an action by which rights or obligations have been determined or from which legal consequences will flow, because it immediately changes tariffs rates charged at importation.

118.    CSMS # 67844987 implements tariffs that lack statutory authorization and are ultra vires. *See* Count I, above.

119.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be … in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

120.    Plaintiff States are thus also entitled to vacatur of CSMS # 67844987 under 5 U.S.C. § 706, all appropriate preliminary relief under 5 U.S.C. § 705, and a preliminary and permanent injunction prohibiting its implementation.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff States pray that the Court:

      a.      Declare that the Section 122 Proclamation is ultra vires and a violation of the separation of powers;

      b.      Stay, hold unlawful, vacate, and set aside the Customs and Border Protection's CSMS # 67844987;

      c.      Preliminarily and permanently enjoin Secretary Noem, Commissioner Scott, the Defendant agencies, their agents, and anyone acting in concert or participation with them from implementing, instituting, maintaining, or giving effect to (i) the Section 122 Proclamation, and (ii) U.S. Customs and Border Protection's CSMS # 67844987;

      d.      Order the United States to refund to Plaintiff States the Section 122 tariffs collected on entries in which they or their instrumentalities are the importers of record, with interest, as provided by law;

      e.      Award Plaintiff States' costs of suit and reasonable attorneys' fees and expenses under any applicable law; and

      f.      Award such additional relief as the interests of justice may require.

Respectfully submitted,

**DAN RAYFIELD**
Attorney General for the State of Oregon

BENJAMIN GUTMAN
Deputy Attorney General
DUSTIN BUEHLER
Special Counsel

By: */s/ Brian Simmonds Marshall*
Brian Simmonds Marshall
Leanne Hartmann*
Samuel Kubernick*
*Senior Assistant Attorneys General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
Brian.S.Marshall@doj.oregon.gov
Leanne.Hartmann@doj.oregon.gov
Samuel.A.Kubernick@doj.oregon.gov

*Counsel for the State of Oregon*

**KRISTIN K. MAYES**
Attorney General
State of Arizona

*/s/ Joshua D. Bendor*
Joshua D. Bendor
*Solicitor General*
Syreeta A. Tyrell
Senior Litigation Counsel
Timothy E.D. Horley*
Jaylia Yan*
*Assistant Attorneys General*
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-3333
Joshua.bendor@azag.gov
Syreeta.Tyrell@azag.gov
Timothy.Horley@azag.gov
Jaylia.Yan@azag.gov
ACL@azag.gov

*Counsel for the State of Arizona*

**ROB BONTA**
Attorney General
State of California

By: *s/Shiwon Choe*
Lara Haddad*
*Supervising Deputy Attorney General*
Shiwon Choe
Carolyn Downs*
Samuel Sokolsky*
*Deputy Attorneys General*
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-4400
Lara.Haddad@doj.ca.gov
Shiwon.Choe@doj.ca.gov
Carolyn.Downs@doj.ca.gov
Samuel.Sokolsky@doj.ca.gov

*Counsel for the State of California*

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
Stephen Thompson*
Mark Ladov
Natasha Korgaonkar*
*Special Counsel*
28 Liberty St.
New York, NY 10005
(212) 416-8679
rabia.muqaddam@ag.ny.gov
stephen.thompson@ag.ny.gov
mark.ladov@ag.ny.gov
Natasha.korgaonkar@ag.ny.gov

*Counsel for the State of New York*

**PHILIP J. WEISER**
Attorney General State of Colorado

By: */s/ Sarah H. Weiss*
Sarah H. Weiss
*Senior Assistant Attorney General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
Sarah.Weiss@coag.gov

*Counsel for the State of Colorado*

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

By: */s/ Ian R Liston*
Ian R. Liston
*Director of Impact Litigation*
Vanessa L. Kassab
*Deputy Attorney General*
Rose Gibson\*
*Assistant Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8875
Ian.Liston@Delaware.gov

*Counsel for the State of Delaware*

**WILLIAM TONG**
Attorney General of Connecticut

By: */s/ Michael Skold*
Michael Skold
*Solicitor General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Michael.Skold@ct.gov

*Counsel for the State of Connecticut*

**KWAME RAOUL**
Attorney General
State of Illinois

By: */s/ Gretchen Helfrich*
Cara Hendrickson
*Executive Deputy Attorney General*
Gretchen Helfrich
*Deputy Chief, Special Litigation Bureau*
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603
Tel. (312) 814-3000
Cara.Hendrickson@ilag.gov
Gretchen.helfrich@ilag.gov

*Counsel for the State of Illinois*

**OFFICE OF THE GOVERNOR** *ex rel.*
**Andy Beshear**, in his official capacity as
Governor of the Commonwealth of Kentucky

By: */s/ S. Travis Mayo*
S. Travis Mayo*
*General Counsel*
Laura C. Tipton*
*Deputy General Counsel*
Office of the Governor
501 High Street
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
laurac.tipton@ky.gov


*Counsel for Governor Andy Beshear*

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s James C. Luh*
James C. Luh*
*Senior Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.maryland.gov

*Counsel for the State of Maryland*

**AARON M. FREY**
Maine Attorney General

By: */s/ Katherine W. Thompson*
Katherine W. Thompson*
*Special Counsel*
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel.: 207-626-8455
Fax: 207-287-3145
Kate.thompson@maine.gov


*Counsel for the State of Maine*

**ANDREA JOY CAMPBELL**
ATTORNEY GENERAL OF
MASSACHUSETTS

By: */s/ Katherine Dirks*
Katherine Dirks
  *Chief State Trial Counsel*
Office of the Massachusetts Attorney General
1 Ashburton Place
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov

*Counsel for the Commonwealth of
Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov

*Counsel for the State of Michigan*


**KEITH ELLISON**
Attorney General
State of Minnesota

By: */s/ Lindsey E. Middlecamp*
PETER J. FARRELL (#0393071)
*Deputy Solicitor General*
LINDSEY E. MIDDLECAMP (#0392589)
*Special Counsel*
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 757-1010 (Voice)
(651) 282-5832 (Fax)
Peter.farrell@ag.state.mn.us
Lindsey.middlecamp@ag.state.mn.us

*Counsel for the State of Minnesota*


**AARON D. FORD**
Attorney General

By: */s/ K. Brunetti Ireland*
K. Brunetti Ireland*
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Counsel for the State of Nevada*


**JENNIFER DAVENPORT**
Attorney General of New Jersey

By: */s/ Lucy I. Sprague*
Lucy I. Sprague*
David N. Birch*
*Deputy Attorneys General*
124 Halsey Street, 5th Floor
Newark, New Jersey 07101
(609) 696-5363
Lucy.Sprague@law.njoag.gov

*Counsel for the State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ Amy Senier*
AMY SENIER
*Senior Counsel*
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
505-490-4060
asenier@nmdoj.gov

*Counsel for the State of New Mexico*


**JOSH SHAPIRO,**
in his official capacity as Governor of the
Commonwealth of Pennsylvania

JENNIFER SELBER
General Counsel

By: */s/ Jacob B. Boyer*
Jacob B. Boyer*
*Deputy General Counsel*
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov

*Counsel for Governor Josh Shapiro*


**JEFF JACKSON**
Attorney General of North Carolina

LAURA HOWARD
Chief Deputy Attorney General

By: */s/ Daniel T. Wilkes*
Daniel T. Wilkes*
*Assistant Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6415
dwilkes@ncdoj.gov

*Counsel for the State of North Carolina*


**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Alex Carnevale*
Alex Carnevale*
*Special Assistant Attorney General*
Office of the Attorney General – State of
Rhode Island
150 South Main Street
Providence, RI 02903
(401) 274 4400
acarnevale@riag.ri.gov

*Counsel for the State of Rhode Island*

**CHARITY R. CLARK**
Attorney General of Vermont

By: */s/ Ryan P. Kane*
RYAN P. KANE
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153
ryan.kane@vermont.gov

*Counsel for the State of Vermont*

**NICHOLAS W. BROWN**
Attorney General
State of Washington

By: s/ *Freeman E. Halle*
FREEMAN E. HALLE, WSBA 61498
TODD SIPE, WSBA 23203
*Assistant Attorneys General*
Office of the Washington State Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
freeman.halle@atg.wa.gov
todd.sipe@atg.wa.gov

*Counsel for the State of Washington*

**JAY JONES**
Attorney General of Virginia

By: */s/ Tillman J. Breckenridge*
Tillman J. Breckenridge*
*Solicitor General*
202 N. 9th Street
Richmond, Virginia 23219
Tel: (804) 786-2071
Fax: (804) 786-1991
solicitorgeneral@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: s/ *Brian P. Keenan*
Brian P. Keenan* State Bar #1056525
*Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0020
(608) 294-2907 (Fax)
brian.keenan@wisdoj.gov

*Counsel for the State of Wisconsin*

* *Admission application pending or forthcoming*

Dated: March 5, 2026