## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE MARK A. BARNETT, CHIEF JUDGE
THE HONORABLE CLAIRE R. KELLY, JUDGE
THE HONORABLE TIMOTHY C. STANCEU, JUDGE

---

**THE STATE OF OREGON, et al.,**

         **Plaintiffs,**

    **v.**                                              **Court No. 26-01472**

**DONALD J. TRUMP, et al.,**

         **Defendants.**

---

## PLAINTIFF STATES' MOTION FOR SUMMARY JUDGMENT, AND, IN THE ALTERNATIVE, FOR A PRELIMINARY INJUNCTION

Pursuant to Rule 56 of the U.S. Court of International Trade, plaintiffs in this action ("States") respectfully move for summary judgment on each of their claims.

In the alternative, the States move under U.S. Court of International Trade Rule 65 for a preliminary injunction barring the United States, the U.S. Department of Homeland Security and its Secretary Kristi Noem, U.S. Customs and Border Protection and its Commissioner Rodney S. Scott, and others in active concert or participation with them, from implementing or enforcing Proclamation 11012, Imposing a Temporary Import Surcharge To Address Fundamental International Payments Problems, 91 Fed. Reg. 9339 ("Section 122 Proclamation"), including by imposing any tariffs pursuant to those orders ("Section 122 Tariffs"), for the pendency of this litigation, including any appeals. The States further move under 5 U.S.C. § 705 for a stay of U.S. Customs and Border Protection's Cargo Systems Messaging Service # 67844987 - Imposing Temporary Section 122 Duties, issued on February 23, 2026.

A proposed order is enclosed.

Dated: March 13, 2026

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:     THE HONORABLE MARK A. BARNETT, CHIEF JUDGE
            THE HONORABLE CLAIRE R. KELLY, JUDGE
            THE HONORABLE TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| THE STATE OF OREGON, et al., | |
| Plaintiffs, | |
| v. | Court No. 26-01472 |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

## <u>ORDER</u>

This matter is before the Court on the Plaintiff States' Motion for Summary Judgment, and, in the Alternative, for Preliminary Injunction. Upon consideration of the Motion and record thereon, and for the reasons set forth in the States' Memorandum of Law, it is hereby

**ORDERED** that the motion for summary judgment is **GRANTED**.

A judgment for the Plaintiff States will enter accordingly.

_____
JUDGE

Dated: _____
       New York, New York

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:   THE HONORABLE MARK A. BARNETT, CHIEF JUDGE
          THE HONORABLE CLAIRE R. KELLY, JUDGE
          THE HONORABLE TIMOTHY C. STANCEU, JUDGE

---

THE STATE OF OREGON, et al.,

      Plaintiffs,

      v.                                    Court No. 26-01472

DONALD J. TRUMP, et al.,

      Defendants.

---

## PLAINTIFF STATES' MEMORANDUM OF LAW
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT,
## AND, IN THE ALTERNATIVE, FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page(s)**

TABLE OF CONTENTS.............................................................................................. i

TABLE OF AUTHORITIES ...................................................................................... iii

I.     INTRODUCTION AND SUMMARY OF ARGUMENT ................................. 1

II.    BACKGROUND ............................................................................................... 4

    A.    Legal and Historical Background ........................................................... 4

        1.    The Balance of Payments is a Record of the Flow of Money on All Transactions Between U.S. and Foreign Residents ................................... 5

        2.    Large and Serious Balance of Payments Deficits Were a Feature of the Now-Defunct Bretton Woods System.................................... 6

            a.    Under Bretton Woods, the United States Became Increasingly Vulnerable to a Run on Its Gold ................................ 8

            b.    The "Nixon Shock" and the End of Bretton Woods ....................... 9

            c.    In 1973, Efforts Toward Legislation to Address Balance of Payments Deficits Began, Resulting in the Trade Act of 1974.................................................................... 11

        3.    The Trade Act of 1974 is Enacted ........................................................... 13

        4.    Since the End of Bretton Woods, the United States Has Never Had Large and Serious Balance of Payments Deficits ..................................... 15

    B.    The Section 122 Orders ........................................................................ 16

    C.    The Harm to States............................................................................... 18

III.   LEGAL STANDARDS .................................................................................... 20

    A.    Summary Judgment .............................................................................. 20

    B.    Preliminary and Permanent Injunction ................................................ 20

IV.    ARGUMENT..................................................................................................... 22

    A.    The Section 122 Tariffs Are Unlawful ................................................. 22

        1.    The President Cannot Invoke Section 122 Under Present Circumstances ......................................................................................... 22

a. No "Fundamental International Payments Problems Requir[ing] Special Import Measures to Restrict Imports" Exist ............................................................ 23

b. No "Large and Serious Balance-of-Payments Deficits" Exist ........................................................................ 25

c. Section 122(a), Which is Presumptively Mandatory, Has Never Been Invoked Before Now .................................. 28

2. The Section 122 Orders Violate Section 122's Limitations .............. 28

a. The Proclamation Violates Section 122's Nondiscrimination Requirement .................................. 29

b. The Proclamation Violates Section 122's Uniformity Requirement ........................................................ 31

3. U.S. Customs and Border Protection (CBP) Enforcement of the Section 122 Orders Exceeds Statutory Authority. .................................. 32

B. The States Have Standing to Sue ................................................ 33

C. The Other Factors Favor a Permanent or Preliminary Injunction ......................... 35

1. Plaintiff States Will Suffer Irreparable Harm ............................ 35

a. Recovery of "Tariff Surcharges" Paid by Third Parties Could be Infeasible .................................................. 35

b. President Trump's Misuse of Section 122 Seriously Impairs Budgeting Processes ................................................ 38

2. The Equities and Public Interest Favor an Injunction .............................. 39

3. A Nationwide Injunction is Necessary to Provide Complete Relief ......... 41

V. CONCLUSION ................................................................................ 44

CERTIFICATE OF COMPLIANCE ................................................ 51

# TABLE OF AUTHORITIES

**Page(s)**

**STATUTES**

5 U.S.C.
    § 705................................................................................................21, 43
    § 706............................................................................................32, 33, 43

19 U.S.C.
    § 1351.................................................................................................29
    § 1881.................................................................................................29
    § 2132............................................................................................... *passim*
    § 2481.................................................................................................29

28 U.S.C. § 1581.................................................................................................42

Tariff Act of 1930, 19 U.S.C. ch. 4...................................................................11

Trade Expansion Act of 1962, 19 U.S.C. ch. 7.................................................11, 29

Trading With the Enemy Act of 1917, 50 U.S.C. ch. 53 .................................11

Amendment of Bretton Woods Agreements Act, Pub. L. No. 94-564, 90 Stat. 2660
    (1976)................................................................................................15

Articles of Agreement of the International Monetary Fund, Dec. 27, 1945, 2 U.N.T.S. 39,
    *as amended* Apr. 30, 1976, 29 U.S.T. 2203................................................7, 15

Bretton Woods Agreements Act, Pub. L. No. 79-171, 59 Stat. 512 (1945) ...................................7

Customs Courts Act of 1980, Pub. L. No. 96-417, 94 Stat. 1727.................................................42

Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978 (1975) ............................................. *passim*

**REGULATIONS**

Imposing Temporary Section 122 Duties, CSMS No. 67844987 (U.S. Customs & Border
    Prot. Feb. 23, 2026)....................................................................................33, 43

Proclamation No. 4074, 36 Fed. Reg. 15,724 (Aug. 17, 1971) .......................................9

Proclamation No. 4098, 36 Fed. Reg. 24,201 (Dec. 22, 1971).......................................10

Proclamation No. 11012 (Feb. 20, 2026), 91 Fed. Reg. 9339 (Feb. 25, 2026)...................... *passim*

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 8.......................................................................................1, 42, 43

## CASES

*Afr. Communities Together v. Lyons*,
    799 F. Supp. 3d 362 (S.D.N.Y. 2025)....................................................................21

*Aluminum Extrusions Fair Trade Comm. v. United States*,
    607 F. Supp. 3d 1332 (Ct. Int'l Trade 2022) .......................................................21

*Am. Frozen Food Inst., Inc. v. United States*,
    855 F. Supp. 388 (Ct. Int'l Trade 1994) ..............................................................35

*Am. Signature, Inc. v. United States*,
    598 F.3d 816 (Fed. Cir. 2010)..............................................................................40

*Amoco Production Co. v. Gambell*,
    480 U.S. 531 (1987)..............................................................................................21

*Atlas Powder Co. v. Ireco Chemicals*,
    773 F.2d 1230 (Fed. Cir. 1985)............................................................................40

*Atmus Filtration, Inc. v. United States*,
    --- F.Supp.3d ----, 2026 WL 616128 (Ct. Int'l Trade Mar. 4, 2026) .................42

*Bernhardt v. Los Angeles County*,
    339 F.3d 920 (9th Cir. 2003) ................................................................................40

*Best Mattresses Int'l Co. v. United States*,
    557 F. Supp. 3d 1338 (Ct. Int'l Trade 2022) .......................................................21

*Biden v. Nebraska*,
    600 U.S. 477 (2023)..............................................................................................33

*BlephEx, LLC v. Myco Indus., Inc.*,
    24 F.4th 1391 (Fed. Cir. 2022) ............................................................................41

*Califano v. Yamasaki*,
    442 U.S. 682 (1979)..............................................................................................41

*Canadian Lumber Trade All. v. United States*,
    517 F.3d 1319 (Fed. Cir. 2008)......................................................................33, 34

*Career Colls. & Schs. of Texas v. U.S. Dep't of Educ.*,
    98 F.4th 220 (5th Cir. 2024) ................................................................................43

*Cassell v. Snyders*,
    990 F.3d 539 (7th Cir. 2021) ................................................................................40

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v.*
    *United States*, 393 F. Supp. 3d 1271 (Ct. Int'l Trade 2019)................................35

*Consumers Union of U.S., Inc. v. Kissinger*,
   506 F.2d 136 (D.C. Cir. 1974) ........................................................................22

*Duncan v. Walker*,
   533 U.S. 167 (2001) .......................................................................................23

*E. Bay Sanctuary Covenant v. Trump*,
   932 F.3d 742 (9th Cir. 2018) ..........................................................................32

*Eastern Air Lines v. Civil Aeronautics Board*,
   261 F.2d 830 (2d Cir. 1958) ...........................................................................21

*eBay Inc. v. MercExchange, L.L.C.*,
   547 U.S. 388 (2006) .......................................................................................21

*Edye v. Robertson*,
   112 U.S. 580 (1884) .......................................................................................42

*Guerrero-Lasprilla v. Barr*,
   589 U.S. 221 (2020) .......................................................................................25

*Head Money Cases*,
   112 U.S. 580 (1884) .......................................................................................43

*In re Section 301 Cases*,
   570 F. Supp. 3d 1306 (Ct. Int'l Trade 2022) ..................................................32

*Invenergy Renewables LLC v. United States*,
   422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019), *modified*, 476 F. Supp. 3d 1323 (Ct.
   Int'l Trade 2020)........................................................................34, 35, 38, 39, 40

*Kingtom Aluminio S.R.L. v. United States*,
   805 F. Supp. 3d 1317 (Ct. Int'l Trade 2025) ..................................................43

*Knowlton v. Moore*,
   178 U.S. 41 (1900) .........................................................................................42

*Learning Res., Inc. v. Trump*,
   607 U.S. ---- , 2026 WL 477534 (U.S. Feb. 20, 2026) ............................ *passim*

*Litton Sys., Inc. v. Sundstrand Corp.*,
   750 F.2d 952 (Fed. Cir. 1984)........................................................................41

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024)........................................................................................28

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) .......................................................................................34

*Madsen v. Women's Health Center, Inc.*,
    512 U.S. 753 (1994)................................................................................41

*Massachusetts v. EPA*,
    549 U.S. 497 (2007)................................................................................33

*Me. Cmty. Health Options v. United States*,
    590 U.S. 296 (2020)..............................................................24, 25, 26, 28

*Mosaic Co. v. United States*,
    160 F.4th 1340 (Fed. Cir. 2025) ......................................................24, 25

*Murphy Co. v. Biden*,
    65 F.4th 1122, 1129 (9th Cir. 2023) ......................................................23

*Nat. Res. Def. Council, Inc. v. Ross*,
    331 F. Supp. 3d 1338 (Ct. Int'l Trade 2018) ........................................34

*Nat'l Ass'n of Gov't Emps., Inc. v. Yellen*,
    120 F.4th 904 (1st Cir. 2024)..................................................................24

*New York v. Cathedral Academy*,
    434 U.S. 125 (1977)................................................................................41

*Nken v. Holder*,
    556 U.S. 418 (2009)................................................................................39

*Novolipetsk Steel Public Joint Stock Co. v. United States*,
    456 F.Supp.3d 1300 (Ct. Int'l Trade 2020) ..........................................29

*Nuclear Regul. Comm'n v. Texas*,
    605 U.S. 665 (2025)................................................................................23

*Rodriguez v. Robbins*,
    715 F.3d 1127 (9th Cir. 2013) ................................................................40

*Silfab Solar, Inc. v. United States*,
    892 F.3d 1340 (Fed. Cir. 2018)..............................................................39

*State v. Su*,
    121 F.4th 1 (9th Cir. 2024) ....................................................................32

*Thyssenkrupp Materials NA Inc. v. United States*,
    498 F. Supp. 3d 1372 (Ct. Int'l Trade 2021) ........................................42

*Totes-Isotoner Corp. v. United States*,
    594 F.3d 1346, (Fed. Cir. 2010)............................................................33

*Transpacific Steel LLC v. United States*,
    466 F. Supp. 3d 1246 (Ct. Int'l Trade 2020), *rev'd on other grounds*, 4 F.4th 1306
    (Fed. Cir. 2021) ................................................................................................29, 30

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025) ......................................................................................42, 43

*Ugine & Alz Belg. v. United States*,
    452 F.3d 1289 (Fed. Cir. 2006) ............................................................................21

*V.O.S. Selections, Inc. v. United States (V.O.S. I)*,
    772 F. Supp. 3d 1350, 1369 (Ct. Int'l Trade) ........................................... *passim*

*V.O.S. Selections, Inc. v. Trump (V.O.S. II)*,
    149 F.4th 1312 (Fed. Cir. 2025) ......................................20, 21, 26, 27, 42

*Williams v. Lew*,
    819 F.3d 466 (D.C. Cir. 2016) ............................................................................24

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...........................................................................................39, 40

*Yoshida Int'l, Inc. v. United States (Yoshida I)*,
    378 F. Supp. 1155 (Cust. Ct. 1974) ..............................................................11, 14

*Yoshida Int'l, Inc. v. United States (Yoshida II)*,
    526 F.2d 560 (C.C.P.A. 1975) ............................................................................11

*Zenith Radio Corp. v. United States*,
    518 F. Supp. 1347 (Ct. Int'l Trade 1981) ......................................................43, 44

## OTHER AUTHORITIES

Declaration of Brandon Lord, *Atmus Filtration, Inc. v. United States*,
    No. 26-01259 (Ct. Int'l Trade, March 6, 2026), ECF No. 31 ...............35, 36, 37

*Economic Report of the President* (1972) ......................................................................9

*Economic Report of the President* (1974) ......................................................13, 25, 26

Harold James, Int'l Monetary Fund, *International Monetary Cooperation Since Bretton
    Woods* (1996) ..............................................................................................8, 10

H.R. 6767, 93d Cong. (as introduced by House Apr. 10, 1973) .............................11, 12

H.R. 10710, 93d Cong. (as introduced by House Oct. 3, 1973) .........................12, 13, 14

H.R. 10710, 93d Cong. (as passed by Senate, Dec. 13, 1974) .................................14, 15

H.R. Rep. No. 93-571 (1973) ........................................................................................13

H.R. Rep. No. 93-1644 (1974) (Conf. Rep.) ................................................................15

Joint Econ. Comm., 88th Cong., *The United States Balance of Payments—Perspective and Policies* (Comm. Print 1963) ............................................................5, 7, 8

Memorandum from Sec'y of Treasury William Simon to President Gerald Ford (Jan. 13, 1976) .............................................................................................................15

*Money: The Gold War*, Time Mag. Archive (Jan. 15, 1965), https://time.com/archive/6874993/money-the-gold-war/ ......................................8

*Net Financial Account (BoP, current US$) - United States*, World Bank Group: Data, https://data.worldbank.org/indicator/BN.FIN.TOTL.CD?locations=US&most_recent_value_desc=false [https://perma.cc/V4VM-KUES] (last visited Mar. 3, 2026) .........17

Owen Humpage, *The Smithsonian Agreement*, Fed. Rsrv. Hist. (Nov. 22, 2013), https://www.federalreservehistory.org/essays/smithsonian-agreement ...................8, 9, 10

President Richard Nixon, Address to the Nation Outlining a New Economic Policy: "The Challenge of Peace" (Aug. 15, 1971) ........................................................9, 10

Reply Brief, *Learning Res., Inc. v. Trump*, No. 25-5202 (D.C. Cir. Aug. 18, 2025), Doc. No. 2130706 .............................................26

Reply Brief, *V.O.S. Selections, Inc. v. Trump*, No. 25-1812 (Fed. Cir. July 18, 2022), ECF No. 147 ......................................................26

Robert Solomon, *The International Monetary System 1945-1976: An Insider's View* (1977) ..................................................................................................8, 9, 10, 15

S. Rep. No. 93-1298 (1974) ...........................................................14, 15, 25, 26, 27

Sanda Kollen Ghizoni, *Creation of the Bretton Woods System*, Fed. Rsrv. Hist. (Nov. 22, 2013), https://www.federalreservehistory.org/essays/bretton-woods-created ...................7

Sandra Kollen Ghizoni, *Nixon Ends Convertibility of U.S. Dollars to Gold and Announces Wage/Price Controls*, Fed. Rsrv. Hist. (Nov. 22, 2013), https://www.federalreservehistory.org/essays/gold-convertibility-ends .........................8, 9

*The Trade Reform Act of 1973: Hearings on H.R. 6767 Before the H. Comm. on Ways & Means*, 93d Cong. (1973) ...........................................................................11, 12, 25

*The Trade Reform Act of 1973: Prepared Statements of Administration Witnesses Submitted to the H. Comm. on Ways & Means*, 93d Cong. (1973) ................................12

U.S. Bureau of Econ. Analysis, *Glossary: Balance of payments* (Apr. 11, 2018), https://www.bea.gov/help/glossary/balance-payments .............................................5

U.S. Bureau of Econ. Analysis, *Glossary: International investment position (IIP) of the United States* (Apr. 13, 2018), https://www.bea.gov/help/glossary/international-investment-position-iip-united-states..................................................................................17

U.S. Bureau of Econ. Analysis, *International Trade & Investment* (Sept. 3, 2024), https://www.bea.gov/resources/learning-center/what-to-know-international-trade-investment..................................................................................5, 6

U.S. Bureau of Econ. Analysis, *U.S. International Economic Accounts: Concepts and Methods* (2025), https://www.bea.gov/resources/methodologies/us-international-economic-accounts-concepts-methods ..................................................................6

U.S. Bureau of Econ. Analysis, *U.S. International Investment Position, 4th Quarter and Year 2024* (2025), https://www.bea.gov/news/2025/us-international-investment-position-4th-quarter-and-year-2024..................................................................17, 18

Yale Budget Lab, *Tracking the Economic Effects of Tariffs* (Mar. 2, 2026), https://budgetlab.yale.edu/research/tracking-economic-effects-tariffs..............................36

## I.     INTRODUCTION AND SUMMARY OF ARGUMENT

President Trump has demonstrated that he wishes to have unbounded authority to impose tariffs on most of the world. But the Constitution assigns to Congress, not the President, the "Power To lay and collect Taxes, Duties, Imposts and Excises." U.S. Const. art. I, § 8. "The power to impose tariffs is very clearly a branch of the taxing power." *Learning Res., Inc. v. Trump*, 607 U.S. ---- , 2026 WL 477534, at *7 (U.S. Feb. 20, 2026) (citation modified). Congress has only delegated authority to the President to impose tariffs in limited and carefully defined circumstances.

To implement his chaotic tariff policies, the President first relied on the International Emergency Economic Powers Act ("IEEPA"), which the Supreme Court has now ruled does not authorize tariffs at all. Now, the President seeks to invoke Section 122 of the Trade Act of 1974 to achieve the same ends—largely global tariffs that he changes at his whim. But these tariffs, like the IEEPA tariffs, are beyond the statutory authority the President identifies and violate the Constitution.

The same day the Supreme Court invalidated his recent IEEPA tariffs, the President decided to sidestep its ruling by imposing a 10 percent tariff on most products worldwide pursuant to Section 122. Proclamation No. 11012 (Feb. 20, 2026), 91 Fed. Reg. 9339 (Feb. 25, 2026) ("Section 122 Proclamation"). The next day, he announced via a Truth Social post that he would raise the worldwide tariff rate to 15 percent. Donald J. Trump (@realDonaldTrump), Truth Social (Feb. 21, 2026, at 07:56 ET), https://perma.cc/AA4X-QJZB (Muqaddam Decl. Ex. 1). The 10 percent tariffs went into effect on February 24, 2026.

Section 122 was created to provide for limited tariffs to address "fundamental international payments problems" that "require special import measures to restrict imports" to "deal with large and serious balance-of-payments deficits," among other things. 19 U.S.C. § 2132(a). These are,

specifically, types of *currency* problems that arose under a long-defunct fixed-rate exchange system that ended in 1976 (the "Bretton Woods" system), not *trade* problems. We no longer have a fixed-rate exchange system; Section 122 no longer has relevance. The President has invoked as justification for the Section 122 Proclamation purported "large and serious balance-of-payments deficits." But the United States does not have a balance of payments deficit.

The Section 122 Proclamation is unlawful. First, the President is unlawfully redefining the term "balance of payments." The balance of payments is a specific accounting term that Congress incorporated into the law. It is made up of three components—the current account, the capital account, and the financial account. The Section 122 Proclamation includes a hodgepodge of mischaracterizations and omissions designed to conflate trade deficits with balance of payments deficits. But trade deficits are only one component of the current account, which is itself just one component of the balance of payments. The Proclamation ignores entirely the huge international investments into the American economy and other net positive financial inflow components which also make up the balance of payments, and the surplus of which offsets the current account deficit.

Second, large and serious balance of payments deficits were a particular type of currency crisis that was of great concern when Congress enacted Section 122, but which can no longer exist following the formal end of the fixed-rate exchange system in 1976. The "balance of payments" is an accounting tool that aggregates a variety of economic measures, not just trade; it must always balance, and the only question is how. In a fixed-rate exchange system, when payment inflows and outflows did not balance, the government would have to finance the difference with its reserve assets, such as gold. Government intervention (including, potentially, the imposition of tariffs to pressure foreign trading partners) was needed to correct an imbalance. But under a floating-exchange-rate system, reserves are not needed; instead, when payment inflows to the United States

2

do not match payment outflows from the United States, the value of the dollar on foreign exchange markets adjusts to equate the two. In other words, floating (or flexible) exchange rates automatically ensure that the balance of payments balances, and render the problem addressed by Section 122 an anachronism.

For these reasons, the President cannot meet the statutory requirements of Section 122, and his effort to impose tariffs under this statute is unlawful. But there are still more reasons the President has violated Section 122. Section 122 also requires that tariffs "be applied consistently with the principle of nondiscriminatory treatment" and be "of broad and uniform application with respect to product coverage," subject to narrow exceptions. 19 U.S.C. § 2132(d), (e). Nevertheless, the Proclamation exempts many goods from Canada, Mexico, Costa Rica, the Dominican Republic, El Salvador, Guatemala, Honduras, and Nicaragua. Section 122 Proclamation ¶ 14(*l*)-(m). It also includes more than 80 pages of product exceptions. *Id.* Annexes I, II (91 Fed. Reg. 9345-9432). The Proclamation includes no indication that any of the statutory bases for exemptions were considered, let alone met.

In short, the President's attempt to exercise enormous tariff authority and the implementation of his Proclamation exceed Section 122's limits and violate the separation of powers. Plaintiffs respectfully request that their motion be granted.

3

## II.    BACKGROUND

### A.    Legal and Historical Background

The Section 122 Proclamation specifically invoked Section 122(a)(1), 19 U.S.C. § 2132(a)(1), to impose tariffs, claiming that the tariffs are required "to deal with large and serious United States balance-of-payments deficits." Section 122 Proclamation ¶¶ 5-6, 12.[1]

> In relevant part, Section 122(a) provides that:
>
> > Whenever fundamental international payments problems require special import measures to restrict imports—
> >
> > (1) to deal with large and serious United States balance-of-payments deficits....
> >
> > the President shall proclaim, for a period not exceeding 150 days (unless such period is extended by Act of Congress)—
> >
> > (A) a temporary import surcharge, not to exceed 15 percent ad valorem, in the form of duties (in addition to those already imposed, if any) on articles imported into the United States ....

The Proclamation cites four metrics that it claims justify its tariffs: a trade deficit, a primary-income deficit, a secondary-income deficit, and an increase in net negative international-investment positions. *Id.* ¶¶ 7-11. None of these, however, constitutes "large and serious balance-of-payments deficits."

Balance of payments deficits measured the official government reserves, chiefly gold, needed to maintain fixed currency exchange rates under the very different international monetary system known as "Bretton Woods" that existed when Section 122 was enacted—where foreign currencies were pegged to the dollar at fixed exchange rates and the dollar, in turn, was linked to

---

[1] The Proclamation also recites the "imminent and significant depreciation of the dollar" precondition from Section 122(a)(2) but does not claim that any significant depreciation is actually imminent. *See* Section 122 Proclamation ¶¶ 1, 4. Nor does the Proclamation claim any cooperation with other countries under Section 122(a)(3)—rather, the Proclamation imposes tariffs unilaterally.

gold. "The deficit, under the official U.S. definition, measure[d] the reduction in U.S. monetary reserve assets (chiefly gold) and the increase in liquid liabilities." Joint Econ. Comm., 88th Cong., *The United States Balance of Payments—Perspective and Policies* 3 (Comm. Print 1963) (1963 Joint Econ. Comm.), https://www.jec.senate.gov/reports/88th%20Congress/The%20United%20 States%20Balance%20of%20Payments%20-%20Perspectives%20and%20Policies%20(247).pdf. "Stated another way, it measure[d] the decline, during the period covered, in the U.S. ability to defend the exchange value of the dollar with liquid resources owned by or automatically available to the monetary authorities." *Id.* Today, however, the world operates with floating currency exchange rates, where large and serious balance of payments deficits do not arise.

### 1.     The Balance of Payments is a Record of the Flow of Money on All Transactions Between U.S. and Foreign Residents

The U.S. Bureau of Economic Analysis ("BEA") defines "balance of payments" as a "[r]ecord of transactions between U.S. residents and foreign residents during a given time period." BEA, *Glossary: Balance of payments* (Apr. 11, 2018), https://www.bea.gov/help/glossary/ balance-payments. There are *three* components to the balance of payments: the current account, the capital account, and the financial account. *Id.*; Irwin Decl. ¶ 8 (declarations at Exhibits 5-28).

The first component, the "current account," is a record of transactions on imports and exports, i.e., the trade balance (the largest component of the current account). The current account balance is calculated as exports of goods and services and income receipts minus imports of goods and services and income payments. Irwin Decl. ¶ 8; *see also* BEA, *International Trade & Investment* (Sept. 3, 2024), https://www.bea.gov/resources/learning-center/what-to-know- international-trade-investment. The United States has run a merchandise trade deficit (the value of imports of goods exceeds the value of exports of goods) since the late 1970s. Irwin Decl. ¶ 8. The

United States runs a surplus on services trade (exporting more than importing) but not enough to offset the merchandise trade deficit. *Id.*[2]

The second component, the "capital account," records capital transfers, such as debt forgiveness and disaster-related insurance settlements, and tends to be rather small. Irwin Decl. ¶ 9; BEA, *International Trade & Investment*.

The third component, the "financial account," records investment flows between the United States and other countries, including bank deposits, loans, stocks and bonds purchases, and direct investments. Irwin Decl. ¶ 9; BEA, *International Trade & Investment*. These two-way financial flows are enormous. Irwin Decl. ¶ 9. The United States is a net recipient of investment from the rest of the world. *Id.*

The United States has had a current-account deficit, reflecting that U.S. imports have exceeded exports, since the 1980s—but this does not constitute a *balance-of-payments* deficit because the current-account deficit is matched by a financial-account surplus. *Id.* ¶ 14. In other words, while the United States pays more to the rest of the world in terms of trade in goods and services, it is paid more by the rest of the world in terms of short- and long-term assets and investments. *Id.*

### 2. Large and Serious Balance of Payments Deficits Were a Feature of the Now-Defunct Bretton Woods System

When Section 122 was enacted, the world operated under a very different monetary system, known as "Bretton Woods." Foreign currencies were pegged to the dollar at fixed rates, and foreign

---

[2] The current account also includes "primary income" and "secondary income." Primary income measures direct income transactions, like investment income and compensation paid to employees. BEA, *U.S. International Economic Accounts: Concepts and Methods* ch. 13 (2025), https://www.bea.gov/resources/methodologies/us-international-economic-accounts-concepts-methods. Secondary income measures transfers made without any corresponding return, including income taxes, government aid, personnel remittances, and charitable donations. *Id.* ch. 14.

official monetary institutions (e.g., central banks) actively maintained those fixed rates by buying up supplies of dollars.

Large and serious balance of payments deficits arose between those foreign dollar holdings and the United States's reserve assets and its limited stock of gold. Now, however, following the end of Bretton Woods in 1976 and the move to a floating-exchange-rate system, large and serious balance of payments deficits do not arise.

Under Bretton Woods, countries agreed to keep their currencies fixed to the U.S. dollar (adjustable within a 1 percent band). Sanda Kollen Ghizoni, *Creation of the Bretton Woods System*, Fed. Rsrv. Hist. (Nov. 22, 2013), https://www.federalreservehistory.org/essays/bretton-woods-created (Ghizoni, *Bretton Woods*); Articles of Agreement of the International Monetary Fund art. IV, Dec. 27, 1945, 2 U.N.T.S. 39 ("IMF Articles of Agreement"); Bretton Woods Agreements Act, Pub. L. No. 79-171, 59 Stat. 512 (1945). The United States, in turn, pledged that it would convert dollars held by foreign official monetary institutions into gold at a fixed price of $35 per ounce and had the responsibility of adjusting the supply of dollars to maintain confidence in its pledge to convert dollars into gold. Ghizoni, *Bretton Woods*.

Maintaining fixed rates generally requires intervention by national governments. 1963 Joint Econ. Comm. 6 ("If foreign exchange markets were free from governmental control or intervention, exchange rates would fluctuate freely, in response to supply and demand pressures."). For example, in a floating-rate exchange world, if the market had an increased demand for French goods and thus for francs to buy those goods, or if there were a decreased demand or oversupply of U.S. dollars, the value of the franc would rise against the dollar under the normal operation of supply and demand. Irwin Decl. ¶¶ 12-13. To maintain fixed rates, the French central bank would have to sell more francs in exchange for dollars, thereby putting more francs into the market and

taking dollars out of the market and into its reserve holdings. Irwin Decl. ¶¶ 18-19; 1963 Joint Econ. Comm. 6. Because the United States had pledged to convert dollar holdings of foreign official institutions into gold, these foreign dollar holdings represented a potential claim against the United States's reserves and its limited stock of gold. 1963 Joint Econ. Comm. 3, 7.

a. **Under Bretton Woods, the United States Became Increasingly Vulnerable to a Run on Its Gold**

Because government reserves (of gold or foreign exchange) are finite, there is a limit to how long this situation can sustain itself. Irwin Decl. ¶ 24. By 1961, the amount of dollar claims outstanding began to exceed the United States's stock of gold. Owen Humpage, *The Smithsonian Agreement*, Fed. Rsrv. Hist. (Nov. 22, 2013), https://www.federalreservehistory.org/essays/smithsonian-agreement. The United States thus was vulnerable to a run on its gold. *Id.*; Sandra Kollen Ghizoni, *Nixon Ends Convertibility of U.S. Dollars to Gold and Announces Wage/Price Controls*, Fed. Rsrv. Hist. (Nov. 22, 2013), https://www.federalreservehistory.org/essays/gold-convertibility-ends (Ghizoni, *Nixon Ends Convertibility*); *Money: The Gold War*, Time Mag. Archive (Jan. 15, 1965), https://time.com/archive/6874993/money-the-gold-war/ ("Despite its $7 billion trade surplus, the U.S. has to worry about an outflow of gold under the current rules simply because it spends so much abroad for tourism, investment, foreign aid and the common defense of the western world.").

This potential run came to a head in 1971. That spring, West Germany unilaterally started allowing its currency to float. Robert Solomon, *The International Monetary System 1945-1976: An Insider's View* 179-80 (1977); Harold James, Int'l Monetary Fund, *International Monetary Cooperation Since Bretton Woods* 215-16 (1996). This led to increased investor speculation, betting on whether the fixed-rate exchange system would further collapse. Solomon 179-84; James 216-17. On August 8, 1971, the press carried stories about how France intended to buy $191

million of the United States's remaining gold. Solomon 184; *accord* Humpage. The market price of gold increased to nearly $44 per ounce—which meant that foreign monetary authorities could use dollars to buy up the United States's gold at the fixed $35 per ounce price and then sell gold in the market at a higher price. Solomon 115, 185. Outflows of dollars from the United States to foreign countries reached enormous proportions. *Id.* at 185; Humpage; *see Economic Report of the President* 148 (1972) (*1972 President Economic Report*), https://fraser.stlouisfed.org/title/economic-report-president-45/1972-8143 (noting how the United States's stock of gold and other reserve assets, around $14.5 billion, was far smaller than the stock of dollars held abroad, and how from January to August 1971, the United States had already paid out over $3 billion of its reserves).

### b.    The "Nixon Shock" and the End of Bretton Woods

With a run on the United States's remaining gold looming, on Sunday, August 15, 1971, President Nixon announced what became known as the "Nixon shock." Ghizoni, *Nixon Ends Convertibility*. Declaring that "speculators have been waging an all-out war on the American dollar," President Nixon unilaterally suspended "temporarily" the $35 per ounce gold-convertibility window. President Richard Nixon, Address to the Nation Outlining a New Economic Policy: "The Challenge of Peace" (Aug. 15, 1971) ("Nixon Shock Address"), https://www.presidency.ucsb.edu/documents/address-the-nation-outlining-new-economic-policy-the-challenge-peace. President Nixon also ordered a 90-day freeze on all prices and wages throughout the United States, *id.*, and imposed "[a]s a temporary measure" a 10 percent tariff on goods imported into the United States. *Id.*; Proclamation No. 4074, 36 Fed. Reg. 15,724 (Aug. 17, 1971).

President Nixon announced that "[t]his import tax is a temporary action. It isn't directed against any other country." Nixon Shock Address. He stressed that this tariff was aimed at the currency exchange rates under Bretton Woods, declaring that the tariff "is an action to make certain

that American products will not be at a disadvantage because of unfair exchange rates. When the unfair treatment is ended, the import tax will end as well.… The time has come for exchange rates to be set straight and for the major nations to compete as equals." *Id.*

Following the Nixon shock, the world's leading countries met in December 1971 at the Smithsonian Institution to try to rescue the Bretton Woods fixed-rate exchange system. Humpage. At that meeting, the United States agreed to devalue the dollar against gold by approximately 8.5 percent, to $38 per ounce instead of $35. *Id.* Other countries agreed to revalue their currencies as well. *Id.* Following the Smithsonian Agreement, President Nixon ended his 10 percent tariff, which had been in place for a total of four months. Proclamation No. 4098, 36 Fed. Reg. 24,201 (Dec. 22, 1971).

Under the Smithsonian Agreement, currency exchange rates were still fixed, albeit in wider bands. Humpage. Foreign central banks still had to intervene to maintain their fixed rates, which meant that they once again accumulated large amounts of dollars. *Id.* Gold prices rose to $60 per ounce by mid-1972 and $90 per ounce by early 1973. *Id.* In February 1973, the United States devalued the official rate of the dollar against gold by an additional 10 percent, to $42 per ounce. *Id.* When markets reopened, speculation against the dollar became rampant. *Id.*

By March 1973, the Bretton Woods system had effectively collapsed, with nearly all major currencies floating against the dollar. Humpage. But "no one was sure at the time whether floating exchange rates were to be a temporary aberration or a more long-lasting phenomenon." Solomon 247, 267. Many countries still wanted to return to a fixed-rate exchange system. Solomon 248; James 249.

It was against this backdrop that Congress began debating the bills that ultimately would become the Trade Act of 1974, including what ultimately would become Section 122.

      **c.**      **In 1973, Efforts Toward Legislation to Address Balance of Payments Deficits Began, Resulting in the Trade Act of 1974**

When President Nixon imposed 10 percent tariffs in 1971, his Proclamation invoked the Tariff Act of 1930 and the Trade Expansion Act of 1962, 36 Fed. Reg. at 15,724, but neither of those statutes actually provided authority for those tariffs. *See Yoshida Int'l, Inc. v. United States*, 378 F. Supp. 1155 (Cust. Ct. 1974) (*Yoshida I*), *rev'd*, 526 F.2d 560 (C.C.P.A. 1975) (*Yoshida II*).[3] The provisions that became Section 122 were designed to formalize statutory authority for tariffs to address foreign-exchange issues and to place guardrails on such tariffs.

In April 1973, the Nixon Administration submitted a proposed bill to the House of Representatives that ultimately would become the Trade Act of 1974. H.R. 6767, 93d Cong. (as introduced by House Apr. 10, 1973) (Muqaddam Decl. Ex. 2); *see The Trade Reform Act of 1973: Hearings on H.R. 6767 Before the H. Comm. on Ways & Means*, 93d Cong. 1 (1973) (*H.R. 6767 Hearings*) (discussing how H.R. 6767 was a Nixon Administration proposal). One section of the bill was a precursor to Section 122 that authorized the President to impose a "temporary import surcharge," i.e., tariffs, "[w]henever the President determines that special import measures are required to deal with the United States balance-of-payments pension [sic] in the presence of a serious balance-of-payments deficit or a persistent surplus[.]" H.R. 6767, § 401(a) (Ex. 2 at 64:5-

---

[3] In July 1974, the Customs Court held that the Nixon shock tariffs were invalid. *Yoshida I*, 378 F. Supp. at 1175-76. In November 1975, the Court of Customs and Patent Appeals affirmed that neither the Tariff Act of 1930, 19 U.S.C. ch. 4, nor the Trade Expansion Act of 1962, 19 U.S.C. ch. 7, authorized the tariffs. *Yoshida II*, 526 F.2d at 572. However, the court accepted the Government's post hoc argument that the tariffs were authorized under the Trading With the Enemy Act of 1917, 50 U.S.C. ch. 53—an act that Nixon's proclamation had never invoked— which gave the President the authority in certain circumstances to "regulate … importation," *Yoshida II*, 526 F.2d at 573-83. In 2026, the Supreme Court held that the language "regulate … importation" in IEEPA (the statute to which the language was moved in 1977) does *not* authorize tariffs. *Learning Res.*, 2026 WL 477534, at *11.

9).[4] The Nixon Administration stressed that the reason for these tariffs was inflexible currency exchange rates, and that more flexible exchange rates would obviate the need for tariffs. As President Nixon's Executive Director of the Council on International Economic Policy stated to Congress, "we have, during the last 18 months, together with our trade partners, twice revised the exchange rates for the world's currencies to make our products more competitive, both at home and abroad. The results of those changes have not yet been fully felt, but they will be felt increasingly as time passes. A more flexible monetary system will help to assure balance in the system and that equilibrium is reached in our own accounts as well as in the accounts of others." *The Trade Reform Act of 1973: Prepared Statements of Administration Witnesses Submitted to the H. Comm. on Ways & Means*, 93d Cong. 127 (1973). In hearings, the House Ways and Means Chairman and Treasury Secretary agreed that the "more appropriate" way to address balance of payments deficits would be "to change the exchange rate" (which is what would occur in a floating-rate system) rather than impose tariffs. *H.R. 6767 Hearings* 301.

Following the hearings on H.R. 6767, the House Ways and Means Committee revised the Nixon Administration's bill and, in October 1973, reintroduced it as H.R. 10710. H.R. 10710, 93d Cong. § 122 (as introduced by House Oct. 3, 1973) (Muqaddam Decl. Ex. 3). Critically, in the revised bill, Congress added new constraints on the tariffs being contemplated. *See id*. Exs. 2, 3. The bill included additional provisions. It introduced a new prerequisite that "fundamental international payments problems require special import measures to restrict imports" before measures like tariffs could be imposed. Ex. 3 at 16:17-19. The bill also required that balance of

---

[4] In addition to tariffs, H.R. 6767 also included import quotas as a possible measure, as has every successive version of the bill and the ultimately-enacted Section 122(a). H.R. 6767, § 401(a)(1)(B). Because the Section 122 Proclamation does not impose any quotas, this brief omits discussion of the quota provisions for simplicity.

payments deficits be "large" as well as serious, *id.* 16:20-21, and limited tariffs to 15 percent for a maximum of 150 days (unless further authorized by Congress), *id.* 17:1-7.

The bill also separated the provisions addressing balance of payments deficits, *id.* 16:17-21, and balance of payments surpluses, *id.* 17:19-23, and introduced a separate triggering condition, an imminent and significant depreciation of the dollar in foreign-exchange markets, *id.* 16:22-23.

The accompanying House Report explained that the Committee "believes that this authority could prove useful in those unusual circumstances where such restraints are necessary to deal with serious balance-of-payments problems, but feels that it should be carefully circumscribed." H.R. Rep. No. 93-571, at 28 (1973). The Committee "does not intend that a small or even a large balance-of-payments deficit of short duration would warrant the exercise of the authority under this section." *Id.* at 29. Only "a large and serious deficit that promises to persist over time" would warrant the exercise of this section—and then "even in a situation where use of this authority might be justified, it is contemplated that other corrective measures will be considered before this authority is exercised." *Id.*

### 3.    The Trade Act of 1974 is Enacted

As the world continued with floating exchange rates, "the overall balance of payments ha[d] become less important," as the Nixon Administration confirmed in its annual economic report to Congress in February 1974. *Economic Report of the President* 193 (1974) (*1974 President Economic Report*), https://fraser.stlouisfed.org/title/economic-report-president-45/1974-8145; *see id.* (discussing why balance of payments was significant in a fixed-exchange-rate world but how imbalances are resolved through exchange-rate movements in a floating-exchange-rate world).

At the end of 1974, the Senate Finance Committee took up and revised H.R. 10710. H.R. 10710, 93d Cong. (as passed by Senate, Dec. 13, 1974) (Muqaddam Decl. Ex. 4). The Senate Committee made a number of changes from the House version. Notably, the Committee recognized that the type of scenarios contemplated in H.R. 10710 might not recur, noting that "under present circumstances such authority is not likely to be utilized." S. Rep. No. 93-1298, at 87-88 (1974). But the Committee stated that it was nonetheless codifying this authority into a statute in large part because the Nixon shock tariffs of 1971 had not been authorized by a statute and had been found unlawful by a court, *Yoshida I*, 378 F. Supp. at 1175-76, illustrating the need for such authority to be set forth explicitly in a statute, even if it was "not likely to be utilized" going forward. S. Rep. No. 93-1298, at 88.

The Senate Committee made a number of changes from the House version. *See* Muqaddam Decl. Exs. 3, 4. Perhaps most significantly, the Committee removed presidential discretion and made the import measures (tariffs or quotas, or both) in Section 122(a) presumptively mandatory. S. Rep. No. 93-1298, at 87. Whereas the House version provided that "the President is authorized" to proclaim tariffs or quotas when "the President determines that fundamental international payments problems require special import measures to restrict imports," the Senate struck "the President determines" language entirely and revised "the President is authorized" to read instead that the President "shall" proclaim such measures. *Id.*; Ex. 4 at 36:4-15, 37:5-14. The Committee explained that this change was to provide that "the President would be *required* to impose import restrictions whenever the U.S. faces large and serious balance of payments deficits." S. Rep. No. 93-1298, at 87 (emphasis added).

The Committee also added a new subsection (b) providing that if the President declined to impose such measures, he would be required to "immediately" report to Congress and explain why

he had not done so. Ex. 4 at 38:9-17. Additionally, the Committee revised the preconditions for reducing tariffs or quotas in the prior subsection (b), now redesignated subsection (c). *Id.* 38:18-40:2. Whereas the House version preconditioned reductions on a balance of *payments* surplus, the Senate changed this to a balance-of-*trade* surplus—while leaving subsection (a) as being conditioned on a balance of *payments* (and not balance-of-trade) deficit. *Id.* 38:21:25; S. Rep. No. 93-1298, at 89.

In a joint committee, the House re-revised the length of Section 122(a) measures (which the Senate had revised up to 180 days) back down to 150 days, and otherwise accepted all of the Senate's revisions. H.R. Rep. No. 93-1644, at 27 (1974) (Conf. Rep.). By this time, President Nixon had resigned, and President Ford signed the bill into law on January 3, 1975. Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978 (1975).

### 4.    Since the End of Bretton Woods, the United States Has Never Had Large and Serious Balance of Payments Deficits

Throughout 1974 and 1975, countries continued to discuss reforms to the international monetary system, including the possibility of returning to fixed rates. Solomon 302-18. These negotiations culminated in January 1976, with the entry of what came to be known as the Jamaica Accords, 29 U.S.T. 2203, which amended the IMF Articles of Agreement to formally bring the Bretton Woods system—fixed exchange rates, the official pricing of gold—to an end. *See* Memorandum from Sec'y of Treasury William Simon to President Gerald Ford (Jan. 13, 1976), https://history.state.gov/historicaldocuments/frus1969-76v31/d128; Amendment of Bretton Woods Agreements Act, Pub. L. No. 94-564, 90 Stat. 2660 (1976).

Floating rates have prevailed uninterrupted since then. And the Senate Finance Committee's prediction regarding Section 122 has proved prescient—without fixed rates, "such authority is not likely to be utilized." S. Rep. No. 93-1298, at 88. In the 50 years since the end of

Bretton Woods in 1976, the United States has never had large and serious balance of payments deficits. Such deficits do not arise under the modern floating-exchange-rate system. Irwin Decl. ¶ 11. Instead, as discussed above, any imbalances in payments are resolved through the normal forces of supply and demand operating to adjust currency exchange rates. *Id.* ¶¶ 12-13. There is now no worry that a balance of payments deficit will result in foreign countries accumulating dollars that they can then use to make a run on the United States's gold reserves, as dollars are no longer convertible to gold.

For these reasons, Section 122 has never been invoked in the half century since it was enacted. As was the case with President Trump's IEEPA tariffs, no President has ever proclaimed or imposed any tariffs or quotas under Section 122(a). Nor has any President, including President Trump, ever "immediately" reported to Congress why he had not proclaimed such tariffs or quotas, as he was required by law to do had any fundamental international payments problems requiring special import measures to deal with large and serious balance-of-payments deficits actually ever existed. 19 U.S.C. § 2132(b). Simply put, as both Congress and the President predicted when Section 122 was enacted, with the definitive end of Bretton Woods and the move to a floating-rate exchange system, the preconditions set forth in Section 122(a) have never arisen.

## B.    The Section 122 Orders

In the Section 122 Proclamation issued on February 20, 2026, President Trump imposed tariffs on most imports worldwide based solely on Section 122. These tariffs took effect four days later, on February 24, 2026. In the Section 122 Proclamation, President Trump described four purported grounds for invoking Section 122, which are riddled with omissions and mischaracterizations.

First, he identified the United States' "substantial trade deficit." Section 122 Proclamation ¶ 8. Second, he stated that, in 2024, "the annual balance on the United States primary income

turned negative for the first time since at least 1960." *Id.* ¶ 9. Third, he stated that "the balance on secondary income has been persistently in a deficit since the 1960s." *Id.* ¶ 11. President Trump failed to note that the trade deficit, primary income, and secondary income are each only *subcomponents* of the "current account," which is balanced by the United States' financial account surplus.

The key fact that President Trump omitted is that the United States' financial account position, which offsets its trade (and primary and secondary income) deficit for the purpose of balance of payment accounting, has the largest surplus of any country in the world, at approximately $1.13 trillion in 2024.[5] And that surplus has been steadily increasing, mirroring the trade deficit, since 2018. For comparison, in 2024, the country with the next highest financial account surplus was the United Kingdom at approximately $82 billion. *Id.*

President Trump also stated that "the net international-investment position of the United States is in an ongoing decline" and went from negative 41 percent of GDP in the decade 2010-2020 but was negative 90 percent of GDP at the end of 2024. Section 122 Proclamation ¶ 10. President Trump omitted another key fact—that this was largely due to the *strength* of the dollar and the performance of U.S. stocks, as compared to foreign currencies and investments. Net international investment position ("NIIP") measures the difference between the value of U.S.-owned assets abroad and foreign-owned assets in the United States. BEA, *Glossary: International investment position (IIP) of the United States* (Apr. 13, 2018), https://www.bea.gov/help/glossary/ international-investment-position-iip-united-states. NIIP grew more "negative" in large part because "major foreign currencies depreciat[ed] against the U.S. dollar," and because "foreign

---

[5] *Net Financial Account (BoP, current US$) - United States*, World Bank Group: Data, https://data.worldbank.org/indicator/BN.FIN.TOTL.CD?locations=US&most_recent_value_desc =false [https://perma.cc/V4VM-KUES] (last visited Mar. 3, 2026).

stock prices underperformed relative to U.S. stock prices," which comparatively lowered the value of U.S. residents' investments in foreign countries (the "assets" in NIIP) and raised the value of foreign residents' investments in the United States (the "liabilities" in NIIP). *See, e.g.*, BEA, *U.S. International Investment Position, 4th Quarter and Year 2024* (2025), https://www.bea.gov/news/2025/us-international-investment-position-4th-quarter-and-year-2024.

Based on the preceding assertions, Trump determined in the Section 122 Proclamation that he would impose "ad valorem duties," *i.e.*, tariffs, of 10 percent on all (not specifically exempted) imports into the United States for 150 days, effective February 24, 2026. *See* Section 122 Proclamation ¶¶ 13-14, (1). The Proclamation also exempts many goods from Canada, Mexico, Costa Rica, the Dominican Republic, El Salvador, Guatemala, Honduras, and Nicaragua. *Id.* ¶ 14(*l*)-(m). It also includes more than 80 pages of product exceptions. *Id.*, Annexes I, II (91 Fed. Reg. 9345-9432).

### C.     The Harm to States

The Section 122 tariffs have already harmed the States, and they will continue to do so if they remain in place. Those harms fall under three general categories.

First, the tariffs impact Plaintiff States that are importers of record. For example, the University of Washington periodically orders products directly from overseas and pays the applicable duties directly to the United States government through its customs broker. *See* Hsu Decl. (WA) ¶ 5. The University saw its duties payments increase from $18,199.37 (on 93 shipments) in 2024 to $1,019,104.44 (on 130 shipments) in 2025—an over 40-fold increase in average cost per shipment. *Id.* Many of those past tariffs were based on the President's invocation of IEEPA, and the University expects to be subject to similar tariffs under the Section 122 Proclamation. *Id.* ¶ 7. *See also* Mistry Decl. (NJ) ¶¶ 7-10 (describing increased costs for State as an importer of specialized goods).

Second, the Plaintiff States are harmed by the increased costs of goods and equipment as purchasers whose vendors are subject to the Section 122 tariffs. Bennett Decl. (MA) ¶¶ 4-11; Bignami Decl. (CA) ¶¶ 6-7; Bowers Decl. (WI) ¶ 8; Bradley Decl. (CA) ¶¶ 5-6; Edgington Decl. (WI) ¶¶ 5-7; Emerson Decl. (OR) ¶¶ 4-7; Hayes Decl. (MN) ¶¶ 4-14; Hicks Decl. (KY) ¶¶ 3-42; Hsu Decl. (WA) ¶ 6; Jaros Decl. (CO) ¶¶ 6-17; Johnson Decl. (IL) ¶¶ 7-10; Mistry Decl. (NJ) ¶ 6; Mosley Decl. (IL) ¶¶ 4-6; Moy Decl. (NY) ¶¶ 9-11); Newton Decl. (AZ) ¶¶ 4-8; Papadopoulos (OR) ¶¶ 4-10; Shell Decl. (CA) ¶¶ 8-11. As vendors themselves face increased tariff-related costs due to the Proclamation, these costs will be passed forward to the States as purchasers. Binger-Grosjean Decl. (NV) ¶¶ 3-6; Bowers Decl. (WI) ¶ 8 (describing tariff passthrough on invoices); Emerson Decl. (OR) ¶ 7 (describing costs of tariffs passed through to state purchaser by vendors); Guillette Decl. (VT) ¶¶ 4-10 (describing tariff costs imposed on state purchaser by vendors); Johnson Decl. (IL) ¶¶ 7-8 (estimating 12% increase in cost of computer products due to new tariffs being passed through by vendors); Moy Decl. (NY) ¶ 10 (increased cost of imported street sweeper due to similar IEEPA tariffs); Raymond Decl. (CT) ¶¶ 4-7 (describing increased price of required technology purchases due to tariffs); Rowland Decl. (NC) ¶¶ 4-12 (describing tariff passthroughs increasing cost of goods for North Carolina Department of Adult Corrections); *see also* Hines Decl. ¶ 9 (summarizing recent studies of 2025 U.S. tariff increases which concluded that import prices rose "by 95 cents or more for each dollar of tariffs"). In some cases, unexpected tariff costs are impairing state agencies' abilities to replace outdated equipment and provide certain essential government services effectively and efficiently, Johnson Decl. (IL) ¶ 9; Raymond Decl. (CT) ¶ 11, and to fulfill their educational and research missions, Guillette Decl. (VT) ¶ 11.

Even using conservative estimates, the States will face $748 million in additional costs per year due to increases in direct purchasing costs related to the Section 122 tariffs. Hines Decl. ¶ 18.

Significantly, because the States are not the importers of record for many purchases, they would not be clearly entitled to reimbursement if the Section 122 Tariffs were declared unlawful.

Lastly, the imposition of the Section 122 tariffs is severely harming States' ability to carry out various administrative duties, causing burdens and delays. The States are faced with challenges of trying to track constantly changing tariffs and, where possible, verifying, reviewing, and approving vendors' and contractors' requests for pricing increases due to these increased tariffs. Jaros Decl. (CO) ¶ 22; Rowland Decl. (NC) ¶ 7. Reviewing each purchase and negotiating with vendors and suppliers would be administratively infeasible and impose additional, irrecoverable costs to the States. Hayes Decl. (MN) ¶ 16; Shell Decl. (CA) ¶ 14; *see also infra* § V.C.1.a.

Moreover, the shifting tariffs will hamper the States' abilities to plan and to budget their limited resources accurately. Ambrosier Decl. (MI) ¶¶ 9-13; Emerson Decl. (OR) ¶¶ 8-10; Guillette Decl. (VT) ¶¶ 12-16; Hicks Decl. (KY) ¶¶ 43-48; Jaros Decl. (CO) ¶¶ 18-21; Johnson Decl. (IL) ¶¶ 11-13; Mistry Decl. (NJ) ¶¶ 16-20; Newton Decl. (AZ) ¶¶ 18-24; Raymond Decl. (CT) ¶¶ 8-12; Rowland Decl. (NC) ¶¶ 13-17; Papadopoulos (OR) ¶¶ 11-13; Shell Decl. (CA) ¶¶ 18-20. Plaintiff States are unable to engage in basic budget forecasting without the order and predictability that the Proclamation has upended.

## III.    LEGAL STANDARDS

### A.    Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." U.S. Ct. Int'l Trade R. 56(a).

### B.    Preliminary and Permanent Injunction

"Under 'well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.'" *V.O.S. Selections, Inc. v.*

*Trump*, 149 F.4th 1312, 1339 (Fed. Cir.) (*V.O.S. II*) (quoting *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006)). "The four factors a plaintiff must establish to secure a permanent injunction are: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be dis-served by a permanent injunction." *Id*. (quotation marks omitted).

"The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success." *Amoco Production Co. v. Gambell*, 480 U.S. 531, 546 n.12 (1987). "[N]o one factor, taken individually, is necessarily dispositive, because the weakness of the showing regarding one factor may be overborne by the strength of the others." *Ugine & Alz Belg. v. United States*, 452 F.3d 1289, 1292-93 (Fed. Cir. 2006) (internal quotation marks omitted); *Best Mattresses Int'l Co. v. United States*, 557 F. Supp. 3d 1338, 1343 (Ct. Int'l Trade 2022). While the plaintiff must show at least a "fair chance of success on the merits," "the more the balance of irreparable harm inclines in the plaintiff's favor, the smaller the likelihood of prevailing on the merits he need show." *Aluminum Extrusions Fair Trade Comm. v. United States*, 607 F. Supp. 3d 1332, 1339 (Ct. Int'l Trade 2022) (internal quotation marks omitted).

The standard for a stay of agency action pursuant to 5 U.S.C. § 705 (which here would have the same practical effect as a preliminary injunction) is the same as the standard for a preliminary injunction. *Afr. Communities Together v. Lyons*, 799 F. Supp. 3d 362, 382 (S.D.N.Y. 2025) (citing *Eastern Air Lines v. Civil Aeronautics Board*, 261 F.2d 830, 830 (2d Cir. 1958)).

IV.    **ARGUMENT**

A.    **The Section 122 Tariffs Are Unlawful**

The States are likely to succeed on the merits of their claims that the Section 122 Orders are unlawful. The facts recited in the President's Proclamation—and current economic conditions—do not meet the requirements for Section 122 to authorize tariffs at all. But even if they did, the Section 122 Orders would not be lawful.

1.    **The President Cannot Invoke Section 122 Under Present Circumstances**

"The power to impose tariffs is very clearly a branch of the taxing power." *Learning Res.*, 2026 WL 477534, at *7 (citation modified). The Framers "did not vest any part of the taxing power in the Executive Branch." *Id.* Rather, "[t]he whole power of taxation rests with Congress." *Id.* "When Congress has delegated its tariff powers, it has done so in explicit terms, and subject to strict limits." *Id.* at *8 (Roberts, C.J., plurality). "And it has conditioned exercise of the tariff power on demanding procedural prerequisites." *Id.* "To make use of such delegated power, the President would of course be required to proceed strictly in accordance with the procedures specified in the statutes conferring the delegation." *Consumers Union of U.S., Inc. v. Kissinger*, 506 F.2d 136, 142-43 (D.C. Cir. 1974).

Section 122(a) sets out strict preconditions: as relevant here, it applies only "[w]henever fundamental international payments problems require special import measures to restrict imports—(1) to deal with large and serious United States balance-of-payments deficits." 19 U.S.C. § 2132(a). No fundamental international payments problems exist, nor do any such nonexistent problems require special import measures to restrict imports to deal with large and serious balance of payments deficits. Section 122(a) thus provides the President with no authority to impose tariffs

here. In the absence of any statutory authority, the President's tariffs are an unlawful exercise of the tariff power that the Constitution vests solely in Congress.

The President's tariffs are also ultra vires. They "extend beyond delegated statutory authority" and "implicate constitutional concerns." *Murphy Co. v. Biden*, 65 F.4th 1122, 1129, 1131 (9th Cir. 2023); *see also Nuclear Regul. Comm'n v. Texas*, 605 U.S. 665 (2025).

###### a.    No "Fundamental International Payments Problems Requir[ing] Special Import Measures to Restrict Imports" Exist

The Proclamation cites four deficit calculations as its basis for invoking Section 122(a). As discussed below, none of these claimed deficits constitute "large and serious balance-of-payments deficits." But even assuming (counterfactually) that they did, the existence of large and serious balance of payments deficits would not, on its own, be sufficient to trigger Section 122(a). Instead, Section 122(a) also sets a precondition that there be "fundamental international payments problems," and that those payment problems "require special import measures to restrict imports to deal with" the supposed large and serious balance-of-payment deficits, before any tariffs can be imposed. No such fundamental international payments problems requiring import restrictions exist.

At the outset, it is important to note two aspects of this "fundamental international payments problems requir[ing] special import measures to restrict imports" precondition. First, it is a separate and additional precondition on top of the requirement for "large and serious balance-of-payments deficits." The original proposed bill that ultimately gave rise to Section 122(a) did not include this precondition—but Congress affirmatively added it, and Congress's decision to do so must be given effect. *See supra* § II.A.2.c; *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (courts must "give effect, if possible, to every clause and word of a statute" and not "treat statutory terms as surplusage"). Second, the President does not have discretion to determine when the precondition

is satisfied. This is made clear by the statutory language and legislative history: the House draft bill conditioned Section 122(a) and 122(c) on when "*the President determines* that fundamental international payments problems require special import measures" to decrease or increase imports, respectively—but Congress ultimately removed "the President determines" from Section 122(a), but not Section 122(c), to remove presidential discretion with respect to determining when the former precondition arises. *See supra* § II.A.3; *Me. Cmty. Health Options v. United States*, 590 U.S. 296, 314 (2020) ("[W]hen Congress includes particular language in one section of a statute but omits it in another, Congress intended a difference in meaning.") (quotation marks omitted).

Turning to the substance of the precondition, as Section 122 does not define "fundamental international payments problems," courts must look to its plain language and legislative purpose. *Mosaic Co. v. United States*, 160 F.4th 1340, 1346-47 (Fed. Cir. 2025).

Fundamental international payments problems might have been a threat under the archaic Bretton Woods system. At the time, the United States had undertaken an obligation to convert dollars held by foreign central banks into gold, but it did not actually have enough gold to deliver on that obligation. Now, however, no such fundamental international payments problems exist. The United States has never defaulted on its obligations or failed to make any payments it owes. *See, e.g.*, *Nat'l Ass'n of Gov't Emps., Inc. v. Yellen*, 120 F.4th 904, 908, 910-11 (1st Cir. 2024) (discussing how United States has never defaulted on its obligations and how claim that it might default is "speculative" and "entirely conjectural") (citing *Williams v. Lew*, 819 F.3d 466, 473 (D.C. Cir. 2016)). Foreign investors continue to have confidence in the United States to pay its obligations, as evidenced by their continued investments and financial inflows to the United States, as reflected in the financial account. *See* Irwin Decl. ¶¶ 9, 14-15. The Proclamation claims that the United States runs certain deficits, but *deficits* are not fundamental international *payments*

problems. *See Me. Cmty. Health*, 590 U.S. at 308 (discussing, in context of agency deficits, how "[i]ncurring an obligation, of course, is different from paying one"). To equate supposed "balance-of-payments deficits" with "fundamental international payments problems" would render the latter superfluous, in violation of the rules of statutory construction. *Id.* at 314. Congress expressly drafted Section 122(a) to make "fundamental international payments problems" a separate precondition—one that is not satisfied here.

Further, even if any fundamental international payments problems were to exist, this alone would not be sufficient to trigger Section 122(a)—those problems also must "require special import measures to restrict imports." As Congress understood at the time, special import measures would not be necessary under a floating-exchange-rate system instead of a fixed-exchange-rate one. *See, e.g.*, *H.R. 6767 Hearings* 300-01 (Treasury Secretary and House Ways and Means Chairman agreeing that "chang[ing] the exchange rate" would address payments problems); *1974 President Economic Report* 193 ("In a world characterized by the managed floating of exchange rates, measurement of the overall balance of payments has become less important."); S. Rep. No. 93-1298, at 88 (recognizing that Section 122(a) authority "is not likely to be utilized"); *see also Mosaic*, 160 F.4th at 1347 (courts can turn to legislative purpose of statutory provision to construe it); *Guerrero-Lasprilla v. Barr*, 589 U.S. 221, 231-34 (2020) (looking to statutory history to interpret statutory provision). The world now operates under precisely that floating-exchange-rate system. Even assuming large and serious balance of payments deficits existed, there are no "fundamental international payments problems" that "require special import measures to restrict imports" to deal with them.

### b.    No "Large and Serious Balance-of-Payments Deficits" Exist

In any event, there are no large and serious balance of payments deficits. As discussed above, balance of payments refers to the measure of the United States's reserve assets against

certain claims on the United States by foreign official monetary institutions. *See, e.g.*, *1974 President Economic Report* 193. This measurement was significant in the Bretton Woods era of fixed exchange rates, but has much less importance in the era of floating rates, as the drafters of Section 122 well understood. *See id.*; S. Rep. No. 93-1298, at 88 (recognizing that Section 122(a) authority "is not likely to be utilized").

The Proclamation cites three claimed deficits or declines: a trade deficit, a primary-income deficit, and a secondary-income deficit. Section 122 Proclamation ¶¶ 8-9, 11. None of these, however, are *balance of payments* deficits. In particular, a trade deficit is not a balance of payments deficit. Congress expressly distinguished between the balance of trade and the balance of payments in Section 122(a)(1) and (c)(1)—the two are not equivalent. *See supra* § II.A.1; *Me. Cmty. Health*, 590 U.S. at 314 (when Congress uses different language in the same statute, Congress intends a difference in meaning); *accord* Reply Br. 13-14, *V.O.S. Selections, Inc. v. Trump*, No. 25-1812 (Fed. Cir. July 18, 2022), ECF No. 147 (government agreeing that "trade deficits[] are conceptually distinct from balance-of-payments deficits"); Reply Br. 19, *Learning Res., Inc. v. Trump*, No. 25-5202 (D.C. Cir. Aug. 18, 2025), Doc. No. 2130706 (same). Trade, primary-income, and secondary-income deficits are all just components of the current account, which itself is a component—but not the entirety—of the full balance of payments. These components are balanced by the financial account, which the Proclamation ignores entirely.[6]

---

[6] In *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025) (*V.O.S. I*), *aff'd in relevant part, V.O.S. II*, 149 F.4th 1312, *aff'd sub nom. Learning Res.*, 2026 WL 477534, this Court agreed that the balance of payments includes not just transactions in goods and services (i.e., the balance of trade) but also includes transactions in income, assets, and liabilities, which balance out to zero. *V.O.S. I*, 772 F. Supp. 3d at 1375. The Court also wrote that because the full balance-of-payments balances out to zero, "balance-of-payments deficits," as used in Section 122(a), must refer to subcomponents of the balance of payments and can refer to the balance of trade. *Id.* But Congress expressly distinguished between the balance of payments and balance of

The Proclamation also cites the United States's net international-investment position of the United States. Section 122 Proclamation ¶ 10. But this is not a balance of payments deficit either. Instead, it is an entirely different metric. As discussed above, *see supra* § II.B, NIIP simply measures the difference between U.S. residents' foreign financial assets and liabilities and also reflects changes in asset prices, such as stock-market appreciation, which are not payments at all. Irwin Decl. ¶ 35. NIIP is not a balance of payments. And the increase in "negative" NIIP does not reflect fundamental international payments problems; to the contrary, it reflects the *strength* of the dollar and the *out*performance of U.S. stocks relative to foreign currencies and investments.

There are no actual large and serious balance of payments deficits, and the President may not substitute other deficit figures for the one that Congress wrote into Section 122(a). Because the Section 122(a) preconditions have not been satisfied, the President has no authority to impose tariffs under Section 122(a).

---

trade, confirming that the two are not interchangeable. *Compare* 19 U.S.C. § 2132(a)(1) *with id.* § 2132(c)(1).

Rather, as four judges of the Federal Circuit explained, the balance of trade (on the import and export of goods and services) is "just one part of the set of transactions covered by the overall balance of payments, which also includes …. capital investments (on the transactions side of the ledger) and payments (on the payments side)." *V.O.S. II*, 149 F.4th at 1373 & n.11 (Taranto, J., joined by Moore, C.J., Prost and Chen, JJ., dissenting). Neither the *V.O.S. II* majority nor *Learning Resources* disagrees with these judges' detailed balance of payments analysis. As they explained, balance of payments problems are "a subset of 'fundamental international payments problems,'" which "concern the payments (financial cash) side of the accounting statement, which involves the reserves of currencies (or their substitutes like gold) and the operation of foreign-exchange markets[.]" *Id.* at 1373-74 & nn.11-14; *accord* Irwin Decl. ¶¶ 17-24. The fact that such problems do not arise in the modern floating-exchange-rate system and that balance of payments balance out to zero, *V.O.S. I*, 772 F. Supp. 3d at 1375, simply reflect how Congress was correct when it predicted that Section 122(a) "is not likely to be utilized." S. Rep. No. 93-1298, at 88.

### c.    Section 122(a), Which is Presumptively Mandatory, Has Never Been Invoked Before Now

Congress expressly provided that Section 122(a) is presumptively mandatory. When the Section 122(a) preconditions arise, the President does not have discretion as to whether to impose tariffs and/or quotas or not. Instead, Congress specifically rewrote Section 122(a) to provide that the President "shall" proclaim tariffs and/or quotas, or else "immediately" report to Congress why he has not done so. 19 U.S.C. § 2132(a)-(b); *see supra* § II.A.4; *see also Me. Cmty. Health*, 590 U.S. at 310-11 ("'[S]hall' imposes a mandatory duty.").

Despite this requirement, as noted above, no President in history, including President Trump prior to February 20, 2026, has ever proclaimed tariffs or quotas under Section 122(a). Nor has any President ever reported to Congress why he has not done so.

The fact that no previous President has ever treated the conditions cited in the Proclamation as triggering Section 122(a) shows that those conditions do not actually meet the statute's requirements. *See, e.g.*, *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 386 (2024) ("[T]he longstanding practice of the government … can inform a court's determination of what the law is.") (citation modified); *Learning Res.*, 2026 WL 477534, at *11 ("[T]he fact that no President has ever found such power in [claimed tariff statute] is strong evidence that it does not exist."). Rather, the President's decision to invoke Section 122(a) as the justification for tariffs now—the same day his IEEPA tariffs were struck down—simply represents another attempt to misconstrue a statute and claim tariff authority that he does not actually have.

### 2.    The Section 122 Orders Violate Section 122's Limitations

In addition to failing to meet the preconditions of Section 122(a), the Section 122 Proclamation violates two other requirements: Section 122(d)'s nondiscrimination requirement and Section 122(e)'s uniformity requirement. In aggregate, the Proclamation's country and product

exclusions exempt more than half of all imports from the Section 122 tariffs. Hines Decl. ¶ 18. These are not only independent violations of Section 122(d) and 122(e); they also underscore that the Proclamation was not instituted because "fundamental international payments problems require special import measures to restrict imports," 19 U.S.C. § 2132(a).

### a. The Proclamation Violates Section 122's Nondiscrimination Requirement

Section 122(d)(1) provides that "import restricting actions proclaimed pursuant to subsection (a) shall be applied consistently with the principle of nondiscriminatory treatment." 19 U.S.C. § 2132(d)(1). In turn, the Trade Act defines "nondiscriminatory treatment" as "trade treatment based on normal trade relations (known under international law as most-favored nation treatment.)." 19 U.S.C. § 2481(9). "The status quo under normal trade relations is equal tariff treatment of similar products, irrespective of country of origin." *Transpacific Steel LLC v. United States*, 466 F. Supp. 3d 1246, 1258 (Ct. Int'l Trade 2020) (citing 19 U.S.C. § 1881), *rev'd on other grounds,* 4 F.4th 1306 (Fed. Cir. 2021)[7]; *see also Novolipetsk Steel Public Joint Stock Co. v. United States*, 456 F. Supp. 3d 1300, 1304 n.5 (Ct. Int'l Trade 2020) (permanent normal trading relations or "PNTR" is "a legal designation, indicating that the United States has extended 'most-favored nation' to a trading partner" (internal citations omitted)).

Section 122(d) does not, by its terms, permit singling out particular countries or trading partners for differential treatment. Rather, any "import restricting actions" taken under Section 122(a) "shall be applied consistently" to trading partners. Section 122(d)(2) provides the only exception to Section 122(a)'s directive: "If the President determines that the purposes of this

---

[7] Subject to specified exceptions, 19 U.S.C. § 1881, titled "normal trade relations," provides that "any duty or other import restriction or duty-free treatment proclaimed in carrying out any trade agreement" under 19 U.S.C. ch. 7, subch. II, or 19 U.S.C. § 1351 (titled "trade agreements") "shall apply to products of all foreign countries, whether imported directly or indirectly."

section will best be served by action against one or more countries having large or persistent balance-of-payments surpluses, he may exempt all other countries from such action."

The Section 122 Proclamation's imposition of tariffs does not comport with Section 122(d) and the principle of "nondiscriminatory treatment." Although it announces a 10 percent "temporary import surcharge" on articles imported into the United States, it provides many exceptions. It expressly excepts "articles that are entered free of duty as a good of Canada or Mexico under the terms of general note 11 to the Harmonized Tariff Schedule of the United States (HTSUS)." Section 122 Proclamation ¶ 14(*l*). The Proclamation also excepts "textile and apparel articles that are entered free of duty as a good of Costa Rica, the Dominican Republic, El Salvador, Guatemala, Honduras, or Nicaragua under the Dominican Republic-Central America Free Trade Agreement." *Id.* ¶ 14(m). The U.S. does have free trade agreements with these countries. However, the U.S. also has free trade agreements with many other countries, including Australia, Chile, Morocco, and South Korea, to name a few. But the Section 122 Proclamation does not except or exempt any of those other trading partners from the tariffs.

But even if the Proclamation exempted all of the U.S.'s free trade agreement partners from the Section 122 tariffs, such action would violate Section 122(d). Section 122(d) requires that any "import restricting actions" taken pursuant to Section 122(a) are to be applied "consistently with the principle of nondiscriminatory treatment." By defining "nondiscriminatory treatment" to encompass NTR (or MFN), the Trade Act requires trading partners to provide "equal tariff treatment of similar products, irrespective of country of origin." *Transpacific Steel*, 466 F. Supp. 3d at 1258. To be sure, Section 122(d)(2) provides a statutory exception to the general rule of nondiscriminatory treatment, to allow the President to take "action against one or more countries having large or persistent balance-of-payments surpluses." Accordingly, consistent with Sections

30

122(d)(1) and (d)(2), the President could, theoretically, impose temporary tariffs on one or more specified countries with such "large or persistent balance-of-payment surpluses." Although the Proclamation identifies countries that are exempt—or partially exempt—from the tariffs, it makes no country-specific determinations about any "large or persistent" balance of payments surpluses about the countries that remain subject to the new tariffs. Nor does the Proclamation explain how the new tariffs will address any purported balance of payments surpluses with those countries.

Thus, even if the President's decision to impose these new tariffs on nearly all of the U.S.'s trading partners could be considered a targeted action aimed at addressing those countries' specific balance of payments surpluses, the Section 122 Proclamation does not do so based on the sole permissible statutory criterion—*viz*., country-specific "large or persistent balance-of-payments deficits." 19 U.S.C. § 2132(d)(2). Section 122(d) prohibits that which the Section 122 Proclamation purports to do—that is, imposing tariffs on *all* countries but then exempting a select few trading partners for unspecified reasons. Such an action violates Section 122's incorporation of the well-established principle of normal trading relations.

**b.    The Proclamation Violates Section 122's Uniformity Requirement**

Similarly, Section 122(e) generally requires that tariffs imposed under Section 122 "shall be of broad and uniform application with respect to product coverage." 19 U.S.C. § 2132(e). Despite this requirement, the Proclamation lists more than 80 pages of product exclusions based on the President's determination "that certain articles should not be subject to import restricting actions because of the needs of the United States economy." *Id.* But that exemption authority is limited by the clause that proceeds it: it may only be invoked "consistent[] with the purposes of this section." *Id.* Here, given the baseline requirement for "broad and uniform application" and

31

Section 122(a)'s purpose to address fundamental international payments problems, *see supra* § IV.1.a, the breadth of the product exclusions exceeds the limited grant of authority.

The stark departure from "broad and uniform application" is not "consistent[] with the purposes" of Section 122. 19 U.S.C. § 2132(e). Section 122 is available only when "fundamental international payments problems require special import measures to restrict imports." 19 U.S.C. § 2132(a). That is, as Section IV.A.1.a explains, the purpose of Section 122(a)'s countermeasures is to address international monetary exchange problems. In modern trade, of course, all products are purchased with currency. Any exclusion of a particular product undermines the amount of trade impacted by the "special import measures" (here, tariffs). For that reason, the statutory design and the legislative history both make clear that Congress intended any tariffs imposed under Section 122 to be across a broad range of products with limited exceptions. Cumulatively, the magnitude of the exclusions here demonstrate that the Proclamation does not uphold the purposes of the Section 122 authority: to rectify balance of payments deficits.

### 3. U.S. Customs and Border Protection (CBP) Enforcement of the Section 122 Orders Exceeds Statutory Authority.

Plaintiff States are also likely to prevail on the merits of their Administrative Procedure Act (APA) claim. Under the APA, a reviewing court must "hold unlawful and set aside agency action" when that action is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). "No language in the APA prevents or excepts review of an agency action that implements a presidential action. Thus, as a textual matter, final agency actions, even if implementing an executive order, are subject to judicial review under the APA." *State v. Su*, 121 F.4th 1, 15 (9th Cir. 2024) (citations omitted); *accord In re Section 301 Cases*, 570 F. Supp. 3d 1306, 1324 (Ct. Int'l Trade 2022) (applying same principle); *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 773 (9th Cir. 2018) (same). Because the CBP's Cargo Systems

Messaging Service Guidance implementing the Section 122 Proclamation violates the requirement of Section 122, it is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). For that reason, this Court should stay, vacate, and set aside CSMS # 67844987, which implements the Section 122 Proclamation. Imposing Temporary Section 122 Duties, CSMS No. 67844987 (U.S. Customs & Border Prot. Feb. 23, 2026).

### B.    The States Have Standing to Sue

Plaintiff States have standing to challenge the Section 122 Tariff Orders, because the orders are causing, and will continue to cause, economic harm to Plaintiff States' governments. That economic harm is "a concrete and particularized injury that is either actual or imminent"; the harm is "fairly traceable" to Defendants' issuance, implementation, and enforcement of the Section 122 Tariff Orders; and "it is likely that a favorable decision will redress that injury" by enjoining the implementation and enforcement of the tariffs. *See Massachusetts v. EPA*, 549 U.S. 497, 517.

First, Plaintiff States are direct importers of tariffed goods. *See supra* § II.C. As the Court explained in the IEEPA litigation (quoting a concession from the federal government's own briefing), "importers who have personally paid tariffs … have standing to challenge tariffs." *V.O.S. I*, 772 F. Supp. 3d at 1369 (citation omitted). That is true for a State entity as for any importer. *See id.* (citing *Biden v. Nebraska*, 600 U.S. 477, 489 (2023)). And an "importer's allegation that it pays unlawful U.S. duties 'typically would satisfy constitutional standing requirements.'" *Id.* (quoting *Totes-Isotoner Corp. v. United States*, 594 F.3d 1346, 1351 (Fed. Cir. 2010)). That can be the end of the inquiry, because the Court need only find that one Plaintiff State has standing for this suit to proceed. *See id.* (citing *Biden v. Nebraska*, 600 U.S. at 489).

Second, Plaintiff States also have standing as "non-importer plaintiff[s]" experiencing pecuniary harms, because courts can "'fairly employ economic logic' to establish a concrete and particularized injury-in-fact that is fairly traceable to a challenged tariff. *Id.* at 1367 (quoting

*Canadian Lumber Trade All. v. United States*, 517 F.3d 1319, 1333 (Fed. Cir. 2008)). As in the IEEPA litigation, Plaintiff States have standing as non-importers because the Section 122 tariffs are creating actual and imminent economic injuries by increasing the costs of goods and services, and "'this injury would be prevented by a declaratory judgment and injunction' setting that tariff aside." *Id.* (quoting *Canadian Lumber*, 517 F.3d at 1334).

The uncertainty of the costs associated with Section 122 Tariffs is also ongoing, and their unpredictable nature hampers the States' ability to budget, to plan, and to negotiate contracts. *See supra* § II.C. This Court has recognized similar harms as not only actual or imminent harm, but also as irreparable. *See Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1291 (Ct. Int'l Trade 2019), *modified,* 476 F. Supp. 3d 1323 (Ct. Int'l Trade 2020) ("The [challenged tariff decision] causes irreparable harm by eliminating the business certainty required by the solar industry to plan and develop future projects.").

These injuries can be stopped by an order enjoining the implementation and enforcement of those tariffs. Redressability, like traceability, "can be established even if the injury is indirect." *Id.* at 1274. The fact "that actions of third parties may redress part of the alleged injury is not a conclusive bar to standing." *Id.* Redressability is satisfied when a third party "is likely to respond to the government's conduct in a way that causes the plaintiff's injury to be redressed." *Nat. Res. Def. Council, Inc. v. Ross*, 331 F. Supp. 3d 1338, 1357 (Ct. Int'l Trade 2018) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992)). Enjoining the Section 122 Tariffs would remedy the economic harm to Plaintiff States by eliminating the tariff costs that they are paying as direct importers, and that other importers are passing on to the States, as well as the uncertainties caused by changing tariffs.

### C.    The Other Factors Favor a Permanent or Preliminary Injunction

#### 1.    Plaintiff States Will Suffer Irreparable Harm

Absent an injunction, the Section 122 Tariffs will irreparably harm Plaintiff States. State agencies and universities are already incurring additional costs due to tariffs and will continue incurring more costs if the tariffs remain in place or increase. Further, President Trump's misuse of Section 122 to impose tariffs—and the confusion generated by his additional threats to modify and escalate those tariffs—has wrought significant uncertainty for state agencies and universities budgeting the costs of providing vital public services.

"Irreparable harm is that harm that cannot be reasonably redressed in a court of law." *Am. Frozen Food Inst., Inc. v. United States*, 855 F. Supp. 388, 394 (Ct. Int'l Trade 1994). "In evaluating irreparable harm, the court must consider the magnitude of the injury, the immediacy of the injury, and the inadequacy of future corrective relief." *Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. United States*, 393 F. Supp. 3d 1271, 1276 (Ct. Int'l Trade 2019) (citation modified). Courts generally give greater weight to the latter two factors. *Id.* Each of those factors supports a showing of irreparable harm here.

##### a.    Recovery of "Tariff Surcharges" Paid by Third Parties Could be Infeasible

As the experience with IEEPA tariffs has proven, States will be harmed by paying more for goods, equipment, and services where third parties must pay the tariffs. And it will likely be infeasible for Plaintiff States to recover all of the costs.

It has long been accepted that a plaintiff challenging the validity of a tariff action can point to the "economic logic" of cost increases caused by the tariff to demonstrate imminent economic harms. *See, e.g., V.O.S. I*, 772 F. Supp. 3d at 1367-68; *Invenergy*, 422 F. Supp. 3d at 1273. This clear economic logic has been borne out by the IEEPA tariffs. According to CBP, "the total amount

of IEEPA duties and estimated duty deposits collected pursuant to IEEPA [was] approximately

$166 billion," involving duties paid by "over 330,000 importers" in over 53 million transactions.

*See* Decl. of Brandon Lord ¶ 12, *Atmus Filtration, Inc. v. United States*, No. 26-01259 (Ct. Int'l

Trade, March 6, 2026), ECF No. 31 ("Lord Decl."). Economists have confirmed that these costs

were passed through to purchasers of imported goods through significant price hikes. Yale's

Budget Lab estimates that, as of December 2025, more than 76 percent of tariff costs were

ultimately paid by American consumers in downstream price increases. *See* Yale Budget Lab,

*Tracking the Economic Effects of Tariffs* (Mar. 2, 2026), https://budgetlab.yale.edu/research/

tracking-economic-effects-tariffs. Plaintiff States, like other purchasers of imported goods, were

harmed by these price increases—and will be harmed by the comparable price increases stemming

from the new Section 122 tariffs.

These statistics are borne out by the real experience of Plaintiff States, who paid more for

goods due to the IEEPA tariffs. *See supra* § II.C (detailing increased state costs related to IEEPA

tariffs); *see also* Hines Decl. ¶¶ 6-9, 10-18 (explaining how tariffs drive up the cost of imported

goods, and how these costs are borne by State governments). Plaintiffs anticipate similar costs

under these new Section 122 tariffs. *E.g.,* Ambrosier Decl. (MI) ¶ 7; Bowers Decl. (WI) ¶¶ 8-10

(describing ongoing need for replacement parts that were subject to tariff passthroughs in 2025);

Johnson Decl. (IL) ¶¶ 7-10 (projecting higher costs for imported computer equipment due to new

tariffs); Moy Decl. (NY) ¶ 11 (estimating roughly $38 million in costs for New York State agencies

based on a 10 percent tariff imposed under Section 122); Raymond Decl. (CT) ¶ 5 (estimating

approximately $2.25 million in increased computer equipment costs based on prior experience).

Once vendors and contractors have passed tariff costs on to Plaintiff States in the form of

increased prices, it is extremely difficult for Plaintiff States to recover those costs. Even if this

Court ultimately holds that the tariffs are unlawful, Plaintiff States have no efficient legal remedy against vendors, contractors, or importers to recover paid tariff surcharges or negotiated price increases. Plaintiff States, including their various agencies and universities, make a large number of purchases each year and engage various service contractors for an array of purposes. Mosley Decl. (IL) ¶¶ 3-6; Raymond Decl. (CT) ¶¶ 4-7. Auditing every vendor's price adjustment to ensure that it is reasonably based on tariff-related costs is difficult and involves substantial administrative costs. Jaros Decl. (CO) ¶ 22; Rowland Decl. (NC) ¶ 7. Indeed, many of the tariff-based costs that vendors and contractors pass on to States could themselves be based on costs that importers or other vendors have incurred and passed along the supply chain. Hines Decl. ¶ 14. For Plaintiff States to calculate and verify every tariff-based cost passed on to them, identify the vendors, contractors, or importers from whom to seek repayment, and then somehow force each of those parties to repay those costs would not be practicable.

Again, the experience with IEEPA is instructive. The federal government has acknowledged its legal obligation to refund these tariffs with interest. *E.g.*, Lord Decl. ¶ 20. But the process for refunding IEEPA tariffs to direct importers has proven predictably difficult and costly due to the "unprecedented volume of refunds" necessitated by the President's unlawful tariff orders. *Id.* ¶ 17. CBP has told another judge of this Court that it is unable to comply with a recent court order, and that tariff refunds will be delayed for months due to the overwhelming staffing and logistical demands that the refund process will require. *See generally id.* Meanwhile, as noted above, there is no clear mechanism at all for purchasers of imported goods (including Plaintiff States) to be reimbursed for the cost increases they paid due to the passthrough of the unlawful IEEPA tariffs.

In short, it is likely impossible for Plaintiff States to be made fully whole for the economic harm suffered each day that the unlawful Section 122 tariffs are in place. The Section 122 Tariff Orders should therefore be enjoined immediately to prevent this irreparable harm.

**b.    President Trump's Misuse of Section 122 Seriously Impairs Budgeting Processes**

The Section 122 Tariffs are similarly harming Plaintiff States' ability to plan and develop budgets, and to procure necessary goods in a timely and predictable manner. The ever-present threat that these tariffs will be raised or lifted deprives Plaintiff States of reasonable certainty as to how much goods will cost, which bids from contractors are the lowest, what their agencies and universities can afford, and how long the procurement process will take.

The uncertainty resulting from the President's shifting tariff threats frustrates Plaintiff States' budgeting. Plaintiff States' agencies and universities cannot properly set their budgets if they lack reasonable certainty as to how much goods and materials will cost over the coming year. *See supra* § II.C. If state entities must plan their budgets with a potential tariff rate on any given item ranging from 0 to 15 percent, depending on whether the President decides to increase, suspend, or modify a tariff on any given date, that undermines their ability to allocate resources and make investments. *E.g.* Ambrosier Decl. (MI) ¶¶ 9-13; Johnson Decl. (IL) ¶¶ 11-13; Raymond Decl. (CT) ¶¶ 8-12; *cf. Invenergy*, 422 F. Supp. 3d at 1291-92 (finding irreparable harm in the form of business uncertainty, including unexpected tax consequences that would "severely disadvantage [the plaintiff's] projects to the points where some likely will not be developed as planned … and others might not be developed at all"). This uncertainty is felt most strongly in States' procurement agencies, but it similarly affects the ability of other State agencies to predict and budget for the invoices they will receive for necessary products. Johnson Decl. (IL) ¶¶ 11-13.

Similarly, unexpected tariff costs are impairing state agencies' ability to replace outdated equipment and provide essential government services. For example, the Illinois Department of Innovation and Technology ("DOIT") anticipates that price increases due to the Section 122 Tariffs will reduce the State's capacity to replace older IT equipment, which will result in greater downtime for state employees due to equipment failures and increased burden on DOIT staff to maintain and troubleshoot aging equipment. Johnson Decl. (IL) ¶ 9. Similarly, the Connecticut Department of Administrative Services warns that unbudgeted cost increases due to tariffs would require the State to purchase less equipment for devices in need of replacement and continue to run existing, aged, and perhaps failing computing resources, resulting in less worker productivity. Raymond Decl. (CT) ¶ 11.

Those are only some examples. *See generally, supra* § II.C. And those harms cannot be redressed by a mere order to reimburse tariff payments at the end of this case. *Cf. Invenergy*, 422 F. Supp. 3d at 1291 ("The [challenged tariff decision] causes irreparable harm by eliminating the business certainty required by the solar industry to plan and develop future projects.").

Without a preliminary injunction, President Trump's continued violation of Section 122 will continue to frustrate Plaintiff States' budgeting and procurement. Those injuries cannot be remedied later.

### 2.    The Equities and Public Interest Favor an Injunction

The final two elements of the test for injunctive relief—the balance of the equities and the public interest—merge when the government is a party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). These factors require the Court to consider the parties' respective hardships should the injunction be granted, as well as whether an injunction serves the public's interest. *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1345 (Fed. Cir. 2018); *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 25-29 (2008).

To begin, there is a strong public interest in protecting the rule of law and not allowing the executive branch to unlawfully impose tariffs on the world at its whim, muddled by threats, additions, exceptions, and pauses. *See Am. Signature, Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010) ("The public interest is served by ensuring that governmental bodies comply with the law[.]"); *Invenergy*, 422 F. Supp. 3d at 1294 (quoting *Am. Signature, Inc.*). That interest is heightened where, as here, the President's unlawful actions have devastating economic consequences nationwide. Hines Decl. ¶ 19 (describing how tariffs erode the value of public income supports by raising consumer prices); *see also Winter*, 555 U.S. at 24 ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."); *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021) (public interest includes "the consequences of granting or denying the injunction to non-parties"); *Bernhardt v. Los Angeles Cnty.*, 339 F.3d 920, 932 (9th Cir. 2003) (same); *Learning Res.*, 2026 WL 477534, at *8 (Roberts, C.J., plurality) (considerations of the effect that Executive's interpretation of statutory authority would have "apply with particular force where, as here, the purported delegation involves the core congressional power of the purse"). And, as described above, there is no efficient legal pathway for complete refunds.

Balancing the parties' relative harm, the federal government "cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required to avoid constitutional concerns." *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013); *Atlas Powder Co. v. Ireco Chemicals*, 773 F.2d 1230, 1231 (Fed. Cir. 1985) (rejecting a defendant's request to "continue the alleged infringements at the rate they occurred when the suit was filed, even though the assessment of likelihood of success had shown that such acts would probably be held unlawful"). Moreover, while Plaintiff States are seeking to prevent immediate and irreparable

harms, *see supra* § IV.C.1, an injunction will not affect the long-term goals identified by President Trump to support his unlawful tariffs. Trade deficits reflected in the United States' current account have been a feature of U.S. trade policy—and the United States' balance of payments—for half a century. *See* Irwin Decl. ¶ 8.

Thus, any burden on the federal government amounts to the restoration of what has long been the status quo. *See Litton Sys., Inc. v. Sundstrand Corp.*, 750 F.2d 952, 961 (Fed. Cir. 1984) ("The function of preliminary injunctive relief is to preserve the status quo pending a determination of the action on the merits."); *BlephEx, LLC v. Myco Indus., Inc.*, 24 F.4th 1391, 1404-05 (Fed. Cir. 2022) (Although "not the sole objective of preliminary injunctions," preservation of the status quo "is inherent in the four preliminary injunction factors—particularly in the 'irreparable harm' and 'balance of hardships' factors").

### 3.    A Nationwide Injunction is Necessary to Provide Complete Relief

A nationwide injunction is required to provide complete relief to Plaintiff States. In fashioning injunctive relief, courts are to consider "what is necessary, what is fair, and what is workable." *New York v. Cathedral Academy*, 434 U.S. 125, 129 (1977). Courts also look to the "objectives of an injunction," and how to meet those objectives "to provide complete relief to the plaintiffs." *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 765 (1994) (internal citations omitted). Ultimately, "the scope of injunctive relief is dictated by the extent of the violation established." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class.").

Here, a nationwide injunction is required for at least three reasons. First, only such an injunction would provide Plaintiff States with the complete relief they seek. Plaintiff States are both direct and indirect purchasers of goods subject to the Proclamation and the unlawful tariffs at

issue. Injunctive relief limited to Plaintiff States alone may provide relief as to their status as direct purchasers, but it would be underinclusive as to their status as *indirect* purchasers. Plaintiffs are entitled to relief from the imposition of the unlawful tariffs on vendors who are also subject to the Proclamation, and whose increased costs will foreseeably impact Plaintiffs as downstream indirect purchasers.[8]

Second, an injunction limited to Plaintiff States would be inconsistent with the Constitutional requirement that taxes be levied uniformly. Under the Uniformity Clause, "all Duties, Imposts and Excises shall be uniform throughout the United States." U.S. Const. art. I, § 8, cl. 1. "The purpose of this clause is to prevent the federal government from discriminating between states when levying taxes and duties." *Thyssenkrupp Materials NA Inc. v. United States*, 498 F. Supp. 3d 1372, 1380 (Ct. Int'l Trade 2021) (citing *Knowlton v. Moore*, 178 U.S. 41, 89 (1900)). A "tax is uniform when it operates with the same force and effect in *every place* where the subject of it is found." *Edye v. Robertson*, 112 U.S. 580, 594 (1884) (emphasis added). An injunction against the Section 122 Proclamation that is limited to Plaintiffs would create disparate tax protocols based on geography that are plainly inconsistent with the Uniformity Clause. *See V.O.S. I*, 772 F. Supp.

---

[8] Defendants may point to the Supreme Court's recent consideration of "whether, under the Judiciary Act of 1789, federal courts have equitable authority to issue universal injunctions" as relevant to this Court's analysis, but such an argument would be misplaced. *Trump v. CASA, Inc.*, 606 U.S. 831, 839 (2025); *see also V.O.S. II*, 149 F.4th 1339-40 (vacating remedy for this Court to consider *CASA* and *eBay* factors). The *CASA* Court was clear that its "decision rest[ed] solely on the statutory authority that federal courts possess under the Judiciary Act of 1789." *Id.* at 841 n.4. As the Court of International Trade was established under different statutory authority, the Customs Courts Act of 1980, Pub. L. No. 96-417, 94 Stat. 1727, the *CASA* Court's decision regarding authority of courts established under the Judiciary Act of 1789 to issue nationwide injunctions does not impact this Court's power to issue such injunctions. *See* 28 U.S.C. § 1581; *see also Atmus Filtration, Inc. v. U.S.*, --- F.Supp.3d ----, 2026 WL 616128, *1 (Ct. Int'l Trade Mar. 4, 2026) (determining that the *CASA* Court's decision "does not constitute a legal direction to this Court."). In any event, *CASA* did not foreclose universal injunctions in cases like this, when a "universal injunction [is] necessary to provide the States *themselves* with complete relief." *CASA*, 606 U.S. at 853.

3d at 1383 (granting nationwide injunction in case challenging unlawful imposition of taxes under IEEPA, noting that "'[A]ll Duties, Imposts and Excises shall be uniform throughout the United States,' U.S. Const. art. I, § 8, cl. 1, and '[t]he tax is uniform when it operates with the same force and effect in every place where the subject of it is found.' *Head Money Cases*, 112 U.S. 580, 594 (1884).").

Third, this Court should vacate the CBP's Cargo Systems Messaging Service Guidance implementing the Section 122 Proclamation under the APA, which would have the same practical effect as a nationwide injunction. *See* 5 U.S.C. §§ 705, 706(2)(C). APA relief "is not party-restricted." *Career Colls. & Schs. of Texas v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024). When an agency action is unlawful, as here, the Court is required to vacate and set aside that action. *Kingtom Aluminio S.R.L. v. United States*, 805 F. Supp. 3d 1317, 1325 (Ct. Int'l Trade 2025). Thus, "general equitable and constitutional principles" that might, under different circumstances, require this Court to limit relief to the named parties, "do not hold water" when it comes to vacatur under the APA. *Career Colls. & Schs.*, 98 F.4th at 255; *see also CASA*, 606 U.S. at 847 n.10 (clarifying that its decision limiting nationwide injunctions did not affect federal courts' power to vacate federal agency action under § 706); *id.* at 869, 873 (Kavanaugh, J., concurring) (observing that the *CASA* decision would not alter federal courts' ability to preliminarily set aside an agency action under the APA).

Finally, this Court should not require Plaintiff States to post security. Rule 65(c) provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Court Int'l Trade R. 65(c). But the Court has the discretion whether to require a bond, *Zenith Radio Corp. v. United*

*States*, 518 F. Supp. 1347, 1349 (Ct. Int'l Trade 1981) (discussing the court's discretion in setting security), and should exercise its discretion to waive that requirement here.

**V.     CONCLUSION**

The States' motion for summary judgment should be granted. In the alternative, the Court should grant a preliminary injunction.

Respectfully submitted,

**DAN RAYFIELD**
Attorney General for the State of Oregon

BENJAMIN GUTMAN
Deputy Attorney General
DUSTIN BUEHLER
Special Counsel

By: */s/ Brian Simmonds Marshall*
Brian Simmonds Marshall
Leanne Hartmann *
Samuel Kubernick *
Brian Collins *
*Senior Assistant Attorneys General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
Brian.S.Marshall@doj.oregon.gov
Leanne.Hartmann@doj.oregon.gov
Samuel.A.Kubernick@doj.oregon.gov

*Counsel for the State of Oregon*

**KRISTIN K. MAYES**
Attorney General
State of Arizona

*/s/ Joshua D. Bendor*
Joshua D. Bendor
*Solicitor General*
Syreeta A. Tyrell
Senior Litigation Counsel
Timothy E.D. Horley *
Jaylia Yan *
*Assistant Attorneys General*
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-3333
Joshua.bendor@azag.gov
Syreeta.Tyrell@azag.gov
Timothy.Horley@azag.gov
Jaylia.Yan@azag.gov
ACL@azag.gov

*Counsel for the State of Arizona*

**ROB BONTA**
Attorney General
State of California

By: *s/Shiwon Choe*
Lara Haddad *
*Supervising Deputy Attorney General*
Shiwon Choe
Carolyn Downs *
Samuel Sokolsky *
*Deputy Attorneys General*
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-4400
Lara.Haddad@doj.ca.gov
Shiwon.Choe@doj.ca.gov
Carolyn.Downs@doj.ca.gov
Samuel.Sokolsky@doj.ca.gov

*Counsel for the State of California*

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
Stephen Thompson *
Mark Ladov
Natasha Korgaonkar *
*Special Counsel*
28 Liberty St.
New York, NY 10005
(212) 416-8679
rabia.muqaddam@ag.ny.gov
stephen.thompson@ag.ny.gov
mark.ladov@ag.ny.gov
Natasha.korgaonkar@ag.ny.gov

*Counsel for the State of New York*

**PHILIP J. WEISER**
Attorney General State of Colorado

By: */s/ Sarah H. Weiss*
Sarah H. Weiss
*Senior Assistant Attorney General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
Sarah.Weiss@coag.gov

*Counsel for the State of Colorado*

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

By: */s/ Ian R Liston*
Ian R. Liston
*Director of Impact Litigation*
Vanessa L. Kassab
*Deputy Attorney General*
Rose Gibson *
*Assistant Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8875
Ian.Liston@Delaware.gov

*Counsel for the State of Delaware*

**WILLIAM TONG**
Attorney General of Connecticut

By: */s/ Michael Skold*
Michael Skold
*Solicitor General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Michael.Skold@ct.gov

*Counsel for the State of Connecticut*

**KWAME RAOUL**
Attorney General
State of Illinois

By: */s/ Gretchen Helfrich*
Cara Hendrickson
*Executive Deputy Attorney General*
Gretchen Helfrich
*Deputy Chief, Special Litigation Bureau*
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603
Tel. (312) 814-3000
Cara.Hendrickson@ilag.gov
Gretchen.helfrich@ilag.gov

*Counsel for the State of Illinois*

**OFFICE OF THE GOVERNOR** *ex rel.*
**Andy Beshear**, in his official capacity as
Governor of the Commonwealth of Kentucky

By: */s/ S. Travis Mayo*
S. Travis Mayo *
*General Counsel*
Laura C. Tipton *
*Deputy General Counsel*
Office of the Governor
501 High Street
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
laurac.tipton@ky.gov

*Counsel for Governor Andy Beshear*

**AARON M. FREY**
Maine Attorney General

By: */s/ Katherine W. Thompson*
Katherine W. Thompson *
*Special Counsel*
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel.: 207-626-8455
Fax: 207-287-3145
Kate.thompson@maine.gov

*Counsel for the State of Maine*

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s James C. Luh*
James C. Luh *
*Senior Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.maryland.gov

*Counsel for the State of Maryland*

**ANDREA JOY CAMPBELL**
ATTORNEY GENERAL OF
MASSACHUSETTS

By: */s/ Katherine Dirks*
Katherine Dirks
  *Chief State Trial Counsel*
Office of the Massachusetts Attorney General
1 Ashburton Place
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov

*Counsel for the Commonwealth of
Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov

*Counsel for the State of Michigan*

**KEITH ELLISON**
Attorney General
State of Minnesota

By: */s/ Lindsey E. Middlecamp*
PETER J. FARRELL (#0393071)
*Deputy Solicitor General*
LINDSEY E. MIDDLECAMP (#0392589)
*Special Counsel*
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 757-1010 (Voice)
(651) 282-5832 (Fax)
Peter.farrell@ag.state.mn.us
Lindsey.middlecamp@ag.state.mn.us

*Counsel for the State of Minnesota*

**AARON D. FORD**
Attorney General

By: */s/ K. Brunetti Ireland*
K. Brunetti Ireland *
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov

*Counsel for the State of Nevada*

**JENNIFER DAVENPORT**
Attorney General of New Jersey

By: */s/ Lucy I. Sprague*
Lucy I. Sprague *
David N. Birch *
*Deputy Attorneys General*
124 Halsey Street, 5th Floor
Newark, New Jersey 07101
(609) 696-5363
Lucy.Sprague@law.njoag.gov

*Counsel for the State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ Amy Senier*
AMY SENIER
*Senior Counsel*
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
505-490-4060
asenier@nmdoj.gov

*Counsel for the State of New Mexico*


**JOSH SHAPIRO,**
in his official capacity as Governor of the
Commonwealth of Pennsylvania

JENNIFER SELBER
General Counsel

By: */s/ Jacob B. Boyer*
Jacob B. Boyer *
*Deputy General Counsel*
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov

*Counsel for Governor Josh Shapiro*


**JEFF JACKSON**
Attorney General of North Carolina

LAURA HOWARD
Chief Deputy Attorney General

By: */s/ Daniel T. Wilkes*
Daniel T. Wilkes *
*Assistant Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6415
dwilkes@ncdoj.gov

*Counsel for the State of North Carolina*


**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Alex Carnevale*
Alex Carnevale *
*Special Assistant Attorney General*
Office of the Attorney General - State of
Rhode Island
150 South Main Street
Providence, RI 02903
(401) 274 4400
acarnevale@riag.ri.gov

*Counsel for the State of Rhode Island*

**CHARITY R. CLARK**
Attorney General of Vermont

By: */s/ Ryan P. Kane*
RYAN P. KANE
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153
ryan.kane@vermont.gov


*Counsel for the State of Vermont*

**NICHOLAS W. BROWN**
Attorney General
State of Washington

By: *s/ Freeman E. Halle*
FREEMAN E. HALLE, WSBA 61498
TODD SIPE, WSBA 23203
*Assistant Attorneys General*
Office of the Washington State Attorney
General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
freeman.halle@atg.wa.gov
todd.sipe@atg.wa.gov

*Counsel for the State of Washington*

**JAY JONES**
Attorney General of Virginia

By: */s/ Tillman J. Breckenridge*
Tillman J. Breckenridge *
*Solicitor General*
202 N. 9th Street
Richmond, Virginia 23219
Tel: (804) 786-2071
Fax: (804) 786-1991
solicitorgeneral@oag.state.va.us

*Counsel for the Commonwealth of Virginia*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: *s/ Brian P. Keenan*
Brian P. Keenan * State Bar #1056525
*Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0020
(608) 294-2907 (Fax)
brian.keenan@wisdoj.gov


*Counsel for the State of Wisconsin*

* *Admission application pending or forthcoming*

Dated: March 13, 2026

## CERTIFICATE OF COMPLIANCE

Pursuant to U.S. Court of International Trade Standard Chambers Procedure 2(B)(1), I certify that this Memorandum of Law in Support of Plaintiff States' Motion for Summary Judgment, and, in the Alternative, for a Preliminary Injunction, including headings, footnotes, and quotations (but excluding the motion, table of contents, table of authorities, counsel's signature blocks, this certificate, and the proposed order) complies with the word limitation requirement. The word count for this submission, as computed by the word processing system used to prepare the brief, is 13,872 words.

Respectfully submitted,

*/s/ Rabia Muqaddam*
Rabia Muqaddam
Chief Counsel for Federal Initiatives
Office of the New York Attorney General

*Counsel for the State of New York*