In The

# United States Court of International Trade

———— •◆• ————

Before Chief Judge Mark A. Barnett, Judge Claire R. Kelly,
Senior Judge Timothy C. Stanceu

| | |
|---|---|
| THE STATE OF OREGON; THE STATE OF ARIZONA; THE STATE OF CALIFORNIA; THE STATE OF NEW YORK; THE STATE OF COLORADO; THE STATE OF CONNECTICUT; <br><br> *(For Continuation of Caption See Inside Cover)* | CASE NO. 26-01472 |

**BRIEF OF ADVANCING AMERICAN FREEDOM, INC.; INDEPENDENT INSTITUTE; RICHARD EPSTEIN; JONATHAN BEAN, RESEARCH FELLOW, INDEPENDENT INSTITUTE, PROFESSOR OF HISTORY, SOUTHERN ILLINOIS UNIVERSITY; PETER T. CALCAGNO, PH.D., PROFESSOR OF ECONOMICS, COLLEGE OF CHARLESTON, DIRECTOR, CENTER FOR PUBLIC CHOICE & MARKET PROCESS; CENTER FOR FREEDOM AND PROSPERITY; EDWARD J. LOPEZ, PROFESSOR OF ECONOMICS, DISTINGUISHED PROFESSOR OF CAPITALISM, EXECUTIVE DIRECTOR AND PAST PRESIDENT, PUBLIC CHOICE SOCIETY, WEST CAROLINA UNIVERSITY; RANDALL G. HOLCOMBE, PROFESSOR OF ECONOMICS, FLORIDA STATE UNIVERSITY; MICHAEL C. MUNGER, DIRECTOR, PHILOSOPHY, POLITICS, AND ECONOMICS PROGRAM, DUKE UNIVERSITY; RIO GRANDE FOUNDATION; WILLIAM F. SHUGHART II, J. FISH SMITH PROFESSOR IN PUBLIC CHOICE, UTAH STATE UNIVERSITY; AND PAUL STAM, FORMER SPEAKER PRO TEM, NORTH CAROLINA HOUSE OF REPRESENTATIVES, AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS**

MARC WHEAT
ADVANCING AMERICAN FREEDOM
801 Pennsylvania Avenue NW, Suite 930
Washington, DC 20004
(601) 467-8617
mwheat@advancingamericanfreedom.com

*Counsel for Amicus Curiae*

CP COUNSEL PRESS     (800) 4-APPEAL • (132031)

THE STATE OF DELAWARE; THE STATE OF ILLINOIS; THE OFFICE OF THE GOVERNOR *ex rel.* Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky; THE STATE OF MAINE; THE STATE OF MARYLAND; THE COMMONWEALTH OF MASSACHUSETTS; THE STATE OF MICHIGAN; THE STATE OF MINNESOTA; THE STATE OF NEVADA; THE STATE OF NEW JERSEY; THE STATE OF NEW MEXICO; THE STATE OF NORTH CAROLINA; JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania; THE STATE OF RHODE ISLAND; THE STATE OF VERMONT; THE COMMONWEALTH OF VIRGINIA; THE STATE OF WASHINGTON; THE STATE OF WISCONSIN,

*Plaintiffs,*

v.

DONALD J. TRUMP, in his official capacity as President of the United States; THE UNITED STATES; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES CUSTOMS AND BORDER PROTECTION; and RODNEY S. SCOTT, in his official capacity as Commissioner for U.S. Customs and Border Protection,

*Defendants.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

CORPORATE DISCLOSURE STATEMENT .......................................................1

STATEMENT OF INTEREST OF AMICI......................................................... 2

INTRODUCTION ................................................................................................3

SUMMARY OF THE ARGUMENT ...................................................................5

ARGUMENT ......................................................................................................6

    I.     The Court Should Rule Expeditiously and Issue a Permanent Injunction to Prevent the Administration from Maintaining an Illegal Regime Merely by Giving it a New Coat of Paint.....................6

    II.    Section 122 Was Obsolete from the Time it Was Adopted and Nothing Has Happened to Reverse That Obsolescence.....................11

        A.    A balance-of-payments deficit was the product of an exchange rate system that was defunct at the time of Section 122's enactment .........................................................11

        B.    A balance-of-payments deficit is not the same as a trade deficit ..............................................................................16

        C.    This Court will not engage in judicial policymaking by simply determining the statutory meaning of "balance-of-payments deficit".................................................................17

    III.    The Original Meaning of the Constitution Prohibits Congressional Delegation of Legislative Power ...............................18

CONCLUSION....................................................................................................24

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Atmus Filtration, Inc. v. United States*,
No. 26-01259 (Ct. Int'l Trade Mar. 6, 2026)....................................................7

*Cooper v. Telfair*,
4 U.S. 14 (4 Dall.), 19 (1800).........................................................................21

*Elrod v. Burns*,
427 U.S. 347 (1976)........................................................................................10

*Gilchrist v. Collector of Charleston*,
10 F. Cas. 355 (1808) ................................................................................ 21-22

*Hayburn's Case*,
2 U.S. (2 Dall.) 409 (1792)..............................................................................20

*Learning Resources, Inc. v. Trump*,
2026 WL 477534 (Feb. 20, 2026) .....................................................................3

*Marbury v. Madison*,
5 U.S. 137 (1803)............................................................................................17

*The Cargo of the Brig Aurora v. United States*,
11 U.S. (7 Cranch) 382 (1813) .......................................................................23

*United States v. Sears*,
27 F. Cas. 1006 (1812) ...................................................................................22

*V.O.S. Selections, et al. v. Trump, et al.*,
Nos. 25-1812, 25-1813, 149 F.4th 112 (Aug. 29, 2025)...........................8, 18

*V.O.S. Selections v. Trump*,
149 F.4th 112 (Fed. Cir. 2025) .................................................................... 7-8

*V.O.S. Selections, Inc. v. Trump*,
2025 WL 1649290 (Fed. Cir. Jun. 10, 2025)....................................................5

*V.O.S. Selections, Inc. v. United States*,
772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025)................................................ 4-5

*Vanhorne's Lessee v. Dorance*,
2 U.S. 304 (2 Dall.) (1795).............................................................................20

ii

**Statutes & Other Authorities:**

19 U.S.C. § 2132 ................................................................................................ 14-15

1 International Monetary Fund 1972-1978: Cooperation on Trial
(International Monetary Fund 1996) .........................................................14

1 The Records of the Federal Convention of 1787 (Max Farrand ed., Yale
University Press 1911).................................................................................19

18 Annals of Cong. 2084 (1808)..................................................................22

18 Annals of Cong. 2125 (1808)..................................................................23

30 18 Annals of Cong. 2125 (1808) .............................................................22

91 Fed. Reg. 21, 22 (Jan. 2, 2026) .................................................................7

An Act in addition to the act intituled (sic) "An act laying an embargo on
all ships and vessels in the ports and harbors of the United States,"
and the several acts supplementary thereto, and for other purposes,
ch. 66, 2 Stat. 499 (1808).............................................................................21

An Act laying an Embargo on all ships and vessels in the ports and
harbors of the United States, ch. 5, 2 Stat. 451 (1807)...............................21

An Act to provide for the settlement of the Claims of Widows and
Orphans barred by the limitations heretofore established, and to
regulate the Claims to Invalid Pensions, ch. 11, 1 Stat. 244 (1792) .............19

Michael Bordo, Eric Monney, Alain Naef, *The Gold Pool (1961-1968)
and the Fall of the Bretton Woods System. Lessons for Central Bank
Cooperation.* 12 fig. 1, Nat'l Bureau of Econ. Res. (Nov. 2017) .................13

"From Thomas Jefferson to Charles Pinckney, 18 July 1808,"
Founders Online, National Archives .........................................................21

*Bretton Woods Conference & the Birth of the IMF and World Bank*,
Library of Congress (last visited Mar. 10, 2026) .........................................11

Kevin Breuninger, *Bessent says global 15% tariff starts this week, predicts
Trump duties will return to the old levels later this year*, CNBC
(Mar. 4, 2026 10:04 PM) ...............................................................................9

Martin Feldstein, *Statement of Dr. Martin Feldstein, Chairman, Council of
Economic Advisors*, in *Trade Deficit: Hearing Before the Subcomm.
on Int'l Trade of the S. Comm. On Fin.*, 98th Cong. (Mar. 23, 1984). .........16

Edwin J. Feulner, Jr., Conservatives Stalk the House: The Story of the
    Republican Study Committee (Green Hill Publishers, Inc. 1983) ..................2

Gerald R. Ford, Statement on Signing Amendments to the Bretton Woods
    Agreement Act (Oct. 21, 1976) ....................................................................15

Milton Friedman, Robert V. Roosa, *The Balance of Payments: Free
    Versus Fixed Exchange Rates* (American Enterprise Institute 1967) ...........16

"From Thomas Jefferson to Charles Pinckney, 18 July 1808,"
    Founders Online, National Archives .............................................................21

A. B. Hersey, *Business Cycle Influences in the U.S. Balance of Payments*,
    *in* Staff of Joint Econ. Comm. 88th Cong., *The United States
    Balance of Payments—Perspectives and Policies* 114 tbl. 3 (1963).............17

Independence Index: Measuring Life, Liberty and the Pursuit of
    Happiness, Advancing American Freedom......................................................2

Thomas Jefferson, *Notes on the State of Virginia*, Query XIII, 136 (1853)............19

John Locke, *Second Treatise on Government* § 141
    (Thomas Hollis ed., 1764) (1689) ................................................................19

James Madison,
    *Notes of Debates in the Federal Convention of 1787* (June 1) ....................19

NBC News, *Full Coverage: Trump holds press conference after Supreme
    Court tariff ruling* (Feb. 20, 2026) ................................................................8

Net Exports on Goods and Services, Federal Reserve Bank of St. Louis
    (last visited Mar. 10, 2026)...........................................................................17

Gerald A. Pollack, *Perspectives on the United States International
    Financial Position, in* Staff of Joint Econ. Comm. 88th Cong., *The
    United States Balance of Payments—Perspectives and Policies*
    (1963)......................................................................................................12, 16

Proclamation No. 11012, *Imposing a Temporary Import Surcharge to
    Address Fundamental International Payments Problems*,
    (Feb. 20, 2026), 91 Fed. Reg. 9339 (Feb. 25, 2026) ......................................4

*Read the complete transcript of Trump's 2026 State of the Union*,
    Associated Press (Feb. 25, 2026 5:04 PM).....................................................10

Richard Nixon, *Special Message to the Congress Proposing Trade Reform
    Legislation* (Apr. 10, 1973) ..........................................................................14

iv

Rule 28(j) ............................................................................................................8

S. Rep. 93-1298, 93d Cong., Rep. of the Comm. on Finance (1974)......................17

Statement of Walter W. Heller, Chairman, Council of Economic Advisors,
    *Recent Changes in Monetary Policy and Balance-of-Payments
    Problems: Hearing Before H. Comm. on Banking and Currency*
    (July 25, 1963) .............................................................................................13

Ana Swanson, Tyler Pager, *U.S. Accuses 16 Trading Partners of Unfair
    Practices and Opens Investigation* New York Times
    (Mar. 11, 2026) ...............................................................................................9

*The Smithsonian Agreement*, Federal Reserve History (Nov. 22, 2013).................14

Thucydides, *Pericles' Funeral Oration* 118 (B. Jowett, trans. 1881) .....................24

"To George Washington from James Iredell and John Sitgreaves,
    8 June 1792," Founders Online, National Archives......................................20

Martin A. Weiss, Cong. Res. Serv., R42019, International Monetary Fund:
    Background Issues for Congress (2013)...................................................11, 13

*U.S. Commerce Secretary Howard Lutnick Speaks with CNBC's Sara
    Eisen on "Squawk on the Street" Today*,
    CNBC (Dec. 3, 2025 10:06 AM)..................................................................8

## CORPORATE DISCLOSURE STATEMENT

Amici curiae Advancing American Freedom; Independent Institute; Richard Epstein; Jonathan Bean, Research Fellow, Independent Institute, Professor of History, Southern Illinois University; Peter T. Calcagno, Ph.D., Professor of Economics, College of Charleston, Director, Center for Public Choice & Market Process; Center for Freedom and Prosperity; Edward J. Lopez, Professor of Economics, Distinguished Professor of Capitalism, Executive Director and Past President, Public Choice Society, West Carolina University; Randall G. Holcombe, Professor of Economics, Florida State University; Michael C. Munger, Director, Philosophy, Politics, and Economics Program, Duke University; Rio Grande Foundation; William F. Shughart II, J. Fish Smith Professor in Public Choice, Utah State University; and Paul Stam, Former Speaker Pro Tem, North Carolina House of Representatives, are nonprofit corporations. They do not issue stock and are neither owned by nor are they owners of any other corporate entity, in part or in whole. They have no parent companies, subsidiaries, affiliates, or members that have issued shares or debt securities to the public. The corporations are operated by volunteer boards of directors.

1

## STATEMENT OF INTEREST OF AMICI

Advancing American Freedom (AAF) is a nonprofit organization that promotes and defends policies that elevate traditional American values, including freedom from arbitrary power.[1] AAF "will continue to serve as a beacon for conservative ideas, a reminder to all branches of government of their responsibilities to the nation,"[2] and believes American prosperity depends on ordered liberty and self-government.[3] AAF files this brief on behalf of its 150,374 members nationwide.

Independent Institute is a non-partisan, academic research organization dedicated to advancing peaceful, prosperous, and free societies. Understanding that peace and prosperity are predicated on principles of entrepreneurship and voluntary economic exchange, Independent supports this brief.

*Amici* Richard Epstein; Jonathan Bean, Research Fellow, Independent Institute, Professor of History, Southern Illinois University; Peter T. Calcagno, Ph.D., Professor of Economics, College of Charleston, Director, Center for Public Choice & Market Process; Center for Freedom and Prosperity; Edward J. Lopez,

---

[1] No counsel for a party authored this brief in whole or in part. No person other than Amicus Curiae and its counsel made any monetary contribution intended to fund the preparation or submission of this brief.

[2] Edwin J. Feulner, Jr., Conservatives Stalk the House: The Story of the Republican Study Committee 212 (Green Hill Publishers, Inc. 1983).

[3] Independence Index: Measuring Life, Liberty and the Pursuit of Happiness, Advancing American Freedom available at https://advancingamericanfreedom.com/aaff-independence-index/.

2

Professor of Economics, Distinguished Professor of Capitalism, Executive Director and Past President, Public Choice Society, West Carolina University; Randall G. Holcombe, Professor of Economics, Florida State University; Michael C. Munger, Director, Philosophy, Politics, and Economics Program, Duke University; Rio Grande Foundation; William F. Shughart II, J. Fish Smith Professor in Public Choice, Utah State University; and Paul Stam, Former Speaker Pro Tem, North Carolina House of Representatives believe that the government's compliance with the Constitution's limits on government power is essential to the preservation of American freedom.

## INTRODUCTION

This case concerns the President's invocation of the Trade Act of 1974's Section 122, a section that was dead on arrival and, for that reason, has never been used. In April 2025, President Trump's "Liberation Day" ushered in tariffs on countries around the world supposedly under the authority of the International Emergency Economic Powers Act (IEEPA). After nearly a year of expedited litigation, the President's use of IEEPA as a tariff power was struck down by the Supreme Court, *Learning Resources, Inc. v. Trump*, 2026 WL 477534 at *14 (Feb. 20, 2026), but not before the government imposed billions of dollars in tariffs on American importers.

3

Importers who paid IEEPA tariffs are now having to fight to get refunds as the administration says it must adjust its refund process to handle the volume of refunds due. And, even if it does ultimately repay all the importers it is legally required to reimburse, the Americans who paid higher prices, lost jobs, or missed out on economic opportunities because of the illegal tariffs will never be made whole.

Within hours of the Supreme Court's decision striking down the President's IEEPA tariffs, the President announced a new rash of duties supposedly under the authority of Section 122. Proclamation No. 11012, *Imposing a Temporary Import Surcharge to Address Fundamental International Payments Problems*, (Feb. 20, 2026), 91 Fed. Reg. 9339 (Feb. 25, 2026). While Section 122, unlike IEEPA, does at least purport to convey tariff authority upon the President in some circumstances, those circumstances have never existed since the formal termination of the Bretton Woods exchange rate system in 1976. Section 122 has thus never been used by any President.

The tariffs being collected even now are, again, illegal, and the importers who are paying them are being set up for ongoing hardship when they are inevitably entitled to a refund in the coming months.

In *V.O.S. Selections, Inc. v. United States*, this Court correctly ruled quickly and issued a permanent injunction against the President's collection of IEEPA tariffs.

4

772 F. Supp. 3d 1350, 1383 (Ct. Int'l Trade 2025). The Federal Circuit, no doubt relying on the good faith of the Executive Branch, stayed that injunction pending appeal. *V.O.S. Selections, Inc. v. Trump*, 2 025 WL 1649290 at *1 (Fed. Cir. Jun. 10, 2025). The Executive proceeded to collect IEEPA tariffs until February 2026 when they were struck down; the Executive Branch is now asking for time to issue refunds.

Because the Executive has demonstrated its reluctance or potential inability to expeditiously refund illegally collected tariff money and because many of the harms, both immediate and downstream, caused by illegal tariffs are irremediable, this Court should again quickly issue a permanent injunction against the President's Section 122 tariffs and should deny any subsequent motion to stay that injunction.

## SUMMARY OF THE ARGUMENT

President Trump's invocation of Section 122 risks dragging American importers through months of litigation not only over the case's merits but over refunds when these tariffs are ultimately struck down. This Court should, as it did in *V.O.S. Selections*, rule expeditiously and issue a permanent injunction to prevent the administration from taking advantage of time litigation takes as a means of extending the enforceability of illegal tariffs.

Section 122 does not empower the President to impose the tariffs at issue in this case. Section 122 of the Trade Act of 1974 was obsolete from the moment it was

5

signed because it empowers the President to address balance-of-payments deficits; a problem that no longer exists in the absence of fixed exchange rates and the dollar's exchangeability for gold under the Bretton Woods system. Section 122 does not empower the President to address trade deficits, as many recognized at the time of its enactment and afterward.

The President seeks to use the tariff power as a means of accomplishing his political agenda. Yet, as the founders and the thinkers who influenced them repeatedly made clear, the legislative branch is not entitled to pass off legislative power to the President.

## ARGUMENT

**I.     The Court Should Rule Expeditiously and Issue a Permanent Injunction to Prevent the Administration from Maintaining an Illegal Regime Merely by Giving it a New Coat of Paint.**

Justice delayed is justice denied. Yet, delay is among the most effective and lopsided litigation tactics of the powerful against the weak. All litigation takes time. For Americans challenging illegal government policies, that time is of the essence. For the government, on the other hand, delay often causes no harm or even allows it to extend the duration of illegal policies while challenges proceed.

In the case of the challenges to President Trump's IEEPA tariffs, despite expeditious action by each court that considered the cases, the Supreme Court's

6

decision still arrived the better part of a year after the litigation began and relief will take even longer.[4] Throughout the litigation, the President was able to use his illegal tariffs as leverage in international negotiation and collect billions of dollars, much of which may never be returned to those Americans from whom they were collected.

If it takes a year for courts to resolve a challenge to a new statutory theory of tariff authority, the President only needs four implausible legal theories to wield illegal tariff power throughout his term. And if courts become fatigued with repeated tariff litigation and no longer expedite consideration, the President may not even need that many.

There is evidence that this is the administration's strategy. In a filing before the Federal Circuit on August 29, 2025 in *V.O.S. Selections v. Trump*, 149 F.4th 112

---

[4] This Court has directed Customs and Border Protection (CBP) to report on its progress toward an automated system for issuing refunds of IEEPA duties. *Atmus Filtration, Inc. v. United States*, No. 26-01259 (Ct. Int'l Trade Mar. 6, 2026) (order directing Defendants to file progress report). CBP informed the Court that developing a new system would save "over 4 million hours" of work manually processing duties payments that included IEEPA duties. Declaration of Brandon Lord at 12, *Atmus Filtration*, No. 26-01259 (Ct. Int'l Trade Mar. 6, 2026). Another obstacle to tariff refunds is CBP's Interim Final Rule Electronic Refunds (91 FR 21) requiring that it only issue refunds electronically. *Id.* at 9. CBP reported to this court on March 6 that only 21,423 entities had completed the set-up process necessary to receive electronic refunds while 330,566 importers had paid IEEPA duties. *Id.* at 10. That means that less than 10% of importers that paid IEEPA duties were prepared to receive refunds at that time. The CBP estimates that, in 2024 and 2025, only approximately 30% of refunds were issued electronically. Electronic Refunds, 91 Fed. Reg. 21, 22 (Jan. 2, 2026). A large majority of those who paid IEEPA tariffs may thus be in no position to receive refunds.

(Fed. Cir. 2025), Secretary of Commerce Howard Lutnick declared "under penalty of perjury" that  "[w]ithout the viability of IEEPA tariffs, the United States would be weakened and would lose the essential tool to address" the alleged national emergency.[5] Further, he claimed that "President Trump's decisive use of IEEPA is America's *last chance* to turn the tide."[6] He claimed that the President's alleged tariff power under IEEPA was "essential."[7]

Yet, just weeks later, Secretary Lutnick told a media outlet, "If . . . the Supreme Court didn't side with the president, which I think they will, then we have other tools and we'll put them right in place. Tariffs are here to stay."[8] Similarly, hours after the Supreme Court's announcement of its decision in *Learning Resources*, the President held a press conference in which he said, "there are methods, practices, statutes, and authorities . . . that are even stronger than the IEEPA tariffs available to the President of the United States."[9] He also claimed that the Court's decision "made a president's

---

[5] Rule 28(j) Letter in *V.O.S. Selections, et al. v. Trump, et al.,* Nos. 25-1812, 25-1813 at 14 *V.O.S. Selections*, 149 F.4th 112 (Aug. 29, 2025).

[6] *Id.* at 15 (emphasis added).

[7] *Id.*

[8] *U.S. Commerce Secretary Howard Lutnick Speaks with CNBC's Sara Eisen on "Squawk on the Street" Today*, CNBC (Dec. 3, 2025 10:06 AM) https://www.cnbc.com/2025/12/03/cnbc-transcript-us-commerce-secretary-howard-lutnick-speaks-with-cnbcs-sara-eisen-on-squawk-on-the-street-today.html.

[9] NBC News, *Full Coverage: Trump holds press conference after Supreme Court tariff ruling* at 2:50-3:12 (Feb. 20, 2026) https://www.youtube.com/watch?v=u8krsQcG4CI&t=13s.

ability to both regulate trade and impose tariffs more powerful and more crystal clear rather than less."[10]

Section 122 tariffs appear to be the next step in this strategy. In an interview in March 2026, Treasury Secretary Scott Bessent said, "It's my strong belief that the tariff rates will be back to their old rate within five months," and acknowledged that Section 122 tariffs are limited to 150 days.[11] The administration may be hoping to keep these tariffs alive during litigation for the duration of that period while it performs investigations necessary to establish tariffs under other statutory provisions.[12]

By kicking the can down the road, the executive branch can trample over constitutional checks on its power. As President Trump said in his State of the Union address:

---

[10] *Id.* at 11:14-11:30.

[11] Kevin Breuninger, *Bessent says global 15% tariff starts this week, predicts Trump duties will return to the old levels later this year*, CNBC (Mar. 4, 2026 10:04 PM) https://www.cnbc.com/2026/03/04/bessent-says-global-15percent-tariff-starts-this-week-move-back-to-prior-rates-within-5-months.html.

[12] The Administration's recent announcement that it is opening investigations into the trading practices of 16 nations with investigations into 60 more likely on the way suggests that Section 122 is, in fact, merely a stopgap measure. Ana Swanson, Tyler Pager, *U.S. Accuses 16 Trading Partners of Unfair Practices and Opens Investigation* New York Times (Mar. 11, 2026) https://www.nytimes.com/2026/03/11/business/economy/trump-trade-investigations-tariffs.html.

> [A]lmost all countries and corporations want to keep the deal that they already made . . . knowing that the legal power that I as president have to make a new deal could be far worse for them and, therefore, they continue to work along the same successful path that we had negotiated before the Supreme Court's unfortunate involvement.[13]

The President may believe, as has so far been the case, that he can wield power on the basis of weak legal arguments because courts will take time to rule against him and will be deferential to him throughout the process.

That is not justice and it is unbecoming of a nation governed by the rule of law. It is therefore imperative that courts continue to expedite these cases and that they impose injunctions without stays. As the Supreme Court has recognized, "The loss of First Amendment freedoms for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The same is true of the right to be free from arbitrary power, the very thing from which our Constitution exists to protect the people.

Stays merely prolong the effectiveness of the administration's illegal actions and make the ultimate refund process more difficult and less likely to be comprehensive. This Court should, as it did in *V.O.S. Selections*, rule for plaintiffs and permanently enjoin enforcement of the President's Section 122 tariffs.

---

[13] *Read the complete transcript of Trump's 2026 State of the Union*, Associated Press (Feb. 25, 2026 5:04 PM) https://apnews.com/article/donald-trump-transcript-state-of-union-2026-c13e2a07df999b464b733f4a6e84dbd4.

**II.     Section 122 Was Obsolete from the Time it Was Adopted and Nothing Has Happened to Reverse That Obsolescence.**

*A. A balance-of-payments deficit was the product of an exchange rate system that was defunct at the time of Section 122's enactment.*

Congress passed the Trade Act of 1974 including Section 122 to address a problem that was, even then, a problem of the past. What they did not know was that that problem would never return, making Section 122 obsolete the day President Ford signed it into law. Now, President Trump seeks to revive this dead law to prop up the zombie corpse of his worldwide unilateral tariffs. This Court should not allow him to do so.

In 1944, representatives of countries from around the world met in Bretton Woods, New Hampshire and agreed to a price-fixing plan for their nations' currencies.[14] Under this system, the value of the dollar was pegged to gold, and the values of foreign currencies were then determined in relation to the dollar or gold.[15] Dollars could be exchanged for gold at a fixed rate of $35 per ounce.

---

[14] *Bretton Woods Conference & the Birth of the IMF and World Bank*, Library of Congress (last visited Mar. 10, 2026) available at https://guides.loc.gov/this-month-in-business-history/july/bretton-woods-conference#note2.
[15] Martin A. Weiss, Cong. Res. Serv., R42019, International Monetary Fund: Background Issues for Congress 2 (2013).

11

Price controls inevitably lead either to shortages or to surpluses in the thing subject to the controls. Under the Bretton Woods system, when the market value of the dollar dropped below the price at which it was fixed, the natural result was a decrease in foreign demand for dollars which could lead, over time, to depletion of the United States' reserves of gold or foreign currencies.[16]

This depletion of gold or foreign currencies is an essential element of a balance-of-payments deficit. According to a report of the Joint Economic Committee in 1963, a balance-of-payments deficit "under the official U.S. definition, measures the reduction in the U.S. monetary reserve assets (chiefly gold) and the increase in liquid liabilities," and it "measures the decline, during the period covered, in the U.S. ability to defend the exchange value of the dollar with liquid resources owned by or automatically available to the monetary authorities."[17]

For most of the time during which the Bretton Woods system was in place, the United States had a small balance-of-payments deficit. However, in 1963, Walter Heller, the chair of the Council of Economic Advisors under John F. Kennedy, warned Congress that an emerging "dollar glut" and that the "conversion of a portion

---

[16] *See id.* at 3 ("Amid declining confidence in the U.S. dollar, foreign central banks increasingly became reluctant holders of U.S. dollars and began exchanging their dollar reserves for U.S. gold holdings.")

[17] Gerald A. Pollack, *Perspectives on the United States International Financial Position, in* Staff of Joint Econ. Comm. 88th Cong., *The United States Balance of Payments—Perspectives and Policies* 3 (1963).

of the foreign dollar accumulation into gold has resulted in a persistent drawing down of our gold stock."[18]

This crisis came to a head in 1971 due to persistent overvaluation of the dollar. Beginning in the mid-1960s, official U.S. dollar holdings of foreign governments surpassed the United States's official gold reserve holdings at the $35 per ounce exchange rate.[19] Several foreign governments began converting their dollar holdings into gold, as permitted under the Bretton Woods Agreement, thereby causing a sustained depletion of U.S. gold reserves.[20] In response, President Richard Nixon suspended the Bretton Woods Agreement's dollar-to-gold convertibility in what became known as the "Nixon Shock" of August 15, 1971.[21] Nixon imposed a temporary 10% tariff in conjunction with the gold window closure as a leverage tool for negotiating a successor exchange rate system. In December 1971, Nixon shored up the Bretton Woods system with the Smithsonian Agreement, which devalued the

---

[18] Statement of Walter W. Heller, Chairman, Council of Economic Advisors, *Recent Changes in Monetary Policy and Balance-of-Payments Problems: Hearing Before H. Comm. on Banking and Currency* 235 (July 25, 1963) available at https://www.google.com/books/edition/Recent_Changes_in_Monetary_Policy_and _Ba/abgfAAAAMAAJ?hl=en&gbpv=1&dq=%22balance+of+payments+deficits% 22&pg=PA235&printsec=frontcover.
[19] Michael Bordo, Eric Monney, Alain Naef, *The Gold Pool (1961-1968) and the Fall of the Bretton Woods System. Lessons for Central Bank Cooperation.* 12 fig. 1, Nat'l Bureau of Econ. Res. (Nov. 2017) available at https://www.nber.org/system/files/working_papers/w24016/w24016.pdf.
[20] Weis, *supra* note 15, at 3.
[21] Bordo et al., *supra* note 19, at 49.

U.S. dollar by approximately 8.5%.[22] A further 10% devaluation of the U.S. dollar in February 1973 prompted several participant countries to withdraw from the Smithsonian Agreement and "float" their currencies on an open foreign exchange market.[23]

Because the future was uncertain at the time and because these countries were still officially obliged to the Bretton Woods Agreement, President Nixon asked Congress in an April 1973 message for new powers to address "international payments imbalances" including the ability to impose "import restrictions on a temporary basis to help correct deficits or surpluses in our payments position."[24] Nixon's interest in "building on the Smithsonian Agreement,"[25] indicates that he anticipated a potential return to a fixed exchange rate system.

In response, Congress enacted the Trade Act of 1974, including Section 122. Section 122 allows the President to impose a tariff of no more than 150 days in duration and no higher than 15% to address one of three types of circumstances. 19

---

[22] *The Smithsonian Agreement*, Federal Reserve History (Nov. 22, 2013) https://www.federalreservehistory.org/essays/smithsonian-agreement.

[23] 1 International Monetary Fund 1972-1978: Cooperation on Trial, 66, 69-72, 75, 79 (International Monetary Fund 1996) available at https://www.elibrary.imf.org/display/book/9781451922684/9781451922684.xml.

[24] Richard Nixon, *Special Message to the Congress Proposing Trade Reform Legislation* (Apr. 10, 1973) available at https://www.presidency.ucsb.edu/documents/special-message-the-congress-proposing-trade-reform-legislation.

[25] *Id.*

U.S.C. § 2132. The President, in his proclamation, alleged that the United States is experiencing a "large and serious United States balance-of-payments deficits." *Id.*

However, no successor to Bretton Woods and the Smithsonian Agreement ever materialized, and the world continues to operate on a market-based floating exchange rate system. In January 1976 the International Monetary Fund (IMF) amended its articles of agreement under the Jamaica Accords. These amendments formally terminated the Bretton Woods fixed exchange rate system and provided IMF sanction for the de facto floating exchange system that had emerged in the turmoil of the fixed exchange rate collapse in March 1973. President Ford signed into law H.R. 13955 in October 1976, giving the United States's assent to these amendments. Ford stated at the time that this decision was the "culmination of years of debate and negotiation following the breakdown of the Bretton Woods par value system in 1971" and reflected the "increased flexibility, resilience, and reliance on market mechanisms which today's monetary relationships require, replacing the exchange rate rigidity and gold emphasis of the Bretton Woods system."[26]

Section 122's "balance-of-payments deficit" provision thus became obsolete. As Milton Friedman explained in 1967, "A system of floating exchange rates

---

[26] Gerald R. Ford, Statement on Signing Amendments to the Bretton Woods Agreement Act (Oct. 21, 1976) available at https://www.presidency.ucsb.edu/documents/statement-signing-amendments-the-bretton-woods-agreements-act.

completely eliminates the balance-of-payments problem."[27] Similarly, Dr. Martin Feldstein of the Council of Economic Advisors explained to the Senate Trade Committee in 1984 that "although we have a trade deficit and current accounts deficit, we do not have a balance-of-payments deficit, in the strict sense envisioned in section 122."[28] Dr. Feldstein made clear that a trade deficit is not synonymous with a balance-of-payments deficit under Section 122.

Today, therefore, there is no balance-of-payments deficit and thus President Trump has no legal authority to impose tariffs under Section 122.

*B. A balance-of-payments deficit is not the same as a trade deficit.*

President Trump cannot use Section 122 to impose tariffs to address the trade deficit because trade deficits and balance-of-payments deficits are distinct concepts. A trade deficit occurs when the value of all imported goods and services exceeds the value of all exports of the same. A balance-of-payments deficit, by contrast, refers to a reduction in official reserve assets in a fixed period of time.[29] While the United States experienced a balance-of-payments deficit throughout most of the Bretton

---

[27] Milton Friedman, Robert V. Roosa, *The Balance of Payments: Free Versus Fixed Exchange Rates* 15 (American Enterprise Institute 1967).

[28] Martin Feldstein, *Statement of Dr. Martin Feldstein, Chairman, Council of Economic Advisors*, *in Trade Deficit: Hearing Before the Subcomm. on Int'l Trade of the S. Comm. On Fin.*, 98th Cong. at 48 (Mar. 23, 1984).

[29] Pollack *supra* note 17.

Woods period, the United States had a small trade surplus for most of this time.[30]

This trade surplus existed until 1976, two years after Section 122's enactment, when

the United States began to experience consistent trade deficits.

Trade deficits were only a part of the balance-of-payments calculation.[31]

However, as explained above, balance-of-payments deficits cannot exist in a floating

exchange rate system. As such, today's trade deficit does not create, constitute, or

contribute to a balance-of-payments deficit.

*C. This Court will not engage in judicial policymaking by simply determining the statutory meaning of "balance-of-payments deficit."*

That the distinction between trade deficits and balance-of-payments deficits

is technical does not mean it is a matter of policy. After all, "[i]t is emphatically the

province and duty of the Judicial Department to say what the law is." *Marbury v.*

*Madison*, 5 U.S. 137, 177 (1803). The term "balance-of-payments deficit" is no ink

blot into which Presidents can read their preferred policies or powers. Rather, it has

---

[30] Net Exports on Goods and Services, Federal Reserve Bank of St. Louis (last visited Mar. 10, 2026) https://fred.stlouisfed.org/series/NETEXP. *See also*, S. Rep. 93-1298, 93d Cong., Rep. of the Comm. on Finance at 8 tbl. 3 (1974).

[31] A. B. Hersey, *Business Cycle Influences in the U.S. Balance of Payments*, *in* Staff of Joint Econ. Comm. 88th Cong., *The United States Balance of Payments—Perspectives and Policies* 114 tbl. 3 (1963). https://www.jec.senate.gov/reports/88th%20Congress/The%20United%20States%20Balance%20of%20Payments%20-%20Perspectives%20and%20Policies%20(247).pdf

a definite meaning, and it is this Court's responsibility to find and apply that meaning.

### III. The Original Meaning of the Constitution Prohibits Congressional Delegation of Legislative Power.

The founders, the thinkers and writers who influenced them, and lawyers in the early republic all understood that an essential part of the separation of powers, a key bulwark of liberty, was that the legislature could not delegate legislative power to any other entity.[32] Writing about the delegation of legislative powers, Locke explained, "*[t]he legislative cannot transfer the power of making laws* to any other hands: for it being but a delegated power from the people, they who have it cannot

---

[32] The founding generation saw taxes on imports and exports as an exercise of the same type of power as taxes internal to the nation. During debates over the ratification of the Constitution, many advocated for taxation on foreign trade, or "external taxation," as preferable to "internal taxation," as a source of revenue for the national government. Regarding the Constitution itself, the debate was over whether Congress should have been granted authority to issue internal as well as external taxes, or whether it should have been limited to external taxation. In other words, the debate was over the desirable extent of the congressional taxing power, demonstrating that "at the founding 'taxations levied on imports were not a special category of power that Congress shared with, or could share with, the President.'" *V.O.S. Selections, Inc.*, No.25-1812 slip op. at 7, n. 8 (additional views of Cunningham, J.) (quoting Br. of Amici Curiae Advancing American Freedom et al. at 18).

pass it over to others."[33] Locke, similarly, argued that, "[t]he legislative power *neither must nor can transfer the power of making laws to anyone else.*"[34]

At the constitutional convention, Madison explained that certain powers were "in their nature Executive, and must be given" to that branch.[35] He then presented a motion to prohibit Congress from delegating additional power to either the executive or judiciary in order to prevent "misconstructions."[36] Charles Pinckney successfully moved to strike out Madison's motion because it was "unnecessary" since the executive inherently lacks the power to make laws.[37]

In 1792, Congress passed, and President Washington signed into law, an Act to Regulate Invalid Pensions.[38] That law required circuit court justices to judge the pension applications of disabled soldiers, subject to revision by the Attorney General or an act of the legislature. The early Supreme Court justices riding circuit refused

---

[33] John Locke, *Second Treatise on Government*, § 141, 323 (Thomas Hollis ed., 1764) (1689) (emphasis in original). *See also*, Thomas Jefferson, *Notes on the State of Virginia*, Query XIII, 136 (1853) ("Our ancient laws expressly declare that those who are but delegates themselves shall not delegate to others powers which require judgment and integrity in their exercise."). 19 *Id.* at 324-32

[34] *Id*. at 324-325

[35] James Madison, *Notes of Debates in the Federal Convention of 1787* (June 1), in 1 The Records of the Federal Convention of 1787, 65 (Max Farrand ed., Yale University Press 1911).

[36] *Id.*

[37] *Id.*

[38] An Act to provide for the settlement of the Claims of Widows and Orphans barred by the limitations heretofore established, and to regulate the Claims to Invalid Pensions, ch. 11, 1 Stat. 244 (1792).

to exercise the powers the law supposedly granted to them because they determined that the mix of legislative and executive duties delegated to the courts by the act were unconstitutional. Chief Justice Jay, in his written opinion to Washington on behalf of himself, Justice Cushing, and Judge Duane, wrote "neither the legislative nor the executive branches, can constitutionally assign to the judicial any duties, but such as are properly judicial, and to be performed in a judicial manner." *Hayburn's Case*, 2 U.S. (2 Dall.) 409, 410 (1792). Justice Iredell, also riding circuit, came to the same conclusion, writing that the courts could "not be warranted" in exercising the power delegated by the act because for the judiciary to exercise "any power not in its nature judicial, or, if judicial, not provided for upon the terms the constitution requires" was unconstitutional.[39]

Similarly, in *Vanhorne's Lessee v. Dorance*, 2 U.S. 304 (2 Dall.), 308, 311 (1795), Justice Paterson explained that law can only be "the work or will of the legislature in their derivative or subordinate capacity." American constitutions acted as the "sun of the political system" and laid out the exact "orbit in which [law] must move." *Id.* Certain powers can only be exercised by the legislative body, such as "the despotic power […] of taking property," and legislatures cannot delegate that power.

---

[39] "To George Washington from James Iredell and John Sitgreaves, 8 June 1792," Founders Online, National Archives, https://founders.archives.gov/documents/Washington/05-10-02- 0290

20

*Id*. The idea of core nondelegable powers was also recognized in the case of *Cooper v. Telfair*.[40]

The nondelegation principle was reiterated during the Jefferson Administration. The Embargo Act of 1807 empowered the President "to give such instructions" to executive officers "as shall appear best adapted for carrying the same into effect."[41] The Supplementary Act passed soon after appeared to further augment this power by giving the President authority to individually decide the detainment of ships he considered suspicious.[42] Jefferson interpreted this as a broad grant of authority, writing the "legislature having found, after repeated trials, that no general rules could be formed," decided to delegate to the President "discretionary power paramount to all their general rules."[43] Justice Johnson, riding circuit, disagreed that Congress could have ever delegated such broad power to the President. In *Gilchrist*

---

[40] *Cooper v. Telfair*, 4 U.S. 14 (4 Dall.), 19 (1800) (Paterson, J.) ("But the power of confiscation and banishment does not belong to the judicial authority, whose process could not reach the offenders: and yet, it is a power, that grows out of the very nature of the social compact, which must reside somewhere, and which is so inherent in the legislature, that it cannot be divested, or transferred, without an express provision of the constitution.").

[41] An Act laying an Embargo on all ships and vessels in the ports and harbors of the United States, ch. 5, 2 Stat. 451 (1807).

[42] An Act in addition to the act intituled (sic) "An act laying an embargo on all ships and vessels in the ports and harbors of the United States," and the several acts supplementary thereto, and for other purposes, ch. 66, 2 Stat. 499 (1808).

[43] "From Thomas Jefferson to Charles Pinckney, 18 July 1808," Founders Online, National Archives, https://founders.archives.gov/documents/Jefferson/99-01-02-8354.

21

*v. Collector of Charleston*, 10 F. Cas. 355, 358 (1808), he found that if the law did what the President claimed, it would "necessarily have the effect of transferring the powers vested in one department to another department."

In *United States v. Sears*, Justice Story, writing for the circuit court, found that the apparent delegation of power to issue instructions for officers was narrow because it "presupposes that the law had already devolved these duties upon them." 27 F. Cas. 1006, 1011 (1812). Congress could not have intended to delegate "an unlimited authority over the commercial property of the citizens." *Id*.

The provision which loomed largest over the Embargo Act controversy was the empowerment of the President to lift the embargo if he received intelligence justifying such an act. The House of Representatives vigorously debated whether this was a delegation of legislative power. The key takeaway is that both proponents and opponents of the measure recognized there existed a principle of nondelegation. Representative Campbell, the motion's sponsor, declared that the bill did not vest commercial regulation, a law-making power, in the President, but only typical executive fact finding.[44] Representative Key opposed the measure as he saw in it the

---

[44] 18 Annals of Cong. 2084 (1808) (Statement of Rep. Campbell) ("For myself I cannot see what objections can be made to this measure. It is not vesting a power in the President to oppress or embarrass the commercial interest; it only invests in him a power, under certain restrictions, a pressure which our fellow citizens feel from the measure we have been forced to adopt.") 30 18 Annals of Cong. 2125 (1808) (Statement of Representative Key).

22

power to "repeal a Legislative act, and we cannot transfer the power of legislating from us to the President."[45]

When the Embargo Act challenge reached the Supreme Court, Joseph Ingersoll, son of signer of the Constitution Jared Ingersoll, representing the appellant owner of the ship *Aurora*, argued, "Congress could not transfer the legislative power to the President. To make the revival of a law depend upon the President's proclamation, is to give to that proclamation the force of a law. Congress meant to reserve to themselves the power of ascertaining when the condition should have been performed." *The Cargo of the Brig Aurora v. United States*, 11 U.S. (7 Cranch) 382, 386 (1813). The Court acknowledged the Congress could not transfer any legislative power to the President, but found that, in this case, Congress had not delegated legislative power. Instead, it held that Congress had "only prescribed the evidence which should be admitted of a fact, upon which the law should go into effect." *Id.* at 387.

The nondelegation principle is well established in early American legal thought and jurisprudence, growing out of hard-won wisdom about the dangers of the executive exercise of legislative power. The founders incorporated that wisdom into the Constitution to ensure that the legislative power of the United States, all of it, would be exercised by Congress, and by Congress alone. Although the Court's

---

[45] 18 Annals of Cong. 2125 (1808) (Statement of Representative Key).

23

more recent jurisprudence has not, heretofore, been particularly strict in its enforcement of the boundary between legislative and executive power, it nonetheless provides ample reason to question the President's reading of Section 122 in this case.

The Constitution divides the government's powers against one another to ensure that the liberty of the people is secure. Government officials cannot change that system apart from the established amendment process.

Section 122 was enacted to allow the President to solve a specific problem in foreign relations that no longer exists. It was not enacted to allow the President to erect barriers to international commerce on the mere assertion of a trade deficit. For decades, "[b]ecause of the greatness of our [country] the fruits of the whole earth [have] flow[ed] in upon us;" we have enjoyed "the goods of other countries as freely as our own."[46] Section 122 was never meant to undermine 2,500 years of our civilization's understanding of the benefits of trade. Because the President's tariffs rip powers away from Congress that the Constitution reserves exclusively to that branch, this Court should grant the petition for certiorari and find that Section 122 does not empower the President to impose these tariffs.

## CONCLUSION

For the forgoing reasons, this Court should rule for Plaintiffs.

---

[46] Thucydides, *Pericles' Funeral Oration* 118 (B. Jowett, trans. 1881).

24

Respectfully submitted,

/s/ J. Marc Wheat

J. MARC WHEAT
ADVANCING AMERICAN FREEDOM, INC.
801 PENNSYLVANIA AVENUE, N.W., SUITE 930
WASHINGTON, D.C. 20004
(202) 780-4848
MWHEAT@ADVANCINGAMERICANFREEDOM.COM

*Counsel for Amici Curiae*

25

# Certificate of Compliance

## UNITED STATES COURT OF
## INTERNATIONAL TRADE

| | |
|---|---|
| THE STATE OF OREGON; THE STATE OF ARIZONA; THE STATE OF CALIFORNIA; THE STATE OF NEW YORK; THE STATE OF COLORADO; THE STATE OF CONNECTICUT; THE STATE OF DELAWARE; THE STATE OF ILLINOIS; THE OFFICE OF THE GOVERNOR *ex rel.* Andy Beshear, in his official capacity as Governor of the Commonwealth of Kentucky; THE STATE OF MAINE; THE STATE OF MARYLAND; THE COMMONWEALTH OF MASSACHUSETTS; THE STATE OF MICHIGAN; THE STATE OF MINNESOTA; THE STATE OF NEVADA; THE STATE OF NEW JERSEY; THE STATE OF NEW MEXICO; THE STATE OF NORTH CAROLINA; JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania; THE STATE OF RHODE ISLAND; THE STATE OF VERMONT; THE COMMONWEALTH OF VIRGINIA; THE STATE OF WASHINGTON; THE STATE OF WISCONSIN, <br><br> *Plaintiffs,* <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States; THE UNITED STATES; DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security; UNITED STATES CUSTOMS AND BORDER PROTECTION; and RODNEY S. SCOTT, in his official capacity as Commissioner for U.S. Customs and Border Protection, <br><br> *Defendants.* | Case No. 1:26-cv-01472-3JP <br><br> Chief Judge Mark A. Barnett <br><br> Judge Claire R. Kelly <br><br> Senior Judge Timothy C. Stanceu |

Pursuant To U.S. Court Of International Trade's Standard Chambers Procedures, Undersigned Counsel Certifies This Brief Complies With The Court's Type-Volume Limitation Rules Because It Contains 5,748 Words.  This Brief Also Complies With All Typeface And Margin Requirements.

Respectfully submitted,

*/s/ J. Marc Wheat*

J. MARC WHEAT

2