**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:    THE HONORABLE MARK A. BARNETT, CHIEF JUDGE
            THE HONORABLE CLAIRE R. KELLY, JUDGE
            THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

| | |
|---|---|
| THE STATE OF OREGON, *et al.*,<br><br>　　Plaintiffs,<br><br>　　　　v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>　　Defendants. | Court No. 26-01472 |
| BURLAP AND BARREL, INC.; BASIC FUN, INC.,<br><br>　　Plaintiffs,<br><br>　　　　v.<br><br>DONALD J. TRUMP in his official capacity as President of the United States, *et al.*,<br><br>　　Defendants. | Court No. 26-01606 |

## <u>ORDER</u>

Upon consideration of plaintiffs' motions for preliminary injunction and summary judgment, defendants' response thereto, and all other pertinent papers, it is hereby

ORDERED that plaintiffs' motions for preliminary injunction and summary judgment are DENIED, and it is further

ORDERED that judgment is entered in favor of defendants.

Dated:_____                    _____
　　New York, New York                                       JUDGE

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

BACKGROUND ............................................................................................................ 4

    I.    The President's Authority to Impose Duties Under Section 122 ......................... 4

    II.    Factual Background ......................................................................................... 11

        A.    Proclamation Imposing Duties Under Section 122 ........................................ 11

        B.    Plaintiffs Sue to Enjoin the Section 122 Tariffs ........................................... 13

SUMMARY OF THE ARGUMENT ............................................................................ 14

STANDARD OF REVIEW ......................................................................................... 15

ARGUMENT ............................................................................................................... 16

    I.    Section 122 Clearly Authorizes the Challenged Tariffs ................................... 16

        A.    This Court's Review of the President's Proclamation is Limited ................... 17

        B.    Deficits in the Current Account Are Balance-of-Payments Deficits ............ 23

        C.    The United States' Balance-of-Payments Deficit Is Large and Serious ....... 38

        D.    Fundamental International Payments Problems Are Not a Separate, Additional

        Precondition for Imposing Temporary Import Surcharges ................................... 41

        E.    The Major-Questions Doctrine Does Not Apply .......................................... 46

        F.    Section 122 Satisfies The Nondelegation Doctrine ...................................... 49

    III.    The Proclamation Lawfully Excepts Certain Products Under Section 122 ...... 51

        A.    No Plaintiff Has Standing to Challenge the Exceptions ............................... 53

        B.    The Exceptions Do Not Violate the Nondiscriminatory Treatment Principle ............. 55

        C.    The Product Exceptions Comply with the Broad And Uniform Application

        Requirement .................................................................................................. 61

        D.    The Exceptions Are Explicitly Severable ..................................................... 64

    IV.    State Plaintiffs' APA Claim Is Meritless ........................................................ 66

V.    Plaintiffs Are Not Entitled to a Preliminary Or Permanent Injunction............................ 68

   A.    Plaintiffs Cannot Establish the Likelihood of Immediate, Irreparable Harm ............... 68

   B.    The Remaining Injunctive Factors Do Not Favor Plaintiffs........................................ 71

   C.    Any Injunction Should Be Limited Only to Plaintiffs with Standing Who Have Also Established Irreparable Harm ............................................................................................. 72

CONCLUSION.................................................................................................................... 83

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*AGS Co. Auto. Sols. v. U.S. Customs & Border Prot.*,
--- F. Supp.3d ---, 2025 WL 3634261 (Ct. Int'l Trade 2025) ..................................... 69

*Air Wisconsin Airlines Corp. v. Hoeper*,
571 U.S. 237 (2014) ................................................................................................. 24

*Ala. Ass'n of Realtors v. HHS*,
594 U.S. 758 (2021) ................................................................................................. 48

*Almendarez-Torres v. United States*,
523 U.S. 224 (1998) ................................................................................................. 43

*Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*,
751 F.2d 1239 (Fed. Cir. 1985) ................................................................................ 19

*Amazon.com, Inc. v. Barnesandnoble.com, Inc.*,
239 F.3d 1343 (Fed. Cir. 2001) ................................................................................ 16

*American Insurance Association* v. *Garamendi*,
539 U.S. 396 (2003) ................................................................................................. 49

*American Power & Light Co. v. SEC*,
329 U.S. 90 (1946) ................................................................................................... 50

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ................................................................................................. 15

*Arizona v. Biden*,
40 F.4th 375 (6th Cir. 2022) ..................................................................................... 76

*Application of Sarkar*,
588 F.2d 1330 (C.C.P.A. 1978) ................................................................................ 32

*Asociacion Colombiana de Exportadores de Flores v. United States*,
717 F. Supp. 847 (Ct. Int'l Trade 1989) ................................................................... 68

*Atari Games Corp. v. Nintendo of Am., Inc.*,
897 F.2d 1572 (Fed. Cir. 1990) ................................................................................ 69

*Atmus Filtration, Inc. v. United States*,
2026 WL 616128 (Ct. Int'l Trade Mar. 4, 2026) .............................................. 80, 81

*Badgley v. United States*,
957 F.3d 969 (9th Cir. 2020) .................................................................................... 32

*Barnes v. United States*,
   788 F. Supp. 3d 1308 (Ct. Int'l Trade 2025) ............................................................ 73

*Barr v. Am. Ass'n of Pol. Consultants, Inc.*,
   591 U.S. 610 (2020) ................................................................................................ 54

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................................. 66, 67, 77

*Bowe v. United States*,
   146 S. Ct. 447 (2026) ............................................................................................ 30

*Biden v. Nebraska*,
   600 U.S. 477 (2023) ......................................................................................... 47, 48

*B-West Imports, Inc. v. United States*,
   75 F.3d 633 (Fed. Cir. 1996) ...................................................................... 18, 23, 47

*Canadian Lumber Trade Alliance v. United States*,
   517 F.3d 1319 (Fed. Cir. 2008) ............................................................................ 76

*Canadian Wheat Bd. v. United States*,
   580 F. Supp. 2d 1350 (Ct. Int'l Trade 2008) ........................................................ 15

*Cargo of the Brig Aurora v. United States*,
   11 U.S. (7 Cranch) 382 (1813) .............................................................................. 51

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) .............................................................................................. 73

*Clarke v. Sec. Indus. Ass'n.*,
   479 U.S. 388 (1987) .............................................................................................. 77

*Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United States*,
   393 F. Supp. 3d 1271 (Ct. Int'l Trade 2019) ........................................................ 68

*Corus Grp. PLC. v. Int'l Trade Comm'n*,
   352 F.3d 1351 (Fed. Cir. 2003) ............................................................................ 22

*Corus Grp. PLC v. Bush*,
   217 F. Supp. 2d 1347 (Ct. Int'l Trade 2002) ........................................................ 70

*Dalton v. Specter*,
   511 U.S. 462 (1994) ................................................................................. 16, 18, 62, 68

*Detroit Int'l Bridge Co. v. Gov't of Canada*,
   189 F. Supp. 3d 85 (D.D.C. 2016) ....................................................................... 67

iv

*ebay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) .................................................................................................. 16

*Emily*,
    9 Wheat. 381 (1824) ................................................................................................. 30

*Facebook, Inc. v. Duguid*,
    592 U.S. 395 (2021) .................................................................................................. 56

*FEA v. Algonquin*,
    426 U.S. 548 (1976) ............................................................................................ 50, 51

*FCC v. Consumers' Research*,
    145 S. Ct. 2482 (2025) ........................................................................................ 47, 49

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ............................................................................................ 75, 77

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) .................................................................................................. 48

*Florsheim Shoe Co., Div. of Interco, Inc. v. United States*,
    744 F.2d 787 (Fed. Cir. 1984) ...................................................................... 17, 18, 47

*Franklin v. Massachusetts*,
    505 U.S. 788 (1992) ............................................................................................ 64, 68

*Garland v. Cargill*,
    602 U.S. 406 (2024) .................................................................................................. 30

*Gemveto Jewelry Co. v. Jeff Cooper Inc.*,
    800 F.2d 256 (Fed. Cir. 1986) .................................................................................. 72

*Gladstone Realtors v. Vill. of Bellwood*,
    441 U.S. 91 (1979) .................................................................................................... 77

*Gundy v. United States*,
    588 U.S. 128 (2019) ............................................................................................ 50, 51

*Hanon Systems Ala. Corp. v. United States*,
    794 F. Supp. 3d 1348 (Ct. Int'l Trade 2025) ........................................................... 43

*HMTX Industries v. United States*,
    156 F.4th 1236 (Fed. Cir. 2025) ......................................................................... 48, 50

*Hoshine Silicon (Jia Xing) Indus. Co. v. United States*,
    780 F. Supp. 3d 1328 (Ct. Int'l Trade 2025) ........................................................... 73

*Humane Soc. of U.S. v. Clinton*,
  236 F.3d 1320 (Fed. Cir. 2001) ................................................................. 18

*In re Gee*,
  941 F.3d 153 (5th Cir. 2019) .................................................................... 54

*In re Section 301 Cases*,
  524 F. Supp. 3d 1355 (Ct. Int'l Trade 2021) ........................................... 81

*Indus. Chems., Inc. v. United States*,
  941 F.3d 1368 (Fed. Cir. 2019) ................................................................ 66

*Industriales de Aceitunas de Mesa v. United States*,
  102 F.4th 1252 (Fed. Cir. 2024) ......................................................... 19, 20

*Invenergy Renewables LLC v. United States*,
  422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019) ....................................... 76, 78

*Invenergy Renewables LLC v. United States*,
  482 F. Supp. 3d 1344 (Ct. Int'l Trade 2020) ............................................ 66

*Iowa ex rel. Miller v. Block*,
  771 F.2d 347 (8th Cir. 1985) .................................................................... 76

*J.W. Hampton, Jr., & Co. v. United States*,
  276 U.S. 394 (1928) .................................................................................. 51

*K Mart Corp. v. Cartier, Inc.*,
  486 U.S. 281 (1988) .................................................................................. 65

*Kahrs Int'l, Inc. v. United States*,
  791 F. Supp. 2d 1228 (Ct. Int'l Trade 2021) ............................................ 27

*Kinney-Coastal Oil Co. v. Kieffer*,
  277 U.S. 488 (1928) .................................................................................. 79

*Learning Resources, Inc. v. Trump*,
  146 S. Ct. 628 (2026) .......................................................................... passim

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) .................................................................................. 77

*Lichter v. United States*,
  334 U.S. 742 (1948) .................................................................................. 19

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024) .................................................................................. 20

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ................................................................................................ 73

*Maple Leaf Fish Co. v. United States*,
  762 F.2d 86 (Fed. Cir. 1985) ........................................................................... passim

*Maple Leaf Marketing, Inc. v. United States*,
  528 F. Supp. 3d 1365 (Ct. Int'l Trade 2021) ...................................................... 66, 67

*Marks v. United States*,
  340 U.S. 188 (1977) ................................................................................................ 47

*Marshall Field & Co. v. Clark*,
  143 U.S. 649 (1892) ....................................................................................... 1, 49, 51

*Maryland v. U.S. Dep't of Agric.*,
  151 F.4th 197 (4th Cir. 2025) ................................................................................. 75

*Mazurek v. Armstrong*,
  520 U.S. 968 (1997) ................................................................................................ 16

*McKinney v. U.S. Dep't of Treasury*,
  799 F.2d 1544 (Fed. Cir. 1986) .................................................................... 77, 78, 79

*MD/DC/DE Broads. Ass'n v. FCC*,
  236 F.3d 13 (D.C. Cir. 2001) ................................................................................. 65

*Mingus Constructors, Inc. v. United States*,
  812 F.2d 1387 (Fed. Cir. 1987) .............................................................................. 15

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
  526 U.S. 172 (1999) ................................................................................................ 65

*Munaf v. Geren*,
  553 U.S. 674 (2008) ................................................................................................ 16

*Murthy v. Missouri*,
  603 U.S. 43 (2024) ............................................................................................ 74, 75

*Neimenggu Fufeng Biotech Co. v. United States*,
  741 F. Supp. 3d 1354 (Ct. Int'l Trade 2024) ......................................................... 54

*Nken v. Holder*,
  556 U.S. 418 (2009) ................................................................................................ 71

*Novosteel SA v. United States*,
  284 F.3d 1261 (Fed. Cir. 2002) .............................................................................. 53

*Pennsylvania ex rel. Shapp v. Kleppe,*
 533 F.2d 668 (D.C. Cir. 1976) ................................................................... 76

*PrimeSource Bldg. Prods., Inc. v. United States,*
 59 F.4th 1255 (Fed. Cir. 2023) ........................................................... 22, 51

*PrimeSource Bldg. Prods., Inc. v. United States,*
 535 F. Supp. 3d 1327 (Ct. Int'l Trade 2021) ........................................... 82

*Reichert v. Kellogg Co.*, -- F.4,
 th --, 2026 WL 734673 (6th Cir. Mar. 16, 2026) ................................. 24, 27

*Retractable Techs., Inc. v. United States,*
 739 F. Supp. 3d 1330 (Ct. Int'l Trade 2024) ...................................... 68, 81

*Rodriguez v. Dep't of Veterans,*
 8 F.4th 1290 (Fed. Cir. 2021) ................................................................... 52

*S. Corp. v. United States*,
 690 F.2d 1368 (Fed. Cir. 1982) ................................................................. 33

*Sale v. Haitian Ctrs. Council, Inc.*,
 509 U.S. 155 (1993) .................................................................................. 22

*Sanders v. Jackson,*
 209 F.3d 998 (7th Cir. 2000) .............................................................. 24, 25

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado,*
 605 U.S. 168 (2025) .................................................................................. 20

*Shandong Huarong General Grp. v. United States,*
 122 F. Supp. 2d 1367 (Ct. Int'l Trade 2000) ........................................... 70

*Silfab Solar, Inc. v. United States,*
 892 F.3d 1340 (Fed. Cir. 2018) ........................................................... 16, 22

*Spokeo, Inc. v. Robins,*
 578 U.S. 330 (2016) .................................................................................. 73

*Sumecht NA, Inc. v. United States*,
 923 F.3d 1340 (Fed. Cir. 2019) ................................................................. 16

*Susan B. Anthony List v. Driehaus*,
 573 U.S. 149 (2014) .................................................................................. 73

*Talbott v. United States*,
 No. 25-5087, 2025 WL 3533344 (D.C. Cir. Dec. 9, 2025) ...................... 82

*Thornley and Pitt v. United States*,
    273 F. Supp. 524 (Cust. Ct. 1967) ................................................................ 65

*Totes-Isotoner Corp. v. United States*,
    594 F.3d 1346 (Fed. Cir. 2010)............................................................... 69, 74

*Transpacific Steel LLC v. United States*,
    4 F.4th 1306 (Fed. Cir. 2021) ............................................................... passim

*Transpacific Steel LLC v. United States*,
    466 F. Supp. 3d 1246 (Ct. Int'l Trade 2020) ...................................... 60, 61

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021).......................................................................................... 54

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025)..................................................................................... passim

*Trump v. Hawaii*,
    585 U.S. 667 (2018).................................................................................... 47, 64

*Trump v. Orr*,
    146 S. Ct. 44 (2025)......................................................................................... 82

*United States v. American Bitumuls & Asphalt Co.*,
    246 F.2d 270 (C.C.P.A. 1957) ..................................................................... 65

*United States* v. *Curtiss-Wright Export Corp.*,
    299 U.S. 304 (1936)......................................................................................... 49

*United States v. George S. Bush & Co.*,
    310 U.S. 371 (1940).................................................................................. 18, 20

*United States v. Hayes*,
    555 U.S. 415 (2009).......................................................................................... 31

*United States v. Rahimi*,
    602 U.S. 680 (2024).......................................................................................... 32

*United States v. Texas*,
    599 U.S. 670 (2023).......................................................................................... 75

*United States v. Wilkes*,
    78 F.4th 272 (6th Cir. 2023) ..................................................................... 24, 27

*United States v. Yoshida Int'l, Inc.*,
    526 F.2d 560 (C.C.P.A. 1975) ...................................................................... 63

*USP Holdings, Inc. v. United States*,
  36 F.4th 1359 (Fed. Cir. 2022) ............................................................. 18, 22, 52, 67

*V.O.S. Selections*,
  772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025) ....................................... 26, 28, 74, 79

*V.O.S. Selections, Inc. v. Trump*,
  149 F.4th 1312 (Fed. Cir. 2025) ................................................................... 22, 79

*Van Dermark v. McDonough*,
  57 F.4th 1374 (Fed. Cir. 2023) ............................................................................ 30

*Wabtec Corp. v. United States*,
  805 F. Supp. 3d 1326 (Ct. Int'l Trade 2025) ....................................................... 42

*Warth v. Seldin*,
  422 U.S. 490 (1975) ............................................................................................. 79

*Washington v. FDA*,
  108 F.4th 1163 (9th Cir. 2024) ............................................................................ 76

*Winter v. NRDC*,
  555 U.S. 7 (2008) ........................................................................................... passim

*Wisconsin Cent. Ltd v. United States*,
  585 U.S. 274 (2018) ............................................................................................. 32

*Wisconsin Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ............................................................................. 68

*XY Planning Network, LLC v. SEC*,
  963 F.3d 244 (2d Cir. 2020) ................................................................................ 76

*Yellen v. Confederated Tribes of Chehalis Rsrv.*,
  594 U.S. 338 (2021) ............................................................................................. 56

*Yoshida Int'l, Inc. v. United States*,
  378 F. Supp. 1155 (Cust. Ct. 1974) ................................................................... 8, 9

*Zenith Radio Corp. v. United States*,
  710 F.2d 806 (Fed. Cir. 1983) ........................................................................ 68, 72

**Statutes**

19 U.S.C. § 1232(a) .................................................................................................. 2

19 U.S.C. § 1307 (1986) ......................................................................................... 78

19 U.S.C. § 1337(j)(2) ................................................................................................ 51

19 U.S.C. § 1677-2 ..................................................................................................... 20

19 U.S.C. § 1881 .................................................................................................. 60, 61

19 U.S.C. § 2132 ................................................................................................. passim

19 U.S.C. § 2462 ......................................................................................................... 21

19 U.S.C. § 2481(9) ................................................................................................... 57

Pub. L. 93-618, sec. 122 ............................................................................................. 43

Pub. L. 93-618 ............................................................................................................. 57

Pub. L. 96-417 ............................................................................................................ 79

Pub. L. 105-206, sec. 5003(b)(2)(B) .......................................................................... 57

## Rules

USCIT Rule 65(c) ........................................................................................................ 82

## Other Authorities

Bureau of Econ. Analysis, *Glossary: Balance of Payments* (Apr. 11, 2018),
www.bea.gov/help/glossary/balance-payments ........................................................... 5

Bureau of Econ. Analysis, *Glossary: Current account (international)* (Apr. 13, 2018),
www.bea.gov/help/glossary/current-account-international .......................................... 6

Bureau of Econ. Analysis, *Glossary: Capital account (international)* (Apr. 13, 2018),
www.bea.gov/help/glossary/capital-account-internationa ........................................... 6

Bureau of Econ. Analysis, *Glossary: Financial account (international)* (Apr. 13, 2018),
www.bea.gov/help/glossary/financial-account-international ........................................ 6

Bureau of Econ. Analysis*, International Transactions*, https://www.bea.gov/data/intl-trade-
investment/international-transactions ..................................................................... 4, 5

Christopher A. Casey & Jennifer K. Elsea, Cong. Rsch. Serv., R45168, *The International
Emergency Economic Powers Act: Origins, Evolution, and Use* (2024) ..................... 8

Edwin Dale, *U.S. Trade Deficit First Since 1888*, The New York Times (Jan. 26, 1972),
www.nytimes.com/1972/01/26/archives/us-trade-deficit-first-since-1888-nations-surplus-of-
imports-over.html ........................................................................................................ 7

H. Rep. 93-571 (Oct. 10, 1973) ........................................................................................*passim*

International Monetary Fund (IMF), *Article IV Report for the United States* 45 (Table 1) (April 2, 2026), https://www.imf.org/-/media/files/publications/cr/2026/english/1usaea2026001.pdf..... 28, 29, 46

The Office of the Historian, *Nixon and the End of the Bretton Woods System*, 1971-1973, U.S. Dep't of State, https://history.state.gov/milestones/1969-1976/nixon-shock ............................... 7

*Paper Prepared in the Department of Treasury*, Foreign Relations of the United States 1969-1976, 3: 76 (Sept. 10, 1971), perma.cc/JTZ8-2KTU ............................................................ 8, 28

*President Richard Nixon, Special Message to the Congress Proposing Trade Reform Legislation* (Apr. 10, 1973), in The American Presidency Project, perma.cc/F9MQ-487F ............................ 8

Proclamation 11012, 91 Fed. Reg. 9339 (Feb. 25, 2026) ...................................................... passim

Reserve Bank of Australia, *The Balance of Payments*, www.rba.gov.au/education/resources/explainers/the-balance-of-payments.html ........................ 5

Scott A. Wolla, *International Trade: Making Sense of the Trade Deficit*, Federal Reserve Bank of St. Louis (Nov. 1, 2016), www.stlouisfed.org/publications/page-one-economics/2016/11/01/international-trade ................................................................................... 5

Scalia & Garner, *Reading Law* § 4 ......................................................................................... 30

S. Rep. No. 93-1298 (Nov. 26, 1974) ..................................................................................*passim*

S. Rep. No. 965, 88-2.............................................................................................................. 30

State Respondents Brief, *Learning Resources, Inc. v. Trump*, Case No. 25-250, October 20, 2025 .................................................................................................................................. 26, 37

Trade Scholars Amicus Brief, *Learning Resources, Inc. v. Trump*, Case No. 24-1287, Oct. 24, 2025.....................................................................................................................................*passim*

V.O.S. Selections, Inc. Brief, *Learning Resources, Inc. v. Trump*, Case No. 25-250, October 20, 2025.................................................................................................................................... 26, 37

William H. Branson, *The Balance of Payments in 1970*, Brookings Inst., www.brookings.edu/wp-content/uploads/1971/01/1971a_bpea_branson.pdf............................... 6

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:    THE HONORABLE MARK A. BARNETT, CHIEF JUDGE
               THE HONORABLE CLAIRE R. KELLY, JUDGE
               THE HONORABLE TIMOTHY C. STANCEU, SENIOR JUDGE

| | |
|---|---|
| THE STATE OF OREGON, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Court No. 26-01472 |
| BURLAP AND BARREL, INC.; BASIC FUN, INC., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD J. TRUMP in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | Court No. 26-01606 |

**DEFENDANTS' RESPONSE IN OPPOSITION TO
MOTIONS FOR PRELIMINARY INJUNCTION AND SUMMARY JUDGMENT**

**INTRODUCTION**

For over a century, Congress has supplemented the President's constitutional power over foreign affairs and national security by delegating to him the authority to manage foreign trade in response to international conditions, including by imposing tariffs. *See Marshall Field & Co. v. Clark*, 143 U.S. 649, 690-91 (1892). Last year, the President imposed tariffs under the

International Emergency Economic Powers Act (IEEPA).  Despite the Supreme Court's decision in *Learning Resources, Inc. v. Trump*, 146 S. Ct. 628 (2026), subsequently invalidating those tariffs, the IEEPA tariffs leveled the playing field for American businesses and manufacturers, opened up markets abroad for American exports, and addressed the devastating trade deficit that has endangered America's national security and economic prosperity.

During the IEEPA litigation—brought by parties including the same plaintiffs or plaintiffs' counsel in this case—plaintiffs repeatedly argued that the President's tariffs were unlawful under IEEPA but would be justified under Section 122 of the Trade Act of 1974 if the tariffs did not exceed 15 percent and did not last more than 150 days.  And courts—including this Court—relied on plaintiffs' counsel's arguments and agreed that Section 122 was the proper authority for imposing such tariffs.

In late February, the President took a decisive new action to address the Nation's large, persistent, and serious balance-of-payments deficit by imposing new tariffs under Section 122.  Section 122 is a "clear and limited delegation[]," *Learning Resources*, 146 S. Ct. at 640, authorizing the President to impose "a temporary import surcharge" of up to 15 percent *ad valorem* on articles imported into the United States, for up to 150 days. 19 U.S.C. § 1232(a).  These new tariffs seek to secure a stable and prosperous future for the United States by dealing with the country's large and serious balance-of-payments deficit.  That balance-of-payments deficit includes a staggering deficit in the Nation's current account—*i.e.*, "balance of payments deficit"—that has nearly doubled in the last few years, and driven by a goods trade deficit that has grown by 40 percent in the last five years alone.

Now that the President has done what plaintiffs' counsel repeatedly suggested and approved of in the IEEPA litigation, plaintiffs here, two private businesses and 24 states,

2

nevertheless challenge the President's exercise of authority explicitly delegated to him by Congress to deal with this type of economic imbalance.

But plaintiffs do not dispute that Section 122 authorizes tariffs. They do not dispute that the challenged tariffs adhere to Section 122's amount and duration limitations. They do not dispute that tariffs can deal with a balance-of-payments deficit. And they do not dispute that there is a large and serious deficit in the balance-of-payment's current account—the only reasonable measure of a balance-of-payment deficit.

Instead, plaintiffs' abandon their prior litigation positions that the President can use Section 122 to impose tariffs under today's circumstances and now remarkably claim that Congress enacted a law that was useless the day it was enacted. They also ask this Court to second guess the President's determination, informed by expert advice from senior economic and trade advisors, that such a large, serious, and persistent balance-of-payments deficit exists and is significantly harming the United States' national interests, including economic and national security interests. And they argue that the President exceeded his statutory authority by creating exceptions to the surcharge, even though Section 122(e) expressly authorizes the President to create product exceptions.

The Court should reject these arguments, deny plaintiffs' summary-judgment and preliminary-injunction motions, and enter judgment in favor of defendants. This Court's review is limited to whether the President acted within his delegated authority, properly construed the statutory language, and adhered to the relevant procedural requirements—the temporary import surcharge imposed here easily passes muster under those standards. Section 122's text, purpose, and history establish that Section 122 authorizes the President to impose a temporary import surcharge after he finds that the United States' balance-of-payments deficit is large and serious.

3

Here, the President found that there is a large and serious balance-of-payments deficit in the United States' current account, a component of the balance-of-payments.  And deficits in the current account constitute "balance-of-payment deficits" under any reasonable interpretation of Section 122.

Section 122 also allows the President to except products from import-restricting actions because of the needs of the U.S. economy, and the President's product exception determinations comply with the statute.  In any event, even if the Court were to invalidate one or more of the exceptions, plaintiffs' requested relief is still not warranted: Under the Proclamation's severability provisions, the remaining exceptions and the primary determination regarding the necessity of the import surcharge should still be upheld as a valid exercise of the President's power under Section 122.

Finally, plaintiffs' request for a preliminary or permanent injunction requires them to show that irreparable harm, the balance of hardships, and the public interest tip in their favor— all showings that they fail to make.  Accordingly, the Court should deny injunctive relief.  To the extent the Court grants injunctive relief, it should restrict such relief only to the plaintiffs with standing, consistent with controlling precedents.  At a minimum, the Court should stay the injunction for seven days to permit the government to seek appellate relief.

**BACKGROUND**

**I.      The President's Authority to Impose Duties Under Section 122**

3.      The key concept in this case is the balance of payments and its relationship to the balance-of-trade deficit.  The balance of payments is an accounting system that summarizes all financial transactions between a single country and all other countries.  The U.S. Department of Commerce's Bureau of Economic Analysis (BEA) tracks goods, services, and investments that flow in and out of the United States.  *See* Bureau of Econ. Analysis, *International Transactions*,

4

https://www.bea.gov/data/intl-trade-investment/international-transactions (last accessed Apr. 3, 2026). The balance of payments is recorded as a "double entry" bookkeeping method, whereby every transaction recorded will have two entries, marked as either a debit or a credit, each in the same amount. [1] *See* Reserve Bank of Australia, *The Balance of Payments*, www.rba.gov.au/education/resources/explainers/the-balance-of-payments.html (last accessed Apr. 3, 2026). "When economic value is provided a credit entry is made, and when an economic value is received a debit entry is made." *Id.* Because every transaction has two offsetting entries, the overall balance of payments will *always* be zero. *Id.*; *see also* Scott A. Wolla, *International Trade: Making Sense of the Trade Deficit*, Federal Reserve Bank of St. Louis (Nov. 1, 2016), www.stlouisfed.org/publications/page-one-economics/2016/11/01/international-trade (last accessed Apr. 2, 2026).

Take, for example, a U.S. company that buys $1 million of products from a foreign company. This transaction would create two entries in the balance-of-payments: One entry will be a $1 million dollar *debit* that reflects the value of the products received from the foreign entity and another entry will be a $1 million *credit* that reflects the value of the payment issued to the foreign entity. These two entries offset, balancing to zero.

Transactions in the balance-of-payments are tracked in three accounts: the current account, the capital account, and the financial account. CEA Decl. ¶ 24; Bureau of Econ. Analysis, *Glossary: Balance of Payments* (Apr. 11, 2018), www.bea.gov/help/glossary/balance-payments. The first component—the current account—tracks (i) goods and services flowing in

---

[1] Balance of payments was understood the same way in the 1970s when Section 122 was enacted. *See* Balance of Payments, Black's Law Dictionary (5th ed. 1979) ("The difference between all payments made by one nation to all other nations in the world and the payments made to that nation by all other nations.").

and out of the United States (trade balance), (ii) primary income (international investment income and labor compensation) and (iii) secondary income (unilateral transfers such as insurance payments, foreign aid, and remittances). *Learning Resources, Inc. v. Trump*, Case No. 24-1287, Oct. 24, 2025 Trade Scholars Amicus Br. (Trade Scholars Br.) 7, 10 n.5; CEA Decl. ¶ 24; Bureau of Econ. Analysis, *Glossary: Current account (international)* (Apr. 13, 2018), www.bea.gov/help/glossary/current-account-international. The capital account, universally acknowledged to be small relative to the current account, records capital transfers between the United States and foreign countries, such as debt forgiveness, migrants' transfers, and acquisitions and disposals of nonproduced nonfinancial assets.[2]  Trade Scholars Br. at 8; CEA Decl. ¶ 38; Bureau of Econ. Analysis, *Glossary: Capital account (international)* (Apr. 13, 2018), www.bea.gov/help/glossary/capital-account-international. Finally, the financial account records transactions between the United States and foreign countries resulting in changes in the level of international claims or liabilities, including deposits and direct investment. Bureau of Econ. Analysis, *Glossary: Financial account (international)* (Apr. 13, 2018), www.bea.gov/help/glossary/financial-account-international; Trade Scholars Br. 7.  The prior example exemplifies the relationship between the current account and the financial account.  A U.S. company's purchase of $1 million dollars in foreign goods creates a $1 million debit in the current account.  And as previously discussed, that debit is balanced by a credit that is entered in the capital or financial account.  Therefore, a deficit in the current account will always be "balanced" by a surplus in the financial account.  Put slightly differently, "the value of whatever is traded (recorded in the current account) is offset by a movement of some form of asset to pay

---

[2] This framework is very similar to that used in the 1970s.  CEA Decl. ¶ 25; William H. Branson, *The Balance of Payments in 1970*, Brookings Inst., www.brookings.edu/wp-content/uploads/1971/01/1971a_bpea_branson.pdf (last accessed Apr. 3, 2026).

6

for it (recorded in the capital and financial account).  Consequently, when the balance of one account is in surplus (i.e. has a positive value, representing a credit), the balance of the other account must be in deficit (i.e. has a negative value, representing a debit)."  Reserve Bank of Australia, *The Balance of Payments*, www.rba.gov.au/education/resources/explainers/the-balance-of-payments.html (last accessed April 3, 2026).

2.      In 1971, amid shifting global economic conditions post-World War II, the United States recorded a trade deficit for the first time since 1888.  Edwin Dale, *U.S. Trade Deficit First Since 1888*, The New York Times (Jan. 26, 1972), www.nytimes.com/1972/01/26/archives/us-trade-deficit-first-since-1888-nations-surplus-of-imports-over.html (last accessed Apr. 3, 2026).  That trade deficit was a significant contributor to a monetary crisis—brought on by fixing the value of the U.S. dollar as one-thirty-fifth of the price of an ounce of gold.  *See* The Office of the Historian, *Nixon and the End of the Bretton Woods System*, 1971-1973, U.S. Dep't of State, https://history.state.gov/milestones/1969-1976/nixon-shock (last accessed Apr. 3, 2026).[3] Before the 1970s, external values of foreign currencies were fixed in relation to the U.S. dollar, whose value was in turn expressed in gold at a congressionally set price; these fixed exchange rates anchored to gold were part of what has been termed the "Bretton Woods system."  *See id.* Under Bretton Woods, other countries pegged their currency to the U.S. dollar and the U.S. Government, in turn, guaranteed it would buy or sell gold at the fixed rate of $35 per ounce.  *Id.*

By the 1960s, the United States did not have enough gold to cover the volume of dollars in worldwide circulation.  *See id.*  Accordingly, on August 15, 1971, President Nixon

---

[3]  Throughout the 1960s, Congress recognized the developing monetary crisis and convened the Joint Economic Committee to consider the United States balance of payments.  *See* S. Rep. No. 965, 88-2 (March 19, 1964).  In this report, Congress recognized that "[a]n expanded trade balance is the most desirable method of adjustment available to the United States" to address balance-of-payments problems.  *Id.* at 16.

immediately canceled the direct international convertibility of the U.S. dollar to gold, imposed wage and price controls, declared a national emergency with respect to what he determined to be a balance-of-payments crisis, and under that emergency imposed a 10 percent tariff on all dutiable merchandise.  *See* Christopher A. Casey & Jennifer K. Elsea, Cong. Rsch. Serv., R45168, *The International Emergency Economic Powers Act: Origins, Evolution, and Use* (2024); Proclamation 4074, 36 Fed. Reg. 15,724 (Aug. 17, 1971).  President Nixon determined that a "prolonged decline in the international monetary reserves" of the United States over a number of years had seriously threatened its "international competitive position" and potentially impaired its ability to ensure national security, and he called upon the public and private sector to "make the efforts necessary to strengthen the international economic position of the United States."  Proclamation 4074, 36 Fed. Reg. at 15,724.  The Nixon administration recognized that the trade deficit was the key driver of the balance-of-payments crisis, stating that "erosion of the merchandise trade position has been a primary element in the unsatisfactory U.S. balance of payments."  *See Paper Prepared in the Department of Treasury*, Foreign Relations of the United States 1969-1976, 3: 76 (Sept. 10, 1971), perma.cc/JTZ8-2KTU.

After a legal challenge to President's Nixon's proclamation, in July 1974 the Customs Court concluded that President Nixon had lacked authority to impose the tariffs.  *Yoshida Int'l, Inc. v. United States*, 378 F. Supp. 1155 (Cust. Ct. 1974).  In light of the Customs Court's decision, President Nixon sought explicit authority from Congress to impose duties in response to balance-of-payments problems.  *See President Richard Nixon, Special Message to the Congress Proposing Trade Reform Legislation* (Apr. 10, 1973), in The American Presidency Project, perma.cc/F9MQ-487F.

8

By this point, the United States had moved off the gold standard and into a floating exchange rate, whereby the value of the U.S. dollar is determined by its supply and demand, rather than its relationship to a fixed weight of gold.  *See* CEA Decl. ¶ 25 (noting the U.S. dollar started to float at least by March 1973), attached as Exhibit A. [4]  As Congress recognized, "[a]fter the U.S. could no longer maintain a fixed parity between the dollar and gold, the fixed exchange rate structure collapsed on August 15, 1971."  S. Rep. No. 93-1298 (Nov. 26, 1974) at 13.

Even though the United States had moved into a floating exchange rate, Congress recognized that balance-of-payments problems could still recur, and thus proceeded to enact Section 122, under which "the President would be required to impose import restrictions whenever the U.S. faces large and serious balance of payments deficits."  *Id.* at 87.  The Senate Finance Committee envisioned that such balance-of-payments deficits would still exist under a floating exchange system, and provided one example: "[i]n the new era created by the rapid increase in oil prices, it is likely that most oil-consuming countries will face large balance of payments deficits."  *Id.*  The Committee also noted that "circumstances can change rapidly and the Committee deems it necessary that the President have authority to impose surcharges and other import restrictions for balance of payments reasons, even though under present circumstances such authority is not likely to be utilized."  *Id.* at 87-88.  In making this

---

[4]  We have included three declarations with this filing from:  (1) Pierre Yared, Acting Chairman of the Council of Economic Advisers; (2) Howard Lutnick, Secretary of the Department of Commerce; and (3) Ambassador Jamison Lee Greer, United States Trade Representative.  These declarations are offered in response to the declarations offered by plaintiffs.  *See* States Decls. Exhs. 5-6, ECF No. 27-5, 27-6.  As we explain below, the Court need not rely on them because review of a Presidential Proclamation permits only review for statutory compliance.  Nonetheless, the declarations may prove useful to the Court in interpreting the complex economic concepts underlying the statutory terms.

9

determination, the Committee recognized the importance of the trade deficit, stating that "recent trade deficits have accounted for over one-half of our overall payments deficits." *Id.* at 7.

In short, before Section 122's enactment, at the time of Section 122's enactment, and since Section 122's enactment, the United States has had a floating currency—not a fixed currency. CEA Decl. ¶ 25.

3.      Section 122 explicitly grants the President balance-of-payments tariff authority. It authorizes the President to impose, for a period not exceeding 150 days, "a temporary import surcharge, not to exceed 15 percent ad valorem, in the form of duties[,]" in order "to deal with large and serious United States balance-of-payments deficits." 19 U.S.C. § 2132(a). It also authorizes the President to reduce duties or raise import quotas to "deal with large and persistent United States balance-of-trade surpluses." *Id.* § 2132(c). Section 122 further requires that "import restricting actions … be applied consistently with the principle of nondiscriminatory treatment" (commonly known as normal trade relations treatment), although it permits the President to exempt countries from such action and act against "one or more countries having large or persistent balance-of-payment surpluses." *Id.* § 2132(d). And, while Section 122 generally requires import-restricting actions—including duties—to be "of broad and uniform application with respect to product coverage," it allows the President to except certain articles from those restrictions based on the needs of the United States economy. *Id.* § 2132(e). The statute limits such exceptions "to the unavailability of domestic supply at reasonable prices, the necessary importation of raw materials, avoiding serious dislocations in the supply of imported goods, and other similar factors[,]" as well as where "the import restriction action will be unnecessary or ineffective in carrying out the purposes of [Section 122], such as with respect to articles already subject to import restrictions." *Id.*

10

## II.     Factual Background

### A.     Proclamation Imposing Duties Under Section 122

On February 20, 2026, pursuant to the authority granted him in Section 122, the President issued a proclamation imposing a temporary import surcharge of 10 percent *ad valorem* on certain articles imported into the United States, with exceptions for certain products. Proclamation 11012, *Imposing a Temporary Import Surcharge To Address Fundamental International Payments Problems*, 91 Fed. Reg. 9339 (Feb. 25, 2026).

With respect to the temporary surcharge, the President considered information from senior government economics and trade advisors to determine, among other things, that "fundamental international payments problems within the meaning of section 122 exist; that those problems significantly harm United States national interests, including economic and national security interests; and that special measures[,]" namely an import surcharge consisting of *ad valorem* duties, was required to deal with the large and persistent balance-of-payments deficit. *Id.* at 9341. The President determined that the United States' balance-of-payments position, "under any reasonable understanding of the term in the context of section 122," including various methods of evaluating the balance of payments, constitutes "a large and serious deficit." *Id.* at 9340. The President assessed the state of the current account, describing how all components of the current account balance are negative, including the deficit in selling goods and services overseas (*i.e.*, the trade deficit), deficits in the country's return on investment or labor (*i.e.*, primary income), and the deficit in voluntary transfers such as remittance (*i.e.*, secondary income). *Id.* Put another way, within the current account, "the United States runs a trade deficit, does not currently make a net income from the capital and labor that it deploys abroad, and experiences more transfer payments, on net, flowing out of the country than into the country." *Id.*

11

In considering each of these elements of the current account balance, the President gave further consideration to the two largest elements, the balances on trade and primary income. Regarding the trade deficit, the President observed that both the goods trade balance and the overall goods and services trade balance are in deficit.  In particular, he noted that the goods trade deficit had grown by over 40 percent in the past five years, reaching $1.2 trillion in 2024 and staying at approximately that level in 2025.  He explained that this deficit was large, persistent, and serious, and that the deficit "contributes to the fundamental international payments problems facing the United States." *Id.*  Turning to primary income, he explained that the annual balance of the country's primary income, which had been in a surplus since at least 1960, turned negative in 2024, meaning that there was no longer a primary income surplus to serve as a counterweight or stabilizing force to the large and persistent trade deficit within the current account.  *Id.*  The President next addressed the United States' net international investment position—which is the difference between foreign-owned U.S. assets and U.S. owned foreign assets and reflects the accumulation of past current account deficits—stating that it had declined steeply from an average of negative 41 percent between 2010 and 2020 to negative 90 percent by the end of 2024.  *Id.; see* CEA Decl. ¶¶ 18, 48.  He further explained that, "[b]ecause the current account is one of the primary drivers of changes in the net international-investment position, the atypically large negative net international-investment position of the United States shows that the United States balance-of-payments deficit is large and serious." *Id.*  Finally, he stated that the balance on secondary income has also been in a persistent deficit since the 1960s. *Id.*

The President further determined that certain products should not be subject to the temporary surcharge "because of the needs of the United States economy," and found that each exception was warranted because of:

> (1) the unavailability of domestic supply at reasonable prices, the necessary importation of raw materials, the avoidance of serious dislocations in the supply of imported goods, or other similar factors; or (2) the fact that the surcharge would be unnecessary or ineffective in carrying out the purposes of section 122, such as with respect to articles already subject to import restrictions or goods in transit[.]

*Id.* at 9341-42. He found that each exception—in whole or in part, separately or in any combination—would best serve the purposes of Section 122 and made clear that each exception determination was independent. *Id.* at 9342. The exceptions are listed in the annexes to the Proclamation.

The President directed modifications to the Harmonized Tariff Schedule (HTSUS) to effectuate the surcharge and instructed the relevant agencies to take any appropriate measures to implement the Proclamation. *Id.* at 9343. Finally, he made clear that the provisions in the Proclamation were severable, stating that "[i]f any exception to the surcharge imposed in this proclamation is held to be invalid in whole or in part, only that exception or that part of the exception shall be treated as invalid. … I would adopt each exception in this proclamation in whole or in part, separately, or in any combination." *Id.*

### B.    Plaintiffs Sue to Enjoin the Section 122 Tariffs

On March 5, 2026, a group of 24 states filed a complaint asking this Court to hold Proclamation 11012 unlawful, permanently enjoin the Government from collecting duties imposed pursuant to the Proclamation, and refund duties collected pursuant to the Proclamation. Case No. 26-01472, ECF No. 2. On March 9, 2026, two private plaintiffs, importers of record, also filed a complaint requesting the same relief. Case No. 26-01606, ECF No. 2. Both the state

13

and private plaintiffs filed motions for summary judgment and preliminary injunction on March 13, 2026.  States Br., Case No. 26-01472, ECF No. 25; Private Pls. Br., Case No. 26-01696, ECF No. 11.  This Court ordered the Government to file a consolidated response brief to both motions for summary judgment and preliminary injunction.  *See* Case No. 26-01472, ECF No. 24.

**SUMMARY OF THE ARGUMENT**

The Court should deny plaintiffs' motion for summary judgment and instead enter judgment in favor of the Government because Section 122 clearly authorizes the actions taken by the President in Proclamation 11012.  As the President found, the United States faces a large and persistent balance-of-payments deficit, and Section 122 authorizes the President to impose a temporary import surcharge, *i.e.*, duties, to deal with the problem.  Contrary to plaintiffs' argument, the large and persistent balance-of-payments deficit *is* a fundamental international payment problem that Section 122 authorizes the President to rectify by imposing a restriction on imports in the form of a surcharge.  And, as this Court has previously acknowledged, deficits in the current account constitute balance-of-payment deficits under Section 122.  This conclusion is grounded in a plain reading of Section 122 and supported by its legislative history.  Plaintiffs' alternative reading that Section 122 deficits apply to the balance on all three accounts taken together ignores prevailing logic and would mean that Congress enacted a useless statute in direct conflict with the strong presumption against ineffectiveness.  Moreover, the product exceptions in Annexes I and II were issued consistent with the needs of the U.S. economy—a fact not challenged by plaintiffs.  Rather, plaintiffs erroneously distort the principle of nondiscrimination and the uniformity requirements in subsections (d) and (e) as a means to challenge the President's actions under subsection (a).  But the exceptions to the import

14

surcharge were independent actions by the President that would not result in the invalidation of the surcharge, and in any case are consistent with the conditions of Section 122.

The Court can enter final judgment for the Government now and need not consider whether a preliminary injunction is warranted. But if it does consider plaintiffs' preliminary-injunction motion, plaintiffs fail to show likelihood of success on the merits of their case. Nor can plaintiffs establish irreparable harm, given that they would have the possibility of a refund of any duties through the reliquidation of entries. Moreover, the equities and public interest cut against enjoining a President from exercising congressionally delegated authority to solve an international payments problem. Plaintiffs' motion for a preliminary injunction should thus be denied. The Court should deny plaintiffs' request for a permanent injunction for the same reasons. To the extent the Court grants any injunctive relief, it should limit that relief to only the plaintiffs with standing and stay it pending appeal or, at a minimum, stay it for seven days to allow the Government to seek appellate relief.

**STANDARD OF REVIEW**

Summary judgment is appropriate where there are no genuine disputes as to any material fact. USCIT R. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987); *see Canadian Wheat Bd. v. United States*, 580 F. Supp. 2d 1350, 1356 (Ct. Int'l Trade 2008) ("Once it is clear there are no material facts in dispute" and the case at hand "hinges on pure questions of law, resolution by summary judgment is appropriate.") (quotation omitted), *aff'd*, 641 F.3d 1344 (Fed. Cir. 2011). Under this Court's rules, the Court may grant summary judgment in favor of the nonmovant. USCIT R. 56(f)(1).

15

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (emphasis and citation omitted). It is "never awarded as of right." *Winter v. NRDC*, 555 U.S. 7, 24 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)). "To receive a preliminary injunction, the movant must show '(1) likelihood of success on the merits, (2) irreparable harm absent immediate relief, (3) the balance of interests weighing in favor of relief, and (4) that the injunction serves the public interest.'" *Sumecht NA, Inc. v. United States*, 923 F.3d 1340, 1345 (Fed. Cir. 2019) (quoting *Silfab Solar, Inc. v. United States*, 892 F.3d 1340, 1345 (Fed. Cir. 2018)). "[C]ase law and logic both require that a movant cannot be granted a preliminary injunction unless it establishes both of the first two factors, *i.e.*, likelihood of success on the merits and irreparable harm." *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1350 (Fed. Cir. 2001) (citation omitted). Similar considerations apply where a plaintiff seeks a permanent injunction. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

**ARGUMENT**

## I.    Section 122 Clearly Authorizes the Challenged Tariffs

Section 122 clearly authorizes the tariffs imposed in Proclamation 11012. Section 122 unequivocally empowers the President to impose duties of up to 15 percent and for up to 150 days, to deal with large and serious balance-of-payments deficits. 19 U.S.C. § 2132(a)(1)(A). The President's action in Proclamation 11012 complies with the statute's plain text, and his determination—particularly his finding of the existence of a large and serious balance-of-payments deficit—constitutes an unreviewable exercise of the President's judgment. *See Dalton v. Specter*, 511 U.S. 462, 477 (1994).

16

Plaintiffs do not dispute that the tariffs comply with Section 122's amount and duration limitations. Plaintiffs also do not deny that if defendants' methods to calculate the United States' balance-of-payments position are correct, defendants' calculations are accurate and the United States has a balance-of-payments deficit. Specifically, plaintiffs do not contest the existence of a large current account deficit, a large trade deficit, or deficits in primary and secondary income. Rather, they claim that there is no "balance-of-payments deficit" (and *there never could be or will be*), and that no fundamental international payments problems exist. Both arguments miss the mark. To the extent the Court entertains plaintiffs' arguments, the best reading of the statute is that the phrase "balance-of-payments deficit" refers to a deficit in the current account and that the phrase "fundamental international payments problems" encompasses the kind of conditions specified in the subparagraphs that follow it, including large and serious balance-of-payments deficits. Text, context, and history all support this reading.

### A.      This Court's Review of the President's Proclamation is Limited

Plaintiffs incorrectly assume that the Court can review the findings in the President's Proclamation *de novo* in considering whether it complies with Section 122. "[T]he Executive's decisions in the sphere of international trade are reviewable only to determine whether the President's action falls within his delegated authority, whether the statutory language has been properly construed, and whether the President's action conforms with the relevant procedural requirements. The President's findings of fact and the motivations for his action are not subject to review." *Florsheim Shoe Co., Div. of Interco, Inc. v. United States*, 744 F.2d 787, 795 (Fed. Cir. 1984).

That disposes of the case. Here, there is no question that, in Section 122, Congress delegated authority to the President to impose tariffs. And there is no question that the Proclamation imposed tariffs that are within the President's authority under Section 122. Section

17

122 limits the amount and duration of the tariffs, and the Proclamation falls within those limits. To reach any other question in this case, the Court would have to disregard *Florsheim*, a binding precedent, to review the presidential findings underlying the Proclamation that there is "a large and serious balance-of-payments deficit" and that "fundamental international payments problems" exist. 91 Fed. Reg. at 9341.

Such review would be proscribed not just by *Florsheim*, but also by other doctrines. "[W]here Congress has authorized a public officer to take some specified legislative action when in his judgment that action is necessary or appropriate to carry out the policy of Congress, the judgment of the officer as to the existence of the facts calling for that action is not subject to review." *United States v. George S. Bush & Co.*, 310 U.S. 371, 380 (1940); *see Dalton*, 511 U.S. at 477 ("Where a statute … commits decisionmaking to the discretion of the President, judicial review of the President's decision is not available."). Even where a statute mandates that the President consider certain information, such "factors do not amount to a formula for the decision-making process which can be judicially reviewed." *Florsheim*, 744 F.2d at 795. "In short, the [P]residential decision is a 'multifaceted judgmental decision,' for which there is 'no law to apply.'" *Id.* at 796; *see also, e.g.*, *USP Holdings, Inc. v. United States*, 36 F.4th 1359, 1369 (Fed. Cir. 2022) ("[D]eterminations committed to the President's discretion are beyond our jurisdiction to review."). Additionally, statutes authorizing the President to act in areas involving foreign affairs are to be particularly broadly construed. *See B-West Imports, Inc. v. United States*, 75 F.3d 633, 636 (Fed. Cir. 1996); *see, e.g.*, *Florsheim*, 744 F.2d at 793 (Section 504(a) of the Trade Act of 1974 "is intimately involved with foreign affairs, an area in which congressional authorizations of presidential power should be given a broad construction and not hemmed in or cabined, cribbed, confined by anxious judicial blinders." (cleaned up)); *Humane*

18

*Soc. of U.S. v. Clinton*, 236 F.3d 1320, 1329 (Fed. Cir. 2001) ("Congress does not set out to tie the President's hands" in matters where "international relations are concerned," and to do so, it "must say so in clear language."); *Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1247 (Fed. Cir. 1985) ("[C]ongressional delegations [to the President] are normally given a broad construction" in the "international field.").

The Federal Circuit has recognized that when a statute contains terms that are "broad" and "general in nature," Congress "intended to delegate the question of whether particular facts satisfy" those terms to the Executive Branch. *Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 102 F.4th 1252, 1259-60 (Fed. Cir. 2024). Thus, "broad," "nonspecific statutory language" that authorizes Executive action when certain conditions are met, but that provides no further detail as to how to assess those conditions, reflects an "expression of [Congress's] well-considered judgment" to delegate necessary "administrative authority." *Id.* at 1259-60 (citing *Lichter v. United States*, 334 U.S. 742, 784 (1948)). If a term is "general but not ambiguous," a case is "more properly viewed as one involving implied delegation of adjudicative authority" to the Executive Branch." *Id.* at 1261.

The statute considered in *Aceitunas de Mesa* bears striking structural similarities to Section 122, conditioning a mandatory Executive action on the existence of an economic condition defined in general terms:

> In the case of an agricultural product processed from a raw agricultural product in which—
>
> (1) the demand for the prior stage product *is substantially dependent* on the demand for the latter stage product, and
>
> (2) the processing operation adds only limited value to the raw commodity,

19

> countervailable subsidies found to be provided to either producers or processors of the product *shall be deemed* to be provided with respect to the manufacture, production, or exportation of the processed product.

19 U.S.C. § 1677-2 (emphases added).  The Court concluded that "Congress's use of more general language indicates its understanding that assessing dependence … is a holistic determination.  It further shows that Congress delegated the task of making that determination to Commerce, based on the circumstances of each case." *Aceitunas de Mesa*, 102 F.4th at 1260.

The same applies here.  Section 122 requires the President to act when he determines there are "large and serious United States balance-of-payments deficits."  But that general language provides no objective measure for how and when to determine a large and serious balance-of-payments deficit exists.  The broad, nonspecific statutory language thus necessarily leaves that determination to the President's discretion.  So where the President has, in his discretion, found that the necessary statutory preconditions exist, and has taken action directed by those statutory preconditions, "the existence of the facts calling for that action is not subject to review." *George S. Bush & Co.*, 310 U.S. at 380.  The Federal Circuit's doctrine on this front is entirely consistent with the well-established doctrine that use of qualitative, judgment-laden words like "'appropriate' or 'reasonable'" leaves the Executive Branch with discretion that courts must not arrogate to themselves. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024); *cf. Seven Cnty. Infrastructure Coal. v. Eagle Cnty., Colorado*, 605 U.S. 168, 182 (2025) ("Black-letter administrative law instructs that when an agency makes those kinds of speculative assessments or predictive or scientific judgments, and decides what qualifies as significant or feasible or the like, a reviewing court must be at its 'most deferential.'") (citation omitted).  And it is compelled by the principle that courts lack any "special competence in matters of economics or foreign affairs." *Learning Resources*, 146 S. Ct. at 646.

20

Congress's use of this general, nonspecific language in Section 122 is particularly noteworthy, given its employment of highly-specific descriptions of statutory prerequisites in other parts of the Trade Act. *See, e.g.*, 19 U.S.C. § 2462(b)(2) ("The President shall not designate any country a beneficiary developing country under this title if any of the following applies ... Such country—has nationalized, expropriated, or otherwise seized ownership or control of property, including patents, trademarks, or copyrights, owned by a United States citizen or by a corporation, partnership, or association which is 50 percent or more beneficially owned by United States citizens."); 19 U.S.C. § 2463(d)(4)(A) ("The President may not exercise the waiver authority under this subsection with respect to a quantity of an eligible article entered during any calendar year beginning after 1995, the aggregate appraised value of which equals or exceeds 30 percent of the aggregate appraised value of all articles that entered duty-free under this title during the preceding calendar year."). Section 122 reflects no such specific limits.

The history of Section 122 also evinces Congress's intent to afford the President discretion in determining whether the use of special import measures to deal with a U.S. balance-of-payments deficit is required. As the House Committee explained:

> The committee recognizes that there will be an *element of judgment on the part of the President* in determining the existence of a serious deficit that justifies use of this authority. The committee considered various formulas for defining a serious balance-of-payments deficit, including a specific formulation based on the existence of a substantial deficit over a certain period of time, but the committee feels that it is not possible to formulate a definition with mathematical exactness.

21

H. Rep. 93-571, at 28-29 (emphasis added).  Congress thus clearly envisioned that determining whether a large and serious balance-of-payments deficit exists would rely on the President's judgment, and effectuated that discretion with broad, general statutory language.[5]

Even if the Court determines that the predicates for proclaiming a temporary import surcharge in the form of duties are not committed to the President's discretion, but instead are susceptible to determination by a court, the Court is nonetheless bound by *Maple Leaf Fish Co. v. United States*, 762 F.2d 86 (Fed. Cir. 1985).  In that case, the Federal Circuit held that, in international trade controversies involving Presidential action, "[f]or a court to interpose, there has to be a clear misconstruction of the governing statute, a significant procedural violation, or action outside delegated authority."  *Id.* at 89; *see also Corus Grp. PLC. v. Int'l Trade Comm'n*, 352 F.3d 1351, 1361 (Fed. Cir. 2003); *Silfab*, 892 F.3d at 1346; *USP Holdings*, 36 F.4th at 1356; *PrimeSource Bldg. Prods., Inc. v. United States*, 59 F.4th 1255, 1260 (Fed. Cir. 2023).  Thus, review of whether the statutory prerequisites are met should be limited to whether there has been a clear misconstruction of the terms of Section 122.[6]

Moreover, as the Supreme Court noted in the IEEPA litigation, the courts "claim no special competence in matters of economics or foreign affairs."  *Learning Resources*, 146 S. Ct. at 646.  Rather, "the President has unique responsibility" in the field of "foreign ... affairs," *Sale*

---

[5]  Discretion as to whether to *impose* duties upon a determination of a large and serious balance-of-payments deficit was removed in the final bill.  States Br. 14, 23-24.  That is entirely different from the discretion afforded to the President in determining whether such a deficit exists in the first place.

[6]  The "clear misconstruction" formulation of the Court's limited review, as outlined in *Maple Leaf*, is consistent with *Loper Bright*.  The clear-misconstruction standard "stat[es] an interpretive principle" that "favor[s] broad readings of statutes in th[is] area [of the law]."  *See V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1358 n.5 (Fed. Cir. 2025) (Taranto, J., dissenting).

*v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 188 (1993), and "statutes granting the President authority to act in matters touching on foreign affairs are to be broadly construed," *B-West Imports*, 75 F.3d at 636. Thus, the Court cannot conduct a *de novo* review and can only fulfill "the limited role assigned to [the courts] by Article III of the Constitution." *Learning Resources*, 146 S. Ct. at 646; *see Maple Leaf*, 762 F.2d at 89 ("In international trade controversies ... involving the President and foreign affairs[,] this [C]ourt and its predecessors have often reiterated the very limited role of reviewing courts.").[7]

In this regard, the declarations attached by plaintiffs should be disregarded, except as allegations of harm. Similarly, reliance upon the declarations attached to this brief are unnecessary except as to the question of harm. Nevertheless, the Court may rely on them for background information about the complex economic concepts underlying the statutory terms and for interpretive guidance.

### B.    Deficits in the Current Account Are Balance-of-Payments Deficits

Plaintiffs' primary challenge to the Proclamation is an argument that there is no "balance-of-payments deficit" under 19 U.S.C. § 2132(a)(1) because, under their interpretation, there can never be a balance-of-payments deficit. Their reading of the statute borders on the absurd. According to plaintiffs, Congress passed a law that has been useless since the day it was enacted. That theory flouts the strong presumption against ineffectiveness, defies the views of reputable economics, finds no support in the legislative history, and wholly contradicts the reading of Section 122 that plaintiffs successfully advanced in this Court, the Federal Circuit, and the Supreme Court over the last year. The better reading of the statute is that the trade deficit is a key component of the United States' balance-of-payments position and practically speaking, drives

---

[7] At a minimum, this Court's review must be highly deferential to the President's determinations.

whether a balance-of-payment deficit exists, because trade in goods and services is the dominating factor in the current account.[8] None of plaintiffs' arguments to the contrary convinces otherwise.

1.    The phrase "balance of payments" is a term with a specialized meaning in the field of economics. It carries that meaning here. When a specialized term like "balance of payments" is used in a statute without an express definition, it bears its technical accounting meaning. *See, e.g.*, *Air Wisconsin Airlines Corp. v. Hoeper*, 571 U.S. 237, 248 (2014) ("[I]t is a cardinal rule of statutory construction that, when Congress employs a term of art, it presumably knows and adopts the cluster of ideas that were attached to each borrowed word in the body of learning from which it is taken.") (citation omitted); *Reichert v. Kellogg Co.*, -- F.4th --, 2026 WL 734673, at *7 (6th Cir. Mar. 16, 2026) (interpreting the term "actuarial equivalent" as "actuarial scientists understood it" at the time of ERISA's enactment); *United States v. Wilkes*, 78 F.4th 272, 278-85 (6th Cir. 2023) (referencing definitions, expert opinions, and usage in legislative history to determine technical meaning of "geometric isomer," "optical isomer," and "diastereomers" in Controlled Substances Act and state law); *Sanders v. Jackson*, 209 F.3d 998, 1000-01 (7th Cir. 2000) (concluding that the undefined statutory term "net worth" refers to "balance sheet net worth" determined under generally accepted accounting principles).

The "balance of payments" is the summary of three accounts that record economic transactions between the United States and the rest of the world. *Supra* pp. 8-9. To summarize: The current account tracks the trade balance, primary income, and secondary income; the capital account tracks transfers between the United States and foreign countries; and the financial

---

[8] This remains true even if including the capital account.

account records transactions between the United States and foreign countries resulting in changes in the level of international claims or liabilities. *Id.* Key here, the current account and the capital accounts are always offset by the financial account to equal zero. After all, the balance of payments is a double-entry bookkeeping measure, and by basic accounting rules, the books have to balance. *See, e.g.*, Trade Scholars Br. at 8 ("The current account *plus* the capital account *minus* the financial account *equals* zero, reflecting the accountant's basic wisdom that the books have to balance."); CEA Decl. ¶ 58.

The balance of payments—the sum of those three accounts—is always zero, it has always been zero since before Section 122 was enacted, and it will always be zero.[9] CEA Decl. ¶ 10. Take a concrete example: if a U.S. company sells a car valued at $50,000 abroad, that car's movement abroad would enter as $50,000 of goods exported in the current account (a credit); on the flip side, that movement of money to the United States from the export of the car would enter as a $50,000 currency acquisition in the financial account (a debit). CEA Decl. ¶ 24. Put simply, every time a good is imported or exported by someone in the United States, the reverse side of that transaction is always recorded in the financial account; accordingly, the three accounts always net to zero.

2.    The parties disagree over what all of that means for the interpretation of the statutory phrase "balance-of-payments deficits" in subsection (a)(1). On plaintiffs' view, the phrase refers to a negative sum of all three accounts—on their view, an impossible condition, since the three accounts always add up to zero. Private Pls. Br. 16; States Br. 16. The better

---

[9] Sometimes plaintiffs claim that the number is not zero but a small number from a "rounding error." Private Pls. Br. 16. But that does not make their theory any more meritorious. A non-zero number under plaintiffs' theory is nothing more than a measurement error based on the obvious reality that there are limitations to measurements. CEA Decl. ¶ 22. If measuring were perfect, then the result under plaintiffs' theory would always be zero.

reading is that a "balance-of-payments deficit[]" is presently occurring because of the deficit in the current account, which is driven and dominated by the trade deficit. The Government's reading of Section 122 fits with this Court's recent interpretation of Section 122, the understanding of the phrase "balance-of-payments deficit" by experts in the field, and statutory context and legislative history. In contrast, the plaintiffs' reading renders the statute a dead letter from its inception, ignores this Court's recent opinions, disregards the understanding of experts, and is inconsistent with the legislative history and context.

This Court has already rejected plaintiffs' argument and recognized that a trade deficit produces a balance-of-payments deficit within the ambit of Section 122.[10] *See V.O.S. Selections*, 772 F. Supp. 3d 1350, 1375 (Ct. Int'l Trade 2025) ("tariffs responding to a trade deficit fit under Section 122 because they 'deal with [a] large and serious United States balance-of-payments deficit[].'") (alterations in original). The Court explained that, because the balance of payments is a record of transactions between the United States and foreign countries and must include

_____

[10] State plaintiffs claim that the dissenting opinion in the Federal Circuit disagreed with this Court's panel decision. That dissent, of course, does not bind this Court. And in any event, plaintiffs' counsel vehemently disagreed with the dissent's view. *See, e.g.*, *Learning Resources, Inc. v. Trump*, Case No. 25-250, October 20, 2025 State Respondents Br. 43 n.6 ("Defendants properly do not endorse the contrary conclusion of the dissent below. In concluding that 'balance-of-payments deficits' means only 'problems that concern the payments (financial, cash) side of the accounting statement,' the dissent mistakenly focused on the word 'payments' in isolation. But the phrase 'balance of payments' is a term of art, and—as the dissent acknowledged—trade in goods is part of the overall balance of payments. All parties appear to agree that 'balance-of-payments deficits' in Section 122 include not just financial or cash deficits but also deficits in the current account, including trade in goods." (cleaned up)); *Learning Resources, Inc. v. Trump*, Case No. 25-250, October 20, 2025 V.O.S. Selections, Inc. Br. 31 ("Judge Taranto questioned the applicability of Section 122, reasoning that balance-of-payments deficits are not balance-of-trade deficits…. It artificially distinguishes between the flow of currency out of a country and the flow of goods into it. In reality, the two are inextricably intertwined. As imports flow in, payments flow out. Indeed, it makes no sense for Congress to have placed a 15% cap on tariffs addressing the subset of trade deficits that are dire enough to cause fundamental international payments problems, only to permit unlimited tariffs addressing other trade deficits under IEEPA." (cleaned up)).

26

"transactions in goods, services, income, assets, and liabilities," it "always balances to zero." *Id.* The Court thus held—in direct contravention to plaintiffs' position here—that "[t]he term 'balance-of-payments deficits' within Section 122 refers, necessarily, to deficits within the various accounts comprising the balance-of-payments (including the trade of goods) rather than to an overall summary deficit, because there cannot be a balance-of-payments deficit *per se*." *Id.* "Trade deficits are one of the key balance-of-payment deficits and can be directly impacted by mechanisms such as import quotas and tariffs, as authorized by Section 122." *Id.*

Experts in trade economics agree that this Court's interpretation best fits with the meaning of the phrase. *See Kahrs Int'l, Inc. v. United States*, 791 F. Supp. 2d 1228, 1240-41 (Ct. Int'l Trade 2021) (condoning reference to experts' views when interpreting a legal term's meaning); *Reichert*, 2026 WL 734673, at *7 (evaluating experts' understanding of a term in their field to interpret a statute's use of that term); *Wilkes*, 78 F.4th at 278-85 (same). A coalition of over 20 prominent trade scholars, in an amicus brief to the Supreme Court supporting the plaintiffs in the IEEPA litigation, agrees that this reading of Section 122 reflects the meaning of its terms in the field of trade economics. As these trade scholars put it, there is a "basic economic understanding that [balance-of-payments] deficits and trade deficits are empirically the same in the United States" and "rise and fall as one." Trade Scholars Br. 4-5.

Crucially, and contrary to plaintiffs' assumption (*see* States Br. at 6, 17, 26), the term "balance-of-payments *deficits*" in Section 122 cannot refer to a deficit in the overall "balance-of-payments." As the Court has already explained, this is because the overall "balance-of-payments" always balances to zero, such that there can never be a deficit in that overall "balance-of-payments." *V.O.S. Selections*, 772 F. Supp. 3d at 1375. Accordingly, "balance-of-payments *deficits*" in Section 122 means the deficits *within* the various accounts that constitute

27

the overall balance-of-payments.  *Id.*  Those component accounts include the current account (and any current-account deficit).  Put slightly differently by the trade scholars, "the [balance of payments] is in deficit when the current account is in deficit and the [balance of payments] is in surplus when the current account is in surplus.  Restated, the 'current account' dictates the [balance-of-payments] in the United States."  Trade Scholars Br. at 8; *see also* International Monetary Fund (IMF), *Article IV Report for the United States* 45 (Table 1) (April 2, 2026), https://www.imf.org/-/media/files/publications/cr/2026/english/1usaea2026001.pdf (IMF Article IV Report) (including only current account balance and merchandise trade balance as a percentage of gross domestic product as the only "selected economic indicators" under the balance-of-payments header).

CEA likewise explains "that the current account is the most appropriate measure for the purposes of Section 122," because "the current account is more expansive than the trade balance and still excludes money-like payments."  CEA Decl. ¶¶ 23, 46.  CEA explains further that "a sustained current account deficit ... requires the accrual of additional net foreign liabilities, and therefore a deterioration in this country's net international investment position, as the deficit country must finance this deficit by borrowing more[.]"  *Id.* at 48.  And a continuing deterioration in the net international investment position "can increase the susceptibility of the economy to fluctuations in exchange rates, market conditions, and foreign demand for domestic assets," and "endanger the ability of countries with very large net negative international investment positions to finance its spending and erode investor confidence in their economy."  *Id.* at 49; s*ee also* IMF Article IV Report at 44 ("The U.S. negative net international investment position (NIIP) is also expected to continue widening ... This worsening of the NIIP ... represents a potentially important source of vulnerability.").

28

Section 122's historical context also confirms that a trade deficit (in the current account) is the driver of a balance-of-payments deficit. First, the Nixon administration recognized that the trade deficit in 1971, the first since 1888, was "a primary element in the unsatisfactory U.S. balance of payments," and that correcting the balance-of-payments deficit required correcting the trade deficit. *Paper Prepared in the Department of Treasury*, https://perma.cc/JTZ8-2KTU; *see* Trade Scholars Br. at 6, 11. If, as plaintiffs claim, a balance-of-payments deficit necessarily includes the financial account and so can never actually exist (as a result of the balancing of the three accounts), it would have made no sense for the Nixon administration to try to correct the issue, much less to state that the trade deficit was the primary driver of the balance-of-payments issue.

Moreover, when discussing the Trade Act of 1974 pre-enactment, the Senate Finance Committee observed that the United States had experienced persistent trade surpluses in the postwar period until the late 1960s. S. Rep. No. 93-1298, at 7. Indeed, the relevant committee reports repeatedly cite the trade deficit as a key reason the bill was needed. *See, e.g.*, H. Rep. No. 93-571 at 13 (noting, as one of the reasons for the bill, that "the traditional surplus in the U.S. balance-of-trade steadily declined in the latter half of the 1960's and turned to substantial deficits in the past 2 years for the first time this century"); *id.* at 29 (noting that, in 1971, "distortions in the exchange rate for the dollar vis-a-vis the countries of Europe and Japan contributed to an acceleration of what had been a persistent deterioration in our balance-of-payments position *and, in particular, our trade position*" (emphasis added)); S. Rep. 93-1298 at 7 ("In 1974, our trade deficit, measured on a c.i.f. basis, is running at an annual rate of almost $12 billion. *These recent trade deficits have accounted for over one-half of our overall payments deficits.*" (emphasis added)). Even in 1964, recognizing the looming balance-of-payments

29

deficit, Congress's Joint Economic Committee recommended "[a]n expanded trade balance" as "the most desirable method of adjust[ing]" the balance of payments.  S. Rep. No. 965, 88-2 at 17.

3.      Plaintiffs' reading is impermissible as a matter of statutory interpretation, flatly inconsistent with the meaning of "balance-of-payments deficit" in economics, and irreconcilable with the reading of Section 122 they advanced before this Court just a few months ago.

a.      Plaintiffs' reading of Section 122 is untenable.  On plaintiffs' interpretation, a balance-of-payments deficit could *never* exist under Section 122 because the "balance of payments" includes all three accounts—current, capital, and financial—and always balances to zero.  That reading would render the statutory provision pointless even at the time it was passed, as the balance of payments has always balanced to zero, including in 1971 when Nixon imposed tariffs, because the balance of payments operates the same regardless of whether a country has a fixed or floating currency.  CEA Decl. ¶ 21.

But "Congress presumably does not enact useless laws." *Garland v. Cargill*, 602 U.S. 406, 427 (2024).  Courts thus apply a "presumption against ineffectiveness" and reject interpretations that would "'rende[r] the law in a great measure nugatory.'" *Id.* (quoting *The Emily*, 9 Wheat. 381, 389 (1824)). [11]  The Supreme Court has applied that principle to reject a reading of a statute that would render it "a dead letter" in "two-thirds of the States from the very moment of its enactment." *United States v. Hayes*, 555 U.S. 415, 426-27 (2009).  Plaintiffs'

---

[11] *See, e.g.*, *Bowe v. United States*, 146 S. Ct. 447, 464 (2026) ("Because Congress presumably does not enact useless laws, it makes no sense to read § 2255(h)'s cross-reference in this way." (cleaned up)); Scalia & Garner, *Reading Law* § 4, at 63 (The presumption against ineffectiveness "follows inevitably from the facts that (1) interpretation always depends on context, (2) context always includes evident purpose, and (3) evident purpose always includes effectiveness."); *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1323 (Fed. Cir. 2021) (same); *Van Dermark v. McDonough*, 57 F.4th 1374, 1381 (Fed. Cir. 2023) ("'A textually permissible interpretation that furthers rather than obstructs the document's purpose should be favored,' and 'evident purpose always includes effectiveness.'").

reading of Section 122(a)(1) is far worse, rendering it entirely nugatory from the moment of its enactment.  That is a non-starter.  By contrast, defendants' construction of "balance-of-payments deficits" as encompassing the deficits *within* the current account (or the combined current and capital account plus FDI) would avoid the absurd result plaintiffs seek and comport with the accounting principle an overall balancing of the books can still contain deficits within component accounts.  Certainly, defendants' interpretation is not a clear misconstruction of Section 122.  *See Maple Leaf*, 762 F.2d at 89.

Recognizing this insurmountable problem, State plaintiffs wrongly claim that the United States had a fixed currency at the time of Section 122's enactment. *See, e.g.*, CEA Decl. ¶ 25; S. Rep. No. 93-1298, at 13.  According to plaintiffs, the Bretton Woods system of fixed exchange rates pinned to the gold standard did not end until 1976—with a move to the floating exchange-rate system—and, thus, at the time Congress enacted Section 122 in 1974, there was still uncertainty regarding the future of that system.  States Br. 7, 10, 15.  This claim is belied by plaintiffs' own statements, elsewhere in their brief, that by "March 1973, the Bretton Woods system had effectively collapsed, with nearly all major currencies floating against the dollar."  *Id.* at 10.  This included the United States, which had moved off the gold standard and into a floating exchange rate by 1973.  CEA Decl. ¶ 25 ("Notably, even though the U.S. dollar started to float in 1973, Section 122 was passed by Congress in 1974 and signed into law by President Ford in 1975, suggesting that Congress's reference to [balance-of-payments] deficits was not simply centered around currency exchange management.").  Indeed, the Senate Finance Committee—in discussing the proposed Section 122 in 1973—observed that "[a]fter the U.S. could no longer maintain a fixed parity between the dollar and gold, *the fixed exchange rate structure collapsed on August 15, 1971*."  S. Rep. No. 93-1298, at 13 (emphasis added).  Even if it were unclear

31

precisely when, as a historical matter, the United States left the fixed currency system, Congress's view when it enacted Section 122 was that the system had collapsed years before, in 1971. Plaintiffs' view thus requires Congress to have intentionally enacted a statute that had no effect even at the moment of enactment—precisely the circumstance addressed by the strong presumption against ineffectiveness. [12]

Moreover, Congress still envisioned that balance-of-payments deficits could exist, even knowing that the relationship between gold and the fixed currency system was no longer an issue. The Senate Committee pointed out an example: "[i]n the new era created by the rapid increase in oil prices, it is likely that most oil-consuming countries will face large balance of payments deficits." *Id.* The Federal Reserve Bank of New York similarly believed that, even in a "floating regime, '[b]alance-of-payments measures are still used to identify disequilibria which may occur when official intervention is large enough to influence exchange rates.'" CEA Decl. ¶ 34 (quoting Patricia Hagan Kuwayama, *Measuring the United States Balance of Payments*, Monthly Review (Federal Reserve Bank of New York) 57, no. 8 (August 1975): 183-190 https://www.newyorkfed.org/medialibrary/media/research/monthly_review/1975_pdf/08_3_75.p df.). History makes clear, and Congress understood, that the system fixing exchange rates to

---

[12] Even if plaintiffs could overcome the strong presumption against ineffectiveness, plaintiffs' theory contradicts another well-established principle of statutory interpretation: "While every statute's *meaning* is fixed at the time of enactment, new *applications* may arise in light of changes in the world." *Wisconsin Cent. Ltd v. United States*, 585 U.S. 274, 284 (2018). "[W]hat *qualifies* as a [balance-of-payments deficit] may depend on the facts of the day." *Id.* And "courts must determine whether new applications fit within the statute's meaning." *Badgley v. United States*, 957 F.3d 969, 977 (9th Cir. 2020); *see also, e.g.*, *Trump v. CASA, Inc.*, 606 U.S. 831, 841 (2025) (assessing whether something was "sufficiently 'analogous'" to determine whether a new concept met the terms of a 1789 statute); *Application of Sarkar*, 588 F.2d 1330, 1333 (C.C.P.A. 1978) ("Congress cannot be expected to foresee, or to annually amend Title 35 to incorporate, every future breakthrough onto entirely new technological terrain."). But plaintiffs' theory impermissibly makes Section 122 "a law trapped in amber." *United States v. Rahimi*, 602 U.S. 680, 691 (2024).

gold was dead by the time Section 122 was enacted, and that Congress nonetheless chose to pass Section 122 to give the President explicit authority to deal with changing circumstances that could lead to balance-of-payments deficits.  Congress would not have passed a statute that was already useless at the time of its enactment.  *See, e.g.*, *S. Corp. v. United States*, 690 F.2d 1368, 1374 (Fed. Cir. 1982) (rejecting statutory interpretation that would render Congress's enactment "an unnecessary and thus a useless act").

President Nixon's circumstances confirm that plaintiffs' reading of Section 122 is wrong. Plaintiffs do not dispute that President Nixon faced a balance-of-payments crisis (from a balance-of-payments deficit) when President Nixon declared a national emergency on August 15, 1971. States Br. 11-12; Private Pls. Br. 30.  Any theory of how to calculate balance of payments for purposes of Section 122 would need to reflect that at the time of President Nixon, there was a balance-of-payments deficit.  Yet that is not true for plaintiffs' theory.  Instead, under plaintiffs' theory, the United States' balance-of-payments position was zero (or a measurement error) at the time of President Nixon's emergency declaration.  But under the government's theory, a balance-of-payments deficit existed at the time of President Nixon and exists today. CEA Decl. ¶ 45.

b.       Plaintiffs' other textual argument is that the text of subsection (c), which uses the phrase "balance-of-trade surpluses," *see* 19 U.S.C. § 2132(c)(1), demonstrates that subsection (a), which uses the phrase "balance-of-payments deficits," cannot refer solely to trade deficits. States Br. at 15, 26; Private Pls. Br. at 20-21.  That argument is flawed.

To start, the distinction between "balance-of-trade surpluses" in subsection (c) and "balance-of-payments deficits" in subsection (a) can easily be explained by the fact that, while a trade deficit is the predominant factor in determining whether a balance-of-payments deficit exists, the current account—which both the trade scholars and CEA agree is the correct measure

33

for assessing a balance-of-payments deficit—includes more than just the trade balance, including balances for primary and secondary income.  CEA Decl. ¶ 46; Trade Scholars Br. 7.  Thus, "balance-of-payments deficits" can encompass not only the balance of trade, but also the primary- and secondary-income balances.  A balance-of-trade surplus, on the other hand, refers to situations where a country is exporting more than importing, which would be reflected in the current account.

The legislative history does not suggest otherwise.  The Senate's targeted revision of subsection (c), which changed "balance-of-payments" to "balance-of-trade,"  intended to address a specific concern where significant inflows through the primary and secondary income channels (such as petrodollars recycled back into the U.S. economy by oil-producing countries or government-to-government transfers as occurred in 1991 after the Persian Gulf War) could, in the context of the balance of payments, outweigh a similarly significant trade deficit.  *See* S. Rep. No. 93-1298, at 89.  Congress thus provided authority to impose different remedies based on these different economic conditions.  But nothing in that change reflects any intent to limit the broader statutory term "balance-of-payments" found in subsection (a) in the event of a deficit. Reflecting a sensitivity to the impact of trade deficits on U.S. industry, Congress ensured that, in this scenario, the President could not use Section 122's authority to lower tariffs, potentially exacerbating the trade deficit. Congress noted that "eliminating or reducing barriers to U.S. imports" would only further hurt domestic industry and not be "a proper remedy for [the] U.S. balance of payments surplus."  *Id.*  By specifying a balance-of-trade surplus in (c)(1), Congress was preventing a misuse of the underlying authority of Section 122.  Congress thus provided authority to impose different remedies based on these different economic conditions.  But

34

nothing in that change reflects any intent to limit the broader statutory term "balance-of-payments" found in subsection (a) in the event of a deficit.

As explained above, a balance-of-payment deficit encompasses the current account and, thus, as a core component, the trade deficit. Properly understood, the Senate report confirms this reading by recognizing that balance-of-payments issues include diverse and widespread issues, but, critically, include trade deficits and surpluses. *See* S. Rep. No. 93-1298, at 89. Providing more limited statutory text in a different part of a statute does not cabin Congress's intent in subsection (a) to provide the President a tool to address any number of "large and serious United States balance-of-payments deficits." Congress did not expressly distinguish payments and trade issues, but instead recognized that trade is an important subset of balance-of-payments issues.

c.     Plaintiffs' reading of legislative history does not support their impermissible reading of the text (and could not salvage it anyway). To support their view that Congress intentionally passed a statute null on arrival, State plaintiffs rely on a statement from the Senate Committee that "under present circumstances such authority is not likely to be utilized." States Br. 14 (quoting S. Rep. No. 93-1298, at 87-88). But context makes clear that, by "present circumstances," the Committee was referring to the fact that, with regard to oil-consuming countries, two other necessary steps—a significant reduction in the world price of oil and international monetary cooperation to cope with "petrodollars"—would alleviate the problems caused by the large balance-of-payments deficits faced by oil-consuming countries. S. Rep. No. 93-1298 at 87-88. It did not mean that the Committee thought that authority under Section 122 would not generally be utilized following the collapse of the gold standard. More importantly, the Committee highlighted both that "circumstances can change rapidly" and that "the Executive

35

ought to have explicit statutory authority to impose certain restrictions on imports for balance of payments reasons." *Id.*

For their part, private plaintiffs cite a 1984 hearing—ten years after Section 122 was enacted—during which a former CEA member stated that, "although we have a trade deficit and a current account deficit, we do not have a balance-of-payments deficit, in the strict sense envisioned in section 122" and therefore "section 122 appears not even to apply to the current situation." Private Pls. Br. 20-21 (quoting *Trade Deficit and the Economy: Hearing Before the Subcomm. On Int'l Trade of the S. Comm. On Finance*, 98th Cong. (Mar. 23, 1984) (Feldstein Statement)). But what plaintiffs omit is that the former CEA member also stated that, at that time, the United States actually had a balance-of-payments *surplus*. Feldstein Statement at 54. Here, there is no such allegation—rather, the only issue is whether measuring the balance-of-payments deficit includes the financial account, or is cabined to the current account, or the current and capital accounts. More importantly, one statement from a single CEA member made a decade after the passage of Section 122 is far from a convincing basis to conclude that Congress went to the trouble of enacting Section 122 fully expecting that it would have no effect, ever. That is especially true when the head of CEA today strongly disagrees. CEA Decl. ¶¶ 53-58.

  d. Tellingly, plaintiffs took the opposite side of these arguments before this Court just a few months ago. During the IEEPA litigation, they repeatedly argued that Section 122 was the appropriate tool to address trade deficits, equating them to balance-of-payments deficits.

- At the CIT, state plaintiffs claimed that "a trade deficit is not extraordinary if the President may respond by deploying the ordinary tools of trade law in Title 19, such as Section 122." *State of Oregon et al v. Trump*, Case No. 25-00077, ECF No. 47 at 17.

- At the Federal Circuit, plaintiffs leaned even harder into this argument, stating that "[t]he threat the President identified to justify the reciprocal tariffs is 'large and persistent annual U.S. goods trade deficits,'" and that "Congress gave the President specific—and limited—authority in Section 122 of the Trade Act of 1974 to impose tariffs to address *that very threat*." *V.O.S. Selections, Inc. et al. v. Trump*, Fed. Cir. No. 2025-1812, ECF No. 100 at 10 (emphasis added). "It is therefore Section 122, not IEEPA, that governs where … the President seeks to impose special tariffs in response to trade deficits." *Id.*, ECF No. 92 at 27.[13] "Thus, [section 122] directly addresses the President's authority to impose tariffs to deal with 'large and serious' trade deficits." *Id.*, ECF No. 100 at 10-11.

- Finally, at the Supreme Court, plaintiffs confirmed their understanding that Section 122 gives the President authority to impose duties to address trade deficits. *Learning Resources*, Case No. 24-1287, Oct. 20, 2025 State Resp. Br. at 14 (S. Ct.) ("[I]n Section 122, Congress specifically provided authority to address large and serious trade deficits."); *id.* at 43-44 (agreeing with the CIT's reasoning and stating that "trade deficits are a type of 'balance-of-payment deficit,' because the balance of trade is a key component of the balance of payments. Thus, the statute directly addresses the President's authority to impose tariffs to deal with 'large and serious' trade deficits." (cleaned up)); *see also* Oct. 20, 2025 Private Resp. Br. at 30-31, 33.

Plaintiffs seek to turn their own inconsistencies around on the Government, based on a statement to the Federal Circuit during the IEEPA litigation that trade deficits are conceptually distinct from balance-of-payments deficits. Private Pls. Br. 23; States Br. 26. But the Government's positions are consistent. Trade deficits and balance-of-payments deficits are different concepts. Though the trade deficit is a key input into a proper calculation of the United States' balance-of-payments position, it is not the only input. CEA Decl. ¶ 24. And plaintiffs' cherry-picked quote only finds context from the remainder of the Government's briefs before the Federal Circuit and the Supreme Court, where we explained that Section 122 imposed no restrictions because (among other reasons) the IEEPA tariffs "respond[ed] to more than just balance-of-payments concerns, instead addressing a multi-faceted emergency that includes non-tariff barriers, a lack of reciprocity in trade relationships, the decay of the U.S. defense industrial

---

[13] This statement was made by the V.O.S. plaintiffs, who were represented by the same counsel representing private plaintiffs here.

base, and more." *V.O.S. Selections v. Trump*, No. 25-1812, Govt. Opening Br. at 27 (June 24, 2025 Fed. Cir.); *see also, e.g.*, *V.O.S. Selections v. Trump*, No. 25-1812, Govt. Reply Br. at 12 (July 18, 2025 Fed. Cir.) ("[W]hile Section 122 empowers the President to address non-emergency balance-of-payments concerns, IEEPA supplies a distinct, complementary authority to address emergencies, including but not limited to balance-of-payments concerns."); *Learning Resources*, No. 24-1287, Govt. Opening Br. at 4 (S. Ct.) (arguing that "Section 122 addresses trade deficits whether or not they involve declared emergencies," whereas IEEPA deals exclusively with emergencies). The Government's reading of Section 122 has remained consistent. Plaintiffs' position, by contrast, irreconcilably contradicts their arguments from just a few months ago.

### C.    The United States' Balance-of-Payments Deficit Is Large and Serious

Plaintiffs do not meaningfully contest the President's determination that the balance-of-payments deficit is "large and serious." In another words, they have not argued that, even assuming a balance-of-payments deficit excludes consideration of the financial account, such a deficit is not large or serious. For good reason: Section 122 describes the preconditions for Presidential action in broad terms, necessarily leaving the judgment regarding the existence of those factual predicates to the President's discretion. Even if the Court reviewed that judgment, the President's finding is correct.

The President's determination that the balance-of-payments deficit is large and serious is unreviewable—or at a minimum, requires substantial deference. *See infra* sec. I(A). In any event, the President's findings are correct. The United States' balance-of-payments deficit is "relative to the overall economy, the current account deficit was larger at the end of 2024" than in 1971. CEA Decl. ¶ 41. "Indeed, in 2024, the United States maintained a current account deficit of 4.0 percent of gross domestic product (GDP), almost double the current account deficit

of approximately 2.0 percent that prevailed between 2013 and 2019, and larger than that which prevailed from 2019 to 2023. As a share of GDP, the staggering deficit of 4.0 percent represented the biggest annual current account deficit since 2008." Proclamation 11012, 91 Fed. Reg. 9340; *see* CEA Decl. ¶¶ 45-52. "The large, persistent, and serious annual United States goods trade deficit has grown by over 40 percent in the past 5 years alone, reaching $1.2 trillion in 2024. In 2025, the United States goods trade deficit remained at approximately $1.2 trillion." 91 Fed. Reg. 9340; *see* CEA Decl. ¶ 16.

The balance-of-payments deficit is also serious. "The effects of th[e] [trade] deficit are serious, and this deficit contributes to the fundamental international payments problems facing the United States." 91 Fed. Reg. 9340; *see* CEA Decl. ¶ 14. "[T]he annual balance on the United States primary income turned negative for the first time since at least 1960 in 2024." 91 Fed. Reg. 9340; *see* CEA Decl. ¶ 18. "[T]he net international-investment position of the United States is in an ongoing [sharp] decline," which "is a highly atypical position for a country, particularly the United States." 91 Fed. Reg. 9340; *see* CEA Decl. ¶ 18. "Indeed, both in terms of United States dollars and as a share of GDP, this represents one of the most negative net international-investment positions of any developed country." 91 Fed. Reg. 9340; *see* CEA Decl. ¶ 18. "Because the current account is one of the primary drivers of changes in the net international-investment position, the atypically large negative net international-investment position of the United States shows that the United States balance-of-payments deficit is large and serious." 91 Fed. Reg. 9340; *see* CEA Decl. ¶ 18.

Plaintiffs make two counterarguments. Neither is persuasive.

First, contrary to state plaintiffs' contention, Section 122's previous non-use is irrelevant. State plaintiffs point out that no President has invoked Section 122 to impose duties or quotas

39

and claim that this shows that the conditions cited in the Proclamation do not meet the statute's requirements.  States Br. 28.  Plaintiffs rely on the Supreme Court's statement that "the fact that no President has ever found such power in IEEPA is strong evidence that it does not exist." States Br. at 28 (quoting *Learning Resources*, 146 S. Ct. at 643).  But IEEPA did not explicitly include use the words "duty" or "import charge"; Section 122 expressly does.

Plaintiffs' argument also ignores that, with the exception of only one other period between 2005-07, the current-account deficit at the end of 2024 represents the highest trade deficit since at least 1960.  CEA Decl. at Figure 3.  That other Presidents did not invoke Section 122 has little relevance.  For example, during President Trump's first term, the current-account deficit hovered at approximately negative 2 percent of the GDP.  *Id.*  In contrast, the deficit at the end of 2024 was negative 4.1 percent of the GDP—nearly double.  *Id.*  In this light, it is hardly surprising he did not assess duties under Section 122 in his first term.

And that President Bush did not assess Section 122 duties during the only other similarly high deficit point in 2005-2007, does not mean that the preconditions were not met for him to do so.  Section 122 leaves to the President's judgment whether and how to find that a balance-of-payments deficit exists.  That President Bush did not make such a determination in 2005-2007 says nothing about President Trump's different judgment in 2026.

Second, plaintiffs argue that because the United States has a floating currency, any balance-of-payments deficit cannot be serious.  States Br. 26; Private Pls' Br. 22.  But that argument has the same logical flaws as its balance-of-payments-deficit argument: Plaintiffs' view would mean Section 122 was a nullity since the day it was enacted, which cannot be right.

In any event, plaintiffs misunderstand the problems that can occur in a floating currency. For example, even in a floating currency system, the "deterioration in the net international

investment position of a country can increase the susceptibility of the economy to fluctuations in exchange rates, market conditions, and foreign demand for domestic assets." CEA Decl. ¶ 49. "The accrual of large foreign liabilities can also lead to a higher share of domestic cash flows accruing to foreigners, which can come at the expense of consumption loss for U.S. households." CEA Decl. ¶ 49. "These problems can, among other things, endanger the ability of the United States to finance its spending and erode investor confidence in the economy." 91 Fed. Reg. 9339; *see* CEA Decl. ¶ 49. "A sustained current account deficit by a country requires the accrual of additional net foreign liabilities,  …, which, in turn, could lead to larger primary income outflows in the future due to more payments abroad servicing those liabilities." CEA Decl. ¶¶ 48-50. And so on. *See, e.g.*, CEA Decl. ¶¶ 51-52.

The President was well within his authority to determine that the United States' balance-of-payments deficit is large and serious. If respect for co-equal branches means anything, it means not second-guessing Presidential judgment-laden determinations in a matter of his competence when courts lack "special competence in matters of economics or foreign affairs." *Learning Resources*, 146 S. Ct. at 646.

> ### D.   Fundamental International Payments Problems Are Not a Separate, Additional Precondition for Imposing Temporary Import Surcharges

Plaintiffs also argue that no "fundamental international payments problems require special import measures to restrict imports," a phrase they view as adding a distinct precondition on Section 122(a)(1). States Br. 23-25. But plaintiffs' argument improperly reads additional preconditions into the statute and "draw[s] a distinction" between *trade* imbalances and *payment* problems "where there is none." Trade Scholars Br. at 20 n.7. The plain text of the statute makes clear that the United States faces fundamental international payments problems when: (1) there are large and serious balance of payments deficits, (2) there is an imminent and significant

41

depreciation of U.S. currency in foreign exchange markets, or (3) there is an international balance-of-payments disequilibrium.  *See* 19 U.S.C. § 2132(a)(1)-(3).  Put differently, a large and serious balance-of-payments deficit is a subset of or a form of a fundamental international payments problem under Section 122, as evidenced by the text of the statute and its legislative history.

*First,* the language in the chapeau to subsection (a) describes the interplay between the international payment problems set forth in subsections (a)(1) through (a)(3) and the import measures set forth in subsections (a)(A) through (a)(C).  In other words, if the "fundamental international payment problems" described in (a)(1) through (a)(3) exist, then the President shall take the "special import measures to restrict imports" listed in (a)(A) through (a)(C).  Large and serious balance-of payments deficits, imminent and significant depreciation of the dollar, or international balance-of-payments disequilibrium *are themselves* the fundamental international payments problems Section 122 seeks to remedy in subsection (a).  *See Wabtec Corp. v. United States*, 805 F. Supp. 3d 1326, 1343 (Ct. Int'l Trade 2025) (relying on an introductory chapeau to define what the statutory provision applies to).  Such problems "endanger the ability of the United States to finance its spending, erode investor confidence in the economy, and distress the financial markets."  Proclamation 11012, 91 Fed. Reg. at 9339.  The language in the chapeau is not mere "surplusage;" *see* States Br. 23, 25; but it neither is an additional precondition on top of "large and serious balance-of-payment deficits."  Rather, international payment "problems" simply refers to "imbalances" in the balance-of-payments.  *See* 19 U.S.C. § 2132(a) (permitting quotas only where the "fundamental imbalance" cannot be dealt with a surcharge); *see also* H. Doc. 93-80, *Message from the President, Drafts of Proposed Legislation on Trade Reform* (Apr. 10, 1973) ("[T]rade policy can sometimes be an effective supplementary tool for dealing with

42

our international payments imbalances."); *Hanon Systems Ala. Corp. v. United States*, 794 F.

Supp. 3d 1348, 1357 (Ct. Int'l Trade 2025) (interpreting "minor or insignificant" in 19 U.S.C.

§ 1677j(b)(1)(C) based on specific statutory criteria).

*Second*, Section 122's title and subsection (a)'s heading confirm that large and serious

United States balance-of-payments deficits are a form of fundamental international payments

problems. *See, e.g.*, *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) ("'the title of

a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the

meaning of a statute"). Section 122 is titled "Balance-of-payments authority"—not

"Fundamental international payments problems authority." *See* Trade Act of 1974, Pub. L. 93-

618, sec. 122, 88 Stat. 1978, 1987 (1975). Congress understood that balance-of-payments

problems, such as large and serious balance-of-payments deficits, are a form of fundamental

international payments problems.

*Third*, contrary to plaintiffs' argument, *see* States Br. 23, the legislative history supports

this view. In the House Report on the original bill, the Committee explained that Section 122

would provide the President with flexible authority "to deal with fundamental international

payments problems, *including* authority to ... deal with a serious balance-of-payments deficit"

and believed that "this authority could prove useful in those unusual circumstances where such

restraints are necessary *to deal with* serious balance-of-payments problems." H. Rep. 93-571, at

27, 28 (emphases added). The Senate Committee clarified that its changes required the President

"to impose import restrictions whenever"—without more—"the U.S. faces large and serious

balance of payments deficits." S. Rep. No. 93-1298, at 87. Moreover, the Committee felt that

"the Executive ought to have explicit statutory authority to impose certain restrictions on imports

for balance of payments *reasons*." *Id.* at 88 (emphasis added); *see also* H. Rep. 93-1644, at 27

(Section 122(a) requires that "the President to take certain import restraining actions in order to deal with large and serious United States balance-of-payment deficits ... ."); S. Rep. 93-1298, at 24 ("The bill would direct the President to proclaim ... import surcharges ... to deal with large and serious U.S. balance of payments deficits . . ."), 49 ("President directed in *deficit situations* to take House-specified corrective actions[.]") (emphasis added). Even in its description of the then "new era created by the rapid increase in oil prices," the Senate Committee described the problem as the creation of "large balance of payments deficits" for oil-consuming countries. *Id.* at 87. Nowhere in the legislative history does Congress suggest any precondition other than those identified in subsections (a)(1) through (a)(3) for the imposition of import restrictions.

*Finally*, plaintiffs' distinction between a "payment" problem and a trade "deficit" misunderstands balance-of-payments. *See* States Br. 24-25. "[L]arge and serious balance-of-payments deficits" are "fundamental international payments problems" on any proper understanding of the latter phrase, even if there were some convincing argument that the conditions in subsections (a)(2) and (a)(3) do not inevitably amount to fundamental international payments problems based on the structure of the statute. Trade deficits are a species of an international "payment" problem, and there is no basis on which a court could conclude that a "large and serious" trade deficit does not amount to a "fundamental" international payments problem. "Large and serious" trade deficits occur when far too much money is flowing out of the country, which can occur if imports vastly exceed exports. Indeed, the actual figure that represents the deficit in the current account reflects that outgoing *payments* for imported goods are numerically greater than incoming *payments* (or receipts) for exported goods. This is a net flow of outbound *payments* in exchange for goods and services. And "[t]he more a country imports, the greater the international payments problem." Trade Scholars Br. at 20 n.7.

44

Plaintiffs' argument is also flawed on its own terms.  Plaintiffs argue that the fact that the United States has never defaulted on its obligations or failed to make any payments it owes, or that "[f]oreign investors continue to have confidence in the United States to pay its obligations" evidences that no such fundamental international payments problem exists.  *See* States Br. 24. This is incorrect for two reasons.

First, the absence of a gold standard does not prevent the possibility of default by the United States.  The United States will always seek to avoid such a situation, due to its significant negative effects, but key financial market participants have, as recently as May 2025, indicated they see default as a risk.  *See Moody's Ratings downgrades United States ratings to Aa1 from Aaa; changes outlook to stable*, ratings.moodys.com/ratings-news/443154 (May 16, 2025) (last accessed April 3, 2026) ("While we recognize the US' significant economic and financial strengths, we believe these no longer fully counterbalance the decline in fiscal metrics.").

Second, a country can experience a fundamental international payments problem without a default.  There is a rich academic literature on the risks associated with large and persistent current account deficits.  When a country's current account deficit becomes too large, it can trigger an uncontrolled and rapid reversal, which has been often associated with declining real income growth, currency depreciation, and other economic disruption.  *See* Sebastian Edwards, *Does the Current Account Matter?*, www.nber.org/system/files/chapters/c10633/c10633.pdf (Jan. 2002) (last accessed April 3, 2026) (standing for the proposition that current account reversals can cause economic disruption); *see also* Caroline L. Freund, *International Finance Discussion Papers*, www.federalreserve.gov/pubs/ifdp/2000/692/ifdp692.pdf (Dec. 2000) (last accessed April 3, 2026) (examining current account reversals across developed economies,

including France, Italy, Spain, Portugal, New Zealand, and Singapore, and noting this is associated with currency collapse and decline in real income growth).

The IMF has been warning about the risks of current account reversal for the United States for years ("In the disruptive scenario, it is assumed that there is a rise in protectionist pressures, accompanied by a worldwide decline in demand for U.S. assets … . The consequence of these shocks … is an abrupt contraction in economic activity in the United States, accompanied by a large real depreciation of the U.S. dollar and a sharp correction in the U.S. trade balance."), and in April 2026, the IMF identified the worsening of the net international investment position of the United States as "a potentially important source of vulnerability" due to the possibility of a "disorderly external rebalancing" triggered by "an [a]brupt shift in portfolio preferences" by "non-bank private investors."  IMF 2026 Article IV Report for the United States, at p. 44.  It is precisely this type of outcome that the President is trying to avoid. Regardless, the President found that fundamental international payments problems exist.  *See* Proclamation 11012, 91 Fed. Reg. at 9339.  That determination is unreviewable, or, at a minimum, substantial deference applies.  For the reasons above, as further explained in Proclamation 11012 and the CEA declaration, the President's determination is correct.

### E.    The Major-Questions Doctrine Does Not Apply

State plaintiffs effectively concede that the major-questions doctrine does not apply here. By contrast, private plaintiffs invoke the doctrine, claiming that, due to the economic significance of the tariffs, the Court should find that Congress did not authorize the President's imposition of duties pursuant to Section 122.  Private Pls. Br. 24-29.  Private plaintiffs are incorrect: The major-questions doctrine either does not apply here or is satisfied.

The major-questions doctrine does not apply in the foreign policy context, "because the canon does not reflect ordinary congressional intent in those areas" where Congress and the

46

President enjoy concurrent constitutional authority. *FCC v. Consumers' Research*, 145 S. Ct. 2482, 2516 (2025) (Kavanaugh, J., concurring). In those areas, the presumption flips: "Congress specifies limits on the President when it wants to restrict Presidential power." *Id.* Foreign policy is one such area, and one where Congress "intends to give the President substantial authority and flexibility." *Id.*; *see also Trump v. Hawaii*, 585 U.S. 667, 686 (2018) (acknowledging "the deference traditionally accorded the President" on foreign policy matters); *B-West Imports*, 75 F.3d at 636 ("statutes granting the President authority to act in matters touching on foreign affairs are to be broadly construed"); *Florsheim*, 744 F.2d at 792-793 (presidential authority over duty-free treatment was "intimately involved with foreign affairs, an area in which congressional authorizations of presidential power should be given a broad construction"). The Supreme Court did not hold otherwise in *Learning Resources*; to the contrary, six Justices declined to apply the major-questions doctrine to the IEEPA tariffs. *See* 146 S. Ct. at 674 (Kagan, J., concurring) ("I do not join the part of [the majority] opinion invoking the so-called major-questions doctrine.") *id.* 720 n.24 (Kavanaugh, J. dissenting) (citing *Marks v. United States*, 340 U.S. 188, 193 (1977) to explain the absence of a precedential holding).

Regardless, even if the major-questions doctrine were not categorically inapplicable, Section 122 easily passes the doctrine's clear-authorization standard. Section 122 is a "clear and limited delegation[]," *Learning Res.*, 146 S. Ct. at 640, and unambiguously provides the President authority to impose the challenged tariffs. *See Biden v. Nebraska*, 600 U.S. 477, 511 (2023) (Barrett, J., concurring) (unlike true "clear-statement" rules, major-questions doctrine does not require "an 'unequivocal declaration' from Congress authorizing the precise agency action under review"); *West Virginia*, 597 U.S. at 723 ("something more than a merely *plausible* textual basis for the agency action is necessary" (emphasis added)).

47

Private plaintiffs' reference to the Center for Disease Control's (CDC) eviction moratorium during the COVID-19 pandemic is therefore wholly inapposite. Private Pls. Br. 26-27 (citing *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 766 (2021)). Unlike the CDC's attempt to regulate the "landlord-tenant relationship" in response to the COVID-19 pandemic, which was far outside its bailiwick, Section 122 directs the President to exercise economic and international trade power well within his expertise. The imposed duties "do not involve a transformation" of authority, given that Congress regularly delegates tariff authority to the President, and explicitly did so in Section 122. *See HMTX Industries v. United States*, 156 F.4th 1236, 1255 (Fed. Cir. 2025), *petition for cert. pending*, No. __ (filed ___); *see also FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000) (looking to evidence of "Congress'[s] consistent judgment to deny the" power being exercised); *Biden v. Nebraska*, 600 U.S. 477, 502 (2023) (asking whether the power exercised amounts to "a fundamental revision of the statute, changing it from one sort of scheme of regulation into an entirely different kind"). The major questions doctrine does not apply any time the Executive exercises delegated authority in a way that prior Administrations have not. "Such 'clear congressional authorization' for the challenged action" in Section 122 "means that this cannot be a major questions case." [14] *HMTX*, 156 F.4th at 1255 (quoting *West Virginia*, 597 U.S. at 724).

---

[14] Private plaintiffs contend that the canon of constitutional avoidance counsels against "a radically expansive vision" of tariff powers under Section 122. Private Pls. Br. 28. It is unclear why plaintiffs believe this canon is remotely applicable here. They claim that "[t]he President's preferred interpretation raises substantial constitutional issues regarding the delegation of unlimited authority to the executive," *id.*, but no such issues are implicated. Congress explicitly delegated tariff authority to the President in Section 122, and nothing in the Proclamation can be reasonably read as claiming unlimited authority. Rather, Section 122 sets forth a clear limit on when the President can impose duties—to deal with a large and serious balance-of-payments deficit—and the President complied with this limit, making that finding and explaining its basis.

### F.     Section 122 Satisfies the Nondelegation Doctrine

Private plaintiffs —but not state plaintiffs—assert that the imposition of duties under Section 122 violates nondelegation doctrine.  But their argument hinges on the flawed premise that "Defendants claim" "sweeping and unreviewable authority" pursuant to Section 122. Private Pls. Br. 29.  As just explained, the Proclamation does not constitute an exercise of sweeping authority.  Section 122 expressly authorizes the imposition of duties subject to certain limitations, and the President clearly followed those limitations in proclaiming the duties at issue here.  As the Supreme Court explained, Section 122 is a "clear and limited delegation[]." *Learning Res.*, 146 S. Ct. at 640.

"[I]n the national security and foreign policy realms, the nondelegation doctrine ... appropriately has played an even more limited role in light of the President's constitutional responsibility and independent Article II authority." *Consumers' Rsch.*, 606 U.S. at 706 (Kavanaugh, J., concurring) (citations omitted); *see United States* v. *Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) (greater delegation permissible in areas implicating "the very delicate, plenary and exclusive power of the President as the sole organ of the federal government in the field of international relations").

Relevant here, Article II gives the President the "lead role in foreign policy." *American Insurance Association* v. *Garamendi*, 539 U.S. 396, 414-15 (2003) (citations and ellipsis omitted). Accordingly, Congress may, without running afoul of the Constitution, "invest the President with large discretion in matters arising out of the execution of statutes relating to trade and commerce with other nations." *Marshall Field & Co.* v. *Clark*, 143 U.S. 649, 691 (1892).

Even under the domestic version of the nondelegation doctrine, Section 122 would easily pass muster.  "The nondelegation doctrine bars Congress from transferring its legislative power

49

to another branch of Government" without supplying "an intelligible principle to guide the delegee's use of discretion." *Gundy v. United States*, 588 U.S. 128, 132, 135 (2019). That standard is "not demanding." *Id.* at 146. "Only twice in this country's history (and that in a single year)" has the Supreme Court "found a delegation excessive … ." *Id.* Courts, including the Supreme Court, have "over and over upheld even very broad delegations." *Id.* Congress must delineate "the general policy, the public agency which is to apply it, and the boundaries of [the] delegated authority." *American Power & Light Co. v. SEC*, 329 U.S. 90, 105 (1946). Section 122 readily meets this undemanding standard.

Section 122's general policy is obvious: "to deal with large and serious United States balance-of-payments deficits." 19 U.S.C. § 2132(a)(1). And its boundaries are likewise plain: the President's chosen action may not exceed "150 days (unless such period is extended by Act of Congress)" and any import duty may not "exceed 15 percent ad valorem," among others. *Id.* § 2132(a)(3). Section 122 is thus a "clear and limited delegation[]." *Learning Res.*, 146 S. Ct. at 640. The nondelegation doctrine does not raise any "serious doubt," *Jennings*, 583 U.S. at 296 (quotation marks and citation omitted), as to the constitutionality of the plain-text understanding of Section 122's authorization of temporary duties. Rather, "[t]his standard provides the specificity that is required for Congress to delegate some of its authority" to the President. *HMTX*, 156 F.4th at 1254.

That Section 122 passes the nondelegation doctrine accords with the Supreme Court's and Federal Circuit's repeated decisions rejecting nondelegation challenges to the President's imposition of trade regulations, including tariffs. *See, e.g.*, *FEA v. Algonquin SNG, Inc.*, 426 U.S. 548, 559-60 (1976) (concluding that the President's imposition of a license fee system under his authority to "adjust imports" in Section 232 of the Trade Expansion Act was not an

50

improper delegation of Congress's power to regulate commerce); *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1332-33 (Fed. Cir. 2021) (same).  As with Section 232, Section 122 has clear conditions, timelines, and amounts, that provide the President an intelligible principle to deal with balance-of-payment problems.  *See PrimeSource*, 59 F.4th at 1263.  So no nondelegation problem exists.

To cite another example involving this Court's jurisdiction, where the International Trade Commission concludes that an importer is engaged in unfair trade practices (such as patent infringement) to the detriment of U.S. industry, the President has the unilateral authority to allow the imports "for policy reasons," without further elaboration. 19 U.S.C. § 1337(j)(2).  The Supreme Court has long approved such broad delegations to the President—particularly delegations of authority to regulate international trade, including through tariffs.  *E.g.*, *Algonquin*, 426 U.S. at 558-560; *J.W. Hampton, Jr., & Co. v. United States*, 276 U.S. 394, 406, 409 (1928); *Marshall Field & Co.*, 143 U.S. at 690-94; *Cargo of the Brig Aurora v. United States*, 11 U.S. (7 Cranch) 382, 384-88 (1813); *see Gundy v. United States*, 588 U.S. 128, 158-59 (2019) (Gorsuch, J., dissenting).

## III.    The Proclamation Lawfully Excepts Certain Products Under Section 122

Section 122 provides certain limitations to the imposition of temporary import surcharges.  First, "[i]mport restricting actions proclaimed pursuant to subsection (a) shall be applied consistently with the principle of nondiscriminatory treatment."  19 U.S.C. § 2132(d)(1).  Notwithstanding this section, however, "if the President determines that the purposes of this section will best be served by action against one or more countries having large or persistent balance-of-payments surpluses, he may exempt all other countries from such action."  *Id.* § 2132(d)(2).  Second, "[i]mport restricting actions" shall also be "broad and uniform" in their "application with respect to product coverage *except* where the President determines,

51

consistently with the purposes of this section, that certain articles should not be subject to import restricting action because of the needs of the United States economy." *Id.* § 2132(e) (emphasis added). Here, the President determined—with the discretion delegated to him by Congress—that certain products should be excepted because of the needs of the U.S. economy. 91 Fed. Reg. at 9341 ¶ 14(a)–(m). Because Congress explicitly left the decision of whether to apply exceptions to certain products to the President's judgment, his determination that certain products be excepted from duties under Section 122 is not reviewable. *See USP*, 36 F.4th 1359 at 1369 ("[D]eterminations committed to the President's discretion are beyond our jurisdiction to review.") (citations omitted). Plaintiffs barely contest the exceptions. [15] Plaintiffs do not contest that each of the exceptions are justified "because of the needs of the United States economy." 19 U.S.C. § 2132(e). Nor do plaintiffs meaningfully contest that each exception is either (1) "limited to the unavailability of domestic supply at reasonable prices, the necessary importation of raw materials, avoiding serious dislocations in the supply of imported goods, [or] other similar factors" or (2) would be "unnecessary or ineffective in carrying out the purposes of [Section 122], such as with respect to articles already subject to import restrictions, goods in transit, or goods under binding contract." *Id.* For good reason: each exception readily meets the

---

[15] In fact, plaintiffs make no structured or developed argument against eleven of the thirteen exceptions. Thus, any specific challenge to those exceptions is forfeited. *See, e.g.*, *Rodriguez v. Dep't of Veterans Affs.*, 8 F.4th 1290, 1305 (Fed. Cir. 2021) ("An issue that is merely alluded to and not developed as an argument in a party's brief is deemed waived.") (citations omitted). And even for the two exceptions plaintiffs specifically challenge (*i.e.*, the exceptions for certain products of Mexico, Canada, and Central America), plaintiffs contend only that the exceptions violate subsection (d)(1)'s nondiscriminatory treatment rule; they do not contest the President's finding that those two exceptions satisfy subsection (e). Thus, plaintiffs also forfeit challenging the President's determination that those two exceptions satisfy subsection (e).

strictures of section 122(e).  *See*, *e.g.*, attached declarations of Amb. Jamieson L. Greer, United States Trade Representative, and Hon. Howard W. Lutnick, Secretary of Commerce.

Instead, state plaintiffs halfheartedly challenge two of the approximately thirteen exceptions.  State plaintiffs argue that the product exclusions for articles entered free of duty under the U.S.-Mexico-Canada Agreement (USMCA) and textiles and apparel articles entered free of duty under the Dominican Republic-Central American Free Trade Agreement (CAFTA-DR) violate the principle of nondiscrimination in Section 122(d).  *See* States Br. 29–31.  Plaintiffs further argue that the product exclusions violate the uniformity requirement in Section 122(e).  *See* States Br. 31-32.  For the reasons stated below, plaintiffs' arguments lack merit.

### A.    No Plaintiff Has Standing to Challenge the Exceptions

As an initial matter, plaintiffs lack standing to challenge the President's exceptions .[16]  Simply put, plaintiffs cannot show—and do not allege—that they are injured by the exceptions listed in the annexes in the Proclamation.[17]  Indeed, even if plaintiffs prevailed on the exceptions issue, they would receive no relief.  If anything, plaintiffs would be *harmed* by the Court striking down any or all the exceptions because the duties would apply to an even wider range of products than as currently stands.  As the Proclamation makes clear, "[t]he surcharge imposed in this proclamation shall apply to imports to which the invalidated exception or the invalidated part of the exception applied before its invalidation[.]"  91 Fed. Reg. at 9,343.

---

[16]  The private plaintiffs only complain about the exceptions in passing, devoting all of two sentences to the argument.  Private Pls. Br. 23-24.  To the extent the Court reads their brief to muster any challenge to the exceptions otherwise, the private plaintiffs—for the same reasons as state plaintiffs—also lack standing to challenge the exceptions.

[17]  Plaintiffs may not argue on reply that they are injured by the exceptions, or contest the severability provision of the Proclamation.  *See, e.g., Novosteel SA v. United States*, 284 F.3d 1261, 1273-74 (Fed. Cir. 2002) (holding that a party waives arguments not presented in its principal brief to the Court of International Trade and specifying that "[r]aising the issue for the first time in a reply brief does not suffice").

53

Nor can plaintiffs simply latch their allegations of harm regarding the *imposition* of Section 122 duties onto their argument that the *exceptions* to those duties violate Section 122's limitations. Because "standing is not dispensed in gross," *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), a "court must analyze Plaintiffs' standing to challenge each provision of law at issue." *In re Gee*, 941 F.3d 153, 161-62 (5th Cir. 2019); *see Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 627 (2020) (plurality op.) ("plaintiffs who successfully challenge one provision of law may lack standing to challenge *other* provisions of that law." (citations omitted)); *Neimenggu Fufeng Biotech. Co. v. United States*, 741 F. Supp. 3d 1354, 1376 n.11 (Ct. Int'l Trade 2024). This is particularly so here, where, as discussed in more depth below, Proclamation 11012 renders the exceptions severable from the imposition of duties. *See infra* at 64-65. To the extent plaintiffs assert that they have standing under *Barr v Am. Ass'n of Political Consultants, Inc.* 591 U.S. 610 (2020), that argument would be unconvincing. In *Barr*, the Supreme Court held that "a plaintiff who suffers unequal treatment has standing to challenge a discriminatory exception that favors others." *Id.* at 634 (citations omitted). But here, plaintiffs do not allege that they are suffering unequal treatment because the articles they import are *not* subject to the exceptions, whereas other importers have been treated favorably because the articles they import *are* subject to the exceptions. Rather, they claim that the Proclamation should be invalidated in its entirety because the exceptions violate the nondiscrimination and uniformity requirements listed in subsections (d)-(3) of Section 122. States Br. 28-32. For these reasons, the Court should not entertain state plaintiffs' arguments challenging the exceptions to the Section 122 duties.

### B.      The Exceptions Do Not Violate the Nondiscriminatory Treatment Principle

#### 1.      The Nondiscriminatory Treatment Clause in Subsection (d) Does Not Govern

Plaintiffs claim that the Proclamation's provisions excepting articles covered by USCMA and entered free of duty, as well as textile and apparel from certain Latin American and Caribbean countries under CAFTA-DR and entered free of duty, violate the nondiscriminatory treatment clause in 19 U.S.C. § 2132(d).  States Br. 29-31.  But the President did not except these goods under subsection (d)(1); rather, they were excepted under subsection (e), which is not subject to the nondiscriminatory treatment clause but rather calls for the "broad and uniform application" of duties subject to the needs of the U.S. economy.  19 U.S.C. § 2132(e).  And, as explained below, the Proclamation's exceptions comply with subsection (e).

Import restrictions proclaimed under subsection (a) of Section 122 must "be applied consistently with the principle of nondiscriminatory treatment."  19 U.S.C. § 2132(d)(1).  But the USCMCA and textile and apparel CAFTA-DR articles were excepted under subsection (e) based on product coverage pursuant to the needs of the United States economy.  91 Fed. Reg. at 9,341; *see* 19 U.S.C. § 2132(e).  The President did not wholly exempt articles of specific nations contrary to the principle of nondiscriminatory treatment, nor did he elect to act against one or more countries having large or persistent balance-of-payments surpluses and exempt other countries from such action.  *See* 19 U.S.C. § 2132(d)(2).  Rather, only *articles* subject to USCMA and covered by HTSUS general note 11, and only *textiles* and *apparels* subject to CAFTA-DR, are excepted.  Indeed, the President explicitly stated in the paragraph covering these exclusions that, based on the needs of the United States economy, the duties imposed by the Proclamation "shall not apply to the following *products*."  91 Fed. Reg. at 9341 (emphasis added).  Moreover, even if the product exceptions cover a significant portion of imported goods

55

of the implicated countries, such goods must still follow strict rules-of-origin limitations set forth in the USMCA and CAFTA-DR (for textiles and apparel), while other articles from such countries are not excepted. *See* HTSUS General Notes 12, 29; 19 C.F.R. Part 182; 19 C.F.R. Part 10, Subsection J.  The Presidential action excepting certain products under USCMA was not tantamount to excluding Canadian and Mexican products entirely and cannot, under any reasonable interpretation, be said to have excluded all products from CAFTA-DR nations.  The product exceptions were thus consistent with the President's authority to except articles under subsection (e) and the concerns of nondiscriminatory treatment by country in subsection (d)(1) are not implicated.

Moreover, when an exception is made under subsection (e), the strictures of subsection (d)(1) do not apply. For example, section 122(e) states: "uniform exceptions may be made where import restricting actions will be unnecessary or ineffective in carrying out the purposes of this section, such as with respect to articles already subject to import restrictions, goods in transit, or goods under binding contract." 19 U.S.C. § 2132(e).  That plainly authorizes an exception for products subject to Section 232 tariffs, as plaintiffs do not deny.  But Section 232 tariffs need not apply to every country. *See Transpacific Steel LLC*, 4 F.4th at 1334 ("[T]he United States's relations with any given country often will differ, in ways relevant to [Section 232], from its relations with other countries" (citations omitted)).  If plaintiffs are right that subsection (e) must always adhere to subsection (d)(1)'s nondiscriminatory-treatment requirement, then an exception that is clearly contemplated by Section 122 might be in jeopardy. This Court should reject "this highly counterintuitive result." *Yellen v. Confederated Tribes of Chehalis Rsrv.*, 594 U.S. 338, 360 (2021); *Facebook, Inc. v. Duguid*, 592 U.S. 395, 406-07 (2021) ("contextually implausible outcome").

56

### 2.     The Exceptions Do Not Violate Subsection (d)

Even assuming the product exceptions for USMCA or textile and apparel CAFTA-DR articles are subject to the nondiscrimination requirement in Section 122(d), the action of the President excepting those products is consistent with the principle of nondiscriminatory treatment.  The Trade Act of 1974 defines "nondiscriminatory treatment" [18] as "trade treatment based on normal trade relations (known under international law as most-favored-nation treatment)."  19 U.S.C. § 2481(9).  Section 122(d) adds that, "[n]otwithstanding paragraph (1), if the President determines that the purposes of this section will best be served by action against one or more countries having large or persistent balance-of-payments surpluses, he may exempt all other countries from such action."  *Id.* § 2132(d)(2).   It further directs that import surcharges are to apply consistently with "such new international rules" that Congress "sense[d]" would be entered into force after the Trade Act of 1974 concerning the application of surcharges for balance-of-payments concerns.  *See id.* § 2132(d)(3), (d)(4).

Congress drafted Section 122(d) against the backdrop of rights and obligations under the General Agreement on Tariffs and Trade (GATT) as they existed in 1974.  *See, e.g.*, Article I, GATT (1947) (concerning the most-favored-nation principle).  At the time, Articles XII–XV and XVIII of the GATT collectively authorized Contracting Parties, now World Trade Organization (WTO) Members, to impose quotas, but not surcharges, to adjust balance-of-payments.  The Senate Finance Committee articulated as follows:

---

[18]  The underlying public law defined the term as meaning "most-favored-nation treatment."  *See* Trade Act of 1974, Pub. L. 93-618, sec. 601(9), 88 Stat. 1978, 2072 (1975).  The definition was subsequently amended to its current definition.  *See* Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 5003(b)(2)(B), 112 Stat. 789 (1998); *Id.* sec. 5003(a)(1)(D) ("The term 'normal trade relations' is a more accurate description of the principle of nondiscrimination as it applies to the tariffs applicable generally to imports from United States trading partners, that is, the general rates of duty set forth in column 1 of the Harmonized Tariff Schedule of the United States.").

> The use of surcharges for balance-of-payments purposes has gained de facto acceptance in the General Agreement on Tariffs and Trade over the years.  Major industrialized countries which have resorted to surcharges include France in 1955, Canada in 1962, the United Kingdom in 1968, and Denmark and the United States in 1971. Nonetheless, explicit GATT rules on the use of surcharges have never been adopted.

S. Rep. 93-1298, at 88; *see also* H. Rep. 93-571, at 30 (similar).  The Committee further commented that:  "Upon the entering into force of new rules regulating the application of surcharges as a part of reform of international balance-of-payment adjustment procedures, the President would be required to impose any surcharge authorized under this section in conformity with such new international rules."  S. Rep. 93-1298, at 88.

Congress intended that any action taken pursuant to Section 122 be consistent with the then-existing GATT rules and any future international rules entered into force for the United States.  The "principles" of nondiscriminatory treatment referenced in Section 122(d) must therefore be read in light of these agreements.  After 1974, the GATT Contracting Parties subsequently adopted new "international rules" on balance-of-payment import surcharges within the GATT in 1979, and in the World Trade Organization (WTO) in 1994.[19]  These rules extended the application of the GATT balance-of-payment provisions to import surcharges, expressed preference for imposing import surcharges over quantitative restrictions, and confirmed that import surcharges could be applied in excess of a Member's tariff bindings.[20]

---

[19]  *See* Declaration on Trade Measures Taken for Balance-of-Payments Purposes, GATT Doc. No. L/4904 (adopted Nov. 28, 1979), https://www.wto.org/english/docs_e/legal_e/tokyo_bop_e.pdf; Understanding on the Balance-of-Payments Provisions of the General Agreement on Tariffs and Trade 1994, https://www.wto.org/english/docs_e/legal_e/understanding_bop_e.htm.

[20] On March 20, 2026, the United States notified the WTO of its decision to introduce an import restriction taken for balance-of-payment purposes.  Notification of this action is consistent with paragraph 9 of the WTO Understanding on the Balance-of-Payments Provisions

58

Section 122(d) requires that import restricting actions be applied consistently "with the principle" of nondiscriminatory (or most-favored nation) treatment. Section 122 does not on its face require "nondiscriminatory treatment" or that surcharges imposed pursuant to its terms are applied on a nondiscriminatory basis, consistent with the non-discrimination obligations in the GATT. For example, GATT Article I—which contains the agreement's general most-favored-nation principle—requires GATT Contracting Parties, now WTO Members, to "immediately and unconditionally" extend any preferential tariff treatment granted to one Member to like products of all Members. Instead, Section 122(d)'s requirement that the President proclaim import restricting actions under the statute in accordance with the "principle of nondiscriminatory treatment" permits the President to draw rational distinctions between unlike articles from different trading partners. [21] Indeed, the Section 122 Proclamation's exemptions for USMCA-originating articles and for CAFTA-DR-originating textiles articles are both rational and permissible under the statute, because these specific supply chains are deeply integrated, and USMCA-originating articles and CAFTA-DR-originating textiles articles contain significant U.S. content. A decision not to except these articles from the Section 122 tariffs would therefore

---

of the GATT and with 19 U.S.C. § 2132(d)(3), to the extent applicable, which required that any action taken under subsection (d)(2) "be applied consistently with such new international rules."

[21] Other GATT provisions similarly reflect the capacity of WTO Members to apply distinctions between articles that are not in like circumstances. For example, GATT Article III contains a "national treatment" obligation to ensure that WTO Members provide no less favorable treatment for imported goods as compared to like domestic goods. Furthermore, GATT Article XX sets out general exceptions to commitments in the GATT (now, WTO)—including its non-discrimination obligation—provided that "such measures are not applied in a manner which would constitute a means of arbitrary or unjustifiable discrimination between countries where the same conditions prevail … ." And finally, WTO Members are expressly empowered to deviate from the general most-favored-nation obligation in GATT Article I, when entering into certain preferential free trade agreements and customs unions under GATT Article XXIV.

be highly disruptive to U.S. exports, which would exacerbate the very balance-of-payments crisis the Section 122 action is intended to address. Therefore, the decision to exempt these specially situated USMCA-originating articles and CAFTA-DR-originating textiles and apparel articles is entirely consistent with the "principle of nondiscriminatory treatment" set forth in Section 122(d)(1).

Congress further contemplated that the President could apply Section 122(d)(2) notwithstanding the principle of nondiscriminatory treatment in subsection (d)(1). Although the President did not invoke section 122(d)(2) in Proclamation 11012, Congress permitted him to distinguish between trading partners based on the need to provide "incentives and pressures" for countries to address balance-of-payments problems. *See* H. Rep. 93-571, at 29. Not providing the contested exceptions here would undermine the purposes of both the Proclamation and Section 122, particularly with respect to USMCA products, because imposing duties on these products under these circumstances would impact regionally-integrated supply chains. Such supply chains can promote U.S. production and export of goods, which can help achieve the ultimate objective of the Proclamation and Section 122.

State plaintiffs wholly ignore the context of subsection (d)(1) and the principle of nondiscriminatory treatment articulated in international rules entered into force since the enactment of the Trade Act of 1974. Instead, they rely on *Transpacific Steel LLC v. United States*, 466 F. Supp. 3d 1246, 1258 (Ct. Int'l Trade 2020), *rev'd*, 4 F.4th 1306 (Fed. Cir. 2021), and 19 U.S.C. § 1881 for the proposition that the principle of nondiscrimination always requires "equal tariff treatment of similar products, irrespective of country of origin." States Br. 30. But *Transpacific* is inapposite and plaintiffs' cited quote is taken completely out of context. In reviewing an importer's claim under the Equal Protection Clause of the Fifth Amendment, this

60

Court held that, "[a]lthough deviation from th[e] general principle [of normal trade relations] is allowable, such deviation cannot be arbitrarily and irrationally enforced in a way that treats similarly situated classes differently without permissible justification." *Transpacific*, 466 F. Supp. 3d at 1258 (and 19 U.S.C. § 1881). The Federal Circuit reversed, holding that "there is no applicable federal-law prohibition on different treatment of the imports of articles from different countries." *Transpacific*, 4 F.4th at 1335 (rejecting the interpretation 19 U.S.C. § 1881 as prohibiting certain actions under Section 212 of the Trade Expansion Act of 1962). In any event, the Court in *Transpacific* explicitly stated that "deviation from this general principle is allowable." 466 F. Supp. 3d at 1258. Here, any deviation was not "arbitrarily and irrationally enforced[,]" *id.*, but implemented because of the needs of the U.S. economy. 91 Fed. Reg. at 9341. Moreover, Section 1881 does not define the principle of nondiscriminatory treatment; instead, it applies a normal trade relation rule to "any duty or other import restriction or duty-free treatment proclaimed in carrying out any trade agreement under [subchapter II of the Trade Expansion Act of 1962] or [19 U.S.C. §] 1351 … ." 19 U.S.C. § 1881.

### C.   The Product Exceptions Comply with the Broad And Uniform Application Requirement

Section 122(e) sets out a general rule that the surcharge must have "broad and uniform application with respect to product coverage" but in the same sentence creates a clear exception to the general rule: "where the President determines, consistently with the purposes of this section, that certain articles should not be subject to import restricting actions because of the needs of the United States economy." 19 U.S.C. § 2132(e). And Section 122(e) makes clear that it is the President—not litigants or the Court—that decides when an exception is warranted. Because Congress left this determination explicitly to the President's discretion, the Court may

61

not review it. *Dalton*, 511 U.S. at 476-77. State plaintiffs argue that the President violated Section 122(e) in three ways. Each argument is wrong.

First, Plaintiffs argue that the Proclamation violates section 122(e)'s general broad-and-uniform rule when the President correctly uses the product-coverage exception. States Br. 31-32. But that cannot be right: By subsection (e)'s own terms, the President does not violate the general broad-and-uniform rule when he creates exceptions through his express exception authority in subsection (e). And here, the President, in his judgment, "determine[d]" that certain product exceptions were needed "because of the needs of the United States economy" and that the exceptions were "consistent[] with the purposes of" Section 122. 91 Fed. Reg. at 9341, 9342. In any event, there is no merit to state plaintiffs' argument that the "magnitude of the exclusions" shows a violation of the broad-and-uniform-application requirement. States Br. 32. Plaintiffs create a condition where none exists in the President's exercise of delegated authority. Subsection (e) contains no limitation on the number, or percentage, of imported products that may be excepted from the temporary surcharge. Rather, the President is authorized to determine, within his discretion, whether a product should be excepted because of the needs of the U. S. economy, based on the unavailability of domestic supply at reasonable prices, the necessary importation of raw materials, avoiding serious dislocations of the supply of imported goods, or other similar factors (or based on his determination that import restricting actions on certain products "will be unnecessary or ineffective in carrying out the purposes of" section 122). 19 U.S.C. § 2132(e). Plaintiffs do not contest the President's findings that the excepted products are covered by the unavailability of domestic supply, necessary importation of raw materials, serious dislocations of supply, or other similar factors. Nor do plaintiffs contest the President's finding that tariffing the excepted products would be unnecessary or ineffective in carrying out the

62

purposes of Section 122. This alone renders their argument toothless. That is especially true because plaintiffs talk out of both sides of their mouths. Plaintiffs claim that the challenged tariffs are both too broad and not broad enough. States Br. 29-32.

Second, state plaintiffs halfheartedly argue that the exceptions are not proper because they do not meet certain other limitations of Section 122(e). States Br. 32. Again, subsection (e) plainly leaves the determination whether to except certain products to the President's unreviewable discretion. And plaintiffs' argument is wrong anyway. Plaintiffs rehash their earlier argument erroneously cabining Section 122's purpose to address only monetary exchange problems created by the gold standard (States Br. at 32), which has no greater merit here. Moreover, plaintiffs do not dispute that the challenged tariffs will deal with the United States' large and serious balance-of-payments deficit by reducing the trade deficit. The tariffs (with the current exceptions) are therefore perfectly consistent with the purpose of Section 122: "to deal with large and serious United States balance-of-payments deficits." 19 U.S.C. § 2132(a), (e); *see* 91 Fed. Reg. at 9342 ("The surcharge imposed in this proclamation will deal with the large and serious United States balance-of-payments deficit."); *cf. United States v. Yoshida Int'l, Inc.*, 526 F.2d 560, 580 (C.C.P.A. 1975) ("Through its impact on imports, the surcharge imposed by Proclamation 4074 had a direct effect on our nation's balance of trade and, in turn, on its balance of payments deficit and its international monetary reserves.").

Third, plaintiffs argue that the exceptions are invalid because the President made "no findings whatsoever." Private Pls. Br. 23. That is obviously wrong. The President explicitly grounded the exceptions in "the needs of the United States economy." 91 Fed. Reg. at 9,341; 19 U.S.C. § 2132(e). He further explained that *each* excepted product "should not be subject to [the] import surcharge because of (1) the unavailability of domestic supply at reasonable prices,

63

the necessary importation of raw materials, the avoidance of serious dislocations in the supply of imported goods, or other similar factors; or (2) the fact that the surcharge would be unnecessary or ineffective in carrying out the purposes of section 122 ... Each of my determinations to except an import from the surcharge imposed in this proclamation is independent from the other." 91 Fed. Reg. at 9341-42; *see also* Greer Decl.; Lutnik Decl.  The Proclamation further specifies that *each* exception is consistent with the limitations and purposes of Section 122.  *Id.*  The President's findings are consistent with the limitations to the broad-and-uniform application requirement set forth in subsection (e), and despite plaintiffs' invitation to do so, the Court should not probe these findings any further.  After all, Presidents are neither agencies nor required to provide detailed reasons for their decisions.  *Cf. Trump v. Hawaii*, 585 U.S. 667, 685-86 (2018); *Franklin v. Massachusetts*, 505 U.S. 788, 827 (1992) (Scalia, J., concurring in part and in the judgment).

### D.    The Exceptions Are Explicitly Severable

Because the Proclamation contains a severability provision with respect to the exceptions, a determination against any or all of the enumerated exceptions cannot invalidate the Proclamation in its entirety.  The only proper remedy would be to apply the duties imposed by the Proclamation to the articles subject to the invalidated exception.  91 Fed. Reg. at 9,343.  Thus, even if the Court invalidates the exceptions in their entirety, the imposition of duties under Section 122 would still stand, and the excepted products would be subject to the duties.

The severability of the exceptions could not have been more clearly expressed.  The Proclamation states:

> (b) If any exception to the surcharge imposed in this proclamation is held to be invalid in whole or in part, only that exception or that part of the exception shall be treated as invalid.  The surcharge imposed in this proclamation shall apply to imports to which the invalidated exception or the invalidated part of the exception

applied before its invalidation... . No other exception, part of an exception, or application of an exception shall be treated as invalid[.]

(c) This severability provision reflects my determination that the surcharge imposed in this proclamation should remain operative until July 24, 2026, in a way that is consistent with law ... regardless of whether any exception or exceptions, in whole or in part, are invalidated.

91 Fed. Reg. at 9343-44. It is abundantly clear from this express language that the President intended the specified portions of his Proclamation to be severable. *See MD/DC/DE Broads. Ass'n v. FCC*, 236 F.3d 13, 22 (D.C. Cir. 2001) (applying *K Mart Corp. v. Cartier, Inc.*, 486 U.S. 281, 294 (1988), and assessing severability based "upon the intent of the agency and upon whether the remainder of the regulation could function sensibly without the stricken provision") (emphasis omitted). It is equally clear that the remainder of the Proclamation—imposing a temporary import surcharge—could function sensibly without the provisions excepting certain products from that very surcharge. *Id.*; *see also Thornley and Pitt v. United States*, 273 F. Supp. 524, 526 (Cust. Ct. 1967) (principles underlying the severability of statutes are applicable "in like manner" to the severability of Presidential proclamations); *United States v. American Bitumuls & Asphalt Co.*, 246 F.2d 270, 276 (C.C.P.A. 1957) (applying severability to Presidential proclamation); *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 191 (1999) (assuming without deciding that the severability analysis for statutes also applies to executive orders).

Plaintiffs can point to no extraordinary circumstance that would suggest the President did not mean what he said, nor can they show that the remainder of the Proclamation would not function without the exceptions. Thus, if the Court finds that any of the exceptions violate Section 122, the temporary duties would simply apply to the products subject to the invalidated

65

exceptions.  Given this, the Court need not consider plaintiffs' exception-related arguments discussed above.  But, if it does, the exceptions do not contravene either the nondiscriminatory treatment or the broad-and-uniform application principle.

## IV.     State Plaintiffs' APA Claim Is Meritless

State plaintiffs attempt an Administrative Procedure Act (APA) claim against U.S. Customs and Border Protection (CBP), based on CBP's Cargo Systems Messaging Service (CSMS) message 67844987 providing guidance on Proclamation 11012.  States Br. at 32-33. Plaintiffs presumably bring this claim to skirt the limited judicial review available for Presidential action, but the claim fails because the CSMS message is not reviewable under the APA.

The APA provides a right to judicial review of all "final agency action[s] for which there is no other adequate remedy in a court[.]"  *Bennett v. Spear*, 520 U.S. 154, 175 (1997) (citing 5 U.S.C. § 704).  A necessary predicate is whether there is an "agency action" at all.  As this Court has previously held, a CSMS message providing guidance regarding a Presidential proclamation is not "agency action" at all because such a message is not "an agency rule, order, license, sanction, [or] relief."  *Maple Leaf Marketing, Inc. v. United States*, 528 F. Supp. 3d 1365, 1378-79 (Ct. Int'l Trade 2021) (citing 5 U.S.C. § 551(13)).  The CSMS message is merely a product of the President's Proclamation, over which CBP exercised no independent discretion.  In this Circuit, CBP's ministerial role in implementing the President's directive deprives the CSMS message of any "agency action" status.  *See Indus. Chems., Inc. v. United States*, 941 F.3d 1368, 1371 (Fed. Cir. 2019) (affirming dismissal when CBP is acting in a "merely ministerial" capacity); *Invenergy Renewables LLC v. United States*, 482 F. Supp. 3d 1344, 1354 (Ct. Int'l Trade 2020) (no APA review of the United States Trade Representative's implementation of a presidential proclamation because "the President is not himself subject to the APA," and "this

66

attempt to formulate claims under the APA … is too tenuous a connection[.]"); *see also, e.g.*, *Detroit Int'l Bridge Co. v. Gov't of Canada*, 189 F. Supp. 3d 85, 100 (D.D.C. 2016) ("[A]n agency's action on behalf of the President, involving discretionary authority committed to the President, is 'presidential' and unreviewable under the APA."). The relevant authority here is not one delegated to or exercised by CBP; rather, it is the power that Congress expressly vested in the President. *See USP Holdings*, 36 F.4th at 1369 (concluding for Section 232 that Commerce "Secretary's threat determination is not reviewable under the APA" because the determination overlaps with the President's delegated authority). Plaintiffs' reliance on out-of-Circuit caselaw cannot trump the Federal Circuit's clear holdings.

Even when there is an agency action within the meaning of the APA, it must be "final" to be reviewable. An agency action is final when it: (1) "mark[s] the 'consummation' of the agency's decisionmaking process"; and (2) is a decision "by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]'" *Bennett*, 520 U.S. at 177-78. Both elements are again missing with respect to the CSMS message. As in *Maple Leaf Marketing*, the CSMS message here cannot reflect the consummation of CBP's decisionmaking process because CBP exercised no decisionmaking authority over the Presidential Proclamation. *See* 528 F. Supp. 3d at 1379. As in *Maple Leaf Marketing*, CBP made no "meaningful decisions with respect to the imposition of ... duties[.]" *Id.*

Nor is the CSMS message a decision from which legal consequences will flow. *Bennett*, 520 U.S. at 178. The CSMS message does not determine any rights or obligations; it merely conveys the duties imposed by the President's Proclamation. Tellingly, if the CSMS message itself did not exist, the duties imposed by the President's Proclamation would still exist and be

67

collected.   And, of course, the President's actions are not reviewable under the APA. [22]

*Franklin*, 505 U.S. at 800-01; *see Dalton*, 511 U.S. at 474 .

## V.       Plaintiffs Are Not Entitled to a Preliminary Or Permanent Injunction

Plaintiffs seek declaratory and injunctive relief, but are not entitled to such relief for the

reasons already explained.  Their request for an injunction, in particular, fails for additional

reasons.

### A.       Plaintiffs Cannot Establish the Likelihood of Immediate, Irreparable Harm

Plaintiffs fail to show entitlement to an injunction because they cannot show they "will be

immediately and irreparably injured" before the Court can decide the case on the merits.

*Asociacion Colombiana de Exportadores de Flores v. United States*, 717 F. Supp. 847, 851 (Ct.

Int'l Trade 1989).  "Critically, irreparable harm may not be speculative, or determined by

surmise." *Comm. Overseeing Action for Lumber Int'l Trade Investigations or Negots. v. United

States*, 393 F. Supp. 3d 1271, 1276 (Ct. Int'l Trade 2019) (cleaned up).  As the Federal Circuit

has explained, an injunction "will not issue simply to prevent a mere possibility of injury ... .  A

presently existing, actual threat must be shown." *Zenith Radio Corp. v. United States*, 710 F.2d

806, 809 (Fed. Cir. 1983) (citation omitted).  Put another way, "[a] movant must show that the

harm is certain to occur and that it is a direct result of the action it is challenging." *Retractable

Techs., Inc. v. United States*, 739 F. Supp. 3d 1330, 1340 (Ct. Int'l Trade 2024) (citing *Wisconsin

Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).  The court "should be wary of issuing an

---

[22]  Private plaintiffs do not assert an APA claim against an agency, but they do complain that the duties were imposed without notice or public comment.  Private Pls. Br. 24, 35.  But action under Section 122, explicitly delegated to the President by Congress, does not require notice and comment, and is not otherwise required to comply with the APA.

injunction based solely upon allegations and conclusory affidavits submitted by plaintiff." *Atari Games Corp. v. Nintendo of Am., Inc.*, 897 F.2d 1572, 1575 (Fed. Cir. 1990).

Plaintiffs cannot show that they will experience irreparable harm while the Court considers their simultaneous motion for summary judgment, especially in view of the expedited briefing and hearing of their motions. First, the majority of plaintiffs have not alleged that they have paid additional duties pursuant to the Proclamation, or that they will imminently be required to do so. *See infra* Section V.C. Of the states, only Washington alleges that one of its arms is an importer of record.[23] The failure of most plaintiffs to establish harm at all cuts against a finding of immediate, irreparable injury. And even for plaintiffs who have deposited duties pursuant to Section 122, we do not contest the Court's authority to order reliquidation for plaintiff if plaintiff prevails. *See AGS Co. Auto. Sols. v. U.S. Customs & Border Prot.*, --- F. Supp.3d ---, 2025 WL 3634261, at *3 (Ct. Int'l Trade 2025).

Second, state plaintiffs allege that they will be harmed by "paying more for goods, equipment, and services where third parties must pay the tariffs," and the tariffs' impact on the states' "ability to plan and develop budgets, and to procure necessary goods in a timely and predictable manner." States Br. 35, 38. As discussed below, non-importer plaintiffs lack standing for their claims of economic harm, meaning such injuries cannot be considered in the injunctive factors analysis. *See Totes-Isotoner Corp.*, 594 F.3d at 1352.

Third, even if plaintiffs have paid or will pay duties, or may incur cost concerns as a result of the Section 122 duties, the speculative statements in their declarations show only the possibility of future economic loss, which this Court has held is insufficient to show irreparable

---

[23] CBP has confirmed that both private plaintiffs appear to have imported goods subject to Section 122 duties.

harm—certainly far short of a real risk of immediate extinction required to justify a preliminary injunction. *See, e.g., Corus Grp. PLC v. Bush*, 217 F. Supp. 2d 1347, 1355 (Ct. Int'l Trade 2002) (concluding that the plaintiff had failed to establish irreparable harm because there was no evidence the plant was "in danger of imminent closure" despite testimony that "sound business principles would require [the company] to close the plant rather than operate at a loss"); *Shandong Huarong General Grp. v. United States*, 122 F. Supp. 2d 1367, 1372 (Ct. Int'l Trade 2000) (similar). As explained in *Corus*, "[e]very increase in duty rate will necessarily have an adverse effect on foreign producers and importers," but if "the court were to find irreparable harm under these facts, the court would likely be required to do so in any challenge to a duty increase because every plaintiff could argue that increased tariffs would cause revenue shortfalls possibly resulting in either operating at a loss or plant closure at some future date." 217 F. Supp. 2d at 1355.

Thus, the mere threat of "economic harm," such as States paying more for goods and services or uncertainty in their budgeting, States Br. 35-39, cannot establish irreparable harm because it would "effectively create a *per se* irreparable harm rule in similar challenges—a result likely contrary to the extraordinary nature of the remedy." *Id.* Nor can plaintiffs rely on their experiences with IEEPA duties to speculate that any alleged harms stemming from Section 122 duties will have the same, or even similar, effect. As discussed above, *see infra* Section I.B, the duties imposed under Section 122 differ from those imposed under IEEPA in multiple significant respects.

Like in *Corus* and *Shandong Huarong*, the private plaintiffs in this case also cannot establish irreparable harm. They fail to provide any "hard evidence" that they face immediate extinction absent a preliminary injunction. Instead, their declarations reflect no more than

70

speculative and generalized concerns as to the effects the tariffs may eventually have on aspects of their businesses. *See* Decl. of Ethan Frisch, Case No. 26-01606, ECF No. 11 at Exh. A ¶¶ 12-14, 18; Decl. of Jay Foreman, Case No. 26-01606, ECF No. 11 at Exh. B ¶¶ 16-22.

Finally, plaintiffs fail to explain how monetary redress would be inadequate. For plaintiffs that have paid or will pay duties, were they to ultimately prevail, defendants do not oppose the Court's authority to order reliquidation of plaintiffs' entries of merchandise subject to the challenged duties if they are found in a final and unappealable decision to have been unlawfully collected. Such reliquidation would result in a refund of all duties determined to be unlawfully assessed, with interest.

### B.    The Remaining Injunctive Factors Do Not Favor Plaintiffs

The remaining factors—the balance of hardships and the public interest, which "merge when the Government is the opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), likewise favor the government. Plaintiffs' purported irreparable harm is far outweighed by the public interest in maintaining the challenged action. The President has identified that the balance-of-payments deficits significantly harms U.S. national interests, including its economic and national security interests, and has determined that an import surcharge in the form of duties is required to deal with those problems. *See, e.g.*, 91 Fed. Reg. at 9341 ("I find that fundamental international payments problems within the meaning of section 122 exist; that those problems significantly harm United States national interests, including economic and national security interests; and that special measures to restrict imports are required to address those problems, as authorized by section 122."); *id.* at 9342 ("Restricting imports through the surcharge imposed in this proclamation is required to address the fundamental international payments problems within the meaning of section 122 that I have found to exist. The surcharge imposed in this

71

proclamation will deal with the large and serious United States balance-of-payments deficit."). The equities and public interest lie there, not with plaintiffs. *See Winter*, 555 U.S. at 24.

As for the balance of hardships, plaintiffs' proposed injunction would be an enormous intrusion on the President's conduct of foreign affairs and efforts to protect address the rapidly deteriorating balance-of-payments position of the United States under section 122 and the Constitution. *See* U.S. Const. art. II, §2. This is particularly so given that size and persistence of the U.S. current account deficit and the fact that further declines in the United States' net negative international investment position could lead to a disorderly external rebalancing of the U.S. economy. As Ambassador Greer explains, the current "conditions represent a potential source of vulnerability that the President must continue to mitigate," highlighting the IMF's expressed concern about the "size and persistence of the U.S. current account deficit." Greer Dec. ¶ 17. Plaintiffs' request to import merchandise without paying the applicable duties would undermine the President's goals, and the requested injunction would weaken the President's efforts to reverse these trends. The balance of hardships favors the Government.

### C.    Any Injunction Should Be Limited Only to Plaintiffs with Standing Who Have Also Established Irreparable Harm

If this Court were to issue an injunction, its order must be limited in scope to the plaintiffs who have standing. All but one of the state plaintiffs, Washington, lack standing to bring this suit because they do not allege that they have been—or will soon be—required to pay duties under Section 122. Injunctive relief must be narrowly tailored, *see Gemveto Jewelry Co. v. Jeff Cooper Inc.*, 800 F.2d 256, 259 (Fed. Cir. 1986), and limited to prevent any irreparable harm shown. *Zenith*, 710 F.2d at 809. And, under the Supreme Court's recent decision in *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), plaintiffs' request for an universal injunction must be denied.

72

### 1.    Article III Standing

To have Article III standing, a plaintiff must prove it has: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)).  This injury must be "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560.  "A particularized injury is one that affects the plaintiff in a personal and individualized way." *Barnes v. United States*, 788 F. Supp. 3d 1308, 1315-16 (Ct. Int'l Trade 2025).  "[A]llegation of possible future injury are not sufficient" to constitute an actual or imminent injury. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  Instead, an injury is imminent "if the threatened injury is 'certainly impending,' or there is a 'substantial risk' that the harm will occur." *Hoshine Silicon (Jia Xing) Indus. Co. v. United States*, 780 F. Supp. 3d 1328, 1335 (Ct. Int'l Trade 2025) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).

Critically, Washington is the only state plaintiff that alleges that one of its arms or agencies has paid or will soon pay Section 122 duties.[24]  No other states claim importer status;[25] rather, they are purchasers who allegedly paid increased costs to third-party importers based on IEEPA duties and say they expect to do the same for Section 122 duties.  While importers have

---

[24]  While Washington says only that it "expects" to pay Section 122 duties soon, it appears based on information from CBP that the University of Washington already has one entry with duties deposited pursuant to Section 122.

[25]  State plaintiffs insinuate that New Jersey claims importer status, citing a declaration from the Deputy State Treasurer of New Jersey.  *See* States Br. 18 (citing Mistry Decl. ¶¶ 7-10 ("describing increased costs for State as an importer of specialized goods")).  But the cited paragraphs in the declaration do not allege that New Jersey is an importer; rather, they focus on duties paid by a vendor and supplemental charges assessed by that vendor.  Mistry Decl., ECF No. 27-20 ¶¶ 7-10.

standing to challenge tariffs, purchasers of imported goods do not. "[P]urchasers have no remedy to challenge [a] tariff classification." *Totes-Isotoner Corp. v. United States*, 594 F.3d 1346, 1352 (Fed. Cir. 2010).[26] This is because the requirements of traceability and redressability are not satisfied where an injury "results from the independent action of some third party not before the court," such as the independent action of an importer raising prices. *Murthy v. Missouri*, 603 U.S. 43, 57 (2024).

Several states erroneously focus on the alleged detrimental effects of duties stemming from *IEEPA*—a completely separate law not the subject of the present litigation. *See, e.g.*, ECF Nos. 27-7 ¶ 7 (Arizona); 27-11 ¶¶ 7, 9 (Colorado); 27-15 ¶¶ 9, 15 (Kentucky); 27-16 ¶ 7 (Massachusetts); 27-17 ¶ 6 (Michigan); 27-20 ¶¶ 6-10 (New Jersey); 27-21 ¶ 10 (New York); 27-22 ¶¶ 4-5 (North Carolina); 27-23 ¶ 5 (Oregon); 27-25 ¶ 5 (Vermont); 27-26 ¶¶ 5-6 (Washington); 27-27 ¶ 8 (Wisconsin). Other states claim an even more attenuated harm, merely listing goods that the state has purchased that originate in foreign countries, with no mention of paying any tariff at all. *See, e.g.*, ECF Nos. 27-8, 27-9, 27-10 (California); 27-14 (Illinois). A state's mere "expect[ation] that [purchases] will be subject to the new tariffs or to price increases," *see* ECF No. 27-14 ¶ 4; "that vendors or suppliers may pursue amendments to existing contracts," ECF No. 27-18 ¶ 13; or that "[i]t is possible that" a state may make purchases subject to the Section 122 duties, ECF No. 27-27 ¶ 10; are no more than allegations of possible future injury. They do not constitute actual or imminent injury traceable to the

---

[26] The Court's previous dismissal of *Totes-Isotoner* in *V.O.S. Selections*, 772 F. Supp. 3d at 1368 n.8, incorrectly stated that *Totes-Isotoner* "had nothing to do with the purchasers' Article III standing." *Totes-Isotoner* concluded that Totes (an importer) could only claim standing on behalf of purchasers when, among other things, "there is some hindrance to the first party [the purchasers] filing its own claim." 594 F.3d at 1352. That hindrance was that "purchasers have no remedy to challenge the tariff classification." *Id.*

imposition of Section 122 duties.  *See FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024) ("The causation requirement also rules out attenuated links—that is, where the government action is so far removed from its distant (even if predictable) ripple effects that the plaintiffs cannot establish Article III standing.").

Thus, the non-importer states' allegations of "expected" "increased cost" in the goods they purchase are too attenuated for standing.  Prices are set by independent private actors and informed by multiple, complex market forces.  State plaintiffs cannot reasonably infer that importers will uniformly pass on not just these costs but also any savings (like duty refunds or post-tariff price decreases) to consumers—let alone to these specific plaintiffs.

State plaintiffs' declarations demonstrate the lack of causation.  For example, some declarations forecast suppliers potentially raising prices by more than 10 percent in response to the Section 122 duties.  *See, e.g.*, ECF Nos. 27-12 ¶ 5 (speculating a 15 percent or higher increase); 27-13 ¶ 7 (speculating at least a 12 percent increase).  But a supplier increasing prices by *15 percent* in response to a *10 percent* duty under Section 122 shows that suppliers are setting prices according to complex market forces.  Those sorts of decisions are independent actions of third parties, rather than an effect directly and solely traceable to Section 122 duties.  *See Murthy*, 603 U.S. at 57.  Meanwhile, other declarations demonstrate that, in response to IEEPA tariffs, suppliers raised prices by much smaller amounts, such as "an increase of 3%."  *See* ECF No. 27-16 ¶ 7.  This too demonstrates that suppliers are acting pursuant to market forces, not directly passing along duties to customers.

The Supreme Court has also criticized States' reliance on downstream harms for standing.  *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023).  So have many other courts. *See, e.g.*, *Maryland v. U.S. Dep't of Agric.*, 151 F.4th 197, 209-10 (4th Cir. 2025) (rejecting as

"too open-ended" plaintiffs' theory of standing based on "indirect impacts to state budgets");

*Washington v. FDA*, 108 F.4th 1163, 1175 (9th Cir. 2024) ("much more is needed" than

"'indirect effects' of federal policy on state revenue or state spending"); *Arizona v. Biden*, 40

F.4th 375, 386 (6th Cir. 2022) ("Are we really going to say that any federal regulation … that

imposes peripheral costs on a State creates a cognizable Article III injury for the State to

vindicate in federal court?"); *XY Planning Network, LLC v. SEC*, 963 F.3d 244, 252-53 (2d Cir.

2020) (no standing based on prospect of decreased tax revenue, as tax revenue "is driven by

countless variables"); *Iowa ex rel. Miller v. Block*, 771 F.2d 347, 353-54 (8th Cir. 1985) (no

standing to challenge policy that would "forc[e] unemployment up and state tax revenues

down"); *Pennsylvania ex rel. Shapp v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976) ("[T]he

unavoidable economic repercussions of virtually all federal policies … suggest to us that

impairment of state tax revenues should not, in general, be recognized as sufficient injury in fact

to support state standing.").

The cases cited by state plaintiffs are inapposite.  In *Canadian Lumber Trade Alliance v.*

*United States*, 517 F.3d 1319, 1333 (Fed. Cir. 2008), the Court employed the doctrine of

"'competitor standing,' which relies on economic logic to conclude that a plaintiff will likely

suffer an injury-in-fact when the government acts in a way that increases competition or aids the

plaintiff's competitors."  But that doctrine does not apply where plaintiffs have not shown that

these tariffs (which are not unique to them) are causing them competitive injury.  None of the

state plaintiffs are "market participants" who are in economic competition for market share.  *See*

*id.* at 1334.  *Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1273-74 (Ct.

Int'l Trade 2019), is also inapposite, as the plaintiffs there did not rely solely on "economic

harm," but also raised concrete claims of procedural harm, which plaintiffs here do not assert.

Accordingly, "the links in the chain of causation" between the non-importer states' harm and the Section 122 tariffs are "too speculative or too attenuated" for Article III standing. *Alliance*, 602 U.S. at 383.

i.      Prudential Standing

The non-importer states further lack prudential standing. *Bennett*, 520 U.S. at 162-63. Prudential standing is an inquiry into a plaintiff's interests "fall within the zone of interests protected by the law invoked" or by a statutory right of action. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014). The zone-of-interests analysis "asks whether this particular class of persons ha[s] a right to sue under this substantive statute." *Id.* at 127-28 (cleaned up). The purpose is to limit review for a plaintiff's interests that "are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n.*, 479 U.S. 388, 399 (1987). "A litigant must assert an injury peculiar to himself or to a distinct group of which he is a part, rather than an interest shared in substantially equal measure by all or a large part of the populace." *McKinney v. U.S. Dep't of Treasury*, 799 F.2d 1544, 1551 (Fed. Cir. 1986) (citing *Gladstone Realtors v. Vill. of Bellwood*, 441 U.S. 91, 99 (1979)).

*Lexmark*, which involved claims for false advertising under the Lanham Act, makes clear that not every consumer who alleges harm falls within the zone of interests. The Supreme Court explained that the Lanham Act authorizes "suit by 'any person who believes that he or she is likely be damaged' by a defendant's false advertising." *Lexmark*, 572 U.S. at 129 (quoting 15 U.S.C. § 1125(a)(1) (2014)). Despite this broad authorization, the Court concluded that "a business misled by a supplier into purchasing an inferior product is, like consumers generally, not under the [Lanham] Act's aegis." *Id.* at 132. Likewise, the non-importer states here are

77

"consumers generally" who are no different than any other purchaser of an importer's goods, and therefore do not fall under Section 122's aegis.

*McKinney* provides further guidance.  In that case, the Federal Circuit analyzed whether consumers of imported merchandise had prudential standing to bar imports from the Soviet Union under 19 U.S.C. § 1307 (1986) (Section 307).  The Court concluded that these consumers were not in the statute's zone of interests because Section 307 "was enacted by Congress to protect domestic producers, production, and workers from the unfair competition which would result from the importation of foreign products produced by forced labor." *McKinney*, 799 F.2d at 1552 (emphasis removed).  By contrast, "[n]o stated or implied intention is evident … to protect the *consuming public* from the importation of goods produced by forced labor." *Id.* (emphasis added).

Similarly, Section 122 is not intended to provide protection for domestic consumers.  It is a statute empowering the President to deal with significant monetary and economic problems. Neither the plain language of Section 122 nor its legislative history "support an interpretation that it was enacted to afford consumers a legal right or interest[.]" *McKinney*, 799 F.2d at 1552.

*Invenergy* does not rescue plaintiffs as, in that case, the Court distinguished *McKinney* only because the plaintiff in *Invenergy* (a consumer) had participated in the challenged administrative proceeding and was concretely affected by the decision. *See Invenergy Renewables*, 422 F. Supp. 3d at 1277 n.7.  If anything, *Invenergy* reinforces the lack of prudential standing here: state plaintiffs who are merely consumers of imported goods have "only an abstract interest in the statute." *Id.*  Finding such a loose connection to Section 122 sufficient to establish prudential standing would mean that nearly every American could be said to fall within the zone of interests of the statute, negating the entire purpose of the doctrine. *See*

78

*McKinney*, 799 F.2d at 1553 (citing *Warth v. Seldin*, 422 U.S. 490, 499-50 (1975)). Whether analyzed under the rubric of Article III or prudential standing, non-importer state plaintiffs fail to establish standing and cannot obtain any relief from the Court.

### 2.    The Scope of an Injunction Must Be Limited to the Parties with Standing

The non-importer states' lack of standing matters because injunctive and declaratory relief are only available to proper parties with standing. During the IEEPA litigation, this Court held that "even if the non-importer states among [the plaintiffs] were to hypothetically lack standing, the contours of available relief would not change." *V.O.S. Selections*, 772 F. Supp. 3d at 1369. But that is categorically incorrect in light of the Supreme Court's decision in *CASA*, which held that universal injunctions "likely exceed the equitable authority that Congress has granted to federal courts." 606 U.S. at 837. As the Court explained, "'[c]omplete relief' is not synonymous with 'universal relief.' It is a narrower concept: The equitable tradition has long embraced the rule that courts generally 'may administer complete relief *between the parties*.'" *Id.* at 851 (quoting *Kinney-Coastal Oil Co. v. Kieffer*, 277 U.S. 488, 507 (1928)).

State plaintiffs contend that *CASA* does not bind this Court. *See* States Br. 42 n.8. But, as the Federal Circuit explicitly confirmed in *V.O.S. Selections*, the standards set forth in *CASA* apply to tariff cases before this Court, and the Federal Circuit required this Court to explain how "its grant of a universal injunction comports with" those standards. 149 F.4th at 1340. Plaintiffs cannot distinguish why the Section 122 cases merit different treatment in this light, and the Federal Circuit's directive binds this Court.

This Court is not more powerful than the district courts. When Congress created the Court of International Trade, it provided that the Court "shall possess all the powers in law and equity of, or as conferred by statute upon, a district court of the United States." Pub. L. 96-417,

79

Title II, § 201, Oct. 10, 1980, 94 Stat. 1727 (codified at 28 U.S.C. § 1585).  Thus, this Court's

equitable powers are the same as those of district courts.  Put differently, this Court is bound by

the same rules of equity as every other district court in the country.  And like every other district

court in the country, this Court lacks the authority to issue a universal injunction when only

proper parties with standing are entitled to relief.  As stated in *CASA*, "the equitable relief

available in the federal courts is that 'traditionally accorded by courts of equity' at the time of

our founding."  606 U.S. at 856 (citation omitted).  Because "[n]othing like a universal

injunction was available at the founding, or for that matter for more than a century thereafter,"

"federal courts lack authority to issue" universal injunctions.  *Id.*

Plaintiffs rely on this Court's recent order in *Atmus Filtration, Inc. v. United States*, 2026

WL 616128 (Ct. Int'l Trade Mar. 4, 2026), in arguing that *CASA* does not bind this Court.  But

that order—issued without briefing on the issue from any of the parties and without any motion

before the Court—lacks persuasive reasoning on this issue.[27]  The Court's assumption regarding

the perceived inapplicability of *CASA* stems largely from the fact that it retains national

geographic jurisdiction, as well as exclusive jurisdiction to hear this case, and the lack of "danger

that another Judge, even one in this Court, will reach any contrary conclusions."  *Id.* at *2.  But

none of that can extend the Court's authority beyond that bestowed by Congress.  That authority

does not include the granting of relief to non-parties (or parties without standing), regardless of

the Court's belief that universal relief is necessary to promote "the efficient administration of

justice," to give "those importers who have filed suit [an] efficient resolution of their claims,"

---

[27]  The requirement to comply with that order is currently suspended.  *See Atmus*, Case No. 26-01259, ECF Nos. 49-50.  And the time to appeal the *sua sponte* grant of a universal injunction has not passed.

and to give "importers who have not filed suit the benefit of the *Learning Resources* decision." *Id.*  As the Supreme Court explained in *CASA*, this sort of effort to grant "complete relief" exceeds the federal courts' equitable powers, because "complete relief," properly understood, "is not synonymous with 'universal relief.'"  606 U.S. at 851.  It is "a narrower concept" that means "complete relief *between the parties*.'"  *Id.*  Therefore, "the question is not whether an injunction offers complete relief to *everyone* potentially affected by an allegedly unlawful act; it is whether an injunction will offer complete relief *to the plaintiffs before the court*."  *Id.*.  Issuing universal relief would directly contravene *CASA*.

State plaintiffs' reliance on uniformity considerations is likewise misplaced.  States Br. 42-43.  The Uniformity Clause in Article I limits *Congress's* power to impose non-uniform duties, imposts, and excises; it does *not* expand the *Judiciary's* equitable powers or modify traditional principles of equity.  *See* U.S. Const. art. I, § 8, cl. 1.  Notably, the Court has not traditionally relied on the Uniformity Clause to order universal injunctions in other cases.  For example, in the *In re Section 301 Cases*, which are similar with regard to the large number of importers affected, the Court limited its order enjoining liquidation to the plaintiffs in the litigation.  *See* 524 F. Supp. 3d 1355 (Ct. Int'l Trade 2021); *see also Retractable Techs., Inc. v. United States*, 739 F. Supp. 3d 1330, 1343 (Ct. Int'l Trade 2024) (limiting the injunction suspending liquidation to "Plaintiff's entries.").  And when the Court held unlawful certain tariffs imposed under section 232 of the Trade Expansion Act of 1962 (a holding the Federal Circuit later reversed), *see Transpacific*, the Court similarly limited refunds to "Plaintiff and Plaintiff-Intervenors."  *Id.*, Case No. 19-00009, ECF No. 66 (July 14, 2020).  State plaintiffs' broad reading of the Uniformity Clause would be an unprecedented—and unlawful—expansion

81

of the Court's power and would constitute a stark deviation from its practice in dealing with other recent cases of large scope and magnitude.

*     *     *

Finally, if the Court issues preliminary injunctive relief (that is limited to those plaintiffs with standing), the Court should require those plaintiffs to (i) identify the entries, by entry number, importer name, and importer number, that would be covered by any such order, and (ii) post a bond for the amount of the tariffs they would otherwise have paid. USCIT Rule 65(c) (requiring "the movant [to] give[] security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."); *see PrimeSource Bldg. Prods., Inc. v. United States*, 535 F. Supp. 3d 1327, 1330, 1334 (Ct. Int'l Trade 2021).

Any injunction should also be stayed pending appeal—or, at a minimum, stayed for seven days to allow the government to seek appellate relief.

The Government will suffer irreparable harm without a stay pending appeal. *See, e.g.*, *Trump v. Orr*, 146 S. Ct. 44, 46 (2025) (irreparable harm to Government when "enforcement of an Executive Branch policy with foreign affairs implications" is enjoined). Any injunction without a stay would disrupt ongoing negotiations that seek to address the balance-of-payments issues the United States is facing. Ambassador Greer highlights this point, emphasizing that the President is using the Section 122 import surcharge to "reduce the U.S. trade deficit, the single-largest driver of our current account deficit, which causes our large and serious balance-of-payments deficit" through sensitive trade negotiations. Greer Dec. ¶¶ 18-20. And there is a strong public interest in allowing the Executive Branch to implement administration policies. *See, e.g., Talbott v. United States*, No. 25-5087, 2025 WL 3533344, at *11 (D.C. Cir. Dec. 9,

82

2025) ("Injunctions that 'improperly intrude' on the Executive Branch often inflict irreparable injury." (quoting *CASA*, 606 U.S. at 859)).  That is especially true here where any injunction causes more legal questions than it solves.  While plaintiffs have the prospect of refunds remedying their harm, the Government might be at a disadvantage if it prevails on appeal, as plaintiffs will surely argue that Section 122's 150-days limitation does not pause while the surcharge is enjoined.

## CONCLUSION

The Court should deny plaintiffs' motions for a preliminary injunction and summary judgment and enter judgment in favor of Defendants.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

ERIC J. HAMILTON
Deputy Assistant Attorney General

PATRICIA M. McCARTHY
Director

/s/Claudia Burke
CLAUDIA BURKE
Deputy Director

JUSTIN R. MILLER
Attorney-In-Charge
International Trade Field Office

SOSUN BAE
Senior Trial Counsel

COLLIN T. MATHIAS
BLAKE W. COWMAN
CATHERINE M. YANG
MATHIAS RABINOVITCH
Trial Attorneys
U.S. Department of Justice

Civil Division
Commercial Litigation Branch
PO Box 480, Ben Franklin Station
Washington, DC 20044
(202) 353-9063
Claudia.Burke@usdoj.gov

Dated: April 3, 2026                    *Attorneys for Defendants*

84

**CERTIFICATE OF COMPLIANCE**

I hereby certify, pursuant to section 2(B)(1) of the Standard Chambers Procedures of this Court and this Court's March 12, 2026 order, that this brief contains 26,113 words, excluding the table of contents, table of authorities, any addendum containing statutes, rules or regulations, any certificates of counsel, and counsel's signature, as calculated by the word processing system used to prepare this brief (Microsoft Word).


/s/ Claudia Burke
CLAUDIA BURKE