UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| THE STATE OF OREGON, et al., | |
| Plaintiffs, | |
| v. | CASE NO. 26-01472 |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

DECLARATION OF AMBASSADOR JAMIESON LEE GREER, UNITED STATES
TRADE REPRESENTATIVE

I, Ambassador Jamieson Lee Greer, hereby state as follows:

1.     I am the United States Trade Representative and the head of the Office of the United States Trade Representative, a component in the Executive Office of the President.  *See* 19 U.S.C. § 2171(a).  I have been the United States Trade Representative since February 26, 2025.

2.     The statements made herein are based on my personal knowledge, on information provided to me in my official capacity, reasonable inquiry, and information obtained from various records, systems, component employees, and information portals maintained and relied upon by the United States Government in the regular course of business, and on my evaluation of that information.

3.     The purpose of this declaration is to explain, in my capacity as the principal advisor to the President on international trade policy and the chief representative for the United States in international trade negotiations, the basis for my recommending to the President that the temporary import surcharge imposed in Proclamation 11012 of February 20, 2026 (Imposing a Temporary Import Surcharge To Address Fundamental International Payments Problems) ("Section 122

1

Proclamation") not apply to certain products because of the needs of the United States economy. This declaration also addresses the harm to the Government should the Court issue an injunction.

4.    On February 20, 2026, President Trump took decisive action to address fundamental international payment problems that the United States faces, in particular a large and serious balance-of-payments deficit, by signing the Section 122 Proclamation.  President Trump invoked his authority under section 122 of the Trade Act of 1974 (19 U.S.C. § 2132) (Section 122), which empowers the President to address certain fundamental international payment problems through surcharges and other special import restrictions.  The Section 122 Proclamation imposed, for a period of 150 days, a 10 percent *ad valorem* import surcharge on articles imported into the United States.

5.    The Section 122 Proclamation exceptions are carefully scoped to ensure broad and uniform application of the Section 122 surcharge with respect to product coverage.  As explained below, these specific exceptions reflect my recommendations to the President that certain articles should not be subject to the Section 122 surcharges because of the needs of the United States economy.  These specific exceptions are limited to the unavailability of domestic supply at reasonable prices, the necessary importation of raw materials, the need to avoid serious dislocations in the supply of imported goods, and other similar factors, as well as articles for which application of an import surcharge will be unnecessary or ineffective in carrying out the purposes of Section 122.

6.    Specifically, I recommended that the temporary import surcharge imposed under the Section 122 Proclamation not apply to metals used in currency and bullion.  Metals used in currency and bullion, such as gold, play critical roles in domestic and international financial

markets.[1]  This specific exception would help avoid serious dislocations in the supply of imported goods that could cause unintended economy-wide disruptions, particularly because of the role such goods play in currency markets.[2]  Finally, imposing the temporary import surcharge on these metals would be unnecessary or ineffective in carrying out the purposes of Section 122.

7.    I also recommended that the temporary import surcharge imposed under the Section 122 Proclamation not apply to energy and energy products.  These products, such as petroleum and natural gas,[3] sustain a wide range of economic activity and infrastructure, and are important to U.S. manufacturing, transportation, agriculture, and defense industries.[4]  As such, importation of certain energy-related raw materials is necessary for the functioning of the U.S. economy,[5] and it is critical to avoid serious dislocations in the supply of imported goods given economy-wide criticality.  Moreover, imposing the surcharge on these products would be unnecessary or ineffective in carrying out the purposes of Section 122.

8.    I also recommended that the temporary import surcharge imposed under the Section 122 Proclamation not apply to natural resources and fertilizers that cannot be grown, mined, or otherwise produced in the United States or grown, mined, or otherwise produced in sufficient quantities to meet domestic demand.  For such goods, environmental, geographical, and other

---

[1] *See* Colin Weiss, "Official Reserve Revaluations: The International Experience," Board of Governors of Federal Reserve System (Aug. 1, 2025), https://www.federalreserve.gov/econres/notes/feds-notes/official-reserve-revaluations-the-international-experience-20250801.html.

[2] *See, e.g.*, Dean Belder, "Navigating Uncertainty: How Trump's Tariffs Are Affecting the Gold Market," Investing News Network (Aug. 27, 2025), https://investingnews.com/trump-gold-tariffs/ (explaining impacts of reciprocal tariffs on certain gold products prior to September modification of Annex II to Executive Order 14257 of April 2, 2025).

[3] *See* U.S. Energy Info. Admin., "U.S. Energy Facts Explained," https://www.eia.gov/energyexplained/us-energy-facts/imports-and-exports.php (explaining that the United States was a net importer in 2023 of crude oil).

[4] *See* Executive Order 14156 of January 20, 2025.

[5] *See, e.g.,* U.S. Energy Info. Admin., *supra* n. 3 (explaining importance of U.S. imports of energy products in meeting domestic demand).

natural factors often prevent the production of these goods in quantities commensurate with U.S. consumption.  This category of goods includes: (1) coffee and tea, for which the U.S. climate is unsuitable for growing, in large part; for example, domestic production of coffee is minimal and accounts for less than one percent of domestic consumption;[6] (2) fertilizers, which are produced domestically, but for which the United States is still import-reliant, especially for specific types (*e.g.*, potash);[7] and (3) certain spices, which are mostly grown outside of the United States because they require tropical or subtropical climates in which to grow.[8] As such, I made this recommendation on grounds that the importation of these raw materials is necessary for the functioning of the U.S. economy and serious dislocations in the supply of these imported products should be avoided.

9.     I also recommended that the surcharge imposed under Section 122 Proclamation not apply to certain agricultural products, such as beef, tomatoes, and oranges, on the grounds that there is unavailable domestic supply at reasonable prices, that the importation of these raw materials is necessary for the functioning of the U.S. economy, and that serious dislocations in the supply of these imported materials should be avoided.  For example, the United States continues to experience domestic supply issues for lean beef trimmings due to widespread environmental issues and other factors.[9] In fact, given the impact of droughts and wildfires in the western United

---

[6] *See* U.S. Dep't of Agric. (USDA), "Production, Supply, and Distribution Online," https://apps.fas.usda.gov/psdonline/app/index.html#/app/home (last visited Apr. 3, 2026).

[7] *See, e.g.*, Jon Adamy, "Fertilizer Production Freefall: US Market Share Shrinks As Global Trade Surges," Michigan Farm News (Sept. 24, 2025), https://www.michiganfarmnews.com/fertilizer-production-freefall-us-market-share-shrinks-as-global-trade-surges#:~:text=Meanwhile%2C%20the%20U.S.%20relies%20on,for%20domestic%20use%20in%202022 ("[T]he U.S. relies on imports to meet demand for potash, with domestic production totaling less than 5% of that needed for domestic use in 2022."); *see* USDA, "Drivers of Fertilizer Markets: Supply, Demand, and Prices" (Sept. 2025), https://ers.usda.gov/sites/default/files/_laserfiche/publications/113324/ERR-354.pdf?v=89250.

[8] *See* American Spice Trade Ass'n, "Map Where Spices Grow: Impact on Global Trade," (Oct. 14, 2025), https://astaspice.org/resources/spice-map.

[9] *See* Proclamation No. 11010, 91. Fed. Reg. 7107 (Feb. 6, 2026).

States since 2022 on the domestic cattle industry and restrictions on the importation of live-animal commodities transiting through Mexico following detections of the New World Screwworm (NWS) in Mexico in May 2025,[10] the President recently invoked his authority under Section 404 of the Uruguay Round Agreements Act (URAA) (Public Law 103-465, 108 Stat. 4809, 4959-61 (19 U.S.C. § 3601)) to improve the domestic supply of beef at reasonable prices.  Similarly, because of concerns about serious dislocations in the supply of tomatoes, oranges, and other foodstuffs, on November 14, 2025, the President issued Executive Order 14360 (Modifying the Scope of the Reciprocal Tariffs With Respect to Certain Agricultural Products).  I advised the President that the imposition of the surcharge imposed under the Section 122 Proclamation could create similarly serious dislocations in the supply of those products and thus, that that surcharge should not apply to the same foodstuff products.

10.      I recommended that the temporary import surcharge imposed under the Section 122 Proclamation not apply to information materials, donations, and accompanied baggage on grounds that imposing the surcharge on these products would be unnecessary in carrying out the purposes of Section 122.  In the case of information materials, imposing the surcharge on imported goods could raise constitutional concerns, as Congress has recognized in respect to other statutes relating to the regulation of importation, particularly section 203(b) of the International Emergency Economic Powers Act (IEEPA) (Pub. L. No. 100-418, § 2502, 102 Stat. 1107, 1371 (1988) (codified at 50 U.S.C. app. § 5(b), 50 U.S.C. § 1702(b))).  Moreover, in my judgment, imposing a surcharge on charitable donations and accompanied baggage is unnecessary to address the country's large and serious balance-of-payments problem because such items are not typically traded goods or services in the calculation of the U.S. current account.

---

[10]  *See id.*

11.     I recommended that the temporary import surcharge imposed under Section 122 Proclamation not apply to goods of Canada or Mexico that qualify as duty free treatment under the *United States-Mexico-Canada Agreement* (USMCA).  I made this recommendation on grounds that there is unavailable domestic supply of some USMCA-compliant products at reasonable prices, that the importation of USMCA-compliant materials is necessary for the functioning of the supply chains of the U.S. economy, and that serious dislocations in the supply of imported USMCA-compliant goods of Canada and Mexico should be avoided.

12.     In his first term, President Trump and Congress brought about the USMCA as a replacement for the North American Free Trade Agreement (NAFTA), the failures of which were well known.  The USMCA, which entered into force on July 1, 2020, is a thirty-four-chapter trade agreement with Canada and Mexico that covers issues spanning the entirety of the three North American economies including: rules of origin for automobiles and automotive parts intended to create strong incentives to invest and manufacture in North America; improvements to the outdated NAFTA rules that benefit American farmers, ranchers, and agribusinesses; as well as commitments on digital trade, financial services, intellectual property rights, and investment.

13.     While the USMCA has many shortcomings, numerous U.S. manufacturers are currently dependent on the importation of raw materials and other inputs for their production processes, including inputs with high levels of regional content.[11]  In my assessment, potentially displacing these supply chains by imposing the surcharge on USMCA-compliant goods would create serious dislocations in the supply of imported goods in current circumstances.  Given that the USMCA Parties are currently conducting a Joint Review of that Agreement and the fact that

---

[11] *See, e.g.*, National Association of Manufacturers (NAM), "USTR-2025-0004-00121823-CAT-11738-Public Document" (Nov. 3, 2025) at pp. 6, 11, 14, 24, and 26, *available at* https://comments.ustr.gov/s/docket?docketNumber=USTR-2025-0004; NAM, "NAM Presses for Stronger, Smarter USMCA" (Nov. 12, 2025), https://nam.org/nam-presses-for-stronger-smarter-usmca-35156/.

these goods of Canada or Mexico were not subject to tariffs imposed under Executive Order 14257, as amended, I recommended that not applying the surcharge under Section 122 Proclamation on USMCA-compliant goods was essential to prevent serious dislocations in certain North American supply chains.

14.     Similarly, I recommended that the temporary import surcharge imposed under the Section 122 Proclamation not apply to textile and apparel articles that qualify for duty free treatment under the *Dominican Republic-Central America Free Trade Agreement* (CAFTA-DR). Such goods include high levels of regional content.  I made this recommendation on grounds that there is unavailable domestic supply at reasonable prices and that serious dislocations in the supply of imported CAFTA-DR-compliant textile and apparel articles should be avoided.

15.     The CAFTA-DR, which entered into force on a rolling basis beginning on March 1, 2006, and concluding on January 1, 2009, is a twenty-two-chapter trade agreement with Costa Rica, the Dominican Republic, El Salvador, Guatemala, Honduras, and Nicaragua.  Of particular importance is the trade in textile and apparel articles, which enter CAFTA-DR countries' markets duty free and quota free if the good meets the CAFTA-DR's rules of origin, providing a highly integrated supply chain for all CAFTA-DR parties, including the United States.

16.     In my assessment, potentially displacing the supply chain by subjecting CAFTA-DR compliant textile and apparel articles to the surcharge would limit the availability of the domestic supply of textile and apparel articles at reasonable prices and create serious dislocations in the supply of imported textile and apparel articles goods.

17.     The President's Section 122 action is necessary to address challenges associated with the U.S. balance of payments position.  In the International Monetary Fund's (IMF) 2026 Article IV consultation country report for the United States, the "[d]irectors expressed concern

7

about the size and persistence of the U.S. current account deficit," which remains significantly above the pre-pandemic baseline rate of 2 percent of gross domestic product (GDP) throughout 2026 and is projected to be above 3.6 percent through 2031.[12]  The IMF projects a deterioration of the current account deficit from 3.7 percent of GDP in 2025 to 3.8 percent in 2026,[13] which militates in favor of allowing the surcharge to remain in place throughout the pendency of any appeal.  Furthermore, the IMF projects a "continue[d] widening" of the U.S. negative net international investment position (NIIP) stressing that this "worsening of the NIIP . . . represents a potentially important source of vulnerability."[14]  These conditions represent a potential source of vulnerability that the President must continue to mitigate.

18.    Furthermore, as a result of the Section 122 and other trade actions, U.S. trading partners have been responsive and continue to engage in good-faith negotiations to rebalance their trade relationships with the United States.  Indeed, on March 13, 2026—just 21 days after the imposition of the Section 122 import surcharge—the United States and Ecuador concluded the U.S.-Ecuador Agreement on Reciprocal Trade, opening Ecuador's market of over 18 million consumers to U.S. agricultural and industrial exports.  By expanding U.S. exports while ensconcing U.S. tariffs on imported goods in each agreement, the Agreement on Reciprocal Trade program helps reduce the U.S. trade deficit, the single-largest driver of our current account deficit which causes our large and serious balance-of-payments deficit.  For this reason, the President expects to conclude more agreements in the coming months.

---

[12] IMF, *2026 Article IV Consultation – Press Release; Staff Report; and Statement by the Executive Director for the United States*, IMF Country Report 2026 (Apr. 2026), at 3, 46 (table 2).

[13] *Id.* at 4.

[14] *Id.* at 44, para. 67.

19.    Preserving the current trade environment is critical to ensuring trading partners' continued cooperation.  Notably, trading partners that signed reciprocal trade agreements with the United States prior to the imposition of the Section 122 surcharge continue to indicate willingness to honor and implement their commitments.

20.    Overturning or suspending the Section 122 action would risk undermining the conclusion of ongoing negotiations, slowing or stopping trading partners' implementation of their commitments, and undermining the President's effort to address fundamental international payments problems.  Such an action would also cause irreversible disruption to the Administration's efforts to rebalance the global trading system and potentially lead to unrecoverable economic and policy consequences.  Accordingly, it remains vital to the foreign policy, economy, and national security of the United States for the Court to permit the Section 122 surcharges to remain in effect.

21.    I declare, under penalty of perjury, that the foregoing is true and correct.

Executed on this 3ʳᵈ day of April, 2026.


/s/ _____

Jamieson Greer
United States Trade Representative
Office of the United States Trade Representative