## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:    THE HONORABLE MARK A. BARNETT, CHIEF JUDGE
THE HONORABLE CLAIRE R. KELLY, JUDGE
THE HONORABLE TIMOTHY C. STANCEU, JUDGE

| | |
|---|---|
| **THE STATE OF OREGON, et al.,**<br><br>    **Plaintiffs,**<br><br>    **v.**<br><br>**DONALD J. TRUMP, in his official capacity as President of the United States, et al.,**<br><br>    **Defendants.** | **Court No. 26-01472** |
| **BURLAP AND BARREL, INC., et al.,**<br><br>    **Plaintiffs,**<br><br>    **v.**<br><br>**DONALD J. TRUMP, in his official capacity as President of the United States, et al.,**<br><br>    **Defendants.** | **Court No. 26-01606** |

## PLAINTIFF STATES' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT, AND, IN THE ALTERNATIVE, FOR A PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

Page

TABLE OF CONTENTS ............................................................................................................. i

TABLE OF AUTHORITIES ...................................................................................................... iii

I.    INTRODUCTION ............................................................................................................. 1

II.   ARGUMENT ..................................................................................................................... 2

      A.    The Executive Branch's Statutory Interpretation Is Not Entitled to
            Deference ............................................................................................................... 2

      B.    The Proclamation Exceeds Section 122 Authority .................................................. 5

            1.    Defendants' Invocation of Section 122(a)(1) Is Fundamentally
                  Flawed ......................................................................................................... 5

                  a.    Defendants' Own Declaration Agrees That "Balance-of-
                        Payments Deficits" Measured Assets Necessary to
                        Maintain Fixed Exchange Rates—Not Current Account
                        Deficits ............................................................................................. 5

                  b.    Defining "Balance-of-Payments Deficits" as Current
                        Account Deficits Is Arbitrary and Unsupported ............................. 8

                  c.    There Are No "Fundamental International Payments
                        Problems" That "Require Special Import Measures to
                        Restrict Imports" ............................................................................ 11

                  d.    The Parties' Prior Positions Have No Bearing on This Case ........ 13

            2.    The Proclamation's Exceptions Violate Section 122 ................................. 14

                  a.    Its Country-Specific Exceptions Violate Section 122(d) .............. 14

                  b.    Its Expansive Product Exceptions Violate Section 122(e) ........... 15

                  c.    The Exceptions Are Not Severable. .............................................. 15

      C.    Plaintiff States Are Entitled to Relief ................................................................... 17

            1.    The States Have Standing ......................................................................... 17

            2.    The APA Applies to the CBP's Administrative Actions to
                  Implement the Section 122 Tariffs ........................................................... 19

        3.      Plaintiffs Are Entitled to a Nationwide Preliminary and Permanent Injunction ........................................................................................ 20

III.     CONCLUSION ............................................................................................. 22

CERTIFICATE OF COMPLIANCE ..................................................................... 29

# TABLE OF AUTHORITIES

**Page(s)**

**STATUTES**

19 U.S.C.
    § 1351................................................................................................................15
    § 1881..........................................................................................................14, 15
    § 2132.......................................................................................................... *passim*

Customs Courts Act of 1980, Pub. L. No. 96-417, 94 Stat. 1727..................................................20

Trade Act of 1974, Pub. L. No. 93-618, 88 Stat. 1978 (1975) ...........................................7, 11, 12

**REGULATIONS**

Imposing Temporary Section 122 Duties, CSMS No. 67844987 (U.S. Customs & Border
    Prot. Feb. 23, 2026).................................................................................................19

Proclamation No. 11012 (Feb. 20, 2026), 91 Fed. Reg. 9339 (Feb. 25, 2026)..................... *passim*

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 8, cl. 1...............................................................................20, 21, 22

**CASES**

*Ackerley Communications, Inc., v. City of Cambridge,*
    135 F.3d 210 (1st Cir. 1998)......................................................................................17

*Am. Signature, Inc. v. United States,*
    598 F.3d 816 (Fed. Cir. 2010)....................................................................................22

*Atmus Filtration, Inc. v. United States,*
    No. 26-01259, 2026 WL 679258 (Ct. Int'l Trade Mar. 5, 2026)....................................20

*Ayotte v. Planned Parenthood of N. New England,*
    546 U.S. 320 (2006)................................................................................................16

*Bennett v. Spear,*
    520 U.S. 154 (1997)................................................................................................19

*Biden v. Nebraska,*
    600 U.S. 477 (2023)................................................................................................17

*Chamber of Com. of U.S. v. Reich,*
    74 F.3d 1322 (D.C. Cir. 1996)..................................................................................19

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984)...................................................................................................4

*Corus Grp. PLC v. Bush*,
    217 F. Supp. 2d 1347 (Ct. Int'l Trade 2002) ....................................................21

*Diamond Alternative Energy, LLC v. EPA*,
    606 U.S. 100 (2025)...............................................................................................18

*Florsheim Shoe Co., Div. of Interco, Inc. v. United States*,
    744 F.2d 787 (Fed. Cir. 1984)............................................................................2, 4

*Gibbons v. Ogden*,
    22 U.S. (9 Wheat.) 1, 201 (1824)..........................................................................4

*Gilda Indus., Inc. v. United States*,
    622 F.3d 1358 (Fed. Cir. 2010).............................................................................4

*Invenergy Renewables LLC v. United States*,
    422 F. Supp. 3d 1255 (Ct. Int'l Trade 2019) ....................................................18

*Japan Whaling Ass'n v. American Cetacean Soc'y*,
    478 U.S. 221 (1986)................................................................................................3

*Learning Res., Inc. v. Trump*,
    146 S. Ct. 628 (2026)..................................................................................... *passim*

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)...............................................................................................18

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369 (2024)......................................................................................4, 8, 11

*Loughrin v. United States*,
    573 U.S. 351 (2014)................................................................................................4

*Maple Leaf Fish Co. v. United States*,
    762 F.2d 86 (Fed. Cir. 1985)..............................................................................3, 4

*Maple Leaf Mktg., Inc. v. United States*,
    528 F. Supp. 3d 1365 (Ct. Int'l Trade 2021) ....................................................19

*McLaughlin Chiropractic Assocs. v. McKesson Corp.*,
    606 U.S. 146 (2025)................................................................................................2

*New Hampshire v. Maine*,
    532 U.S. 742 (2001)..............................................................................................14

*Off. of U.S. Trustee v. John Q. Hammons Fall 2006, LLC*,
    602 U.S. 487 (2024)................................................................................22

*Pittston Co. v. United States*,
    199 F.3d 694 (4th Cir. 1999) ...............................................................14

*Railway Labor Execs. Ass'n v. Gibbons*,
    455 U.S. 457 (1982)..............................................................................22

*Reno v. American Civil Liberties Union*,
    521 U.S. 844 (1997)..............................................................................16

*Solar Energy Indus. Ass'n v. United States*,
    111 F.4th 1349 (Fed. Cir. 2024) .............................................................4

*Starbucks Corp. v. McKinney*,
    602 U.S. 339 (2024).............................................................................8, 9

*Transclean Corp. v. Jiffy Lube Int'l, Inc.*,
    474 F.3d 1298 (Fed. Cir. 2007)............................................................14

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)..............................................................................19

*Trump v. CASA, Inc.*,
    606 U.S. 831 (2025)..............................................................................20

*V.O.S. Selections, Inc. v. Trump*,
    149 F.4th 1312 (Fed. Cir. 2025) ..........................................6, 13, 14, 18

*V.O.S. Selections, Inc. v. United States*,
    772 F. Supp. 3d 1350 (Ct. Int'l Trade 2025) .......................................17

*W. States Med. Ctr. v. Shalala*,
    238 F.3d 1090 (9th Cir. 2001) .............................................................16

*Wis. Cent. Ltd. v. United States*,
    585 U.S. 274 (2018)................................................................................8

**OTHER AUTHORITIES**

Brief of Trade Scholars in Economics, Politics, and Law as Amici Curiae in Support of
    Respondent V.O.S. Selections, *Learning Res., Inc. v. Trump*, No. 24-1287 (U.S.
    Oct. 24, 2025) ........................................................................................8

*Economic Report of the President* (1971), https://fraser.stlouisfed.org/title/economic-
    report-president-45/1971-8142 ........................................................5, 6, 9

*Economic Report of the President* (1972), https://fraser.stlouisfed.org/title/economic-report-president-45/1972-8143 ..............................................................................10

*Economic Report of the President* (1974), https://fraser.stlouisfed.org/title/economic-report-president-45/1974-8145 ........................................................................5, 7, 9

Joint Econ. Comm., 88th Cong., *The United States Balance of Payments—Perspective and Policies* (Comm. Print 1963), https://www.jec.senate.gov/reports/88th%20Congress/The%20United%20States%20Balance%20of%20Payments%20-%20Perspectives%20and%20Policies%20(247).pdf....................................................5, 7

Harold James, Int'l Monetary Fund, *International Monetary Cooperation Since Bretton Woods* (1996), ), https://www.elibrary.imf.org/display/book/9781475506969/9781475506969.xml ..............................................................7, 8

Kira A. Davis, *Judicial Estoppel and Inconsistent Positions of Law Applied to Fact and Pure Law*, 89 Cornell L. Rev. 191 (2003) ........................................................14

Peter B. Kenen & Raymond Lubitz, *International Economics* (3d ed. 1971) ............................6, 7

Reply Brief, *V.O.S. Selections, Inc. v. Trump*, No. 25-1812, 2025 WL 2083367 (Fed. Cir. July 18, 2025)................................................13

Rev. Comm. for Balance of Payments Stat., *The Balance of Payment Statistics of the United States: A Review and Appraisal* (1965) ..............................................6, 9

S. Rep. No. 93-1298 (1974) ................................................................6, 7, 10, 11, 13

S. Rep. No. 94-1148 (1976) ................................................................................6, 8

Transcript of Oral Argument, *Oregon v. Trump*, No. 25-00077 (Ct. Int'l Trade May 21, 2025) ................................................13

U.S. Bureau of Econ. Analysis, *Survey of Current Bus.* (June 1976), https://fraser.stlouisfed.org/title/survey-current-business-46/june-1976-9661 ....................................11

U.S. Bureau of Econ. Analysis, *U.S. International Transactions for 1960-2025* (Mar. 25, 2026), https://tinyurl.com/y2mewj6c................................................................10, 12

## I.    INTRODUCTION

Defendants' arguments ultimately rise and fall on one central contention—that the President has unreviewable discretion to determine whether a precondition of Section 122 is met. Apparently, this is so even if the President invents a new definition of that precondition. Since President Trump issued his Proclamation, Plaintiffs have combed through legislative history and explored in detail the economic concepts involved in this case. This work, reflected extensively in Plaintiff States' opening brief, makes clear that it is legal error to conflate trade deficits with "balance-of-payment deficits," as used in Section 122. The brief also makes clear that Section 122 may only be invoked to address "fundamental international payments problems," a term Defendants assert is effectively surplusage. And the brief makes clear that Congress understood Section 122 to address a particular problem that it recognized might never recur but would be devastating if it did.

In response, Defendants claim that "balance-of-payments deficits" means current account deficits, without citing any source from the time Section 122 was enacted. Defendants cite only a post hoc declaration, which itself acknowledges that current account deficits were *not* how balance of payments deficits were calculated at the time. But their critical point is: whatever the meaning of the words in Section 122, that meaning is irrelevant because the President can decide to use Section 122 whenever he wants without judicial review. Not so. Section 122 requires the President to take action when certain objective conditions are met, unless he believes it would be contrary to the national interest. *See* 19 U.S.C. § 2132(a)(1)-(3), (b). The statute also gives the President discretion to choose which of the tools offered by Congress (temporary and limited import surcharge, quotas, or both) should be imposed. *See id.* § 2132(a)(A)-(C). But the President cannot rewrite the statutory prerequisites that unlock those discretionary authorities. Nor does discretion allow granting exemptions that violate the statute.

1

Defendants' remaining arguments fare no better. Plaintiffs have standing based on explicit holdings in *V.O.S. Selections* regarding direct and indirect importers. The CSMS guidance does not solely quote the President's Proclamation and is thus subject to APA review. Given the unlawfulness of the Proclamation and the CSMS message, and the need for an injunction to remedy their injuries, Plaintiffs are entitled to the relief they have sought.

This is another case where the President invokes a statute to impose whatever tariffs he wants, its limits be damned. Congress has provided authority in Section 122 under narrow circumstances, and the Defendants have plainly exceeded that authority. Plaintiffs' Motion should be granted.

## II.    ARGUMENT

### A.    The Executive Branch's Statutory Interpretation Is Not Entitled to Deference

This is a statutory interpretation case. Defendants miscast Plaintiffs' argument as a request for *de novo* review of factual findings or discretionary judgments, arguing that the Court plays no role in reviewing the President's imposition of tariffs. Opp'n 17. But as Plaintiffs set out in their Summary Judgment brief, the question is one of statutory interpretation, not of fact-finding. *See* Mot. 22; *accord* Defs.' Answer *passim* ("[T]he case solely presents questions of law."). Even under the authorities Defendants cite, it is within this Court's jurisdiction to review "whether the President's action falls within his delegated authority [and] whether the statutory language has been properly construed." Opp'n 17 (quoting *Florsheim Shoe Co., Div. of Interco, Inc. v. United States*, 744 F.2d 787, 795 (Fed. Cir. 1984)). That is the role Plaintiffs ask the Court to play here. *See generally McLaughlin Chiropractic Assocs. v. McKesson Corp.*, 606 U.S. 146, 157 (2025) (noting a strong presumption that Congress does not mean to prohibit all judicial review).

Plaintiff States do not contest that Section 122 authorizes the President to impose tariffs

under specific circumstances. Rather, they point out that those circumstances are not present here. *See* Mot. 22-28. To determine whether the imposition of tariffs is appropriate, the Court must determine whether the President is acting within his authority as delegated by Congress. *See Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221, 230 (1986) ("[I]t goes without saying that interpreting congressional legislation is a recurring and accepted task for the federal courts."). It is, therefore, the Court's role to determine Congress's meaning of "fundamental international payments problems" and "balance-of-payments deficits" as those terms are used in Section 122 to assess whether the President is acting within his delegated authority.

Defendants misapply *Maple Leaf*. The Plaintiff States do not seek "ordinary administrative review … in which the court looks to see if substantial evidence supports the agency's findings." *Maple Leaf Fish Co. v. United States*, 762 F.2d 86, 90 (Fed. Cir. 1985). The *Maple Leaf* plaintiffs sought to challenge "the ITC's ultimate factual determination that there *was* injury to domestic frozen mushroom producers." *Id.* Here, by contrast, the Plaintiff States argue that the facts recited in the Proclamation do not meet the *statutory* prerequisites to invoke that power, rather than challenge the Executive's *factual* determination. Thus, at core, the Plaintiff States challenge executive "action outside delegated authority." *Id.* at 89.

As all nine Supreme Court justices explained earlier this year, when reviewing the scope of purported delegations to the President, the courts do not defer to the President's statutory interpretation. *See Learning Res., Inc. v. Trump*, 146 S. Ct. 628, 642 (2026) (plurality op.) ("the President must 'point to clear congressional authorization' to justify his extraordinary assertion of the power to impose tariffs"); *id.* at 675 (Kagan, J., concurring) ("Usual text-in-context interpretation"); *id.* at 691 (Kavanaugh, J., dissenting) ("In foreign affairs cases, courts read the statute as written"). That recognition is consistent with *Maple Leaf*'s acknowledgement that the

courts review "action outside delegated authority…." 762 F.2d at 89. To the extent that Defendants seek deference to their statutory interpretation from *Maple Leaf*, *Learning Resources* has decisively rejected that view. *See also Solar Energy Indus. Ass'n v. United States*, 111 F.4th 1349, 1358 (Fed. Cir. 2024) (reserving the question of whether *Maple Leaf* survives *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024)); *Gilda Indus., Inc. v. United States*, 622 F.3d 1358, 1363 (Fed. Cir. 2010) (recognizing the link between *Maple Leaf* and *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984), which was overruled by *Loper Bright*).

Contrary to Defendants' pronouncements, Plaintiff States do not challenge the President's findings of fact such that Defendants could rely on *Florsheim*. *See* Opp'n 18. Similarly, judicial review is not proscribed by "other doctrines," such as where a statute commits decision-making to the discretion of the President; the preconditions unlocking Section 122 authority are not committed to presidential discretion.[1] *See* Mot. 28. And the mere fact that tariffs involve foreign affairs does not limit the Court's review: *Learning Resources* decisively rejected that argument. 146 S. Ct. at 638 ("The power to impose tariffs is 'very clear[ly] ... a branch of the taxing power.'" (quoting *Gibbons v. Ogden*, 22 U.S. (9 Wheat. 1) 1, 201, (1824)). Congress has made clear that the President's authority to invoke Section 122 to levy tariffs is narrow; the question here is whether those statutory requirements have been met.

---

[1] To the extent the House Committee report cites "an element of judgment on the part of the President in determining the existence of a serious deficit that justifies the use of" Section 122, the text of that report makes clear that it is the term *serious* that may allow for deference, not the term "balance-of-payment deficit." *See* Opp'n 21. Additionally, the Senate subsequently revised the House bill to expressly *remove* presidential discretion with respect to determinations regarding balance of payments deficits, while retaining presidential discretion with respect to balance of trade surpluses. Mot. 14; *compare* 19 U.S.C. § 2132(c) ("Whenever *the President determines* that ...") *with id.* § 2132(a) (deleting "the President determines"); *see Loughrin v. United States*, 573 U.S. 351, 358 (2014) ("[W]hen Congress includes particular language in one section of a statute but omits it in another—let alone in the very next provision—this Court presumes that Congress intended a difference in meaning.") (citation modified).

Finally, Defendants mischaracterize the phrase "large and serious United States balance-of-payments deficits" as "general language" that the President can interpret however he sees fit. *See* Opp'n 20. Elsewhere, Defendants concede that "'balance of payments' is a term with a specialized meaning in the field of economics" and that "[i]t carries that meaning here." *Id.* at 24. The text and history of Section 122 make clear Congress's meaning of the language, and that meaning is not general. *See* Mot. 12-13. Where courts may lack "special competence in matters of economics or foreign affairs," *Learning Res.*, 146 S. Ct. at 646, it is still charged with statutory interpretation such that it can determine whether the President is acting outside his authority.

### B.    The Proclamation Exceeds Section 122 Authority

#### 1.    Defendants' Invocation of Section 122(a)(1) Is Fundamentally Flawed

##### a.    Defendants' Own Declaration Agrees That "Balance-of-Payments Deficits" Measured Assets Necessary to Maintain Fixed Exchange Rates—Not Current Account Deficits

Defendants' argument that "balance-of-payments deficits" means current account deficits is baseless. As discussed in Plaintiffs' motion and below, "balance-of-payments deficits" has never meant current account deficits.

Rather, as Plaintiffs explained, "under the official U.S. definition," balance of payments deficits were reductions in U.S. reserve assets (at the time, chiefly gold) versus potential claims on those reserves, which were necessary to "defend the exchange rate of the dollar" in a fixed-exchange-rate system. Mot. 5 (quoting Joint Econ. Comm., 88th Cong., *The United States Balance of Payments—Perspective and Policies* 3 (Comm. Print 1963) (*1963 Joint Econ. Comm.*), https://www.jec.senate.gov/reports/88th%20Congress/The%20United%20States%20Balance%20of%20Payments%20-%20Perspectives%20and%20Policies%20(247).pdf); Mot. 25-26 (citing *Economic Report of the President* 193 (1974) (*1974 President Report*), https://fraser.stlouisfed.org/title/economic-report-president-45/1974-8145); *Economic Report of the President* 146 (1971)

5

(*1971 President Report*), https://fraser.stlouisfed.org/title/economic-report-president-45/1971-8142 (balance of payments measured "this country's ability to maintain conversions of dollars into gold at a fixed price ratio"); Irwin Decl. ¶¶ 22-23. Under a floating-rate system, if there is demand for, e.g., French francs, supply-and-demand principles drive the franc's exchange rate upward. Under Bretton Woods, however, the French central bank prevented floats by selling francs and buying up dollars. Mot. 7-8; *see also* Peter B. Kenen & Raymond Lubitz, *International Economics* 59-60, 69-70 (3d ed. 1971) (contemporaneous understanding) (cited by *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312, 1373 nn.11-12 (Fed. Cir. 2025) (*V.O.S. II*) (Taranto, J., dissenting)); S. Rep. No. 94-1148, at 10 (1976). The French central bank could (and did) then use those dollar holdings to buy up the United States's limited supply of gold. Mot. 5, 8-9; Kenen 70-71; S. Rep. No. 94-1148, at 2. That risk—declines in U.S. reserves against increases in potential claims on those reserves under a fixed-rate system—is what balance of payments deficits measured.

This should come as no surprise to Defendants: their own declaration from the Acting Chairman of the Council of Economic Advisers ("CEA") agrees. It discusses how "official statistics during the 1970s" on balance of payments deficits reported the "official reserve transactions balance," which tracked net disposition of dollars "to manage the foreign exchange value of the dollar," and the "basic balance," which "served as a gauge for the imbalance between 'underlying' long-term demand and supply of foreign exchange." Yared Decl. ¶ 25.[2] The reason why "large and serious balance-of-payments deficits" no longer arise is because countries no

---

[2] The government also reported the "liquidity balance." *See, e.g.*, S. Rep. No. 93-1298, at 8-9 (1974). All of these measured the "surplus or deficit aris[ing] from the nature of [Bretton Woods], in which leading countries are committed to stable exchange rates," with the differences being which liabilities were measured against U.S. reserve assets. Rev. Comm. for Balance of Payments Stat., *The Balance of Payment Statistics of the United States: A Review and Appraisal* 102 (1965) (*1965 Review and Appraisal*); *id.* at 101-21; *1971 President Report* 146-49.

longer maintain fixed exchange rates against the natural operation of supply and demand. Mot. 16; Irwin Decl. ¶¶ 11-13; *1963 Joint Econ. Comm.* 6-7; *1974 President Report* 193; Kenen 59-63.

Defendants fundamentally mischaracterize Plaintiffs' positions. *First*, they claim that Plaintiffs argue balance of payments deficits exist only when the sum of the current account, capital account, and financial account is negative. Opp'n 25 (claiming to cite Mot. 16). But Plaintiffs said nothing of the sort. *See* Mot. 16. Defendants argue that, by definition, the sum of the three accounts must be zero. Opp'n 5-7, 25. But Plaintiffs are not arguing that "large and serious balance-of-payments deficits" can never arise because all transactions net to zero. Rather, because "balance-of-payments deficits" measure a specific component of those transactions—the changes in U.S. reserves versus liabilities needed to maintain fixed exchange rates—"large and serious balance-of-payments deficits" do not arise when countries no longer maintain fixed exchange rates or require the United States to convert dollars into gold.

*Second*, Defendants also incorrectly claim that Plaintiffs argue that Section 122(a)(1) is definitionally nugatory. Opp'n 30. Plaintiffs actually said that Section 122(a)(1) has effect in a fixed-rate system—a return to which was still very much a possibility when the Trade Act of 1974 was enacted. Mot. 15; *see also* Harold James, Int'l Monetary Fund, *International Monetary Cooperation Since Bretton Woods* 268 (1996), https://www.elibrary.imf.org/display/book/9781475506969/9781475506969.xml.[3] Defendants wrongly assert that Plaintiffs "claim that the United States had a fixed currency at the time of Section 122's enactment." Opp'n 31. Plaintiffs actually stated that the fixed-rate system had effectively collapsed by then—but fixed rates had not been *conclusively* abandoned, and it was possible they would be restored by international

---

[3] Additionally, in the wake of the Nixon shock surcharges (which had not been authorized by statute), Congress wanted to provide for statutory authority, even as it recognized that "such authority is not likely to be utilized." S. Rep. No. 93-1298, at 88.

agreement. Mot. 10, 15; *see* S. Rep. No. 94-1148, at 4 (discussing how agreement to abolish official gold pricing was reached only in August 1975, and how the United States and France continued to debate fixed versus floating rates past September 1975); James 234-35, 258 (discussing how "floating emerged as the only possible solution because of unwillingness to agree over the character of a fixed rate system"). Bretton Woods came to a definitive end only in 1976. And as one of the cases Defendants cite confirms, even if this end "leave[s] [the statute] with little to do," that does not give Defendants license to rewrite it. *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 282 (2018) (Opp'n 32 n.12). Courts "only … apply, not revise or update, the terms of statutes." *Id.* at 284.

### b.      Defining "Balance-of-Payments Deficits" as Current Account Deficits Is Arbitrary and Unsupported

Defendants agree that "balance-of-payments deficits" "bears its technical accounting meaning" as understood "at the time of [Section 122]'s enactment." Opp'n 24. Yet Defendants claim that "balance-of-payments deficits" means current account deficits without citing any source from the time of Section 122's enactment. *See id.* at 2-4, 17, 23-28, 33-34. Instead, Defendants cite the CEA Declaration, which itself cites no source, *see* Yared Decl. ¶¶ 23, 46 (cited by Opp'n 28)—and which (as described above) affirms that current account deficits were *not* how the government reported balance of payment deficits in 1974, *id.* ¶ 25.[4]

Defendants' claim that "balance-of-payments deficits" means current account deficits fails several times over. *First*, CEA's assertion of that point is not controlling. *See supra* § II.A; *Loper Bright*, 603 U.S. at 400-01. This is particularly true given CEA cites no sources—"deference to what is 'nothing more than an agency's convenient litigating position' is 'entirely inappropriate.'"

---

[4] Defendants also cite an amicus brief, which similarly does not cite any contemporaneous sources. *See* Trade Scholars Br. 8, *Learning Res.*, No. 24-1287 (U.S. Oct. 24, 2025).

*Starbucks Corp. v. McKinney*, 602 U.S. 339, 351 (2024) (citation omitted).

*Second*, contemporaneous records confirm that "balance-of-payments deficits" are *not* current account deficits. "In presenting the balance of payments, the Office of Business Economics [predecessor to the Bureau of Economic Analysis ("BEA")] d[id] not actually show the traditional balance on current account," confirming that the concepts are distinct. *1965 Review* 177 n.1. When balance of payments deficits and current account deficits were reported together, they were reported as distinct statistics:

TABLE 52.—*U.S. balances on international transactions, 1972–73*

[Billions of dollars, seasonally adjusted]

| Type of transaction | First 3 quarters | | 1972 IV | 1973 | | |
|---|---|---|---|---|---|---|
| | 1972 | 1973 | | I | II | III |
| Goods [1] | −5.2 | −0.5 | −1.7 | −1.0 | −0.2 | 0.7 |
| Services | 1.4 | 3.5 | .9 | 1.1 | .9 | 1.4 |
| Military transactions | −2.7 | −2.1 | −.9 | −.8 | −.7 | −.6 |
| Investment income [2] | 5.6 | 6.7 | 2.2 | 2.3 | 2.1 | 2.3 |
| Other | −1.5 | −1.1 | −.5 | −.4 | −.5 | −.3 |
| GOODS AND SERVICES | −3.7 | 3.0 | −.9 | .2 | .7 | 2.1 |
| Unilateral transfers, net [3] | −2.9 | −2.7 | −.9 | −.7 | −1.0 | −.9 |
| CURRENT ACCOUNT | −6.6 | .3 | −1.8 | −.6 | −.4 | 1.2 |
| Long-term capital | −1.7 | .7 | .2 | −.4 | −.2 | 1.3 |
| U.S. Government [4] | −.8 | −.6 | −.6 | −.3 | .1 | −.4 |
| Direct investment | −2.6 | −1.7 | −.6 | −1.8 | −.4 | .5 |
| Other private | 1.7 | 3.0 | 1.4 | 1.7 | .1 | 1.2 |
| CURRENT ACCOUNT AND LONG-TERM CAPITAL | −8.3 | 1.0 | −1.6 | −.9 | −.6 | 2.5 |
| Short-term claims | −1.8 | −4.7 | −1.2 | −3.8 | −.6 | −.3 |
| Short-term liabilities | 2.3 | .5 | 2.6 | −1.8 | 1.1 | 1.2 |
| Errors and unrecorded transactions, net | −1.6 | −4.8 | −1.5 | −3.9 | .4 | −1.4 |
| Allocations of SDR | .5 | | .2 | | | |
| TOTAL [5] | −8.9 | −8.1 | −1.5 | −10.5 | .3 | 2.1 |

[1] Excludes transfers under military grants.
[2] Includes direct investment fees and royalties.
[3] Excludes military grants of goods and services.
[4] Excludes official reserve transactions and includes transactions in some short-term U.S. Government assets.
[5] Equals official reserve transactions balance.

Note.—Detail may not add to totals because of rounding.

Sources: Department of Commerce, Bureau of Economic Analysis, and Department of the Treasury.

*1974 President Report* 193-94 (highlighting added); *accord, e.g.*, *1971 President Report* 148. Critically, the current account can have a surplus when the balance of payments is in deficit, and vice versa, confirming again that these concepts are distinct and cannot be equated.

*Third*, Defendants' argument why "balance-of-payments deficits" means current account deficits commits the same fallacy that Defendants (erroneously) lodge against Plaintiffs.

9

Defendants argue that because the overall balance of payments always balances to zero, "balance-of-payments deficits" must mean "deficits *within* the various accounts that constitute the overall balance-of-payments." Opp'n 27-28. But because the overall balance nets to zero, there will *always* be a deficit within at least one account—by definition, any positive account must be balanced by a negative one. Defendants' argument thus renders "balance-of-payments deficits" a meaningless tautology.

Defendants try to escape this by claiming that current account deficits are the ones that count, but this is arbitrary. Defendants argue that "a trade deficit (in the current account) is the driver of a balance-of-payments deficit." Opp'n 29. But the financial account can be as well. In promulgating Section 122, Congress understood that the balance of payments had been in deficit from 1960 to 1974, S. Rep. No. 93-1298, at 8-9—but for most of that time (1960-1970), the current account was in *surplus*; the *financial* account was in deficit. BEA, *U.S. International Transactions for 1960-2025*, *l.* 30 (Mar. 25, 2026), https://tinyurl.com/y2mewj6c (*1960-2025 Transactions*); *accord* S. Rep. No. 93-1298, at 8-9 (trade balance also was in surplus). In 1970-1971, the deficit on basic balance worsened by $7.1 billion, of which $2.2 billion was due to current account declines—and $4.9 billion was due to net increases in long-term capital outflows, i.e., the financial account. *Economic Report of the President* 154 (1972), https://fraser.stlouisfed.org/title/economic-report-president-45/1972-8143. Given that both the current account and the financial account can drive balance of payments deficits, Defendants' claim that "balance-of-payments deficits" necessarily means current account deficits is wholly arbitrary and contradicted by the historical record.

Defendants also refer to the Senate's discussion of petrodollars, Opp'n 35, but this further undermines their position. The Senate Report discusses how the United States might "suffer[] a

10

large *trade* deficit" from buying oil (current account transactions) but how, if oil-producing countries then invested those dollars in the United States (financial account transactions), the United States could have "a large *payments* surplus … at the same time." S. Rep. No. 93-1298, at 89. This again confirms that "balance-of-payments deficits" are *not* current account deficits.

In the end, not even Defendants claim that "balance-of-payments deficits" meant current account deficits when the Trade Act was enacted. Rather, what Defendants say is that BEA no longer reports the components needed to replicate balance of payments deficits as calculated at the time, Yared Decl. ¶ 37, and Defendants thus are redefining "balance-of-payments deficits" to mean current account deficits because "the current account is more expansive," Opp'n 28. That is not how statutory construction works. A "statute's meaning is fixed at the time of enactment." *Loper Bright*, 603 U.S. at 400. BEA stopped such reporting in 1976 because balance-of-payments tracking "was necessary to comply with the fixed exchange rate rules under the Bretton Woods Agreement" but was no longer informative after Bretton Woods ended that January. BEA, *Survey of Current Bus.* 19, 21, 24-26 (June 1976), https://fraser.stlouisfed.org/title/survey-current-business-46/june-1976-9661 (cited by Yared Decl. ¶ 27). This does not give Defendants license to rewrite Section 122(a)(1)—rather, it further confirms how Section 122(a)(1) does *not* apply in the modern floating-rate system.

c.     **There Are No "Fundamental International Payments Problems" That "Require Special Import Measures to Restrict Imports"**

Section 122(a)(1) further requires "fundamental international payments problems" that "require special import measures to restrict imports." Defendants acknowledge that they cannot render this language surplusage, yet proceed to do just that, claiming balance of payments deficits "*are themselves*" fundamental international payments problems. Opp'n 42. This is improper. Mot. 23-24. Defendants cite to speculative payment risks, Opp'n 45-46, but speculation is not a

11

"fundamental" international payments problem. Mot. 24-25. Additionally, fundamental problems alone are insufficient: they must also "require special import measures to restrict imports." As made clear in the Nixon shock and the hearings on the Trade Act, the reason such measures might be required was because of inflexible currency exchange rates; those measures would not be required if exchange rates could float. *Id.* at 9-10, 12, 25. Exchange rates now float precisely that way.

Finally, if, as Defendants claim, large trade or current account deficits are "fundamental international payments problems" that "require special measures to restrict imports," the triggering conditions for Section 122(a)(1) have been present for decades. *See 1960-2025 Transactions l.* 30 (with one exception in 1991, current account has been in deficit continually since 1982). When Section 122(a)(1)'s triggering conditions are met, the President must invoke it or must "immediately" report to Congress why he has not. Mot. 28 (citing 19 U.S.C. § 2132(a)-(b)). Yet no President, including this one, has ever invoked Section 122(a)(1) before now.[5] That "no President has ever found" that "fundamental international payments problems" means current account deficits is "strong evidence that it does not," *Learning Res.*, 146 S. Ct. at 643—not even this President operated as if they did, until the day the Supreme Court struck down his unlawful IEEPA tariffs. Rather, the Proclamation is just an attempt to contort yet another statute (Section 122(a)(1)) to replace one set of unlawful tariffs with another, where the President has no actual legal authority to do so.

---

[5] Defendants claim that the current account deficit was -2% during President Trump's first term, but -4.1% at the end of 2024 in an attempt to explain why he did not invoke Section 122(a)(1) in his first term. Opp'n 40. Setting aside that current account deficits are not balance-of-payments deficits, *supra* § II.B.1.a-b, President Trump did not invoke Section 122(a)(1) during his second term at any point between January 2025 and February 2026—nor, critically, did he "immediately" report to Congress why he had not done so, as he would have had to have done if (counterfactually) current account deficits really did satisfy Section 122(a)(1)'s conditions.

### d.    The Parties' Prior Positions Have No Bearing on This Case

Defendants argue that Plaintiffs' position is inconsistent with the position some States took as plaintiffs in the IEEPA litigation, implying that the Court should rule for them on that basis. They are wrong in both respects.

The federal defendants misread the position the States took in this Court in the IEEPA case. At oral argument, the States made clear their position that the balance of payments and the balance of trade are distinct: "The mechanism that Section 122 uses to address balance of payments is the balance of trade. … Section 122 … say[s] if you're going to use tariffs to try to change the balance of trade, the only reason that's available … is a balance-of-payments issue." Tr. of Oral Arg. at 7:23-8:6, *Oregon v. Trump*, No. 25-00077 (Ct. Int'l Trade May 21, 2025) (Marshall Decl. Ex. 1); *see also id.* 24:14-24 ("JUDGE RESTANI: [I]t sounds as if 122 is only for fundamental international payments problems, which I don't know that we have that. [COUNSEL]: I agree with that, but … the mechanism … to address that is a balance-of-trade mechanism for tariffs.").

After this Court's decision adopted a more expansive reading of Section 122, the States incorporated that understanding in their appellate briefing. The defendants disagreed, arguing that Section 122 could not be invoked to address trade (and, implicitly, current account) deficits:

> Nor does [Section 122] have any obvious application here, where the concerns the President identified in declaring an emergency arise from trade deficits, which are conceptually distinct from balance-of-payments deficits. *See, e.g.*, S. Rep. No. 93-1298, at 89 (1974) (Senate report on Section 122, recognizing the possibility of "a large *payments* surplus" at the same time as "a large *trade* deficit").

Reply Br. 13-14, *V.O.S. II*, No. 25-1812, 2025 WL 2083367 (Fed. Cir. July 18, 2025). The Federal Circuit dissent embraced the federal government's view: "a goods trade deficit *alone* is not enough for application of either IEEPA or section 122." *V.O.S. II*, 149 F.4th at 1373 (Taranto, J., dissenting); *see also id.* at 1374 ("section 122 does not apply to the problems underlying the

13

reciprocal tariffs, which are not the payments problems that are the precondition to section 122's application."). None of the opinions in the reviewing courts that held for the States relied on Section 122. And, in this case, the parties have now fully briefed the Section 122 issues.

All of this back-and-forth about past positions leads nowhere. The Defendants do not invoke judicial estoppel, nor could they. None of the traditional judicial estoppel factors present here: Plaintiff States' position is not "clearly inconsistent"; they did not "succeed[] in persuading a court to accept [their] earlier position"; and they would not "derive an unfair advantage…." *New Hampshire v. Maine*, 532 U.S. 742, 750-51 (2001). In any event, judicial estoppel is unavailable against the twelve Plaintiff States that were not parties to the prior action, and estopping the remaining States would be inequitable given that these actions effectively determine the lawfulness of tariffs charged to all importers.[6] Without judicial estoppel, Defendants' effort to resurrect those past positions adds nothing to this case.

### 2.    The Proclamation's Exceptions Violate Section 122

The Proclamation's exceptions violate Section 122(d)'s "nondiscrimination" provision, and Section 122(e)'s "uniformity" provision.

#### a.    Its Country-Specific Exceptions Violate Section 122(d)

Section 122(d) requires that any "import restricting actions proclaimed pursuant to subsection (a) shall be applied consistently with the principle of nondiscriminatory treatment." "Nondiscriminatory treatment," in turn, is statutorily defined as "trade treatment based on normal

---

[6] This is among the reasons that applying judicial estoppel to pure questions of law is contested. *See generally* Kira A. Davis, *Judicial Estoppel and Inconsistent Positions of Law Applied to Fact and Pure Law*, 89 Cornell L. Rev. 191 (2003); *see also Pittston Co. v. United States*, 199 F.3d 694, 701 n.4 (4th Cir. 1999) ("Judicial estoppel applies only to the making of inconsistent statements of fact…."). *But see Transclean Corp. v. Jiffy Lube Int'l, Inc.*, 474 F.3d 1298, 1307 (Fed. Cir. 2007) (noting the Federal Circuit applies judicial estoppel to claims construction).

trade relations," which, generally speaking, means that "any duty or other import restriction or duty-free treatment proclaimed in carrying out any trade agreement under this subchapter or section 1351 of this title shall apply to products of all foreign countries, whether imported directly or indirectly." 19 U.S.C. § 1881. Invoking Section 122(e)'s product exceptions to justify that the Proclamation excepts certain products under the U.S.-Mexico-Canada Agreement ("USMCA") and the Dominican Republic-Central American Free Trade Agreement ("CAFTA-DR") fails. Those exceptions run afoul of Section 122(d)'s nondiscrimination provision, as similar products from other trading partners are not exempt from the tariffs.

At bottom, Section 122(d) permits exceptions to the nondiscrimination requirement only to address countries with "large or persistent balance-of-payment surpluses." 19 U.S.C. § 2132(d)(2). The Section 122 Proclamation at issue here does not do that, and it therefore violates Section 122(d).

### b.    Its Expansive Product Exceptions Violate Section 122(e)

Section 122(e) requires that product exceptions must be made "consistent[] with the purposes" of the statute: correcting "fundamental international payments problems." 19 U.S.C. § 2132(a). Even so, the Proclamation proceeds to list over 80 pages of product exclusions based on the President's conclusion that "certain articles should not be subject to import restricting actions because of the needs of the United States economy." *Id*. § 2132(e); *see also* Section 122 Proclamation Annexes I, II. The breadth and range of the exceptions set out in the Annexes to the Section 122 Proclamation show that the Proclamation goes beyond Section 122's purpose: correcting fundamental international payments problems by correcting large and serious balance-of-payments deficits with "broad and uniform" tariffs.

### c.    The Exceptions Are Not Severable.

Defendants argue that, even if the Proclamation's exceptions to the 10 percent tariffs do

15

not meet Section 122's requirements, they are severable from the rest of the Proclamation and "cannot invalidate the Proclamation in its entirety." Opp'n 64-65. However, the Court cannot excise all USMCA, CAFTA-DR, and product-based exceptions without essentially rewriting the Proclamation.

Granted, when courts find an executive action unlawful, they try to "limit the solution to the problem." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328-29 (2006). And courts generally "enjoin only the unconstitutional applications of a statute while leaving other applications in force," or "sever its problematic portions while leaving the remainder intact." *Id.* at 329 (internal citations omitted). However, courts will not "rewrite" a law or proclamation "to conform it to constitutional requirements." *Reno v. ACLU*, 521 U.S. 844, 884-85 (1997) (internal citations omitted).

Here, the Court should reject Defendants' assertion that, even if the USMCA and CAFTA-DR-based and product-based exceptions violate Section 122, the other portions of the Proclamation are still valid. The boilerplate severability provision is contradicted by the rest of the Proclamation. While its inclusion of a severance clause may create the presumption that the validity of the Proclamation does not "depend on the survival of its constitutionally offensive provisions," that presumption "is not conclusive." *See W. States Med. Ctr. v. Shalala*, 238 F.3d 1090, 1097 (9th Cir. 2001) (so stating with respect to congressional legislation). Here, the Court should conclude that the Proclamation is not susceptible to severance because the Proclamation reflects an interdependent strategy. As Secretary Lutnick testified, the Proclamation:

> strikes a carefully measured balance between a broad and uniform tariff aimed to redress significant balance-of-payment trends and overall disequilibrium, while at the same time recognizing product exceptions that will preserve the carefully crafted national security tariff programs …

16

*See* Lutnick Decl. ¶ 16. If the Court upholds the tariffs and strikes the exceptions, that "carefully measured balance" and those "carefully crafted national security tariff programs" would be in jeopardy. Given the statements by the President and Secretary Lutnick, this Court should conclude that Defendants' intent in enacting the Proclamation was to create a unitary policy. It should therefore conclude that the exceptions are not severable from the rest of the Proclamation, and it should find the Proclamation unlawful in its entirety. *Cf. Ackerley Commc'ns*, *Inc.*, *v. City of Cambridge*, 135 F.3d 210, 215 (1st Cir. 1998) ("[i]f the court is unable to know whether the Legislature would have enacted a particular bill without the unconstitutional provision, it will not sever the unconstitutional provision, but will strike the entire statute") (internal citations omitted).

### C.     Plaintiff States Are Entitled to Relief

#### 1.     The States Have Standing

Plaintiffs States have standing to seek all the requested relief. *First*, as Defendants concede, Washington State has standing as an importer to challenge the Section 122 tariffs. Opp'n 73-74, Mot. 18. "Since '[i]f at least one plaintiff has standing, the suit may proceed,' there is no need to go further," because "the contours of available relief would not change." *V.O.S. Selections, Inc. v. United States*, 772 F. Supp. 3d 1350, 1369 (Ct. Int'l Trade 2025) (*V.O.S. I*) (quoting *Biden v. Nebraska*, 600 U.S. 477, 489 (2023)).

*Second*, as this Court previously found in *V.O.S. I*, non-importers can demonstrate Article III standing to challenge the President's unlawful tariffs by using "economic logic" to show "downstream harm," so long as those harms are "'fairly traceable to the challenged conduct and likely to be redressed by the lawsuit.'" *Id.* at 1367-68 (quoting *Biden*, 600 U.S. at 489). Plaintiff States have submitted declarations and expert testimony to demonstrate that the Section 122 tariffs are increasing purchasing costs and budget uncertainty, which harm state agencies with limited budgets. *See* Mot. 19-20, 36-37. As Plaintiffs' experience with IEEPA demonstrated, sometimes

17

these tariff costs are passed through directly to purchasers, while in other instances the price increase is less direct. *See id.* Such evidence of economic harm is sufficient to confer standing. *See Learning Res.*, 146 S. Ct. at 637 (granting relief to small businesses and state plaintiffs by striking down IEEPA tariffs); *Invenergy Renewables LLC v. United States*, 422 F. Supp. 3d 1255, 1273-74 (Ct. Int'l Trade 2019) (finding that consumer suffering economic harm had Article III standing to challenge duties on product); *see also Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 114-16 (2025) (holding that "commonsense economic principles" and evidence of "downstream" harm support Article III standing when a court ruling "would likely redress at least some of the [plaintiffs'] monetary injuries").

Perhaps recognizing the absurdity of attacking Article III standing after the IEEPA litigation,[7] Defendants attempt to argue that Plaintiff States lack "prudential standing" to challenge the Section 122 tariffs. Opp'n 77-79. As this Court has noted, "prudential standing" asks whether a court should decline jurisdiction, despite constitutional standing, when a party is outside the zone of interests that a statute protects. *See Invenergy*, 422 F. Supp. 3d at 1275 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126, 128 n.4 (2014)). This court has found that the "zone of interests" test should not bar consumers from challenging the implementation of a tariff statute. *See id.* at 1276-77. But in any event, this prudential doctrine has no bearing on the ability of sovereign states to challenge the President's unconstitutional conduct, including his effort to impose tariffs where he lacks any legal authority.

Defendants also claim that Plaintiff States lack standing to challenge the haphazard exemptions within the Section 122 tariffs. Opp'n 53-54. But the President's imposition of

---

[7] Even the dissenting opinion in the Federal Circuit "agree[d] with the majority's decision on jurisdiction and standing." *See V.O.S. II*, 149 F.4th at 1348-49.

18

discriminatory and non-uniform tariffs are not just independent legal violations of Sections 122(d) and (e); they underscore that the tariffs were not instituted in response to "fundamental international payments problems" as required by law. *See* Mot. 28-32. Plaintiffs plainly have standing to seek the "form of relief" requested in their Complaint, *see TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021), and therefore may raise these legal arguments to demonstrate the overall infirmity of the Section 122 tariffs.

### 2. The APA Applies to the CBP's Administrative Actions to Implement the Section 122 Tariffs

Defendants urge the Court to reject Plaintiffs' APA claim because they argue that CSMS # 67844987 is no more substantive than the CSMS messages at issue in *Maple Leaf Marketing, Inc. v. United States*, 528 F. Supp. 3d 1365, 1378 (Ct. Int'l Trade 2021). Opp'n 66-67. In *Maple Leaf Marketing*, the court concluded that CSMS messages were merely byproducts of a presidential proclamation. 528 F. Supp. 3d at 1378-79. But CSMS # 67844987 is not a bare recitation of the President's Proclamation like the message in *Maple Leaf Marketing*. Those messages consisted largely of a set of quotations of the relevant proclamations. *See id.* at 1378 n.14, 1379 n.15. Indeed, the plaintiffs in that case "acknowledge[d]" that they were "not challenging a meaningful CBP decision." *Id.* at 1378. Plaintiffs here do not so concede. CSMS # 67844987 creates requirements related to documentation and entering data and provides for "drawback"—provisions not contained within the Proclamation. It is therefore final agency action because it determines "rights or obligations" from which "legal consequences will flow[.]" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation modified). Courts have been clear that a directive from the President does not "insulate" final agency actions from APA review. *See Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996). Contrary to Defendants' assertions, Plaintiffs are not attempting to "skirt" anything but seeking relief that covers all relevant actions

that implement the Section 122 tariffs.[8]

### 3. Plaintiffs Are Entitled to a Nationwide Preliminary and Permanent Injunction

In their motion, Plaintiffs demonstrated that a nationwide injunction of the Section 122 tariffs is necessary to prevent the irreparable harm that will occur due to the non-recoverable costs that Plaintiffs and their instrumentalities will incur from the direct and indirect purchase of unlawfully tariffed goods, in addition to the chaos the tariffs have created for State budgeting and planning. Mot. 34-39. Furthermore, Plaintiffs showed how such a nationwide injunction is consistent with the Supreme Court's decision in *CASA* (assuming *CASA* even applies in this Court[9]) and required by the Uniformity Clause of the Constitution. *Id.* at 41-44.

In response, Defendants incorrectly and unpersuasively attack Plaintiffs' standing and lean entirely on *CASA*. The Court should reject Defendants' arguments and preliminarily and permanently enjoin the Section 122 tariffs across the nation.

Defendants fail to grapple with the Supreme Court's explicit ruling in *CASA* that a universal injunction may be called for where "necessary to provide the States *themselves* with complete relief." 606 U.S. at 853. Here, because only importers of record have a clear refund remedy, an injunction is necessary to stop the States from paying hundreds of millions indirectly due to the Section 122 tariffs. Hines Decl. ¶ 19. Insofar as Defendants' argument rests on a faulty

---

[8] The Court need not reach this APA claim if it can provide full relief through Plaintiffs' other claims.

[9] *Trump v. CASA, Inc.*, 606 U.S. 831 (2025), expressly limited its holding to courts established "under the Judiciary Act of 1789." *Id.* at 839. This Court was established under the Customs Court Act of 1980, an entirely different statute passed nearly two centuries later, *see* Pub. L. No. 96-417, 94 Stat. 1727, and consequently is not confined by the *CASA* Court's determination of equitable powers granted to district courts under the Judiciary Act of 1789, *see Atmus Filtration, Inc. v. U.S.*, No. 26-01259, 2026 WL 679285, at *1 (Ct. Int'l Trade Mar. 5, 2026).

standing analysis of the downstream impact of the tariffs on Plaintiff States (other than Washington), that argument fails for all the reasons stated *supra* § II.C.1.[10]

More fundamentally, Defendants' one-paragraph response to the constitutional infirmity their position creates with respect to the Uniformity Clause should be rejected. Opp'n 81-82. Indeed, as tariffs are "tax[es] levied on imported goods and services," *Learning Res.*, 146 S. Ct. at 638, and therefore must be uniformly applied, any determination made by this Court pertaining to tariffs is required by the Constitution to have "uniform" impact "throughout the United States." *See* U.S. Const. art. I § 8, cl. 1 ("[A]ll Duties, Imposts and Excises shall be uniform throughout the United States.").

Defendants' only response to this Constitutional requirement is their assertion that nationwide relief would be inconsistent with some of this Court's precedents wherein individualized relief was granted. Opp'n 81. But the issue of the Uniformity Clause was not directly before the Court in any of those cases. More importantly, Defendants ask this Court to do what they agree Congress could not: create a non-uniform tax system that would privilege Plaintiffs over nonparties.

If Defendants are suggesting that a narrower injunction would allow them to continue to collect unlawful tariffs from nonparties even though they cannot continue to collect them from the parties, or to continue to collect them in some parts of the country but not in the Plaintiff States,

---

[10] Defendants' reliance on *Corus Grp. PLC v. Bush*, 217 F. Supp. 2d 1347 (Ct. Int'l Trade 2002), is misplaced. *Corus* stands for the unremarkable proposition that the possibility of economic injuries, without more, is generally insufficient to demonstrate irreparable harm for purposes of a preliminary injunction. *Id.* at 1355-56. But this Court was clear that "[g]enerally, where a party is required to fundamentally alter its business operations during litigation in order to comply with a challenged Government action, that party suffers irreparable harm," and "there is no requirement that a party seeking injunctive relief establish imminent failure." *Id.* at 1354. Here, Plaintiffs have clearly articulated the unsought changes the tariffs have wrought on their "business" interests— the ability "to plan and to budget their limited resources accurately." Mot. 20, 34-35.

they have not explained how that regime would comport with the Uniformity Clause. And while Defendants rightly observe that the "Uniformity Clause in Article I limits *Congress*'s power to impose non-uniform duties, imposts, and excises," Opp'n 81, the Executive can only impose tariffs under authority delegated by Congress and is therefore similarly constrained. *See*, *e.g.*, *Railway Labor Execs. Ass'n v. Gibbons*, 455 U.S. 457, 466-71 (1982) (holding that bankruptcy statute, which authorized the Interstate Commerce Commission to manage a specific railroad bankruptcy, violated the Bankruptcy Clause's uniformity requirement); *Off. of U.S. Trustee v. John Q. Hammons Fall 2006*, *LLC*, 602 U.S. 487, 495-96 (2024) (holding that prospective relief to remedy violation of the uniformity requirement of the Bankruptcy Clause is appropriate). If the Court finds that the Section 122 tariffs exceed the President's delegated authority, it would make no sense— and would offend the Uniformity Clause—for Defendants to be permitted to continue collecting these same unlawful tariffs in some but not all of the United States.

Finally, Defendants' analysis of the balance-of-hardships and public-interest prongs of the test for an injunction rely on the incorrect supposition that the President's finding that the United States' current account has a deficit is equivalent to a "balance-of-payments deficit[]." Opp'n 71. But, for all the reasons stated *supra* § II.B, Defendants fundamentally misunderstand what constitutes a balance of payments deficit. Therefore, the public interest favors "ensuring that governmental bodies comply with the law." *Am. Signature*, *Inc. v. United States*, 598 F.3d 816, 830 (Fed. Cir. 2010).

## III.    CONCLUSION

The States' motion for summary judgment should be granted. In the alternative, the Court should grant a preliminary injunction.

Respectfully submitted,

**DAN RAYFIELD**
Attorney General for the State of Oregon

BENJAMIN GUTMAN
Deputy Attorney General
DUSTIN BUEHLER
Special Counsel

By: */s/ Brian Simmonds Marshall*
Brian Simmonds Marshall
Leanne Hartmann *
Samuel Kubernick *
Brian Collins *
*Senior Assistant Attorneys General*
Oregon Department of Justice
100 SW Market Street
Portland, OR 97201
Tel (971) 673-1880
Fax (971) 673-5000
Brian.S.Marshall@doj.oregon.gov
Leanne.Hartmann@doj.oregon.gov
Samuel.A.Kubernick@doj.oregon.gov

*Counsel for the State of Oregon*

**ROB BONTA**
Attorney General
State of California

By: *s/Shiwon Choe*
Lara Haddad *
*Supervising Deputy Attorney General*
Shiwon Choe
Carolyn Downs *
Samuel Sokolsky *
*Deputy Attorneys General*
California Department of Justice
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
(415) 510-4400
Lara.Haddad@doj.ca.gov
Shiwon.Choe@doj.ca.gov
Carolyn.Downs@doj.ca.gov
Samuel.Sokolsky@doj.ca.gov

*Counsel for the State of California*

**KRISTIN K. MAYES**
Attorney General
State of Arizona

*/s/ Joshua D. Bendor*
Joshua D. Bendor
*Solicitor General*
Syreeta A. Tyrell
Senior Litigation Counsel
Timothy E.D. Horley *
Jaylia Yan *
*Assistant Attorneys General*
2005 North Central Avenue
Phoenix, Arizona 85004
Phone: (602) 542-3333
Joshua.bendor@azag.gov
Syreeta.Tyrell@azag.gov
Timothy.Horley@azag.gov
Jaylia.Yan@azag.gov
ACL@azag.gov

*Counsel for the State of Arizona*

**LETITIA JAMES**
Attorney General for the State of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam
*Chief Counsel for Federal Initiatives*
Stephen Thompson *
Mark Ladov
Natasha Korgaonkar *
*Special Counsel*
28 Liberty St.
New York, NY 10005
(212) 416-8679
rabia.muqaddam@ag.ny.gov
stephen.thompson@ag.ny.gov
mark.ladov@ag.ny.gov
Natasha.korgaonkar@ag.ny.gov

*Counsel for the State of New York*

23

**PHILIP J. WEISER**
Attorney General State of Colorado

By: */s/ Sarah H. Weiss*
Sarah H. Weiss
*Senior Assistant Attorney General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
Sarah.Weiss@coag.gov

*Counsel for the State of Colorado*

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

By: */s/ Ian R Liston*
Ian R. Liston
*Director of Impact Litigation*
Vanessa L. Kassab
*Deputy Attorney General*
Rose Gibson *
*Assistant Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8875
Ian.Liston@Delaware.gov

*Counsel for the State of Delaware*

**WILLIAM TONG**
Attorney General of Connecticut

By: */s/ Michael Skold*
Michael Skold
*Solicitor General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Michael.Skold@ct.gov

*Counsel for the State of Connecticut*

**KWAME RAOUL**
Attorney General
State of Illinois

By: */s/ Gretchen Helfrich*
Cara Hendrickson
*Executive Deputy Attorney General*
Gretchen Helfrich
*Deputy Chief, Special Litigation Bureau*
Office of the Illinois Attorney General
115 South LaSalle Street
Chicago, IL 60603
Tel. (312) 814-3000
Cara.Hendrickson@ilag.gov
Gretchen.helfrich@ilag.gov

*Counsel for the State of Illinois*

24

**OFFICE OF THE GOVERNOR** *ex rel.*
**Andy Beshear**, in his official capacity as
Governor of the Commonwealth of Kentucky

By: */s/ S. Travis Mayo*
S. Travis Mayo *
*General Counsel*
Laura C. Tipton *
*Deputy General Counsel*
Office of the Governor
501 High Street
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
laurac.tipton@ky.gov


*Counsel for Governor Andy Beshear*

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: */s James C. Luh*
James C. Luh *
*Senior Assistant Attorney General*
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.maryland.gov

*Counsel for the State of Maryland*

**AARON M. FREY**
Maine Attorney General

By: */s/ Katherine W. Thompson*
Katherine W. Thompson *
*Special Counsel*
Office of the Attorney General
6 State House Station
Augusta, ME 04333
Tel.: 207-626-8455
Fax: 207-287-3145
Kate.thompson@maine.gov


*Counsel for the State of Maine*

**ANDREA JOY CAMPBELL**
ATTORNEY GENERAL OF
MASSACHUSETTS

By: */s/ Katherine Dirks*
Katherine Dirks
 *Chief State Trial Counsel*
Office of the Massachusetts Attorney General
1 Ashburton Place
Boston, MA 02108
(617) 963-2277
katherine.dirks@mass.gov

*Counsel for the Commonwealth of
Massachusetts*

25

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Neil Giovanatti*
Neil Giovanatti
*Assistant Attorneys General*
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
GiovanattiN@michigan.gov

*Counsel for the State of Michigan*


**KEITH ELLISON**
Attorney General
State of Minnesota

By: */s/ Lindsey E. Middlecamp*
PETER J. FARRELL (#0393071)
*Deputy Solicitor General*
LINDSEY E. MIDDLECAMP (#0392589)
*Special Counsel*
445 Minnesota Street, Suite 600
St. Paul, Minnesota 55101-2125
(651) 757-1010 (Voice)
(651) 282-5832 (Fax)
Peter.farrell@ag.state.mn.us
Lindsey.middlecamp@ag.state.mn.us

*Counsel for the State of Minnesota*


**AARON D. FORD**
Attorney General

By: */s/ K. Brunetti Ireland*
K. Brunetti Ireland *
*Chief of Special Litigation*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
kireland@ag.nv.gov


*Counsel for the State of Nevada*


**JENNIFER DAVENPORT**
Attorney General of New Jersey

By: */s/ Lucy I. Sprague*
Lucy I. Sprague *
David N. Birch *
*Deputy Attorneys General*
124 Halsey Street, 5th Floor
Newark, New Jersey 07101
(609) 696-5363
Lucy.Sprague@law.njoag.gov


*Counsel for the State of New Jersey*

26

**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ Amy Senier*
AMY SENIER
*Senior Counsel*
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
505-490-4060
asenier@nmdoj.gov

*Counsel for the State of New Mexico*

**JEFF JACKSON**
Attorney General of North Carolina

LAURA HOWARD
Chief Deputy Attorney General

By: */s/ Daniel T. Wilkes*
Daniel T. Wilkes *
*Assistant Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6415
dwilkes@ncdoj.gov

*Counsel for the State of North Carolina*

**JOSH SHAPIRO,**
in his official capacity as Governor of the
Commonwealth of Pennsylvania

JENNIFER SELBER
General Counsel

By: */s/ Jacob B. Boyer*
Jacob B. Boyer *
*Deputy General Counsel*
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 460-6786
jacobboyer@pa.gov

*Counsel for Governor Josh Shapiro*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Alex Carnevale*
Alex Carnevale *
*Special Assistant Attorney General*
Office of the Attorney General - State of
Rhode Island
150 South Main Street
Providence, RI 02903
(401) 274 4400
acarnevale@riag.ri.gov

*Counsel for the State of Rhode Island*

27

**CHARITY R. CLARK**
Attorney General of Vermont

By: */s/ Ryan P. Kane*
RYAN P. KANE
*Deputy Solicitor General*
109 State Street
Montpelier, VT 05609
(802) 828-2153
ryan.kane@vermont.gov


*Counsel for the State of Vermont*

**NICHOLAS W. BROWN**
Attorney General
State of Washington

By: */s/ Freeman E. Halle*
FREEMAN E. HALLE, WSBA 61498
TODD SIPE, WSBA 23203
*Assistant Attorneys General*
Office of the Washington State Attorney
General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
freeman.halle@atg.wa.gov
todd.sipe@atg.wa.gov


*Counsel for the State of Washington*

**JAY JONES**
Attorney General of Virginia

By: */s/ Tillman J. Breckenridge*
Tillman J. Breckenridge *
*Solicitor General*
202 N. 9th Street
Richmond, Virginia 23219
Tel: (804) 786-2071
Fax: (804) 786-1991
solicitorgeneral@oag.state.va.us


*Counsel for the Commonwealth of Virginia*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: */s/ Brian P. Keenan*
Brian P. Keenan * State Bar #1056525
*Assistant Attorney General*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-0020
(608) 294-2907 (Fax)
brian.keenan@wisdoj.gov


*Counsel for the State of Wisconsin*

* *Admission application pending or forthcoming*

Dated: April 7, 2026

28

**CERTIFICATE OF COMPLIANCE**

Pursuant to U.S. Court of International Trade Standard Chambers Procedure 2(B)(1) and the Court's Scheduling Order, Dkt. 24, I certify that this Reply in Support of Plaintiff States' Motion for Summary Judgment, and, in the Alternative, for a Preliminary Injunction, including headings, footnotes, and quotations (but excluding the motion, table of contents, table of authorities, counsel's signature blocks, this certificate, and the proposed order) complies with the word limitation requirement. The word count for this submission, as computed by the word processing system used to prepare the brief, is 6920 words.

Respectfully submitted,

*/s/ Brian Simmonds Marshall*
Brian Simmonds Marshall

*Counsel for the State of Oregon*

29