## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

<table>
<tr><td>

THE STATE OF OREGON, ET AL.,

  *Plaintiffs,*

V.

DONALD J. TRUMP, IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES, ET AL.,

  *Defendants.*

</td><td>

Case No. 1:26-cv-01472-3JP

</td></tr>
</table>

### BRIEF OF ECONOMISTS AS AMICUS CURIAE IN SUPPORT OF PLAINTIFFS

Holger Spamann (*Admission Pending*)
1525 Massachusetts Ave.
Cambridge, MA 02138
Tel. (617) 496-6710

Aaron R. Cooper (*Admission Pending*)
Adam G. Unikowsky
Nikita Lalwani (*Admission Pending*)
JENNER & BLOCK LLP
1099 New York Ave. N.W.
Suite 900
Washington, D.C. 20001
Tel. (202) 639-6000
Fax (202) 639-6066
acooper@jenner.com
aunikowsky@jenner.com
nlalwani@jenner.com

Debbie L. Berman (*Admission Pending*)
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel. (312) 222-9350
Fax (312) 527-0484
dberman@jenner.com

April 8, 2026

*Counsel for Amicus Curiae*

**TABLE OF AUTHORITIES**

TABLE OF AUTHORITIES ............................................................................................... ii

INTERESTS OF *AMICUS CURIAE* ...............................................................................1

SUMMARY OF ARGUMENT ..........................................................................................1

ARGUMENT .....................................................................................................................3

I.     The Proclamation Fails to Meet the Statutory Conditions of "Large and Serious United States Balance-of-Payments Deficits" and "Fundamental International Payments Problems" Under Section 122(a). ..........................................................3

          A.     "Large and serious United States balance-of-payments deficits" are impossible in today's system of floating exchange rates. ......................................3

          B.     The United States does not face "fundamental international payment problems." ................................................................................................8

II.    The harm caused by the tariffs is not limited to the tariff payments and cannot be fully undone after the fact. ..............................................................................10

CONCLUSION ...............................................................................................................12

# TABLE OF AUTHORITIES

**CASES**

*Alabama Ass'n of Realtors v. Department of Health & Human Services*, 594 U.S. 758 (2021)...............................................................................................................10

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)...............................................10

*United States v. Yoshida International, Inc.*, 526 F.2d 560 (C.C.P.A. 1975)....................4

*V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025), *aff'd sub nom. Learning Resources, Inc. v. Trump*, 146 S. Ct. 628 (2026) ...............................1, 2, 8

*Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008).........................10

*Yoshida International, Inc. v. United States*, 378 F. Supp. 1155 (Cust. Ct. 1974)...........4

**STATUTES**

19 U.S.C. § 2132(a) ....................................................................................................2, 3

19 U.S.C. § 2132(a)(1)..................................................................................................1, 3

19 U.S.C. § 2132(a)(2)......................................................................................................1

19 U.S.C. § 2132(a)(3)......................................................................................................1

19 U.S.C. § 2132(c)(1)......................................................................................................7

Bretton Woods Agreements Act, Pub. L. No. 94-564, 90 Stat. 2660 (1976) ...................5

**LEGISLATIVE MATERIALS**

*Trade Deficit: Hearing Before the Subcomm. on Int'l Trade of the S. Comm. on Fin.*, 98th Cong. 48 (1984) (statement of Dr. Martin Feldstein, Chairman, Council of Economic Advisors)....................................................................................5, 7

**OTHER AUTHORITIES**

Carol Bertaut et al., *The International Role of the U.S. Dollar – 2025 Edition*, The Federal Reserve (July 18, 2025), https://www.federalreserve.gov/econres/notes/feds-notes/the-international-role-of-the-u-s-dollar-2025-edition-20250718.html ................................................................................................................8, 9

The Budget Lab, *State of U.S. Tariffs: February 21, 2006* (Feb. 21, 2026), https://budgetlab.yale.edu/research/state-tariffs-february-21-2026........................10

Milton Friedman & Robert V. Roosa, *The Balance of Payments: Free Versus Fixed Exchange Rates*, First Lecture (1967).................................................................6

International Monetary Fund, *Balance of Payments (BOP)*, https://data.imf.org/en/datasets/IMF.STA:BOP (last visited Apr. 6, 2026) .............................7

Douglas A. Irwin, *Three Simple Principles of Trade Policy* (1996) ..............................................11

Paul Krugman, *A Model of Balance-of-Payments Crises*, 11 J. Money, Credit, & Banking 311 (1979) ..................................................................5

N. Gregory Mankiw, *Principles of Economics* (7th ed. 2015) .......................................................11

Proclamation No. 11012, 91 Fed. Reg. 9339 (Feb. 20, 2026) .................................................1, 3, 11

Reply Brief for Appellants, *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025) (Nos. 2025-1812, -1813), 2025 WL 2083367 ..........................................................6

Paul Samuelson, *Economics* (9th ed. 1973).................................................................................4

Robert M. Stern, et al., *The Presentation of the U.S. Balance of Payments: A Symposium*, 123 Essays in Int'l Fin. 41 (1977). ..............................................................6

U.S. Bureau of Economic Analysis, *International Data: Table 4.1. U.S. International Transactions in Primary Income*, https://apps.bea.gov/iTable/ ?reqid=62&step=6&isuri=1&tablelist=56&product=1&_gl=1*1gumo6h *_ga*NzU3NTc3NDk2LjE3NzE5NDkzOTk.*_ga_J4698JNNFT*czE3NzUy Mjg3NzAkbzQkZzEkdDE3NzUyMjg4MTMkajE3JGwwJGgw (last visited Apr. 6, 2026).................................................................................6

Erica York & Alex Durante, *Tracking the Impact of the Trump Tariffs & Trade War*, Tax Found. (Mar. 13, 2026), https://taxfoundation.org/research/all/ federal/trump-tariffs-trade-war/ ......................................................................10

**INTERESTS OF *AMICUS CURIAE***

*Amici curiae* are professional economists at leading universities and public policy research organizations who have dedicated their professional lives to understanding international economics.[1] Many have put their expertise to use in public service for the federal government. *Amici* have an interest in ensuring that the fundamentals of international economics are correctly represented in this litigation.

**SUMMARY OF ARGUMENT**

Plaintiffs challenge the ten percent ad valorem tariffs that President Trump imposed on February 20, 2026, under Section 122 of the Trade Act of 1974, 19 U.S.C. § 2132(a). Section 122 authorizes the President to proclaim temporary duties or quotas "[w]henever fundamental international payments problems require special import measures to restrict imports" for any of three enumerated purposes: to address "large and serious United States balance-of-payments deficits," to prevent "imminent and significant depreciation of the dollar in foreign exchange markets," and/or to cooperate with other countries to correct "an international balance-of-payments disequilibrium[.]" 19 U.S.C. § 2132(a)(1)-(3). In imposing the tariffs, the President relied on the first of these purposes, proclaiming: "Specifically, my advisors have determined that an import surcharge in the form of *ad valorem* duties is *required to deal with large and serious United States balance-of-payments deficits*." Proclamation No. 11012, 91 Fed. Reg. 9339 ¶ 5 (Feb. 20, 2026) ("Proclamation") (emphasis added); *see also id.* ¶¶ 8, 13.

For the President to invoke authority under Section 122 in the way that he has, two separate conditions must be met. First, per the cited statutory standard, the tariffs must be required to deal with "large and serious United States balance-of-payments deficits." *V.O.S. Selections, Inc. v.*

---

[1] A complete list of Amici is included in Appendix A, attached hereto.

*Trump*, 149 F.4th 1312, 1372 (Fed. Cir. 2025) (J. Taranto, dissenting), *aff'd sub nom. Learning Res., Inc. v. Trump*, 146 S. Ct. 628 (2026). Second, the statute imposes "the necessary threshold condition" of the existence of "fundamental international payments problems." *Id.*; *see also* 19 U.S.C. § 2132(a).

Neither required condition is met here. Section 122 was drafted and enacted in the early 1970s, when the United States was operating under the Bretton Woods system of fixed exchange rates. The term "large and serious United States balance-of-payments deficits" takes specific meaning from that time. 19 U.S.C. § 2132(a). Under that fixed exchange rate system, a balance-of-payments deficit reflected an acute drain on U.S. gold and currency reserves that threatened the country's ability to meet its international obligations. But now, under the floating exchange rate system the United States has maintained for more than fifty years, exchange rates adjust automatically to correct payment imbalances, making the reserve-drain emergency Section 122 was designed to address structurally impossible — and therefore legally impossible. Moreover, the United States does not face fundamental international payments problems, as it is able to pay for its imports and meet its debt obligations. As such, the Proclamation fails to satisfy either statutory condition: the United States cannot run a "large and serious United States balance-of-payments deficit" because, in today's system of floating exchange rates, they are no longer possible; and the United States does not have a "fundamental international payments problem" because the United States has consistently been able to meet its payment obligations. 19 U.S.C. § 2132(a).

Finally, the President's universal tariffs will fundamentally transform the U.S. economy. These sweeping tariffs, which apply to goods that enter the United States from nearly all trading partners, will have massive budgetary, allocative, and distributive effects across the country. As

2

such, this new round of tariffs will cause irreparable harm through immediate and irreversible large-scale economic consequences that cannot be fully remedied even if the tariffs are later declared illegal and any paid tariffs are refunded.

## ARGUMENT

I.    **The Proclamation Fails to Meet the Statutory Conditions of "Large and Serious United States Balance-of-Payments Deficits" and "Fundamental International Payments Problems" Under Section 122(a).**

Section 122 of the Trade Act authorizes emergency trade measures only when the United States faces "fundamental international payments problems" and, as invoked by the Proclamation, if temporary import restrictions are required to address "large and serious United States balance-of-payments deficits." 19 U.S.C. § 2132(a). As *Amici* explain here, the United States cannot be facing "large and serious United States balance-of-payments deficits" and "fundamental international payments problems" as contemplated by the statute, because the United States now operates under a floating exchange rate system that makes such deficits impossible, and because the United States has consistently been able to meet its payments obligations, a situation that is unlikely to change. *Id.*

A.    **"Large and serious United States balance-of-payments deficits" are impossible in today's system of floating exchange rates.**

As the first of two conditions, Section 122 of the Trade Act allows the President to issue tariffs to deal with "large and serious United States balance-of-payments deficits," which the President cites in the Proclamation for the 10 percent tariffs. *See* Proclamation ¶ 5; *see also* 19 U.S.C. § 2132(a)(1). These balance-of-payment deficits were conceivable when the Trade Act was passed in the 1970s. But in today's system of floating exchange rates, they are no longer possible.

To understand this point, it is important to situate the meaning of "large and serious United States balance-of-payments deficits" within the context of the statute. Section 122 was signed into

law on January 3, 1975, as part of the Trade Act of 1974, which was first introduced in October of 1973.[2] When Section 122 was signed in 1975, the Bretton Woods system, which came into effect in 1945, was still in place. Under the Bretton Woods system, the dollar[3] was pegged to gold at the price of $35 per ounce, and other currencies were pegged to the dollar. That is, the exchange rates between the dollar and gold, and between the dollar and other currencies, were fixed. This meant that foreign governments could exchange dollars for gold at the U.S. Treasury.

The Bretton Woods system was vulnerable to balance-of-payment imbalances, especially for the United States. By the late 1960s, more dollars were circulating internationally than the U.S. Treasury could convert to gold at the peg, while the dollar was overvalued: its pegged value was greater than it would have been had the market prices of the dollar and gold floated freely against each other. As the Nobel Laureate Paul Samuelson explained in the 1973 edition of the leading economics textbook of the era, this "[c]hronic overvaluation of [the] dollar caused [a] hemorrhage of gold and reserves, [a] soaring balance-of-payments deficit." Paul Samuelson, *Economics* 714 (9th ed. 1973).

These are the potential "large and serious United States balance-of-payment deficits" being referred to in Section 122 of the Trade Act. As the Chairman of the Council of Economic Advisers under President Reagan, Martin Feldstein told the Senate Finance Committee in 1984, "[t]he technical definition for the balance-of-payments is the rate of accumulation of official reserve

---

[2] When the Trade Act of 1974 was being finalized, the Customs Court had just declared unlawful a surcharge that President Nixon had imposed when he suspended convertibility, ending the guarantee that foreign governments and central banks could exchange their dollar holdings for gold at a fixed price. *See Yoshida Int'l, Inc. v. United States*, 378 F. Supp. 1155 (Cust. Ct. 1974). Section 122(a) of the Trade Act was therefore drafted with that context in mind, aiming to insulate such actions from litigation. The *Yoshida* decision was later overturned, and the surcharge validated, by the U.S. Court of Customs and Patent Appeals. *United States v. Yoshida Int'l, Inc.*, 526 F.2d 560 (C.C.P.A. 1975).

[3] All references to the dollar are to the United States dollar.

assets, including gold." *Trade Deficit: Hearing Before the Subcomm. on Int'l Trade of the S. Comm. on Fin.*, 98th Cong. 48 (1984) (statement of Dr. Martin Feldstein, Chairman, Council of Economic Advisors); *see also* Article XII of the General Agreement on Tariff and Trade 1994/1947 (tying "balance of payments," the subject of the provision according to its paragraph 1, to "a serious decline in its monetary reserves" or "very low monetary reserves" in its paragraph 2). ) Similarly, Nobel Laureate Paul Krugman explained in his seminal 1979 paper on balance-of-payment crises: "When the government is no longer able to defend a fixed parity because of the constraints on its actions, there is a 'crisis' in the balance of payments." Paul Krugman, *A Model of Balance-of-Payments Crises*, 11 J. Money, Credit, & Banking 311, 311 (1979).

But the Bretton Woods system was abolished in 1976 through the Jamaica Accords — and along with that, the possibility that there could be a "balance-of-payment deficit" as used in Section 122. Indeed, it was precisely the U.S. balance-of-payment deficits just described that precipitated the end of Bretton Woods. In 1971, the United States ended its commitment to exchange dollars for gold, followed in 1976 by the formal end of the Bretton Woods system, when President Ford signed into law Public Law 94-564. An Act to provide for amendment of the Bretton Woods Agreements Act, Pub. L. No. 94-564, 90 Stat. 2660 (1976). That no agreement was reached on a new international monetary regime until 1976 explains why Section 122, signed into law a year before, is predicated on problems generated by the "old" regime, quite apart from the possibility that the regime might be reinstituted.

This brought the United States to the system of floating exchange rates that currently shapes international finance and under which "serious United States balance-of-payment deficits" cannot exist. As Nobel Laureate Milton Friedman had explained in 1967, "a system of floating exchange rates completely eliminates the balance-of-payments problem—just as in a free market

5

there cannot be a surplus or a shortage in the sense of eager sellers unable to find buyers or eager buyers unable to find sellers. The price may fluctuate but there cannot be a deficit or a surplus threatening an exchange crisis."[4] Milton Friedman & Robert V. Roosa, *The Balance of Payments: Free Versus Fixed Exchange Rates*, First Lecture at 15 (1967). That is where the United States now finds itself: in a situation where there is no fixed exchange rate to sustain, and where it does not make sense to speak of serious balance-of-payment deficits.

For the avoidance of doubt, in the language of international economics, "balance-of-payment deficits" are "conceptually distinct" from trade deficits and deficits associated with the balance on primary or secondary income, which are the concepts the President relies upon in his proclamation. *See, e.g.*, Reply Brief for Appellants at 13, *V.O.S. Selections, Inc. v. Trump*, 149 F.4th 1312 (Fed. Cir. 2025) (Nos. 2025-1812, -1813), 2025 WL 2083367 (noting that "trade deficits[] … are conceptually distinct from balance-of-payments deficits").[5]

The government conflates the economic concept of balance of payments with an accounting statement bearing the same name. The Balance of Payments—capitalized here to

---

[4] Edward M. Bernstein, who was the International Monetary Fund's first research director and who chaired the Review Committee for Balance of Payments Statistics, a U.S. expert panel appointed in the early 1960s to evaluate and improve the quality of U.S. international trade and payments data (also known as the Bernstein Committee), concurred. He explained in 1977: "Under a system of fluctuating exchange rates, the international transactions of a country are in continuous balance, and that balance is maintained by the exchange market—in the short run through any necessary changes in capital flows, including official transactions, and with a lag through changes in the current account." Robert M. Stern, et al., *The Presentation of the U.S. Balance of Payments: A Symposium*, 123 Essays in Int'l Fin. 41 (1977).

[5] The Proclamation state that the balance on primary income turned negative in 2024 and argues that this provides support for the existence of a balance-of-payment deficit. While that line of argument is erroneous on conceptual grounds, it is worth noting that the balance was positive in 2025. In other words, the most recent data tell us the United States is running a primary income surplus. U.S. Bureau of Economic Analysis, *International Data: Table 4.1. U.S. International Transactions in Primary Income*, https://apps.bea.gov/iTable/?reqid=62&step=6&isuri= 1&tablelist=56&product=1&_gl=1*1gumo6h*_ga*NzU3NTc3NDk2LjE3NzE5NDkzOTk.*_ga _J4698JNNFT*czE3NzUyMjg3NzAkbzQkZzEkdDE3NzUyMjg4MTMkajE3JGwwJGgw (last visited Apr. 6, 2026).

distinguish it from the economic concept—is "a statistical statement that summarizes transactions between residents and nonresidents during a period. It consists of the goods and services account, the primary income account, the secondary income account, the capital account, and the financial account." Int'l Monetary Fund, *Balance of Payments (BOP)*, https://data.imf.org/en/datasets/IMF.STA:BOP (last visited Apr. 6, 2026). It is implausible that Section 122(a)(1) could be referring to the Balance of Payments in this sense. As the government acknowledges, as an accounting statement, the Balance of Payments necessarily balances. There cannot be an aggregate "Balance of Payments deficit" in this sense of the word (again using capitalization to emphasize that we are referencing the accounting statement). The government's "solution" is to pick and choose some individual entries from the accounting statement: the current account balance, the balance on primary income, etc. This would effectively render Section 122(a)(1) an invitation to arbitrary government action because some components of the Balance of Payment will always be in deficit.

The text of Section 122 directly reflects this distinction between balance-of-payment deficits and balance-of-trade deficits when it refers to balance-of-*trade* surpluses in subsection 122(c). 19 U.S.C. § 2132(c)(1) (referencing the need to "deal with large and persistent United States balance-of-trade surpluses," rather than balance-of-payment surpluses). And there is no reason why these two different kinds of deficits would coincide. As Feldstein put it in his 1984 testimony cited above: "[A]lthough we have a trade deficit and a current account deficit, we do not have a balance-of-payments deficit, in the strict sense envisioned in section 122." Feldstein, *supra*, at 48. In the current situation, financial account surpluses serve to offset trade deficits and current account deficits.

Because the reference to "large and serious balance-of-payments deficits" in Section 122 by definition cannot apply to the United States today, the President cannot find statutory authority to issue the Proclamation under Section 122 of the Trade Act.

**B. The United States does not face "fundamental international payment problems."**

As to the second and threshold condition, the United States does not face "fundamental international payments problems". *V.O.S. Selections, Inc.*, 149 F.4th at 1372 (J. Taranto, dissenting).

As an initial matter, the Proclamation fails to define or identify any "fundamental international payments problems" that would justify Section 122 tariffs. That defect is fatal on its own.

In any event, such problems do not exist. Broadly speaking, such problems can take one of two forms: countries can face international payment problems either in *current* transactions (if they are unable to pay for imports of goods and services taking place today) or with respect to *past* transactions (if they are unable to fulfill existing obligations to pay interest and principal on debt held by foreigners). The United States faces neither problem today.

First, there is no evidence of an international payments problem with respect to current transactions. In fact, imports of goods and services into the United States were greater in 2025 than in any prior year, and the same was true in 2024. As the government acknowledges, the United States has for decades now been able to pay for imports of goods and services well beyond its exports of goods and services.

Nor is this likely to change. The dollar is "overwhelmingly the world's most frequently used currency in global trade." Carol Bertaut et al., *The International Role of the U.S. Dollar – 2025 Edition*, The Federal Reserve (July 18, 2025), https://www.federalreserve.gov/

econres/notes/feds-notes/the-international-role-of-the-u-s-dollar-2025-edition-20250718.html. The United States has ready access to the dollar because it issues the currency.

Second, with respect to past transactions, the United States also does not face any fundamental international payments problems. There is ample demand for U.S. debt as is evident from its borrowing costs despite record high levels of debt issuance. This is also unlikely to change, as the dollar's roles in official foreign exchange reserves, international payments, foreign-currency debt issuance, foreign-currency banking claims and liabilities all remain dominant. *Id.* Indeed, the most important example of the second form of international payment problems in the context of Section 122 involves currency that can be exchanged for gold or a different asset the country cannot costlessly produce. As discussed with respect to the balance-of-payment problems, this is the international payment problem that was front of mind for the legislators who drafted and enacted Section 122. Currency is a form of debt — a liability of the issuing government — and in a system of managed or fixed exchange rates, the issuing government sometimes commits to exchanging it for gold or a different asset. But this is not so in today's system of floating exchange rates.

Generally, a country can encounter fundamental international payment problems if its currency is not accepted by trading partners and international financiers or if it operates a system of fixed or managed exchange rates. The United States is not in either such situation — today, dollars are accepted for payment all over the world, even without the backing of gold or another precious commodity. The "necessary threshold condition" of fundamental international payment problems is thus not met for the President to issue the tariffs under Section 122.

9

II.    **The harm caused by the tariffs is not limited to the tariff payments and cannot be fully undone after the fact.**

As Plaintiffs seek "a preliminary and permanent injunction" prohibiting the implementation of the Proclamation, Compl. ¶ 120, *Amici* also address the requirement that there will be "irreparable injury." *See, e.g.*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20-24 (2008) (discussing the need to show likelihood of "irreparable harm" being suffered for preliminary injunction); *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (noting that Plaintiffs must demonstrate suffering "an irreparable injury" for a permanent injunction).

These tariffs will apply to goods that enter the United States from nearly all trading partners, and they will cause major economic harm that cannot be undone by refunds. Money paid in tariffs can be refunded after the fact. But this is not so for economic dislocations that have been the avowed goal of the President's tariffs.

This is not to say that the volume of tariffs collected is insignificant. To the contrary, the Budget Lab at Yale estimates that the tariffs will raise about 52 percent or nearly 70 percent, if levied at 15 percent, of the revenue raised by the IEEPA tariffs, or some $30 billion, during the (initial) 150 days during which they will be in effect. The Budget Lab, *State of U.S. Tariffs: February 21, 2006* (Feb. 21, 2026), https://budgetlab.yale.edu/research/state-tariffs-february-21-2026; Erica York & Alex Durante, *Tracking the Impact of the Trump Tariffs & Trade War*, Tax Found. (Mar. 13, 2026), https://taxfoundation.org/research/all/federal/trump-tariffs-trade-war/. The Supreme Court recently deemed a policy with an economic impact of nearly $50 billion to be of "vast economic and political significance." *Ala. Ass'n of Realtors v. Dep't of Health & Human Servs.*, 594 U.S. 758, 764 (2021) (quotation marks omitted). However, the tariffs' economic consequences extend well beyond the transfer of revenue from importers to the government. And

10

while such transfers could be undone by refunds, that is not so for other categories of harm, which are equally significant, if not more so.

Most importantly, tariffs reduce and redirect total trade flows, both imports and exports. Douglas A. Irwin, *Three Simple Principles of Trade Policy* at 2-9 (1996); N. Gregory Mankiw, *Principles of Economics* at 143 (7th ed. 2015). Indeed, that is the President's avowed goal. For example, the Proclamation partly addresses the "goods trade deficit." Proclamation ¶ 8. Reducing a sectoral trade deficit, however, necessarily requires changing trade patterns. The exchanges that do not happen while tariffs are in effect will in many cases be permanently destroyed, and with that the gains that would have accrued to the parties involved. Consumers purchase inferior or more expensive products and firms are forced to shift to combinations of inputs they would not have chosen freely. Refunding tariffs to importers involved in trades that did happen does nothing to undo this damage. This is an example of what economists refer to as "deadweight loss."

These harms will occur even if businesses doubt the tariffs' legality. Much trade is the result of long-term planning and investment. Such planning and investment will react even to the possibility that some tariffs will be upheld. At a minimum, businesses may delay investments until the uncertainty is resolved. Such delay is itself an economic harm.

For similar reasons, some importers will look for new suppliers, and some exporters will sign contracts with new customers, while the tariffs are in effect. Once these new suppliers are part of the firms' commercial networks, going back to their original business partners will frequently involve switching costs, effectively locking businesses into suboptimal supply chains permanently. Some firms will secure exemptions for their imports, gaining a temporary advantage over their competitors that may well translate into a permanent improvement in their market position.

11

Finally, the imposition of tariffs, even if they are ultimately refunded, will create liquidity problems for some households and firms — problems which can extend to reduced credit scores, evictions, defaults on loans, or even bankruptcy. Refunds on tariffs cannot undo these harms. This constitutes a further way in which irreparable harm is to be expected.

Enjoining these harms as litigation proceeds is crucial to ensure these harms are not inflicted in the first place.

## CONCLUSION

Because the President cannot satisfy the economic conditions requisite to rely on Sec. 122 of the Trade Act, and because the Proclamation will cause irreparable harm, the Court should enjoin the Proclamation.

Dated: April 8, 2026

Respectfully submitted,

/s/ Adam Unikowsky
Holger Spamann
1525 Massachusetts Ave.
Cambridge, MA 02138
Tel. (617) 496-6710

Aaron R. Cooper
Adam G. Unikowsky
Nikita Lalwani (*Admission Pending*)
JENNER & BLOCK LLP
1099 New York Ave. N.W.
Suite 900
Washington, D.C. 20001
Tel. (202) 639-6000
Fax (202) 639-6066
acooper@jenner.com
aunikowsky@jenner.com
nlalwani@jenner.com

Debbie L. Berman
JENNER & BLOCK LLP
353 N. Clark Street
Chicago, IL 60654
Tel. (312) 222-9350

12

Fax (312) 527-0484
dberman@jenner.com

*Counsel for Amicus Curiae*

13

## CERTIFICATE OF COMPLIANCE

Counsel hereby certifies that the foregoing brief contains 3,937 words, in compliance with this Court's word limitations.

Dated: April 8, 2026                    Respectfully submitted,


/s/ Adam Unikowsky
Holger Spamann (*Admission Pending*)
1525 Massachusetts Ave.
Cambridge, MA 02138
Tel. (617) 496-6710

Aaron R. Cooper (*Admission Pending*)
Adam G. Unikowsky
Nikita Lalwani (*Admission Pending*)
Jenner & Block LLP
1099 New York Ave. N.W.
Suite 900
Washington, D.C. 20001
Tel. (202) 639-6000
Fax (202) 639-6066
acooper@jenner.com
aunikowsky@jenner.com
nlalwani@jenner.com

Debbie L. Berman (*Admission Pending*)
Jenner & Block LLP
353 N. Clark Street
Chicago, IL 60654
Tel. (312) 222-9350
Fax (312) 527-0484
dberman@jenner.com

*Counsel for Amicus Curiae*

14

**APPENDIX A: SIGNATORIES**

Stan Veuger is Senior Fellow at the American Enterprise Institute.

Daron Acemoglu is Institute Professor at the Massachusetts Institute of Technology. He received the Nobel Prize in Economics in 2024.

Alan J. Auerbach is Professor of the Graduate School and Robert D. Burch Professor of Economics and Law, Emeritus, at the University of California, Berkeley. He served as Deputy Chief of Staff of the Joint Committee on Taxation in 1992.

Robert J. Barro is Paul M. Warburg Professor of Economics at Harvard University.

Andrew G. Biggs is Senior Fellow at the American Enterprise Institute and serves as Member of the Financial Oversight and Management Board for Puerto Rico. He served as Principal Deputy Commissioner and in other senior positions at the Social Security Administration between 2003 and 2007.

Emily Blanchard is Associate Professor at the Tuck School of Business at Dartmouth College. She served as Chief Economist at the Department of State from 2022 to 2023.

Alan Blinder is Gordon S. Rentschler Memorial Professor of Economics and Public Affairs at Princeton University. He served as Vice Chairman of the Board of Governors of the Federal

Reserve System between 1994 and 1996 and as Member of the Council of Economic Advisers between 1993 and 1994.

Michael D. Bordo is Distinguished Professor Emeritus at Rutgers University, Distinguished Visiting Fellow at the Hoover Institution at Stanford University, and Distinguished Visitor at the Griswold Center for Economic Policy Studies at Princeton University.

Donald J. Boudreaux is Professor of Economics at George Mason University, Martha and Nelson Getchell Chair for the Study of Free Market Capitalism and Senior Fellow with the F.A. Hayek Program for Advanced Study in Philosophy, Politics, and Economics at the Mercatus Center at George Mason University, and Adjunct Scholar at the Cato Institute.

Leah Boustan is Professor of Economics and Director of the Economic History Program at Yale University.

Alex Brill is Senior Fellow at the American Enterprise Institute. He served as Policy Director and Chief Economist of the House Ways and Means Committee between 2002 and 2007, and as Staff Economist at the Council of Economic Advisers from 2001 to 2002.

Daniel Bunn is President and CEO of the Tax Foundation. He worked as Senior Policy Advisor to the Senate's Joint Economic Committee and on the policy staff for Senators Mike Lee and Tim Scott from 2013 to 2018.

16

James C. Capretta is Senior Fellow and the Milton Friedman Chair at the American Enterprise Institute. He served as Associate Director for Human Resource Programs at the Office of Management and Budget from 2001 to 2004.

Steve Cicala is Associate Professor of Economics at Tufts University.

Kimberly Clausing holds the Eric M. Zolt Chair in Tax Law and Policy at the UCLA School of Law and is nonresident Senior Fellow at the Peterson Institute for International Economics. She served as Deputy Assistant Secretary of the Treasury for Tax Analysis from 2021 to 2022.

Steven J. Davis is Thomas W. and Susan B. Ford Senior Fellow and Director of Research at the Hoover Institution at Stanford University, and Senior Fellow at the Stanford Institute for Economic Policy Research.

Mihir A. Desai is Mizuho Financial Group Professor of Finance at Harvard Business School and Professor of Law at Harvard Law School.

Karen Dynan is Professor of the Practice of Economic Policy at Harvard University, and nonresident Senior Fellow at the Peterson Institute for International Economics. She served as Assistant Secretary of the Treasury for Economic Policy from 2013 to 2017.

Douglas Elmendorf is Professor of Public Policy at Harvard University's Kennedy School of Government. He served as Director of the Congressional Budget Office from 2009 to 2015.

17

Jeffry Frieden is Professor of International and Public Affairs and Political Science at Columbia University.

Jason Furman is Aetna Professor of the Practice of Economic Policy jointly at the Harvard Kennedy School and the Department of Economics at Harvard University, and nonresident Senior Fellow at the Peterson Institute for International Economics. He served as Chair of the Council of Economic Advisers from 2013 to 2017.

Gita Gopinath is Gregory and Ania Coffey Professor of Economics at Harvard University. She served as First Deputy Managing Director of the International Monetary Fund from 2022 to 2025 and as its Chief Economist from 2019 to 2022.

Samuel Gregg is President and Friedrich Hayek Chair in Economics and Economic History at the American Institute for Economic Research.

Kyle Handley is Professor of Economics, Rafael and Marina Pastor Chancellor's Endowed GPS Faculty Fellow, and Director of the Center for Commerce and Diplomacy at the University of California, San Diego's School of Global Policy and Strategy.

Ben Harris is Vice President and Director of Economic Studies at the Brookings Institution, where he also holds the Bruce and Virginia MacLaury Chair. He served as Assistant Secretary for Economic Policy and Chief Economist at the Department of the Treasury from 2021 to 2023, as

18

Chief Economist and Economic Adviser to the Vice President from 2014 to 2017, and as Senior Economist at the Council of Economic Advisers from 2011 to 2013.

David R. Henderson is Research Fellow at the Hoover Institution at Stanford University. He served as Senior Economist at the White House's Council of Economic Advisers from 1982 to 1984.

Douglas Holtz-Eakin is President of the American Action Forum. He was Director of the Congressional Budget Office from 2003 to 2005 and served as Chief Economist of the Council of Economic Advisers from 2001 to 2002.

Simon Johnson is Ronald A. Kurtz (1954) Professor of Entrepreneurship at the MIT Sloan School of Management. He served as Chief Economist of the International Monetary Fund between 2007 and 2008. He received the Nobel Prize in Economics in 2024.

Steven B. Kamin is Senior Fellow at the American Enterprise Institute. He was Director of the Division of International Finance at the Board of Governors of the Federal Reserve System from 2011 to 2020.

Mary E. Lovely is Anthony M. Solomon Senior Fellow at the Peterson Institute for International Economics and Professor Emerita of Economics at Syracuse University's Maxwell School of Citizenship and Public Affairs.

19

Philip A. Luck is Director of the Economics Program and Scholl Chair in International Business at the Center for Strategic and International Studies. He served as the Deputy Chief Economist at the Department of State from 2022 to 2025.

N. Gregory Mankiw is Robert M. Beren Professor of Economics at Harvard University. He served as Chair of the Council of Economic Advisers from 2003 to 2005.

Marc Melitz is David A. Wells Professor of Political Economy at Harvard University.

Jeffrey Miron is Senior Lecturer and Director of Graduate and Undergraduate Studies in the Department of Economics at Harvard University, and Vice President for Research at the Cato Institute.

Marc-Andreas Muendler is Professor of Economics and Founding Director of the Globalization and Prosperity Lab at the University of California, San Diego.

Brent Neiman is Edward Eagle Brown Professor of Economics at the University of Chicago Booth School of Business. He served as Counselor to the Secretary of the Treasury and as Deputy Under Secretary of the Treasury for International Finance from 2022 to 2025.

Stephen O'Connell is Gil and Frank Mustin Professor of Economics at Swarthmore College. He served as Chief Economist at the United States Agency for International Development from 2014 to 2015.

Kyle Pomerleau is Senior Fellow at the American Enterprise Institute.

Robert A. Rogowsky is Professor of Trade and Economic Diplomacy at the Middlebury Institute of International Studies. He served as Chief Economist of the United States International Trade Commission from 1995 to 1999 and as its Director of Operations from 1992 to 2010.

Jay C. Shambaugh is Professor of Economics and International Affairs and Co-Director of the Institute for International Economic Policy at George Washington University, and nonresident Senior Fellow at the Brookings Institution. He served as Under Secretary of the Treasury for International Affairs from 2022 to 2025, as Member of the White House's Council of Economic Advisers from 2015 and 2017, as Chief Economist from 2010 to 2011, and as Senior Economist from 2009 to 2010.

Mark Sobel is U.S. Chairman at the Official Monetary and Financial Institutions Forum. He served as United States Representative at the International Monetary Fund from 2015 to 2018 and as Deputy Assistant Secretary for International Monetary and Financial Policy from 2000 to 2015.

Michael R. Strain is Director of Economic Policy Studies and Paul F. Oreffice Senior Fellow in Political Economy at the American Enterprise Institute, and Professor of Practice in the McCourt School of Public Policy at Georgetown University.

21

Laura D. Tyson is Distinguished Professor of the Graduate School at the Haas School of Business, University of California, Berkeley. She served as Chair of the National Economic Council from 1995 to 1996 and as Chair of the Council of Economic Advisers from 1993 to 1995.

Alan D. Viard is Senior Fellow Emeritus at the American Enterprise Institute. He served as Visiting Scholar at the U.S. Department of the Treasury's Office of Tax Analysis in 2005, and as Senior Economist at the White House's Council of Economic Advisers from 2003 to 2004.

Mark J. Warshawsky is Senior Fellow and Wilson H. Taylor Chair in Health Care and Retirement Policy at the American Enterprise Institute. He served as Assistant Secretary of the Treasury for Economic Policy from 2004 to 2006.

Janet Yellen is Distinguished Fellow in Residence at the Brookings Institution. She served as Secretary of the Treasury from 2021 to 2025, as Chair of the Board of Governors of the Federal Reserve System from 2014 to 2018, as President of the Federal Reserve Bank of San Francisco from 2004 to 2010, and as Chair of the Council of Economic Advisers from 1997 to 1999.

Erica York is Vice President of Federal Tax Policy at the Tax Foundation.

Owen Zidar is Professor of Economics and Public Affairs at Princeton University. He served as Staff Economist at the Council of Economic Advisers from 2010 to 2011.

22